United States District Court
Middle District of North Carolina
Case No. 1:22-cv-00186

| | |
|---|---|
| Rebecca Pifer, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| Lincoln Life Assurance Company of Boston, | ) |
| | ) |
| | ) |
| Defendant. | ) |
| | ) |

Plaintiff's Response to Defendant's Motion for Summary Judgment

Ms. Pifer opposes Lincoln's motion for summary judgment for the reasons stated herein. This memorandum discusses the standard of review in ERISA abuse of discretion cases and the reasons why Lincoln's summary judgment arguments should be denied.

A.     Standard of Review in ERISA Cases

Under the abuse of discretion standard, an administrator's decision will not be disturbed if it is reasonable, even if the reviewing court would have come to a different conclusion independently. *Evans v. Eaton Corp. Long Term Disability Plan,* 514 F.3d 315, 323 (4th Cir. 2008). The administrator's decision is reasonable "it is the result of a deliberate, principled reasoning process and it is supported by substantial evidence." *DuPerry v. Life Insurance Co. of North America*, 632 F.3d 860, 869 (4th Cir. 2011), *quoting Bernstein v. CapitalCare, Inc.,* 70 F.3d 783, 788 (4th Cir. 1995); *Griffin v. Hartford Life & Accident Insurance Co.,* 898 F.3d 371, 381 (4th Cir. 2018). "Substantial evidence" to support a benefits decision is "evidence which a reasoning mind would

accept as sufficient to support a particular conclusion." *DuPerry, supra, quoting LeFebre v. Westinghouse Electric Corp., 747 F.2d 197, 208 (4th Cir. 1984)*.

In determining the reasonableness of a fiduciary's discretionary decision, the Court should consider the eight non-exclusive factors set forth in *Booth v. Wal-Mart Stores, Inc. Associates Health & Welfare Plan, supra. Harrison v. Wells Fargo Bank, N.A., 773 F.3d 15, 20 (4th Cir. 2014)*.

The *Booth* factors should be viewed "as more particularized statements of the elements that constitute a 'deliberate, principled reasoning process' and 'substantial evidence.'" *Greenwell v. Group Health Plan for Employees of Sensus USA Inc., No. 5:19-CV-577-FL, 2022 WL 3134110, at \*12 (E.D.N.C. Mar. 29, 2022), quoting Donnell v. Metropolitan Life Insurance Co., 165 Fed.Appx. 288, 294 n.6 (4th Cir. 2006)* (unpublished).

B.      Lincoln's Summary Judgment Arguments should be Rejected

This section responds to Lincoln's arguments in favor of summary judgment.

1.      The Argument that Ms. Pifer's Evidence was Limited to "Subjective Complaints" is Contrary to the Evidence

Lincoln's principal argument is that Ms. Pifer's proof was limited to "her own subjective self-assessment" and that such evidence "cannot, standing alone, constitute the 'proof' required under the Group Policy." (Lincoln's Memorandum, pp. 20-21.). This argument is easily refuted. Ms. Pifer's disability claim is supported by physical examination findings, clinical observations, and test results recorded in her medical records, physical therapy evaluations, imaging studies, and the opinions of her treating

providers. Lincoln relied on such evidence and Ms. Pifer's statements in deciding to pay "any occupation" benefits for over eight years. *See, e.g.,* Lincoln's Claim Note 157, dated February 7, 2020, which states that Lincoln performed an annual review of Ms. Pifer's claim and based on the information provided decided to continue paying benefits.

From August 5, 2020, to September 7, 2021, Ms. Pifer had at least eight physician visits, one physical therapy evaluation, and five imaging studies. The records of those appointments, evaluations, and tests contain "objective evidence" that supports Ms. Pifer's claim.

Ms. Pifer was evaluated by Dr. Belhorn on August 5, 2020, for a follow-up of her generalized osteoarthritis and Ehlers-Danlos syndrome. (LIN000140-42). Ms. Pifer reported mild increased symptoms in her hands and worsening fatigue. (LIN000142). She had to pace herself while doing yard work. She had difficulty sleeping. She did not feel like she was improving. She had increased pain in her right shoulder on the lateral aspect and difficulty with certain motions. She had issues with her neck that responded to physical therapy. (*Id.*). Dr. Belhorn found that Ms. Pifer had Heberden's nodes and Bouchard's nodes[1] in her fingers bilaterally and tenderness in her right shoulder. (*Id.*) Dr. Belhorn ordered x-rays of Ms. Pifer's right shoulder.

---

[1] Heberden's nodes are small bony growths on the joint closest to the tip of the fingers. Bouchard nodes occur on the middle joints of the fingers. They are symptoms of osteoarthritis of the hands and can cause pain and limited range of motion. *See https://my.clevelandclinic.org/health/symptoms/21829-heberdens-nodes.*

3

An x-ray study of Ms. Pifer's right shoulder performed on August 6, 2020, showed advanced glenohumeral arthropathy and prominent lucency in the superior aspect of the glenoid cavity consistent with a geode. (LIN000134-35).

Ms. Pifer was seen by Dr. William Silver on September 10, 2020, for a follow-up regarding her right shoulder pain. (LIN000135-38). His report states that Ms. Pifer reported radiating pain in her right upper arm that usually lasted one to two days after being active with the arm. She advised that the pain had been present for approximately one year and had been progressively worsening. (LIN000137). Dr. Silver administered a cortisone injection. (LIN000138).

Ms. Pifer next saw Dr. Belhorn on February 8, 2021. (Lincoln 132-35). Ms. Pifer reported that she was relatively stable on Celebrex and tramadol, she had seen Dr. Silver who had diagnosed a rotator cuff impingement, she had a significant benefit from a steroid injection Dr. Silver administered on September 10, 2020, and she was trying to do some strength training and Tai Chi to help improve her shoulder symptoms. (LIN000134). Dr. Belhorn again found that Ms. Pifer had Heberden's and Bouchard's nodes bilaterally and mild loss of range of motion in the cervical spine and shoulders. (*Id.*).

On February 17, 2021, Ms. Pifer told a Lincoln representative that Dr. Silver's steroid injection had "helped but did not fix" her right shoulder pain. She had worsening Ehlers-Danlos symptoms and "a lot" of joint pain, especially in the hands, neck, and right shoulder, and ambulated with a cane when she needed it. (LIN000010, Phone Note 82). Ms. Pifer further explained that she had a lot of trouble sleeping and felt very tired, she

could no longer garden or travel, walking was painful, and her knees and ankles "rolled" which was very painful. (*Id.*).

Dr. Kallianos' March 12, 2021, examination report states that Ms. Pifer was using a cane and reported increased fatigue due to her Ehlers-Danlos. (LIN000196). Dr. Kallianos assessed that Ms. Pifer was experiencing worsening symptoms since her last physical exam and remained totally disabled. (LIN000198).

The FCE report dated April 21, 2021 records Ms. Pifer's use of a cane, pain symptoms, and limited functionality. (LIN000462-76).

Ms. Pifer was next seen by Dr. Kallianos on May 25, 2021, for treatment of neck stiffness, right shoulder pain, and increased right arm paresthesia following a recent motor vehicle accident. (LIN000197-201). Dr. Kallianos ordered imaging studies.

A cervical spine MRI performed on June 10, 2021, revealed chronic multi-level cervical degenerative disc disease with facet arthropathy, narrowing of the central canal at C5-C6 and C6-C7, and variable degrees of bony encroachment on the foramina, likely most prominent at C5-C6. (LIN000313-14).

At Ms. Pifer's August 16, 2021 appointment with Dr. Belhorn (LIN000222-27), Ms. Pifer reported that she was not doing well due to multiple stressors and was experiencing increased pain, fatigue, and joint laxity. (LIN000222). She had increased neck pain and tingling in her hands following her May 2021 motor vehicle accident. She had fallen the previous week and further injured her right shoulder. Her ankles had been rolling more frequently and her knees had been dislocating. (*Id.*). She had undergone physical therapy for her neck pain due to her having bulging disks and bone spurs in her

5

cervical spine. Ms. Pifer reported that her pain was an eight on a ten-point scale. Dr. Belhorn found that Ms. Pifer had mild loss of range of motion in the cervical spine and shoulders. (LIN000223). She assessed that Ms. Pifer was suffering from generalized osteoarthritis and increased joint laxity due to Ehlers-Danlos syndrome. (*Id.*). Dr. Belhorn prescribed Celebrex for Ms. Pifer's joint laxity and pain, ordered laboratory tests, and scheduled Ms. Pifer for a physical therapy evaluation on August 19, 2021. (*Id.*).

Ms. Pifer had a physical therapy evaluation by Minh Phuong Le on August 19, 2021. (LIN000229-31). Ms. Pifer reported that she was experiencing weakness in her right arm, numbness, and tingling in her entire arms and hands, and was unable to sit and stand for extended periods. (LIN000229). Ms. Le found moderate to severe loss of range of motion and strength in Ms. Pifer's cervical spine, pain with resisted neck motions, decreased sensation in her right upper extremity, hypermobility, pain from C1 to C7, tenderness bilaterally of the paracervicals and the trapezius, and increased tightness in the upper trapezius and paracervical muscles. (LIN000229-30). Ms. Le assessed that Ms. Pifer had decreased cervical range of motion and upper extremity strength; radicular symptoms; and bilateral shoulder pain, right greater than left. (LIN000230). She added that Ms. Pifer had difficulty performing her activities of daily living and recreational activities. (LIN000230).

Ms. Pifer saw Dr. Silver again on August 24, 2021. (LIN000237-39). At the August 24, 2021, appointment, Ms. Pifer reported a pain level of seven on a ten-point scale. (LIN000237). She was experiencing pain in her right shoulder and upper spine and numbness in her left hand following her motor vehicle accident and recent fall. (*Id.*). Dr.

6

Silver determined that Ms. Pifer likely had a right shoulder rotator cuff tear and ordered an MRI. (LIN000238).

A right shoulder joint MRI performed on September 2, 2021, showed that Ms. Pifer suffers from severe glenohumeral arthropathy, a chronically torn and worn labrum, cuff tendinosis, AC arthropathy, and a chronically torn biceps long head tendon, etc. (LIN000315).

On September 7, 2021, Dr. Silver reviewed the MRI results with Ms. Pifer and administered a cortisone injection. (LIN000240).

Ms. Pifer saw Dr. Kallianos again on October 15, 2021, for bilateral knee pain. (LIN000218-19). His physical examination findings include tenderness, swelling, crepitus, and instability. (LIN000219). Dr. Kallianos wrote that Ms. Pifer may have a cartilage issue in the left knee with some ACL instability in the right knee. (*Id.*). He recommended that Ms. Pifer undergo x-rays and MRIs of both knees and added, "She is still permanently disabled." (*Id.*).

MRIs of Ms. Pifer's knees on October 26, 2021, revealed degeneration of her knees due to osteoarthritis. (LIN000316-17 and LIN000318-19).

In summary, Lincoln's argument that Ms. Pifer's proof was limited to "her own subjective self-assessment" is contrary to the overwhelming weight of the evidence.

2.      <u>Lincoln's Argument that the Opinions of Ms. Pifer's Treating Physicians "Were not Worthy of Substantial Weight" is Unfounded</u>

Dr. Belhorn completed two disability forms on October 18, 2021. (LIN000308-09). She wrote that Ms. Pifer's restrictions and limitations were "no prolonged sitting,

standing, heavy lifting, or repetitive activities" (LIN000309) and that her physical impairment rating was "Class 5," which means "Severe limitation of functional capability; incapable of minimum (sedentary*) activity (75-100%)." (LIN000308). Dr. Silver completed an Annual Physician's Statement form on October 25, 2021. (LIN000311). He wrote that due to Ms. Pifer's right shoulder condition she should engage in no heaving lifting or repetitive activity. (*Id.*). Dr. Kallianos wrote in his reports dated March 12, 2021, and October 15, 2021, that Ms. Pifer was "totally disabled" and "permanently disabled." (LIN000198 and LIN000219).

Lincoln argued that the disability statements provided by Dr. Belhorn, Dr. Silver, and Dr. Kallianos were "not worthy of substantial weight because they were conclusory, unsupported and contrary to all the objective evidence in the record demonstrating that Plaintiff had sedentary functional capacity as of May 2021." (Lincoln's Memorandum, p. 19). Lincoln also pointed out that none of the treating physicians reviewed the entire record, which included the surveillance, the FCE, the reports of other treating physicians, and Dr. Vincent's opinions. (*Id.*).

Lincoln's argument must be rejected. In the first place, from 2012 to 2020 Lincoln approved annually Ms. Pifer for continued "any occupation" benefits based on its review of medical information and disability statements received from Ms. Pifer's providers.[2]

---

[2] *See, e.g.*, LIN000014 – Lincoln's Claim Note 141, dated February 25, 2016, "APS supports. F/U 1 yr;" LIN00013 – Claim Note 144, dated March 8, 2017, "No change to EE condition, supports contd disb. F/U 1 year;" LIN000012 - Claim Note 150, dated March 5, 2018, "No change to EE condition, supports contd disb. F/U 1 year;" and LIN000011 – Claim Note 157 dated February 7, 2020, "Based on info recvd, it is supportive for ongoing LTD. F/U for annual review."

Ms. Pifer's treating physicians, Dr. John Kallianos and Dr. Linda Belhorn, provided the very type of disability statements that Lincoln now argues were "not worthy of substantial weight."[3]

Second, an ERISA fiduciary must provide the beneficiary with the specific reasons for the adverse determination on appeal. 29 C.F.R. § 2560.503-1(j) (1) (2016); *Weaver v. Phoenix Home Life Mut. Ins. Co.*, 990 F.2d 154, 158 (4th Cir. 1993). A court may not consider a new reason for a claim denial offered for the first time on judicial review. *Thompson v. Life Insurance Co. of North America*, 30 Fed.Appx. 160, 164 (4th Cir. 2002). In this case, Lincoln did not inform Ms. Pifer that the opinions of her treating providers were being disregarded because they were "conclusory" or because the providers had not reviewed all the records submitted to Lincoln.

Finally, Lincoln's final denial letter indicates that Ms. Pifer's appeal was based on the report of Dr. Vincent, who stated that he relied on the FCE. If Lincoln determined that the opinions of Ms. Pifer's treating providers were entitled to "little weight," it violated the ERISA claim regulations by not informing Ms. Pifer of its basis for disagreeing with or not following the views of her treating healthcare professionals. 29 C.F.R. § 2560.503-1(j)(6)(i). It would be unfair and contrary to precedent for the Court to

---

[3] *See* LIN000669 – Kallianos Attending Physician's Statement ("APS") August 10, 2013, LIN000668 – Belhorn APS January 1, 2014, LIN000676 – Kallianos APS February 11, 2014, LIN000658 – Kallianos APS February 20, 2015, LIN000637 – Belhorn APS February 17, 2016, LIN000629 – Belhorn APS January 25, 2017, LIN000610 – Belhorn APS February 14, 2018, LIN000590 – Belhorn APS January 21, 2019, and LIN000579 – Belhorn APS February 5, 2020.

consider reasons for rejecting Ms. Pifer's claim that were not stated during the claim administration process.

   3.    The Improvement in Ms. Pifer's Condition as of February 2021 was Limited and Temporary

Lincoln correctly points out that Dr. Linda Belhorn's February 5, 2021 examination report indicates that Ms. Pifer had experienced improvement in her right shoulder symptoms following the cortisone injection Dr. Silver administered on September 10, 2020 and that she was trying to do some strength training and Tai Chi to help improve her shoulder symptoms. (LIN000134). However, records dated after the February 5, 2021, appointment indicate that any such improvement was limited and short-lived. The evidence, fairly considered, does not support Lincoln's contention that Ms. Pifer's condition had improved significantly as of the time her benefits were terminated.

   4.    Ms. Pifer did not Refuse to Undergo an IME

Lincoln's contention that Ms. Pifer "refused" to undergo an independent medical examination ("IME") is inaccurate. Lincoln notified Ms. Pifer by a letter dated December 21, 2021, that it had scheduled her for an IME on January 4, 2021, with Dr. Alvin Antony. (LIN000124). The next day, Ms. Pifer's counsel objected to having Dr. Antony perform the IME. (LIN000115). The letter states that Dr. Antony "is well-known for working exclusively for insurance companies and for providing examination reports of questionable accuracy." (*Id.*). Ms. Pifer offered to undergo a medical examination by another provider who did not have close ties to the insurance industry and who was

10

experienced in evaluating and treating Ms. Pifer's illnesses. (*Id.*). Lincoln responded that it was unable to provide an independent physician to evaluate Ms. Pifer (LIN000005, Phone Note 98) and elected instead to proceed with a file review by Dr. Hunter Vincent. (LIN000110 and LIN000004, Claim Notes 210 and 211).

5.       Lincoln did not Place Great Weight on the Surveillance Video

An investigator hired by Lincoln conducted surveillance of Ms. Pifer on February 17, 2021, February 23, 2021, and March 4, 2021. (LIN000482-90). The investigator observed Ms. Pifer only on February 23, 2021. A video recording taken that day shows Ms. Pifer walking in and out of view, walking to the driver's side of the vehicle, placing the items she was carrying in the vehicle, entering the vehicle, and departing. The recording lasted two minutes and forty-seven seconds.[4]

Lincoln did not place great weight on the surveillance in making its denial decision. It is mentioned briefly in both Lincoln's final denial letter and in Dr. Vincent's report. (LIN000053-64 and LIN000075-87). What the video shows Ms. Pifer doing is not determinative of whether she can work a full-time job. There is no indication of whether Ms. Pifer was in pain during or after the recorded activity. It does not show her doing anything beyond what she claimed were her limitations. The surveillance is entitled to little weight in evaluating Ms. Pifer's claim. *See Gorski v. ITT Long Term Disability Plan for Salaried Employees*, 314 Fed. Appx. 540, 543 (4th Cir. 2008) (the fact that the

---

[4] The video recording may be viewed at
https://cms.hubenterprises.com/permavid.php?fn=bEzUKGaBmIsUkWXteauTfkoSvmjbSgJATnHcedVQ
TeIGaaJHmOYRormAVfTNj

surveillance "showed Gorski bending, carrying water jugs, driving, and walking for a relatively short time with no apparent discomfort does not cast significant doubt on the opinions of her physicians that she was not physically able to work for a sustained period of time.").

C.      The *Booth* Factor Analysis Demonstrates Why Lincoln's Motion should be Denied

This case should be decided based on an assessment of the reasonableness of Lincoln's discretionary decision, as analyzed under the eight non-exclusive *Booth* factors. They are: (1) the plan language; (2) the purposes and goals of the plan; (3) the adequacy of the materials considered to make the decision and the degree to which they support it; (4) whether the fiduciary's interpretation was consistent with other provisions of the plan and earlier interpretations of the plan; (5) whether the decision-making process was reasonable and principled; (6) whether the decision was consistent with the procedural and substantive requirements of ERISA; (7) any external standard relevant to the exercise of discretion; and (8) the fiduciary's motives and any conflict of interest it may have. (*Id.*).

This case involves principally factors three, four, five, six, and eight. As will be shown below, those factors weigh in Ms. Pifer's favor.

1.      Lincoln's Reliance on the FCE was Unreasonable – *Booth* factors three and five

An ambiguous and equivocal FCE report does not constitute "substantial evidence" that supports a plan's denial of disability benefits. Reliance on such a report constitutes an abuse of discretion. In *Stup v. Unum Life Insurance Company of America,*

12

390 F.3d 301, 309-10 (4th Cir. 2004), the Fourth Circuit held that an FCE report that contained an equivocal opinion by the physical therapist and ambiguous test results "simply does not provide 'substantial evidence'" to support the plan's conclusion that the claimant could perform sedentary work. *Id.* at 309-10. Moreover, because the FCE lasted only two and a half hours it did not necessarily indicate Ms. Stup's ability to perform sedentary work for an eight-hour workday, five days a week. *Id.* at 309.

Many other courts have also held that an FCE cannot evaluate a claim of disabling pain or assess the claimant's ability to work full-time. *See Krysztofiak v. Boston Mutual Life Insurance Co.*, 424 F.Supp.3d 446, 454 (D. Md. 2019), *quoting Lamanna v. Special Agents Mutual Benefits Association,* 546 F.Supp.2d 261, 296 (W.D. Pa 2008) (tests of strength such as an FCE "can neither prove nor disprove claims of disabling pain"); *Robertson v. Standard Insurance. Co.*, 139 F.Supp.3d 1190, 1208-09 (D. Or. 2015), *order clarified,* No. 3:14-CV-01572-HZ, 2015 WL 13682034 (D. Or. Nov. 13, 2015) (the FCE failed to explain how the results of 88 minutes of testing "translate into the ability to work at a sedentary level on a sustained basis"); *Michael v. American International Group, Inc.*, No. 4:05CV02400 ERW, 2008 WL 4279582, at *18 (E.D. Mo. Sept. 15, 2008) (FCE tests of the ability to apply force, administered over three hours, do not measure pain or the ability to perform the tasks of sedentary employment); *Perryman v. Provident Life and Accident Insurance Co.*, 690 F.Supp.2d 917, 947-49 (D. Ariz. 2010) (FCE rejected for multiple reasons); *Campbell v. Aetna Life Insurance Co.*, No. 04-CV-698 TCK(FHM), 2006 WL 8457269, at *3 (N.D. Okla. Jan. 11, 2006), *report and recommendation adopted,* No. 04-CV-698-TCK-FHM, 2006 WL 8457274 (N.D. Okla.

13

May 4, 2006); Harvey v. Berryhill, No. 1:16CV574, 2017 WL 943946, at *4 (M.D.N.C. Mar. 9, 2017) (in a Social Security case, the court rejected the ALJ's reliance on an FCE due its "hopeless ambiguity and internal inconsistency").

Ms. Pifer underwent the FCE on April 21, 2021. (LIN000462-76). The physical therapist who performed the evaluation, Anna Davidow, opined that Ms. Pifer was able to work at the "sedentary" physical demand level for an eight-hour work-day, lift 12.5 pounds and carry 10 pounds "occasionally," sit and perform hand manipulation on a "frequent" basis, and stand and walk on an "occasional" basis. (LIN000462). However, most of the test results and clinical observations noted in the FCE report are contrary to Ms. Davidow's conclusion that Ms. Pifer was able to work in a sedentary occupation. The report contains the following information:

- Ms. Pifer came to the test location ambulating with a cane and exhibited a slow, methodical gait pattern. (LIN000466).

- Ms. Pifer advised Ms. Davidow that her symptoms were "somewhat manageable" but had "progressively worsened." She complained of constant pain along her bilateral upper extremities that extended to her hands, bilateral knee pain, lower back pain, cervical and upper back pain, general weakness, frequent instability, and frequent tingling and numbness in her hands. (LIN000465).

- Ms. Pifer advised Ms. Davidow that she was able to sit for 20 minutes, stand for 20 minutes, walk for 30 minutes, and drive for 20 minutes. (LIN000465). She stated that she was independent in her activities of daily living and basic household chores, however, her adult son lived with her and performed the majority of the household tasks. (*Id.*)

- Ms. Pifer was in pain throughout the testing. Ms. Pifer reported pain at an intensity level of 7 on a 10-point scale. (LIN000465). Ms. Davidow wrote, "Deficits identified during testing include elevated pain throughout testing, specifically in the right shoulder and upper back area." (LIN000462).

14

- Ms. Davidow found that Ms. Pifer had moderate tenderness along the anterior aspect of her right shoulder, bilateral upper trapezius, interscapular area, and lower back. (LIN000466).

- The treadmill test was stopped because Ms. Pifer was unable to achieve the minimum required speed of two miles per hour. She ambulated at one mile per hour for eight minutes at which time she requested a seated rest break due to pain and fatigue. She then resumed ambulation for an additional five minutes but requested to terminate again because of right foot discomfort, bilateral shoulder pain, and fatigue. (LIN000466).

- All three lifting tests were terminated by Ms. Pifer due to continued pain across the bilateral upper back and shoulders and noted fatigue. Ms. Pifer was only able to lift the minimum required weight. (LIN000467).

- During the "carry testing," Ms. Pifer ambulated with the use of a cane and carried the weight in her left arm. *(Id.).*

- "Frequent carry" and "frequent push/pull" testing were not performed as Ms. Pifer was not able to demonstrate "frequent ambulation." (*Id.*).

- Ms. Pifer demonstrated "elevated pain" with standing and walking, yet Ms. Davidow concluded that Ms. Pifer would stand and walk on an "occasional" basis. (LIN000469).

- Ms. Pifer demonstrated elevated pain with "object handling," yet Ms. Davidow concluded that Ms. Pifer could perform object handling on a "frequent" basis. *(Id.).*

- Ms. Pifer experienced increased difficulty and increased discomfort on testing of grip and pinch strength (LIN000471) and elevated pain on testing of object handling. (LIN000469).

- Ms. Davidow reported "no deficit observed" regarding fingering, simple hand grasp, firm hand grasp, and fine and gross manipulation (LIN000469) and concluded that Ms. Pifer could perform those activities on a "frequent" basis." (LIN000464). However, the only tests Ms. Davidow administered to assess Ms. Pifer's ability to use her hands were tests of grip and pinch strength and object handling, and during both tests, Ms. Pifer reported increased difficulty and discomfort. (LIN000471).

15

- Even though Ms. Pifer complained of pain, numbness, and tingling in her hands (LIN000465), Ms. Davidow did not test Ms. Pifer's hand range of motion or strength. (LIN000473). All of the entries under the heading "Hand" are "N/A," which indicates that testing was not performed. (*Id.*).

- Ms. Pifer had elevated discomfort in her bilateral upper back area during the isometric push/pull test. (LIN000471).

- Ms. Pifer's cervical active range of motion was limited. (LIN000472). Her range of motion and strength in her shoulders were below normal. *(Id.).* Her strength in her elbows and wrists was diminished. *(Id.).*

- Ms. Pifer's strength in her hips, knees, and ankles was below normal. *(Id.).*

- The FCE report does not indicate any observations of Ms. Pifer's ability to sit. The amount of time spent sitting is not noted in the report, yet Ms. Davidow somehow concluded that Ms. Pifer could sit on a "frequent" basis during an eight-hour workday. (LIN000469).

- The entire testing time was only two hours and nine minutes. (LIN000462).

Ms. Davidow's opinion that Ms. Pifer could work a sedentary occupation on a full-time basis is not supported by the test results. In contrast, the report of the physical therapy evaluation performed by Minh Phuong Le on August 19, 2021 (LIN000229-31) contains examination findings that are similar to the FCE's and Ms. Lee's conclusion that Ms. Pifer had difficulty performing her activities of daily living and recreational activities. (LIN000230).

Lincoln abused its discretion by relying on the FCE.

2. <u>Dr. Vincent's Report does not constitute Substantial Evidence Because of His Reliance on the FCE – *Booth* factors three and five</u>

Dr. Vincent's report likewise does not constitute "substantial evidence" due to his reliance on the flawed FCE report in concluding that Ms. Pifer was able to work. In *Stup,*

390 F.3d at 310, the Court rejected the opinion of a Unum physician who relied on the FCE's conclusion that Ms. Stup could work a sedentary job. *See also Nickel v. Unum Life Insurance Co. of America*, 582 F.Supp.2d 869, 880 (E.D. Mich. 2008) (the reviewing physician's reliance on the FCE was arbitrary and capricious in light of the entire record); *Manning v. Johnson & Johnson Pension Committee*, 504 F. Supp. 2d 1293, 1304 (M.D. Fla. 2007) (the consulting physician's reliance on the FCE "certainly detracts from her opinion that [the plaintiff] is capable of sedentary work for eight hours per day").

3.   Dr. Vincent Failed to Explain on what Basis he Doubted Ms. Pifer's Veracity and Disagreed with the Opinions of Her Treating Physicians – *Booth* factors three, five, and six

Dr. Vincent's report never explained on what basis he discounted Ms. Pifer's subjective complaints of debilitating pain and fatigue or the opinions of the physicians who treated her. As such, his report constitutes "an unreasoned and unexplained rejection of the evidence in the record, [Pifer's] claims regarding her level of pain and functionality, and the opinions of [her treating physicians] that she was totally disabled." *Gorski v. ITT Long Term Disability Plan for Salaried Employees*, 314 Fed. Appx. 540, 547 (4th Cir. 2008). There, the Court rejected the report of a reviewing physician who never explained the basis on which he doubted the claimant's veracity or why he rejected the views of her treating physicians. (*Id.*).

In relying on Dr. Vincent's report, Lincoln violated the ERISA claim regulations, which require that a benefit denial notification include a discussion of the basis for disagreeing with or not following the views of the claimant's healthcare professionals. 29 C.F.R. § 2560.503-1(j)(6)(i) (2016).

17

4.     Lincoln's Failure to Consider Ms. Pifer's Symptoms Journal was an Abuse of Discretion – *Booth* factors three, five, and six

A plan administrator must take into account "all comments, documents, records, and other information submitted by the claimant relating to the claim." 29 C.F.R. § 2560.503-1(h)(2)(iv) (2016). An administrator may not ignore relevant evidence in the records before it. *Black & Decker Disability Plan v. Nord,* 538 U.S. 822, 834 (2003) ("Plan Administrators . . . may not arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician."). The Fourth Circuit has held that a principled reasoning process necessarily requires the claims administrator to address the claimant's subjective complaints of pain in a thorough, meaningful way if the administrator is to deny the claim. *DuPerry, supra,* at 874. In *Brown v. Nortel Networks, Inc.,* No. 5:03-cv-658-FL(3) (E.D.N.C. November 29, 2004),[5] the court held that it was unreasonable for the plan to rely on a medical review that was not based on all of the relevant materials that the plaintiff had submitted in support of her appeal. (*Id.* at p.9). The requirement that a plan review all information was not satisfied by the fact that the claims administrator considered it when the plan's physician consultant did not. (*Id.* at p. 10).

Ms. Pifer's 122-page symptoms journal contains detailed entries made during the period June 7, 2021, through October 22, 2021. (LIN00320-381 and LIN000243-303). The journal entries note Ms. Pifer's limited activities and struggle with pain and fatigue.

---

[5] Copy attached.

It was not provided to Dr. Vincent, and Lincoln did not review it either. Lincoln did not provide the symptoms journal to Dr. Vincent. Lincoln Claim Note 214 includes a message from the vendor Lincoln hired to provide the file review that "the medical records" had been received, but the message does not mention Ms. Pifer's journal. Dr. Vincent's report states he was asked to review "the medical records" and then lists the records he reviewed, but makes no mention of the symptoms journal. (LIN000075).

Although the journal is mentioned in Lincoln's final denial letter as having been submitted as part of Ms. Pifer's appeal (LIN000054 and 57), there is no discussion of the symptoms journal either in the denial letter or in Lincoln's claim notes. No Claim Note entries indicate that Lincoln's staff independently analyzed Ms. Pifer's appeal evidence.

Neither Lincoln nor Dr. Vincent considered Ms. Pifer's symptoms journal. Thus, Lincoln violated 29 C.F.R. § 2560.503-1(h)(2)(iv) and abused its discretion by failing to consider this important evidence.

5.　　Lincoln's Termination of Ms. Pifer's Benefits is Inconsistent with its Prior Decisions – *Booth* factors three, four, and five

If an insurer has repeatedly approved a claimant for disability benefits for many years, the failure to produce evidence of improvement may be a "suspicious failing" if the insurer decides to terminate. *Nickola v. CNA Group Life Assurance Co.*, Case No. 03 C 8559, 2005 WL 1910905, at *8 (N.D. Ill. Aug. 5, 2005), *citing McOsker v. Paul Revere Life Ins. Co.*, 279 F.3d 586, 589 (8th Cir. 2002) ("but unless information available to an insurer alters in some significant way, the previous payment of benefits is a circumstance that must weigh against the propriety of an insurer's decision to discontinue those

payments"); *Cook v. Liberty Life Assurance Co. of Boston,* 320 F.3d 11, 23 (1st Cir. 2003) (reversing termination where the claimant provided the same type of evidence she had always provided to show disability under the "any occupation" definition); *Connors v. Connecticut General Life Ins. Co.,* 272 F.3d 127, 136 (2nd Cir. 2001) (reversing termination where there was no significant change in the claimant's physical condition and the claimant had been provided disability benefits for almost thirty months under the "any occupation" definition of disability); *Mills v. Union Security Insurance Co.,* Case No. 4:10-CV-58-BO, 2011 WL 2036698, at *15 (E.D.N.C. May 24, 2011). Those cases suggest that once benefits are granted, it is an abuse of discretion to terminate those benefits if the claimant's condition has not changed.

Lincoln's decision to terminate Ms. Pifer's benefits cannot be reconciled with its findings over eight years that she was entitled to continued benefits under the "any occupation" definition. Although Dr. Belhorn's February 8, 2021, examination report could be interpreted as showing that Ms. Pifer was somewhat better at that time, it is telling that Lincoln did not request Ms. Pifer's three treating physicians to provide disability statements at that time, as it had done from 2013 through 2020. Rather, Lincoln conducted surveillance of Ms. Pifer and sent her for an FCE. The three-minute surveillance video does not show anything conclusive about Ms. Pifer's functionality, and the test results and clinical observations noted in the FCE report support Ms. Pifer's claim. The evidence submitted with Ms. Pifer's appeal shows that her condition worsened in the latter part of 2021.

Lincoln's decision to uphold the termination of Ms. Pifer's long-term disability benefits is not supported by substantial evidence. *See Hines v. Unum Life Insurance Co. of America, 110 F. Supp.2d 458, 463–64 (W.D. Va. 2000)* (to terminate benefits based on one set of normal tests and 20 hours of surveillance in the face of eight years of treatment for migraines, vertigo, and right-sided dysfunction was "borderline unconscionable at best.").

6. Lincoln's Conflict of Interest is an Important Factor – *Booth* factor eight

If a benefit plan gives discretion to an administrator or fiduciary who is operating under a conflict of interest, "the conflict must be weighed as a factor in determining whether there is an abuse of discretion" in the denial of a claim. *Metropolitan Life Ins. Co. v. Glenn, 554 U.S. 105, 111 (2008), quoting Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115 (1989)* (internal quotation marks omitted)*; Sutherland v. Sun Life Assurance Co. of Canada, 716 Fed.Appx. 209, 210 (4th Cir. 2018)*. Under *Glenn,* the administrator's conflict of interest must be considered as only "one factor among many" in determining the reasonableness of the administrator's discretionary decision. *Carden v. Aetna Life Ins. Co., 559 F.3d 256, 260-61 (4th Cir. 2009), quoting Glenn.*

Lincoln's conflict of interest is a serious concern. The reasons advanced by Lincoln in support of its decision to deny Ms. Pifer's claim find little support in the record and border on bad faith.

D. Conclusion

Lincoln's arguments in favor of summary judgment are contrary to the evidence. Application of the eight factors set forth in *Booth v. Wal-Mart Stores, Inc. Associates*

21

*Health & Welfare Plan,* 201 F.3d 335, 342-43 (4th Cir. 2000) leads to the conclusion that

Lincoln abused its discretion. Lincoln's motion for summary judgment should be denied.

November 16, 2022                         /s/ Andrew Whiteman
Date                                      Andrew Whiteman
                                         N.C. State Bar Number 9523
                                         Whiteman Law Firm
                                         5400 Glenwood Ave., Suite 225
                                         Raleigh, North Carolina 27612
                                         Tel: (919) 571-8300
                                         Fax: (919) 571-1004
                                         aow@whiteman-law.com

                                         *Attorney for plaintiff*

Certificate of Service

The undersigned hereby certifies that a copy of the foregoing was filed electronically with the United States District Court for the Middle District of North Carolina, with notice of case activity to be generated and sent electronically to the following attorneys of record registered to receive such service:

W. Kyle Dillard
Ogletree, Deakins, Nash, Smoak & Stewart, P.C.
300 North Main Street, Suite 500
Greenville, SC 29601
kyle.dillard@ogletree.com

Vanessa N. Garrido
Ogletree, Deakins, Nash, Smoak & Stewart, P.C.
8529 Six Forks Road
Forum IV, Suite 600
Raleigh, NC 27615
vanessa.garrido@ogletree.com

*Attorneys for Defendant*

November 16, 2022                         /s/ Andrew Whiteman
Date                                      Andrew Whiteman
                                          N.C. State Bar number 9523
                                          Whiteman Law Firm
                                          5400 Glenwood Avenue, Suite 225
                                          Raleigh, North Carolina 27612
                                          (919) 571-8300 (Telephone)
                                          (919) 571-1004 (Facsimile)
                                          aow@whiteman-law.com

23

## Certificate of Word Count

Pursuant to LR 7.3 of the Rules of Practice and Procedure, the undersigned certifies that the body of the brief, headings, and footnotes in the foregoing brief, but excluding the caption, signature lines the certificate of service, and this certificate of word count, contains 5,673 words. In making this certification, the undersigned relies on the word count feature of Microsoft Word.


November 16, 2022       /s/ Andrew Whiteman
Date             Andrew Whiteman
                N.C. State Bar number 9523
                Whiteman Law Firm
                5400 Glenwood Avenue, Suite 225
                Raleigh, North Carolina 27612
                (919) 571-8300 (Telephone)
                (919) 571-1004 (Facsimile)
                aow@whiteman-law.com