# EXHIBIT 1

2009 WL 3215954
Only the Westlaw citation is currently available.
United States District Court, D. Maryland.

Georgia FRANKTON
v.
METROPOLITAN LIFE INSURANCE COMPANY.

No. 1:08–cv–2209.
|
Sept. 30, 2009.

**Attorneys and Law Firms**

Jason H. Ehrenberg, Bailey and Ehrenberg PLLC, Washington, DC, for Georgia Frankton.

Adam Harrison Garner, McGuire Woods LLP, Baltimore, MD, for Metropolitan Life Insurance Company.

MEMORANDUM

J. FREDERICK MOTZ, District Judge.

**\*1** On August 29, 2008, Plaintiff Georgia Frankton ("Plaintiff") filed suit under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001 *et seq.,* challenging the termination of her long term disability benefits by Defendants Metropolitan Life Insurance Company ("MetLife"). Now pending before the Court are the Defendants' Motion for Summary Judgment as to Plaintiff's Claim, and Plaintiff's Cross Motion for Summary Judgment. For the reasons that follow, I will grant the Defendants' Motion and deny Plaintiff's Cross Motion.

**I. Factual Background** [1]

Plaintiff began her employment with Baltimore Gas & Electric Company, now a subsidiary of Constellation Energy Group ("Constellation"), in October of 1976. (Mem. Supp. Defs.' Mot. Summ. J. ("Defs.' Mem.") 2.) Plaintiff, a financial reconciler with Constellation, participated in the Constellation Energy Group Long Term Disability Plan ("the Plan"). (*Id.* at 1.) The Plan is an employee welfare benefit plan governed by ERISA. MetLife is the designated claims administrator and has discretion and authority to make initial and final determinations under the Plan.

Constellation's written job description for Plaintiff's position states that a financial reconciler:

> Processes, reviews, reconciles and enters data into the Oracle applications in accordance with departmental standards and procedures under unit supervision. Requires independent judgment in interpretation of data and knowledge of related work performed in the same and/or other departments. Duties may include maintaining records, handling processing and verifying invoices and customer payments, preparing various forms and verifying information from various sources. Resolves inquiries from supervision, employees, vendors and customers regarding invoice related data.

(Defs.' Mem., Ex. A at 962.) Constellation's formal job description for Plaintiff does not indicate that a financial reconciler is required to perform any physical activity. However, a supplement to the formal description, included in the administrative record, indicates that certain physical tasks are required once every two to three weeks. (*Id.* at 260–61.) These tasks include standing for 1 ½ to 1 ¾ hours, bending over, and lifting trays weighing ten to fifteen pounds, as well as pushing and pulling carts for check distribution once every two to three weeks. (*Id.* at 261.)

After twenty six years of continuous employment, Plaintiff ceased her active employment with Constellation on November 11, 2002. (*Id.* at 961.) Shortly thereafter, through her employer, she filed a claim for long-term disability ("LTD") benefits with MetLife. Her claim was supported by multiple medical diagnoses from her treating physician, Dr. Nelson Hendler, including Thoracic Outlet Syndrome, Cervical Radiculopathy, and Cervical and Lumbar Facet Syndrome. (*Id.* at 137.) Dr. Hendler's Attending Physician Statement indicated that Plaintiff was able to sit for four hours intermittently, stand for three hours intermittently, walk six hours intermittently, and lift twenty pounds occasionally. (*Id.* at 285.) Dr. Hendler concluded that until Plaintiff underwent two surgical procedures, Anterior Cervical Fusion

and Thoracic Outlet Surgery, she would not be able to return to work at her position with Constellation. (*Id.*)

**\*2** On April 23, 2003, MetLife informed Plaintiff that it had denied her claim for disability benefits. (*Id.* at 283–85.) MetLife disagreed with Dr. Hendler's conclusions, stating that the "diagnostic testing of the cervical spine shows minimally abnormal findings without evidence of nerve root or spinal cord compression." (*Id.* at 285.) Furthermore, MetLife concluded that the physical limitations, diagnosed by Dr. Hendler, fell within the requirements of Plaintiff's job as a financial reconciler with Constellation. (*Id.*) Plaintiff appealed MetLife's denial, and on April 29, 2004 MetLife approved her claim for LTD benefits effective June 1, 2003.

Plaintiff has maintained that as a result of her condition, she suffers from severe, debilitating physical pain concentrated on the right side of her body. (*Id.* at 559.) She states that the condition affects all functional abilities, including "hearing, voice/vocal cord impairment ... walking, standing, lifting." (*Id.*) From January 23, 2003 to July 23, 2003 she underwent three surgical procedures: two provocative discographies and one anterior cervical discectomy and fusion. (*Id.* at 558.) According to Plaintiff, these procedures did little to stem her symptoms. Since the surgical procedures, Plaintiff's course of treatment has included a regular course of trigger injections every two weeks, as well as a prescription for Demerol to be taken once every four hours. By letter dated October 10, 2005, Plaintiff indicated to MetLife that her condition was continuing to deteriorate. (*Id.* at 556.)

Six months after granting Plaintiff's appeal, MetLife requested additional documentation from Plaintiff to evaluate whether she continued to qualify for benefits. (*Id.* at 681.) Under the Plan, the definition of disability narrows after twenty four months of benefit payments. On June 1, 2005, Plaintiff would have been in receipt of disability benefits for twenty four months. (*Id.*) The relevant language of the plan is as follows:

Disability or Disabled means that, due to an Injury or Sickness, you require the regular care and attendance of a Doctor and:

1. you are unable to perform each of the material duties of your regular job, as set forth in the Employee's job description that is maintained by the Employer; and

2. after the first 24 months of Monthly Benefit payments, you must also be unable to perform each of the

material duties of any occupation for which you are reasonably or may reasonably become qualified taking into consideration your prior training or training available through a rehabilitation program offered to you and approved by us, your education, your experience and your past earnings.

(*Id.* at 1037–38.) Thus, after twenty four months of benefit payments, determination of whether a claimant is disabled shifts from an evaluation of the claimant's "regular job" to an evaluation of "any occupation." (*Id.* at 1038.) MetLife requested that Plaintiff provide it with pharmacy records, medical records, and an additional Attending Physician Statement that focused on her functional capabilities. MetLife reviewed the additional documentation provided by Plaintiff and concluded that she should undergo an independent medical examination. (*Id.* at 25.)

**\*3** On March 14, 2005, Dr. John Parkerson, an independent board-certified occupational medicine specialist, examined Plaintiff. Based on his examination, Dr. Parkerson concluded that Plaintiff "could return to work at her regular job without any specific restrictions. The restrictions provided by the attending physician are not fully supported by the physical examination." (*Id.* at 625.) Dr. Parkerson elaborated, stating "[s]he is not temporarily totally disabled on a physical basis. Her limitations are [sic] either have a primary psychiatric basis ... or possibly a consciously self limiting condition." (*Id.*) However, Dr. Parkerson did not give her a clean bill of health; he diagnosed her with status post instrumented cervical fusion C4–6, possible vascular thoracic outlet syndrome, lumbar degenerative disc disease and depressive disorder vs. somatoform disorder. (*Id.* at 624.) Dr. Parkerson found that Plaintiff had "some limitation of neck rotation," but ultimately found that her "objective examination" was "not consistent with her reported functional status." (*Id.* at 625.)

MetLife forwarded a copy of the independent medical examination report to Dr. Hendler on March 28, 2005 for his review and comment. (*Id.* at 36.) MetLife requested that Dr. Hendler indicate if he had any disagreement with Dr. Parkerson's findings and to provide MetLife with any objective evidence supporting such disagreement. (*Id.* at 37.) Dr. Hendler only responded to MetLife's request for comment after it had terminated Plaintiff's benefits. By letter dated May 4, 2005, Dr. Hendler indicated that he and Dr. Parkerson are in agreement regarding Plaintiff's medical diagnosis, and that the primary disagreement arises over whether the diagnosis precludes her from returning to work. (*Id.* at 571.)

MetLife also conducted video surveillance of Plaintiff on the day of her independent medical examination and on the two days following the examination. (*Id.* at 605.) On March 14, 2005, a private investigator observed Plaintiff walking with a normal gait, and bending from the waste several times. (*Id.*) The private investigator further observed Plaintiff carrying clothes to a dry cleaner, and transferring grocery bags from her shopping cart to the trunk of her car. (*Id.*) Plaintiff contends that she was in pain during these errands. (*Id.* at 555.) On March 15, 2005, the investigator did not observe Plaintiff leave her home. (*Id.* at 605.) Plaintiff contends that she spent the day and a half after her medical examination confined to her bed due to pain and exhaustion from the observed activities. (*Id.* at 555.) On March 16, 2005, the investigator observed Plaintiff walk from her home to her car with no apparent symptoms of pain. (*Id.* at 605.)

On March 7, 2003, Plaintiff filed an application for disability insurance with the Social Security Administration ("SSA"). (Mem. Supp. Pl.'s Cross Mot. Summ. J. ("Pl.'s Mem.") Ex. A at 3.) The claim was denied initially and on reconsideration. (*Id.*) On March 22, 2005, following a hearing at which Plaintiff and a vocational expert testified, the SSA concluded that Plaintiff was entitled to Disability Insurance Benefits pursuant to Section 216(i) of the Social Security Act. (*Id.* at 5–6.) Specifically, the Administrative Law Judge concluded that "the claimant's assertions concerning her ability to work are credible ... the claimant is unable to perform the requirements of her past relevant work ... the claimant's residual functional capacity does not enable her to do sustained work activities in an ordinary work setting on a regular and continuing basis." (*Id.*)

**\*4** On April 19, 2005 MetLife determined that Plaintiff was no longer disabled within the meaning of the Plan's "regular job" definition of disability, nor within the "any occupation" definition of disability. (*Id.* at 614–17.) MetLife sent a letter to Plaintiff dated April 19, 2005 delineating the basis of its determination:

Employer statement and Job Description provided February 19, 2003;

Employee Statement by [Plaintiff] dated March 6, 2003;

Personal Health Profile Update provided by [Plaintiff] in January 2005;

Attending Physician's Statement Completed by Nelson Hendler, M.D. on January 6, 2005;

Medical records of Nelson Hendler, M.D. from June 2, 2004 through February 4, 2005;

Independent Medical Examination performed on March 14, 2005;

Surveillance of [Plaintiff's] activities performed from March 14, 2005 through March 16, 2005."

(*Id.* at 614–15.) The letter explained that MetLife had concluded that the independent medical examination was inconsistent with Plaintiff's self described physical limitations. The letter further indicated that Dr. Hendler had not responded to the independent medical examiners report. MetLife then advised that Plaintiff's long term disability benefits were terminated as of April 19, 2005. Plaintiff appealed.

On October 10, 2005, MetLife submitted Plaintiff's appeal of its April 2005 administrative determination to Dr. Dennis Gordon, an Independent Physician Consultant. MetLife submitted Plaintiff's claim file (including additional documentation provided by Dr. Hendler after the April 2005 administrative decision) for review. (Defs.' Mem. at 9–10); *see also* (Defs.' Mem., Ex. A at 529–43) (Dr. Gordon's complete report). On October 21, 2005, after submitting the claim file to Dr. Gordon, MetLife received additional records from Dr. Hendler. (Defs.' Mem., Ex. A at 544.) MetLife determined that the documents were largely duplicative and decided not to forward them to Dr. Gordon for consideration. (Reply Supp. Defs.' Mot. Summ. J. ("Defs.' Reply") at 6.) These documents included Plaintiff's most recent "office note" (which MetLife had not received) and a "medical profile" prepared by Plaintiff (which was already part of the record). (Defs.' Mem., Ex. A at 544.) After review of the claim file, Dr. Gordon concluded that there was no physiological basis for many of Plaintiff's complaints stating, "there is nothing in the file that is incompatible with sedentary work." (*Id.* at 531.)

After receiving Dr. Gordon's report, MetLife indicates that it "reviewed all of the records in the claim file, including all of the medical records, the [independent medical examiner's] report, the investigator's records, the Social Security Awards, the records submitted on appeal, and the [independent physician's] report" and determined that the records did not support Plaintiff's claim. (Defs.' Mem. at 11.) In a letter dated

November 10, 2005, MetLife informed Plaintiff that "the original decision to terminate benefits beyond April 18, 2005 was upheld upon appeal." (Defs.' Mem., Ex. A at 525.)

## II. Standard of Review

 **\*5** A motion for summary judgment should be granted when the record establishes that there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). The substantive law of the cause of action determines which facts are material. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A dispute about a material fact is genuine and summary judgment is inappropriate "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* In analyzing whether a genuine issue of material fact exists, the evidence and reasonable inferences from that evidence must be viewed in the light most favorable to the nonmoving party. *Id.* at 255.

The MetLife Plan is governed by ERISA. *See* 29 U.S.C. § 1003. Under section 502(a)(1)(B) of ERISA, a "civil action may be brought by a participant or beneficiary to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan or to clarify his rights to future benefits under the terms of the plan." 29 U.S.C. § 1 132(a)(1)(B).

To determine the appropriate standard of review under ERISA, a Court reviewing a plan administrator's decision to deny benefits, must determine whether the plan gives the administrator the discretion to construe uncertain terms and determine eligibility for benefits. *See Booth v. Wal–Mart Stores, Inc.,* 201 F.3d 335, 340–41 (4th Cir.2000); *Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 115, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989). If the plan does not grant discretionary authority, the court reviews the employee's claim de novo, looking to the plan's terms and other manifestations of the parties' intent. *Booth,* 201 F.3d at 341. If, on the other hand, the plan confers discretion on the administrator, the court reviews the administrator's decision for abuse of discretion. *See id.* at 341–42.

In the instant case, the MetLife Plan gives its administrator discretion to construe the terms of the plan. A plan's intention to confer discretionary authority must be clear and unambiguous. *See Gallagher v. Reliance Standard Life Ins. Co.,* 305 F.3d 264, 268–69 (4th Cir.2002). The MetLife Plan

provides that the administrator will pay "the accrued benefits monthly at the end of the period for which they are due ... if the written proof of a claim ... has been made on time; and is *satisfactory to us."* (Defs.' Mem ., Ex. A at 1054.) In *Bartel v. Sun Life,* the Court concluded that plan language requiring that "[p]roof [of disability] must be satisfactory to Sun Life" was sufficient to confer discretionary authority. 536 F.Supp.2d 623, 628 (D.Md.2008); see also *Champion v. Black & Decker,* 550 F.3d 353, 357–59 (4th Cir.2008) (reaching the same conclusion after review of similar language); *Nance v. Sun Life Assur. Co. of Canada,* 294 F.3d 1263, 1267–68 (10th Cir.2002) (same); *Brigham v. Sun Life of Canada,* 317 F.3d 72, 81 (1 st Cir.2003) (noting that circuits that have considered the "to us" language after "satisfactory" have concluded that it is an indicator of subjective, discretionary authority on the part of the administrator, distinguishing such language from policies that require "satisfactory proof" without specifying who must be satisfied). The language in the MetLife plan is sufficient to confer discretionary authority on the plan administrator. [2]

 **\*6** Under an abuse of discretion standard, an administrator's decision will not be disturbed if it is reasonable, even if the court "would have come to a different result in the first instance." *Evans v. Eaton Corp. Long Term Disability Plan,* 514 F.3d 315, 322 (4th Cir.2008); *see also Booth,* 201 F.3d at 341; *Firestone,* 489 U.S. at 111. An administrator's decision will be reasonable "if it is the result of a deliberate, principled reasoning process and if it is supported by substantial evidence." *Evans,* 514 F.3d at 322 (quoting *Bernstein v. CapitalCare, Inc. .,* 70 F.3d 783, 788 (4th Cir.1995)). Ultimately, a plan administrator must adhere to the text of ERISA and the plan to which they have contracted, must base their decision on good evidence and sound reasoning, and reach their conclusion after a fair and searching process. [3] *See Evans,* 514 F.3d at 322–23.

## III. Long Term Disability Benefits Decision

Plaintiff contends that MetLife abused its discretion in determining that she could perform sedentary work. However, contrary to Plaintiff's arguments, her claim was subjected to a full and fair reasoning process.

MetLife collected medical reports from Plaintiff's numerous health care providers. The record includes reports from her treating physician, Dr. Hendler, dating back to 2002, and records from prior treating physicians dating from

December 21, 1999. Some of these medical records indicate disagreement among examining physicians regarding the cause and extent of Plaintiff's disability. For example, Dr. Michael S. Kaplan concluded on January 17, 2003 that Plaintiff's plethora of symptoms "do not fit either anatomical or clinical descriptions." (Defs.' Mem. at 944–45.)

MetLife sought independent evaluations of Plaintiff's medical records and physical condition. MetLife ordered an Independent Medical Examination, performed by Dr. John Parkerson, on March 14, 2005. Dr. Parkerson reviewed more than five years worth of medical records including MRI and CT scans, electrodiagnostic studies, as well as evaluations from Dr. Hendler prepared as recently as March 8, 2005. (*Id.* at 620–23.) Dr. Parkerson conducted a physical examination which in his opinion was "remarkably normal." (*Id.* at 624.) After Plaintiff appealed the decision to terminate her LTD benefits, MetLife forwarded the claim to an Independent Physician Consultant, Dr. Dennis S. Gordon, for review.

The independent medical evaluators reached reasoned and principled conclusions. Both Dr. Parkerson and Gordon considered the relevant evidence in the claim file and justified their conclusions in light of contrary evidence favorable to Plaintiff's claim. Indeed, Dr. Parkerson concurred with Dr. Hendler's physical diagnosis stating that "even with her cervical fusion, possible TOS, and lumbar degenerative disc disease, she could return to work in some capacity and is able to resume her regular job." (*Id.* at 625.) When Dr. Gordon reviewed the entire claim file he addressed Dr. Hendler's disagreements with Dr. Parkerson's conclusions, and Dr. Hendler's Mensana Clinic Pain Validity Test which Dr. Hendler had used in diagnosing Plaintiff. (*Id.* at 571–602.) Specifically, Dr. Gordon concluded that Dr. Hendler's Pain Validity Test was not a reliable or generally used diagnostic tool (*Id.* at 542–43.)

 **\*7** MetLife also considered non-medical evidence when reaching its decision. MetLife relied on surveillance video of Plaintiff conducted on the day of the independent medical exam. (*Id.* at 605.) Two descriptions of Plaintiff's employment are included in the record as well, outlining both the sedentary and periodic physical requirements of her job. (*Id.* at 261.) Finally, Dr. Parkerson, Dr. Gordon, and the Plan Administrator all reviewed documents prepared by Plaintiff detailing her symptoms. (*Id.* at 614–15.)

MetLife's decision was not only the result of a principled decision making process, but its decision that Plaintiff was able to return to work was supported by substantial evidence. In reaching its conclusion, MetLife relied on the opinions of an Independent Medical Examiner, an Independent Physician Consultant, and video surveillance conducted over three days. Dr. Parkerson, the Independent Medical Examiner reviewed, Plaintiff's entire medical history and conducted a physical examination. Dr. Parkerson tested her range of motion, strength of her upper and lower extremities, and evaluated the health of her spine. (*Id.* at 623–24.) Ultimately, Dr. Parkerson found that Plaintiff was not "temporarily totally disabled on a physical basis." (*Id.* at 625.) Dr. Gordon, the Independent Physician Consultant, reviewed Plaintiff's claim file, which included five years of her medical history and the evaluations of eleven different treating physicians. (*Id.* at 532.) After reviewing the file, Dr. Gordon concluded that "there is nothing in the file ... that is incompatible with sedentary work." (*Id.* at 531.) Finally, the claim file includes an evaluation of video surveillance of Plaintiff that comports with the medical evaluations of Drs. Parkerson and Gordon. (*Id.* at 605.) MetLife's extensive investigation and persistent efforts to obtain complete and independent evaluations of Plaintiff's condition provided MetLife with substantial evidence justifying its determination.

Plaintiff contends that her claim was not subject to a principled and fair review. Instead, she claims that MetLife's decision was the result of demonstrable bias based on selectively chosen evidence. (Pl.'s Mem. at 6.) Plaintiff contends that MetLife failed to properly consider her job description, and withheld Dr. Hendler's most recent records from the Independent Physician Consultant. Plaintiff further contends that by failing to credit Dr. Handler's medical diagnosis and the Social Security Administration's award of Disability Insurance, MetLife has abused its discretion. (*Id.* at 6–8.) However, none of these arguments individually, or collectively, is sufficient to raise an issue of material fact to prevent MetLife from prevailing on its motion for summary judgment. I will address each argument in turn.

Plaintiff argues that Met Life's determination was unreasonable because it failed to reconcile its decision with her job description, which included periodic "standing and lifting over ten pounds as well as pushing and pulling carts and bending over." [4] (Pl.'s Mem. at 7.) The periodic physical requirements of Plaintiff's job are included in her claim file. (*See* Def.'s Mem., Ex. A at 261.) While MetLife did not specifically reference these physical requirements in its decision, the Supreme Court has explicitly stated in the context of ERISA, "courts [may not] impose on

plan administrators a discrete burden of explanation when they credit reliable evidence that conflicts with a treating physicians evaluation." *Black & Decker Disability Plan v. Nord,* 538 U.S. 822, 834, 123 S.Ct. 1965, 155 L.Ed.2d 1034 (2003). Therefore, the absence of explanation is not alone sufficient to show demonstrable bias or abuse of discretion.

**\*8** If MetLife had reached a conclusion which failed to comport with the physical requirements of Plaintiff's job, a justification for that discrepancy may have been necessary. But in the instant case, the unreferenced physical requirements fall within the conclusions of the Independent Medical Examiner and the Independent Physician Consultant. Dr. Parkerson concluded that Plaintiff could "return to work at her regular job without any specific restrictions." (Def.'s Mem., Ex. A at 625.) Furthermore he opined that "her limitations are either [sic] have a primary psychiatric basis ... or possible [sic] a consciously self limiting condition." (*Id.*) Dr. Gordon concluded that there is "no physiological basis for her right sided body complaints" and "there is no objective reason why the claimant could not do at least light level work form the physical point of view." (*Id.* at 531–32.) These conclusions comport with the minimal physical requirements of Plaintiff's job. Therefore, there is no reasonable basis upon which to claim that MetLife selectively ignored the details of Plaintiff's job to reach its conclusion that she was capable of returning to work.

Plaintiff also contends that Dr. Hendler's most recent medical records were unreasonably withheld from Dr. Gordon, the Independent Physician Consultant. Plaintiff does not indicate what new information the "office note" provides, or how its substance undermines the reasonableness of MetLife's conclusion. Instead, Plaintiff points only to the failure to include it as evidence of an unreasonable process. However, failing to forward these documents to Dr. Gordon was not unreasonable. First, MetLife did not receive Dr. Hendler's most recent medical records until after it had forwarded the claim file to Dr. Gordon for review. (*Id.* at 47.) Second, the additional documents provided by Dr. Hendler are duplicative. Dr. Hendler provided Plaintiff's most recent "office note" and a "medical profile" drafted by Plaintiff. (*Id.* at 544.) When Dr. Hendler's records were received by MetLife, Plaintiff's "medical profile" was already in the record and under review by Dr. Gordon. (*Compare id.* at 545 *with id.* at 558.) Dr. Hendler's most recent "office note" was the only piece of new information. Plaintiff correctly notes that "[p]lan administrators ... may not arbitrarily refuse to credit a claimant's reliable evidence." *Black & Decker,* 538

U.S. at 834. However, in the instant case, the process by which Dr. Gordon reviewed the record does not suggest any attempt to ignore relevant evidence supporting Plaintiff's Claim. Dr. Gordon reviewed Plaintiff's complete medical history, which included Dr. Hendler's diagnoses and findings. Furthermore, the "office note" was included in the record when MetLife conducted its final administrative review. (Defs.' Mem. at 6 .)

The failure to include the "office note" in the record before the Independent Physician Consultant amounts to a procedural irregularity, as Plaintiff does not indicate what the note would have added to the record substantively. Such a minor procedural violation is not sufficient to undermine the reasonableness of MetLife's conclusions. The Fourth Circuit has held that "it is well established that failure to technically comply with all of ERISA's procedural requirements does not automatically invalidate an otherwise sound denial of benefits ... Substantial compliance is typically sufficient." *Larson v. Old Dominion Freight Line, Inc.,* 277 Fed. Appx. 318, 321 (4th Cir.2008).

**\*9** Plaintiff next argues that MetLife failed to accord Dr. Hendler's diagnosis appropriate weight. However, MetLife's rejection of the opinion of Plaintiff's treating physician and decision to base its determination on the evaluation of two independent doctors is not sufficient to show an abuse of discretion. ERISA does not require plan administrators to accord special deference to the opinions of treating physicians. *See Black & Decker,* 538 U.S. 834.[5] The Court in *Black & Decker* specifically rejected the "treating physician" rule applied in Social Security Disability Benefits Determinations. *Id.* And while plan administrators may not arbitrarily ignore reliable evidence, MetLife has not done so here. Both Dr. Parkerson's and Dr. Gordon's reports are replete with references to and criticism of Dr. Hendler's records and diagnoses. (*See* Defs.' Mem., Ex. A at 620–23, 529–43.) For example, Dr. Gordon detailed his perceived flaws in Plaintiff's medical treatment and explained the basis for his contrary medical judgment. (*Id.* at 529–43.) It is not an abuse of discretion for an administrator to adopt the reasonably formed opinion of one doctor over another. *See Stup v. UNUM Life Ins. Co. of Am.,* 390 F.3d 301, 308 (4th Cir.2004) ("[A]n administrator does not act unreasonably by denying benefits if the record contains conflicting medical reports.' ") (quoting *Elliott v. Sara Lee Corp.,* 190 F.3d 601, 606 (4th Cir.1999)).

Finally, Plaintiff contends that MetLife abused its discretion by failing to consider an award letter from the SSA, dated March 22, 2005, providing her with disability insurance

benefits. However, this court will not consider the award letter in determining the reasonableness of MetLife's determination. Under the abuse of discretion standard, "an assessment of the reasonableness of the administrator's decision must be based on the facts known to it at the time." *Sheppard & Enoch Pratt Hosp. v. Travelers Ins. Co.,* 32 F.3d 120, 125 (4th Cir.1994). At the time of the appeal, MetLife had been informed by Plaintiff that she had received disability insurance benefits. (*See* Defs.' Mem., Ex. A at 38, 41, 43.) However, there is neither a copy of the award letter in the record, nor any other evidence to indicate that MetLife had received it, except for a specific request from MetLife to Plaintiff to produce a copy of the letter. (*Id.* at 38.) Plaintiff cannot now supplement the administrative record to include her award letter, nor insist that a reviewing court consider the text of the award letter in determining whether the administrator abused his discretion. *See Bartel v. Sun Life Assur. Co. of Canada,* 536 F.Supp.2d 623, 630–31 (D.Md.2008) (citing *Bernstein v. Capital Care,* 70 F.3d 783, 788 (4th Cir.1995)); *see also Stup v. UNUM Life Ins. Co.,* 390 F.3d 301, 307 n. 3 (4th Cir.2004) (holding that under ERISA a court's review of a plan administrator's determination for abuse of discretion is limited to the administrative record before the administrator at the time the determination was made).

**\*10** MetLife concedes that it was generally aware that the SSA had awarded Plaintiff disability benefits; however, MetLife did not abuse its discretion by reaching a different determination than the SSA. (*See* Defs.' Mem., Ex. A at 38.) SSA determinations of disability are based on different standards than those under independent long term disability plans like the MetLife Plan. For example, SSA regulations provide that greater weight will be given to medical opinions from treating physicians. *See Black & Decker Disability Plan,* 538 U.S. at 825 (citing to CFR §§ 404.1527(d) (2), 416.927(d)(2) (2002)). Under ERISA, there is no preference for treating physicians' opinions. (*Id.* at 834.) Because of divergent standards, there is "no obligation to weigh the agency's disability determination more favorably than other evidence." *Gallagher,* 305 F.3d at 275 (citing *Elliot,* 190 F.3d at 607).

Contrary to Plaintiff's claims, *Metropolitan v. Life Insurance Company v. Glenn,* is inapposite to the instant case. In *Glenn,* the Court found that "the record says little about MetLife's efforts to assure accurate claims assessment." *Metropolitan Life Insurance Company v. Glenn,* 554U.S. 105, ——, 128 S.Ct. 2343, 2351, 171 L.Ed.2d 299 (2008). The defendant considered favorable statements of a treating

physician while ignoring his unfavorable assessments. *Glenn v. MetLife,* 461 F.3d 660, 669 (6th Cir.2006). The transferable skills analyst upon whom the defendant relied based his conclusions on "technical information that seems to have been almost randomly selected from his reports." *Id.* An independent medical examination was never requested. And the defendant reaped significant financial benefits from an award of SSA benefits and then failed to consider the award in its own determination. These factors indicated the inherent unreasonableness of the defendants' decision making process in *Glenn.* In the instant case, Met Life engaged an independent medical examiner and an independent physical consultant. Rather than ignore the findings of the treating physician, Drs. Parkerson and Gordon considered his diagnosis in its totality and justified their decision in light of his conclusions.

Plaintiff's reliance on *Groski v. ITT Long Term Disability Plan for Salaried Employees* is equally misplaced. In *Groski,* the defendant was found to have abused its discretion because it relied exclusively on the unreasoned opinion of a physician who had never examined Plaintiff. The decision was unreasonable because the physician failed to explain his conclusion that there were "no objective findings" to support Plaintiff's complaints. *Groski v. ITT Long Term Disability Plan for Salaried Employees,* 314 Fed.Appx. 540, 544 (4th Cir.2008). With respect to the doctor's conclusions, the court noted that

> he never revealed why he rejected the view of the other doctors that dislodged surgical hardware was irritating surrounding nerve tissue, resulting in debilitating pain for Gorski. In fact, he never discussed at all the June 2000 CT scan and flexion and extension films that several doctors reported as depicting the dislodged hardware and resulting nerve root impingement and as supporting Gorski's claims regarding the extent of her pain.

**\*11** *Id.* at 547. The unreasonableness of the defendant's decision was not refusing to credit the treating physician, but in adopting an unreasoned and unexplained conclusory opinion in the face of contrary objective evidence. In the instant case, Dr. Parkerson physically examined Plaintiff and

reviewed her medical history. In his report he acknowledged Dr. Hendler's physical diagnosis and agreed with it. But he went on to explain his contrary assessment that the objective physical irregularities were not precluding her from returning to her job. Similarly, Dr. Gordon reviewed Plaintiff's claim file, addressing line by line the assessments of Plaintiff's treating physicians over the course of five years. Contrary to the physician relied upon in Groski, the physicians relied upon in the instant case reached their conclusions after principled, reasoned approaches and justified their disagreements with Plaintiff's treating physician.

MetLife conducted a full, principled and reasonable evaluation of Plaintiff's claim. For the foregoing reasons, I grant Defendants' motion for summary judgment as to Plaintiff's claim. A separate order to that effect is being entered herewith.

**All Citations**

Not Reported in F.Supp.2d, 2009 WL 3215954

## Footnotes

1   The facts are presented in the light most favorable to the Plaintiff, the non-moving party. *See Lee v. York County Sch. Div.,* 484 F.3d 687, 693 (4th Cir.2007).

2   The parties do not dispute that abuse of discretion is the appropriate standard of review. *See* (Def. Mem. at 12–14); (Pl.'s Mem. at 8).

3   The Fourth Circuit has set forth a nonexclusive list of factors a court may consider when determining whether an exercise of discretion is reasonable: "[A] court may consider, but is not limited to, such factors as: (1) the language of the plan; (2) the purposes and goals of the plan; (3) the adequacy of the materials considered to make the decision and the degree to which they support it; (4) whether the fiduciary's interpretation was consistent with other provisions in the plan and with earlier interpretations of the plan; (5) whether the decisionmaking process was reasoned and principled; (6) whether the decision was consistent with the procedural and substantive requirements of ERISA; (7) any external standard relevant to the exercise of discretion; and (8) the fiduciary's motives and any conflict of interest it may have." *Booth,* 201 F.3d at 342–43.

4   The portion of plaintiff's job description citing physical activity states: "These tasks are done once every 2–3 [weeks] ... check insertion in mail room requires approximately 1 ½ to 1 ¾ hours of standing, gathering inserted checks, and manipulating letter trays which weigh approximately 10–15 pounds. It also involves pushing/pulling a cart between Payroll Services Unit and the mail room. Check Bundling/Distribution in the Payroll Unit requires 1 ½ to 2 hours of standing, sitting and some bending over. It also requires manipulating letter trays and Federal Express packages as well as pushing/pulling a cart between the Payroll Services Unit and the Loading Dock." (Defs.' Mem., Ex. A at 261.) While these tasks are performed once every two to three weeks, The Plaintiff contends they are "significant" physical activities. (Pl.'s Mem. at 7)

5   The facts of *Nord* are similar to the instant case. Nord was an employee of Black and Decker who claimed he was unable to work due to chronic back pain. Nord submitted documentation from a treating physician attesting to his condition, but MetLife denied his claim for benefits. Black and Decker then had Nord undergo an independent examination by a neurologist who concluded that Nord could perform sedentary work with the aid of pain medication. In reliance on the independent medical examination, MetLife denied Nord's claim.

**End of Document**                                                    © 2022 Thomson Reuters. No claim to original U.S. Government Works.

2013 WL 395098
United States District Court,
M.D. North Carolina.

Donna LOHR, Plaintiff
v.
UNITEDHEALTH GROUP,
INCORPORATED, Defendant.

No. 1:11CV134.
|
Jan. 31, 2013.

**Attorneys and Law Firms**

Nancy Pulliam Quinn, The Quinn Law Firm, Greensboro, NC, for Plaintiff.

David A. Lester, Jones, Walker, Waechter, Poitevent, Carrere & Denegre, L.L.P., Robin A. Franco, Balch & Bingham LLP, Birmingham, AL, H. Brent Helms, Nathan Douglas Childs, Robinson & Lawing, LLP, Winston–Salem, NC, for Defendant.

**MEMORANDUM OPINION AND ORDER**

N. CARLTON TILLEY, JR., Senior District Judge.

 **\*1** This suit arises from a dispute between Plaintiff Donna Lohr and Defendant UnitedHealth Group, Incorporated ("United") regarding Defendant's partial denial of Ms. Lohr's claim for short term disability ("STD"). Plaintiff alleges a violation of her rights under the Employee Retirement Income Security Act of 1974, 29 U.S.C. §§ 1001–1461, ("ERISA"). The case is before the Court on Defendant's Motion for Summary Judgment [Doc. # 32]. [1] For the reasons set forth below, the Defendant's motion for Summary Judgment will be GRANTED.

I.

Ms. Lohr has worked as a claims representative for United since 2005. R. at 21. [2] As a benefit of her employment, Ms. Lohr received STD insurance through the UnitedHealth Group Short–Term Disability Plan (the "Plan"). Under the Plan, Ms. Lohr automatically received "Basic STD Coverage," providing STD benefits of 60% of her pre-

disability earnings. Ms. Lohr also purchased "Supplemental STD Coverage," providing STD benefits of 80% of her pre-disability earnings. *See* Doc. # 33 at 3; Plan at 21.

Before receiving STD benefits a Plan participant must qualify as "disabled." Plan at 23. Under the terms of the Plan, in order for a participant to be considered disabled the following four conditions must be met:

- You have been seen face-to-face by a Physician about your Disability within 10 business days of the first day of absence related to the Disability leave of absence;

- Your physician has provided Medical Evidence that supports your inability to perform the Material Duties of your Own Occupation;

- You are under the Regular and Appropriate Care of a Physician; and

- Your Medical Condition is not work-related and is a Medically Determinable Impairment.

*Id.* at 25. In order to qualify as a "Medically Determinable Impairment" under the fourth requirement, a "physical or mental impairment must be established by Medical Evidence consisting of signs, symptoms and laboratory findings, and not only by the individual's statement of symptoms." *Id.* at 52. The Plan grants the Claims Administrator "the exclusive right and discretion, with respect to claims and appeals, to interpret the plan's terms, to administer the plan's benefits, to determine the applicable facts and to apply the plan's terms to the facts." *Id* . at 11. United delegated this discretionary authority to Sedgwick Claims Management Services, Inc. ("Sedgwick"). *Id.* at 7.

On May 18, 2010, a CT scan of Ms. Lohr's abdomen and pelvis revealed "cystic changes to both ovaries." R. at 109. The next day, she met with her gynecologist, Dr. David Lowe. *See id.* at 99–100. Dr. Lowe's notes from that visit describe the ovarian masses, and state that Ms. Lohr "is asymptomatic [,][d]enies any fever, chills, nausea, vomiting, diarrhea or constipation [,]" and has "[n]o bowel issues." *Id.* at 100. Ms. Lohr took paid leave on May 19 and May 20 and began her disability leave of absence on May 21, 2010. *See id.* at 19.

 **\*2** Ms. Lohr next met with Dr. Lowe on June 2, 2010 for a preoperative evaluation. *See id.* at 95–97. Dr. Lowe's notes indicate that he discussed a surgical plan with Ms. Lohr, and that he again determined Ms. Lohr to be "asymptomatic." *Id.* at 97. On June 3, Dr. Lowe faxed Sedgwick an

attending physician statement, stating that Ms. Lohr was totally disabled from May 19 to June 11, 2010. *See id.* at 187. In the statement, Dr. Lowe described his "objective supportive findings" by referencing a "report attached," and his "subjective supportive findings" as "asymptomatic." *Id.* at 186. When asked how these findings affected "the patient's ability to function," Dr. Lowe responded "no work." *Id.* Dr. Lowe included a form stating that Ms. Lohr could not perform sedentary work without accommodation, and limiting periods of sitting, standing, and walking to either half an hour or an hour. *See id.* at 188.

Ms. Lohr underwent surgery on June 4, 2010. Afterwards, she was discharged home, given a prescription for Vicodin, and instructed to return for a follow-up appointment in two to three weeks. *See id.* at 101–102. On June 16, Sedgwick notified Ms. Lohr that it had approved her claim for STD benefits for the postoperative period between June 4 and June 11. *See id.* at 212. On June 18, Sedgwick notified Ms. Lohr that it had denied her claim for STD benefits for the pre-operative period between May 21 and June 3, stating that "the medical information submitted does not demonstrate that you are unable to perform the material duties of your own occupation and/or that you are under the regular and appropriate care of a physician as required." *Id.* at 86. On June 22, Sedgwick notified Ms. Lohr that it had denied her claim for STD benefits for "the period beginning" June 12, 2010, for the same reasons stated in its June 18 letter. *Id.* at 123. Each of these two denial letters explained Ms. Lohr's opportunities for internal appeal to Sedgwick, included a blank appeals form, and noted Ms. Lohr's right to bring a civil suit after she exhausted her internal appeals.

On June 24, 2010, Ms. Lohr met with Dr. Lowe for a post-operative appointment. Following this appointment, Dr. Lowe sent Sedgwick what it entitled a "Letter of Appeal," stating:

> [Ms. Lohr] is still in a great deal of pain from her surgery. She had extensive adhesions removed and had borderline cancer cells. I gave her a prescription for Vicodin and recommended she continue to be out of work through July 17 to completely heal from her surgery. She is house confined while taking Vicodin. She is not to lift, push, pull, or carry more than 10 # s. She is unable to sit, stand, or walk for periods

> greater than 1 hr. She is to continue with pelvic rest.

*Id.* at 126. On July 17, Dr. Lowe submitted correspondence extending Ms. Lohr's disability to July 20, when she was to be re-evaluated. *See id.* at 62. On July 20, Dr. Lowe's office sent Sedgwick a form indicating that Ms. Lohr could return to work on August 1, 2010, but not explaining why this extension was required. *See id.* at 68.

**\*3** On July 19, United requested that Ms. Lohr's disability status be reviewed by an independent reviewing physician. *See id.* at 65–66. On July 27, independent reviewing physician Dr. Joshua Cohen, who is board certified in Obstetrics and Gynecology, issued a report reviewing Ms. Lohr's medical history and disability status. *See id.* at 70–75. In forming his opinion, Dr. Cohen not only reviewed Ms. Lohr's medical records, but also spoke with Linda, Dr. Lowe's nurse practitioner, about Ms. Lohr's treatment history. *See id.* According to Dr. Cohen, Linda indicated that Dr. Lowe's office "did not recommend any disability prior to the surgery of 06/04/10[,][h]owever, they honored the patient's request and they documented date of disability from 05/19/10 forward." *Id.* at 75. When asked about the periods following June 4, Dr. Cohen characterized Linda as having stated that "[m]ost of [Ms. Lohr's] complaints were subjective; however, we honored her request to extend her disability and we extended it I think up to about end of July 2010[sic] mainly per her request and because of her subjective complaints of pain." *Id.* at 72. After reviewing Ms. Lohr's medical records, Dr. Cohen also noted that "[t]here are no documentations of any objective gynecological clinical findings contained in the medical record or reported during the telephone conference that would impact the employee's ability to function in her regular unrestricted occupation during the dates in question." *Id.* at 74. Dr. Cohen likewise noted that:

> All the findings are clinically significant during the dates from 06/04/10 through 06/11 /10 and not prior or after. Of course, having ovarian cysts is clinically significant. Nevertheless, this patient had no symptoms and was clearly documented [sic] by the treating gynecologist, Dr. Lowe that prior to the surgery during the examination

of 05/19/10, the patient was asymptomatic.

*Id.* at 74.

On July 28, Ms. Lohr submitted a handwritten appeal of "the prior denial" to Sedgwick, stating that she was diagnosed with a kiwi-sized tumor, that she had to have both her ovaries removed, and referencing the medical documentation that had previously been sent to Sedgwick from Dr. Lowe. *Id.* at 173. On August 2, 2010, Ms. Lohr returned to work. On August 3, 2010, Dr. Cohen supplemented his report based on additional medical records submitted by Ms. Lohr, and reached the same conclusion as he had in his July 27 report. *Id.* at 22–26.

Sedgwick addressed Ms. Lohr's July 28 appeal on August 11, 2010, upholding its prior denial of Ms. Lohr's claim "for the periods from May 21, 2010 through June 3, 2010, and from June 12, 2010 until your fill-time return to work date." *Id.* at 29. In notifying Ms. Lohr of this decision, Sedgwick also informed Ms. Lohr that "[y]ou have exhausted your appeal rights under the Plan and you have a right to bring a civil action under Section 502(a) of [ERISA] ." *Id.* at 30. On August 12, 2010, Ms. Lohr contacted the North Carolina Department of Insurance (the "Department"), informing it of her medical history and asking what recourse she had regarding her denied STD benefits. *See id.* at 35–36. On August 13, 2010, the Department contacted Sedgwick, noting that Ms. Lohr's claim may be an ERISA claim outside their regulatory authority but regardless requesting that Sedgwick provide them with a status report. *See id.* at 34. On August 23, 2010, Sedgwick responded to the Department, stating that the Plan was indeed governed by ERISA, denying all of Ms. Lohr's allegations, but also stating that "upon further review and administration of the claim, benefits have been extended through July 17, 2010." *Id.* at 47. The letter also stated that "Ms. Lohr's claim remains denied beginning July 18, 2010, but she will have an opportunity to appeal this denial if she so chooses." *Id.* at 47.

**\*4** On August 26, 2010, Sedgwick sent Ms. Lohr two letters. The first notified her that her "claim has been approved beginning 6/4/2010 through 7/17/2010." *Id.* at 39. The second notified her that "your ongoing claim for benefits is denied for the period beginning 7/18/2010," explaining that "we have not received medical documentation to establish that your condition continues to meet the definition of disability as outlined below." *Id.* at 52. The second letter again described

her right to appeal this denial with Sedgwick, included a blank appeals form, and described her right to bring a civil action under ERISA after she exhausted her internal appeals. *See id.* at 52–53. Ms. Lohr did not appeal the August 26 denial.

Ms. Lohr filed this suit in January of 2011, *see* Doc. # 4, and it was removed to federal court on February 23, 2011. *See* Doc. # 1. Ms. Lohr claims that Sedgwick improperly denied her claim for disability for the period of May 21 to June 3, 2010 (the "preoperative period") and the period from July 18 to August 1, 2010 (the "disputed postoperative period"). *See* Doc. # 35 at 1. United has since filed for summary judgment [Doc # 32], claiming first that Ms. Lohr did not exhaust her claims as to the disputed postoperative period, and second that Sedgwick did not abuse its discretion when it denied Ms. Lohr's claims as to both periods.

## II.

Summary judgment is proper only when, viewing the facts in the light most favorable to the non-moving party, there is no genuine issue of any material fact and the movant is entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986); *Holland v. Washington Homes, Inc.,* 487 F.3d 208, 213 (4th Cir.2007). An issue is genuine if a reasonable jury, based on the evidence, could find in favor of the non-moving party. *See Anderson v. Liberty Lobby,* 477 U.S. 242, 248 (1986); *Holland,* 487 F.3d at 213. The materiality of a fact depends on whether the existence of the fact could cause a jury to reach different outcomes. *See Anderson,* 477 U.S. at 248. Summary judgment requires a determination of the sufficiency of the evidence, not a weighing of the evidence. *See id.* at 249. In essence, the analysis concerns "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251–52.

The applicable standard of review by a district court of the denial of benefits under ERISA plans is well-settled. If a plan administrator is granted discretionary authority to determine eligibility or to construe the terms of the plan, the denial of benefits must be reviewed for abuse of discretion. *See Firestone Tire and Rubber Co. v. Bruch,* 489 U.S. 101, 111 (1989); *Ellis v. Metropolitan Life Ins. Co.,* 126 F.3d 228, 232 (4th Cir.1997). In this case, the Plan's language gives the Claims Administrator "the exclusive right and discretion, with respect to claims and appeals, to

interpret the plan's terms, to administer the plan's benefits, to determine the applicable facts and to apply the plan's terms to the facts." Plan at 11. This language unambiguously gives discretion to the Claims Administrator to determine eligibility for benefits under the plan. As such, the decision of the Claims Administrator—in this case, Sedgwick—is reviewed for abuse of discretion.[3]

**\*5** The Fourth Circuit has explained the contours of the abuse of discretion standard in the ERISA context as follows:

> First, in ERISA cases, the standard equates to reasonableness: We will not disturb an ERISA administrator's discretionary decision if it is reasonable, and will reverse or remand if it is not. Second, the abuse of discretion standard is less deferential to administrators than an arbitrary and capricious standard would be; to be unreasonable is not so extreme as to be irrational. Third, an administrator's decision is reasonable if it is the result of a deliberate, principled reasoning process and if it is supported by substantial evidence. Fourth, the decision must reflect careful attention to the language of the plan, as well as the requirements of ERISA itself.

*Evans v. Eaton Corp. Long Term Disability Plan,* 514 F.3d 315, 322 (4th Cir.2008). In sum, the standard requires "administrators' decisions to adhere both to the text of ERISA and the plan to which they have contracted; to rest on good evidence and sound reasoning; and to result from a fair and searching process." *Id.* at 322–323. The Court of Appeals has identified a list of factors for consideration by the reviewing court in determining whether discretion has been abused:

> (1) the language of the plan; (2) the purposes and goals of the plan; (3) the adequacy of the materials considered to make the decision and the degree to which they support it; (4) whether the fiduciary's

interpretation was consistent with other provisions in the plan and with earlier interpretations of the plan; (5) whether the decisionmaking process was reasoned and principled; (6) whether the decision was consistent with the procedural and substantive requirements of ERISA; (7) any external standard relevant to the exercise of discretion; and (8) the fiduciary's motives and any conflict of interest it may have.

*Booth v. Wal–Mart Stores, Inc. Assoc. Health and Welfare Plan,* 201 F.3d 335, 342–43 (4th Cir.2000).

### III.

United argues that Ms. Lohr is barred from challenging Sedgwick's denial of her STD benefits for the disputed postoperative period since she failed to exhaust her administrative remedies under the Plan. Though ERISA does not contain an explicit exhaustion requirement, an ERISA claimant still must exhaust those administrative remedies provided for in an employee benefits plan before bringing suit under 29 U.S.C. § 1132(a)(1)(B). *See Makar v. Health Care Corp. Of Mid–Atlantic,* 872 F.2d 80, 82 (4th Cir.1989). Here, the Plan states that "[y]ou must file an appeal within 180 days after you receive the claim denial from the Claims Administrator," establishes that the appeal must be filed with the Plan Administrator, and provides a comprehensive explanation of how to file such an appeal. *Plan* at 137–139. The Plan also makes explicit the judicially-created requirement for exhaustion, explaining a party's right to judicial review and then stating that "[c]ompleting the claim and appeals procedure is mandatory for resolving every claim and dispute arising under the Health Plan." *Id.* at 139. As such, under both ERISA and the terms of the Plan itself, Ms. Lohr must have appealed all denied claims to the Plan Administrator if she wishes to bring a civil challenge to the denial under 29 U.S.C. § 1132(a)(1)(B). If she did not bring such an appeal, she failed to exhaust those remedies provided by the Plan, and this court cannot hear her claim.

**\*6** Sedgwick, the Plan Administrator, denied Ms. Lohr's claim for the preoperative period on June 18, 2010. *See* R. at 86. Ms. Lohr appealed that decision on July 28, 2010. *See*

*id.* at 173. That appeal was denied on August 11, 2010. *See id.* at 29. At no point did Sedgwick issue a second decision as to the preoperative period. As such, Ms. Lohr exhausted the internal procedures for challenging her denial of benefits for the preoperative period, and now appropriately challenges that denial under 29 U.S.C. § 1132(a)(1)(B).

In denying Ms. Lohr's July 28 appeal, Sedgwick also denied Ms. Lohr's claims "from June 12, 2010 until your full-time return to work date." *Id.* at 29. However, it revised this opinion on August 26, sending one letter notifying Ms. Lohr that her claim was approved from June 4 to July 17, *see id.* at 39, and another letter notifying her that her claim was denied "for the period beginning" July 18. *Id.* at 52. The second letter again explained Ms. Lohr's opportunities for an appeal to the Plan Administrator, stated that she could challenge the denial in a civil action "after there has been full exhaustion of your appeal rights under the plan," and referenced a blank appeals form attached to the letter. *Id.* at 52–54. Ms. Lohr, however, did not appeal this decision. As such, she failed to exhaust those administrative remedies provided for in the Plan as to the disputed postoperative period.

Ms. Lohr claims that "[a]s a general rule under ERISA, the exhaustion requirement is a matter within the discretion of the trial court," citing only to *Kross v. Western Elec. Co., Inc., 701 F.2d 1238 (7th Cir.1983).*[4] Doc. # 35 at 4. However, the Fourth Circuit has held that "an ERISA claimant generally is required to exhaust the remedies provided by the employee benefit plan in which he participates as a prerequisite to an ERISA action for denial of benefits." *Makar v. Health Care Corp. of Mid–Atlantic, 872 F.2d 80, 82 (4th Cir.1989).*[5] The Fourth Circuit has not indicated that district courts have the discretion to waive the exhaustion requirement unless an exception applies.

An exception to the exhaustion requirement exists when "there is clear and positive evidence that the [administrative] remedies are futile or useless." *Kunda v. C.R. Bard., Inc, 671 F.3d 464, 472 (4th Cir.2011)* (quotations omitted). "The futility exception ... is quite restricted, and has been applied only when resort to administrative remedies is 'clearly useless.' " *Kern v. Verizon Commc'ns, Inc., 381 F.Supp.2d 532, 537 (N.D.W.Va.2005)* (quoting *Communication Workers of America v. AT & T, 40 F.3d 426, 433 (D.C.Cir.1994)).* Ms. Lohr's brief mentions the futility exception, and one could construe it as arguing that the exception should apply in this case.[6] *See* Doc. # 35 at 4. However, the only facts cited in support of the exception's application are "the short

period of benefits in question[,]" "the clear lack of prejudice to Defendant[,]" and the allegedly resulting fact that "an administrative appeal would not be the best use of the parties' resources." *Id.* at 5. These assertions are not relevant to whether or not an internal appeal would be futile. Nor does an independent review of the record reveal clear and positive evidence of futility. Ms. Lohr received one unfavorable opinion from Sedgwick on appeal, but also received favorable results after further pursuing her claim with the North Carolina Department of Insurance. There is no evidence that Sedgwick would have approached a second appeal with a closed mind.[7] Since there is not clear and positive evidence that it would have been futile to appeal Sedgwick's denial of Ms. Lohr's claim, the exhaustion requirement is not waived as a result of futility.

**\*7** Ms. Lohr also claims that "[t]he Fourth Circuit has excused plaintiffs from the requirement of exhaustion of all administrative remedies when the plan administrator did not effectively communicate the procedure for doing so." Doc. # 35 at 4. The district court opinion cited by Ms. Lohr does demonstrate that exhaustion requirements can be waived if a plan administrator "failed to comply with the notice provisions of 29 C.F.R. § 2560.503–1(g)(1)." *Hall v. Tyco Intern. Ltd., 223 F.R.D. 219, 238 (M.D.N.C.2004)* (exhaustion waived when "not only did Plaintiff not receive a letter complying with 29 C.F.R. § 2560.503–1(g)(1), he did not receive a letter at all"). Here, however, Ms. Lohr received a letter notifying her that her claim had been denied, explaining her opportunities for internal appeal, and complying with all other relevant regulatory requirements. *See* R. at 52–53. Ms. Lohr cannot claim insufficient notice as grounds for waiving the exhaustion requirement in this case.

Ms. Lohr did not exhaust internal administrative remedies as to the disputed postoperative period, and no exception to the exhaustion requirement applies. As such, United's motion for summary judgment as to the disputed postoperative period is GRANTED.

### IV.

United also argues that its decision to deny Ms. Lohr's STD claims for both of the periods at issue "was reasonable, in that it was consistent with the terms of the Plan, it was the result of principled decision making, and it was supported by substantial evidence." Doc. # 33 at 12. Since Ms. Lohr failed to exhaust administrative remedies as to the

disputed postoperative period, the court only addresses the appropriateness of Sedgwick's decision as to the preoperative period.

Sedgwick did not abuse its discretion when it denied Ms. Lohr disability benefits for the preoperative period. As noted above, in order to be considered disabled under the Plan, a claimant's physician must have "provided Medical Evidence that supports your inability to perform the Material Duties of your Own Occupation," and the claimant's medical condition must be a "Medically Determinable Impairment." Plan at 25. In order to qualify as a "Medically Determinable Impairment," a "physical or mental impairment must be established by Medical Evidence consisting of signs, symptoms and laboratory findings, and not only by the individual's statement of symptoms." *Id.* at 52.

There were somewhat conflicting medical opinions as to Ms. Lohr's disability during the preoperative period. Ms. Lohr's treating physician, Dr. Lowe, claimed that Ms. Lohr was disabled during that period. Reviewing physician Dr. Cohen determined that she was not. As the Plan Administrator, it was Sedgwick's duty to resolve such a conflict. *See Booth v. Wal–Mart Stores, Inc. Assocs. Health and Welfare Plan,* 201 F.3d 335, 345 (4th Cir.1999) (When confronted with a "record of conflicting opinion, it was within the discretion of the [plan administrator]—indeed it was the duty of that body —to resolve the conflicts."). As to the preoperative period, Sedgwick resolved the differences in opinion in favor of Dr. Cohen, finding that there was "no documentation of any objective gynecological clinical findings ... that would impact [Ms. Lohr's] ability to function in [her] regular unrestricted occupation." R. at 29. Sedgwick provided ample explanation for its conclusion to credit Dr. Cohen's opinion over Dr. Lowe's. For example, it considered the fact that while Dr. Lowe stated that Ms. Lohr was disabled starting on May 19, he originally recommended disability starting on June 4, and only backdated the recommendation at Ms. Lohr's request. Records likewise indicate that Dr. Lowe did not authorize a leave of absence before Ms. Lohr's surgery on June 4, noted on May 19 that "[s]he is asymptomatic," and noted on June 2 that "[c]urrently, she is asymptomatic." *Id.* at 97; 100. Indeed, while Sedgwick's denial conflicts with Dr. Lowe's ostensible conclusion as to whether or not Ms. Lohr was "disabled" during the preoperative period, it does not appear to conflict with his evaluation of her underlying medical conditions. Considering Ms. Lohr's records in light of the Plan's definition of disability, Sedgwick did not abuse its discretion in crediting Dr. Cohen's opinion over Dr. Lowe's and finding that Ms. Lohr was not disabled during the preoperative period.

**\*8** Ms. Lohr states that "[d]eference should be given to treating physician's assessment of a patient's condition." Doc. # 35 at 2. No legal authority is cited in support of this proposition. It directly contradicts the Supreme Court, which has unanimously held that when determining eligibility for ERISA disability benefits, "plan administrators are not obliged to accord special deference to the opinions of treating physicians." *Black & Decker Disability Plan v. Nord,* 538 U.S. 822, 834 (2003). Ms. Lohr neither acknowledges this authority nor offers any reason as to why controlling Supreme Court precedent should be disregarded. Sedgwick did not abuse its discretion by failing to give deference to Dr. Lowe's opinion as a treating physician.

Ms. Lohr also states that Dr. Cohen's "alleged finding" as to the lack of objective medical evidence supporting her disability "failed to review the entire record from Plaintiff's submissions as well as those of her medical providers." Doc. # 35 at 3. There is no mention of any specific aspect of the record which Dr. Cohen failed to review. Dr. Cohen's report in fact reveals a detailed analysis of Ms. Lohr's medical files, as well as an independent inquiry with Dr. Lowe's office as to the specific foundations of his opinion regarding her disability. *See* R. at 71–75. Dr. Cohen's opinion is not invalid for failing to review the entire record.

Ms. Lohr also argues Sedgwick's decision "fails to take into consideration the psychological effects of a cancer diagnosis on [Ms. Lohr's] ability to concentrate on her work tasks as well." Doc. # 35 at 2. Again, in order to qualify as disabled under the Plan, Ms. Lohr would have needed to establish that she suffered from a "Medically Determinable Impairment" by putting forth "Medical Evidence consisting of signs, symptoms and laboratory findings, and not only by the individual's statement of symptoms." Plan at 52. Ms. Lohr does not direct the court to any medical evidence indicating that Ms. Lohr suffered from any relevant psychological condition. Ms. Lohr does not appear to have claimed a psychological disability until bringing this suit, and a review of the record reveals no medical evidence supporting such a finding. Sedgwick did not abuse its discretion when it found no evidence of psychological disability in the preoperative period.

Sedgwick did not abuse its discretion when it denied Ms. Lohr's claim for STD for the preoperative period. The denial

was consistent with the well-reasoned opinion of reviewing physician Dr. Cohen. While it was inconsistent with the ultimate conclusion reached by Ms. Lohr's treating physician Dr. Lowe, it was nonetheless consistent with his underlying medical evaluations when viewed in light of the Plan's definition of "disability." Since the denial adhered to both the text of ERISA and the Plan, since it rested on good evidence and sound reasoning, and since it resulted from what appeared to be a fair and searching process, United's Motion for Summary Judgment as to the preoperative period is GRANTED.

V.

**\*9** For the reasons set forth above, Defendant's Motion for Summary Judgment [Doc. # 32] is GRANTED.

**All Citations**

Not Reported in F.Supp.2d, 2013 WL 395098, 55 Employee Benefits Cas. 2557

## Footnotes

1    The parties stipulated that they would settle this issue on cross-motions for summary judgment. *See* Doc. # 25 at 3. Both parties timely filed notices of intent to file dispositive motions. *See* Doc. # 26; 29. Plaintiff's counsel failed to move for summary judgment, however, and instead only opposed Defendant's motion for summary judgment.

2    The court has received the Settled Administrative Record under seal, which will be referred to as "R. at ———."

3    In Section Three of Ms. Lohr's brief, Ms. Lohr's counsel claims that "Defendant arbitrarily and capriciously denied Plaintiff's benefits under the Plan," and then proceeds to claim that "the Court's review of these matters is *de novo,* [sic] utilizing an abuse of discretion standard based on the whole record." Doc. # 35 at 2. It is unclear what Ms. Lohr's counsel intends to communicate in these sentences, and is unclear if she disputes the applicable standard of review.

4    Though every other case cited by Ms. Lohr's counsel included a citation identifying the issuing court, counsel omitted any such reference when citing *Kross. See* Doc. # 35 at 4. Even if cross *Kross* supported Ms. Lohr's position, it is from the Seventh Circuit, and is not controlling.

5    Ms. Lohr's counsel cites no legal authority supporting her claim that "courts may waive the [exhaustion] requirement" if "the facts of the case do not promote the policy of judicial economy and efficient resolution of claims under an employee benefits plan[.]" Doc. # 35 at 4. Nor does counsel explain how permitting claimants to ignore benefit plans' internal dispute resolution procedures and instead go straight to federal court would "promote the policy of judicial economy and efficient resolution of claims" when it likely would have the opposite result.

6    Ms. Lohr's counsel mentions the futility exception as an instance in which her novel exhaustion exception for "judicial economy and efficient resolution of claims" is "especially true," and then claims broadly that "this logic would clearly apply in [Ms. Lohr's] case." Doc. # 35 at 4–5.

7    Those cases finding clear and positive evidence that an internal appeal would have been futile address significantly clearer fact patterns than those at issue. For example, sufficient evidence of futility was found in *O'Bryhim v. Reliance Standard Life Ins. Co.,* 997 F.Supp. 728 (E.D.Va.1998), a case cited by Ms. Lohr's counsel. In that case, a claimant had previously filed three unsuccessful internal appeals, successfully brought suit in federal court, and had the Plan Administrator's appeals counsel ignore the district court's findings of

WESTLAW    © 2022 Thomson Reuters. No claim to original U.S. Government Works.

fact on remand. In order to exhaust internal remedies, the claimant would have had to again appeal that decision to the same individuals on the appeals counsel who had issued the most recent denial.

---

**End of Document**                                    © 2022 Thomson Reuters. No claim to original U.S. Government Works.

Teague v. Hartford Life and Accident Insurance Company, Not Reported in Fed. Supp....

2006 WL 8455977

2006 WL 8455977
Only the Westlaw citation is currently available.
United States District Court, W.D. North Carolina,
Asheville Division.

Shelby TEAGUE, Plaintiff,

v.

HARTFORD LIFE AND ACCIDENT
INSURANCE COMPANY, Defendant.

1:05cv223
|
Signed March 17, 2006

**Attorneys and Law Firms**

Heather Newton, Heather Newton, Attorney at Law/Certified
Mediator, Asheville, NC, for Plaintiff.

Debbie Weston Harden, Katherine T. Lange, Womble,
Carlyle, Sandridge & Rice, PLLC, Charlotte, NC, for
Defendant.

**MEMORANDUM AND RECOMMENDATION**

Dennis L. Howell, United States Magistrate Judge

 **\*1 THIS MATTER** is before the court upon plaintiff's
Motion for Summary Judgment (#9), defendant's Motion
for Summary Judgment (#17), defendant's Motion to Strike
(#14), and plaintiff's Opposition to Defendant's Motion
to Strike (#21). The undersigned also has considered all
memoranda filed in support, opposition, and reply to
the various motions. Having carefully considered such
pleadings and reviewed the extensive administrative record,
the undersigned respectfully enters the following findings,
conclusions, and recommendations as to plaintiff's claims
under the Employee Retirement Income Security Act
("ERISA").

**FINDINGS AND CONCLUSIONS**

**I. Background**

 **A. The Accident**
Prior to a 1999 automobile accident which caused plaintiff to
leave her work, plaintiff had been employed with Continental
Teves for nine years, working on an assembly line. Her
employer offered and plaintiff participated in a long term
disability benefits plan ("LTD plan"), which is governed by
ERISA. While such plan was sponsored by Continental Teves,
Inc., it was insured and administered by Defendant Hartford.

On August 21, 1999, plaintiff was severely injured in a motor
vehicle accident, in which she sustained a broken femur, a
right distal radius fracture, herniated cervical disks, massive
bilateral hemothorax, a fractured rib, and other injuries.
Administrative Record ("A.R."), at 0308. In addition to such
traumatic injuries, it also appears that plaintiff suffers from
asthma, high blood pressure, and obesity. Since the accident
in 1999, plaintiff has not returned to her former work and there
is no evidence of record that she has engaged in substantial
gainful employment since that date.

 **B. Continental Teves Pays Plaintiff's Claim for Short
Term Disability Benefits**
After the accident, plaintiff did not return to her job at
Continental Teves. Instead, her employer paid plaintiff's claim
for short term disability benefits for six months following the
accident. Defendant herein appears to have had no role in such
decision and does not appear to play any role in administration
of Continental Teves's short term disability plan.

 **C. Hartford Honors Plaintiff's Claim for Long Term
Disability Benefits**
After the short term disability benefits were exhausted,
plaintiff applied for and received LTD benefits. A finding
by defendant was made in plaintiff's favor under the LTD
plan's "your occupation" definition of disability on March 17,
2000. A.R., at 1293-4. It is undisputed that defendant made
payments to plaintiff as required by the policy until June 1,
2004, when the defendant notified the plaintiff that it was
the opinion of the defendant that the plaintiff was no longer
disabled and terminated the benefits. A.R., at 1046.

Inasmuch as the plan provided for an offset if any social
security disability benefits were received by plaintiff from
the Social Security Administration, the defendant offered the
plaintiff a lower monthly payment to avoid overpayment and
recoupment; however, the plaintiff, on December 22, 2000,
opted for the higher "net" payment. A.R., at 1250.

## D. Pursuant to the Plan, Hartford Offsets LTD Benefits Based on Plaintiff's Receipt of Social Security Disability

**\*2** While plaintiff argues that defendant "hired" a Social Security lawyer for her and that the defendant made representations to the Social Security Administration through that attorney, the only competent evidence of record is that defendant recommended a lawyer to the plaintiff and that the plaintiff in fact paid the fees of that attorney by a deduction from the back benefits payable to her from the award of Social Security disability benefits. A.R., at 862, 919, 920. In any event, plaintiff successfully applied for and received Social Security disability insurance proceeds based on the total disability of the plaintiff. In accordance with the LTD plan, such payments operated as an offset to her LTD benefits and defendant sought and attempted to recoup from plaintiff retrospective overpayments that correlated to payment of back benefits by the Social Security Administration. A.R., at 1250.

## E. The Definition of Disability Changes Pursuant to the Plan.

The plan's definition of disability changed from "your occupation" to "any occupation" on February 21, 2002. A.R., at 1165, 0019. This change in the plan narrowed the definition of disability for plaintiff. Even with this narrowing, defendant conducted a periodic review of plaintiff's medical records and approved plaintiff for benefits under the plan's "any occupation" definition of disability. A.R., at 1165. Specifically, defendant continued plaintiff's LTD benefits because it could not identify any occupation she could perform based on her education, training, and experience. A.R., at 1164-65.

## F. Hartford Finds that Plaintiff Can Perform Sedentary Work as of June 2004

It is undisputed that the Plan Administrator may conduct periodic reviews of persons who have been granted disability benefits to determine whether they remain eligible. In March 2004, defendant commenced a review [1] of plaintiff's claim which eventually lead to benefits being revoked. In a claim note, the examiner stated,

> Claim was reviewed by R[ehab] C[ase] M[anager] for test change determination–was unable to identify

occupations because of no transferable skills. It appears claimant has some work capacity. Will send letter to A[ttending] P[hysician] to determine current r[estrictions] and l[imitations] and have RCM review for potential occupations.

A.R., at 80-81.

The defendant's review of plaintiff's 2003 medical records led defendant to believe that plaintiff's primary complaints concerned hypertension and asthma and that she was not presenting to her physicians with complaints of chronic pain. The defendant determined that by September of 2003, the plaintiff's medical records indicated that her headaches (thought to be caused by her hypertension) had decreased, her asthma was asymptomatic, and she was "still having some of the pain issues, but actually doing relatively well overall at this point in time." A.R., at 221. As of December of 2003, her hypertension had significantly improved to the point of being "much better at this time" and her "neuropathy pain seems to have significantly improved, although not completely gone." A.R., at 222.

In addition to reviewing medical records, defendant also sent questionnaires to the plaintiff's two treating physicians, that being Dr. Robert Anderson, a family physician, and Dr. David Cypcar, an asthma specialist. On March 4, 2004 the defendant sent to Dr. Anderson, the plaintiff's family physician, a "functionality letter" which provided, as follows:

> We have reviewed her file and, based on information provided by you, we have concluded she appears to have full-time sedentary capacity for employment. Specifically, Ms. Teague should be capable of sitting 8 hours per day with allowances for periodic breaks and change of position every 2 hours. In addition, it appears from the information provided that she would be capable of performing the following activities: Frequent reaching/handling/ fingering/ repetitive activities bilaterally with hands/occasional lifting/carrying/pushing/pulling 10

Teague v. Hartford Life and Accident Insurance Company, Not Reported in Fed. Supp....

2006 WL 8455977

pounds. Do you agree with the restrictions and limitations as indicated above? _____ Yes, I agree _____ No, I do not agree (please provide medical documentation which supports your opinion).

**\*3** A.R., at 1096. On March 9, 2004, Dr. Anderson checked "yes" on the letter indicating that he agreed with the statement that the plaintiff was capable of full-time, sedentary capacity for employment and he returned the letter to the defendant.[2] A.R., at 1101.

Thereafter, on March 17, 2004, the defendant sent an identical functionality letter to the plaintiff's asthma and allergy doctor, that being Dr. Cypcar. On March 24, 2004, in answer to the question "Do you agree with the restrictions and limitations as indicated above?" Dr. Cypcar checked "yes," but wrote "qualified as below." A.R., at 1097. Dr. Cypcar qualified his response by writing that

[a]s an allergy and asthma specialist, I don't feel particularly qualified to make a determination of disability based on what I sense are primarily musculoskeletal issues. From a pulmonary standpoint, I am in full agreement with restrictions and limitations as indicated above.

A.R., at 1097.

In drafting the letters to plaintiff's physicians, defendant contends that it drew the new restrictions and limitations from its review of plaintiff's file. Defendant contends that it noticed in the updated medical records the lack of complaints of chronic pain in plaintiff's office visits, and the improvement in plaintiff's asthma and hypertension. A.R., at 89.

The court has also reviewed the medical notes. It appears that after February 2002, the focus of plaintiff's complaints to her doctors, as documented in office visit notes, began to shift away from her chronic pain and toward concerns related to her hypertension and asthma. There is little reference to any

chronic pain in the medical records from February 2002 to June 2004:

(1) A February 14, 2002, office visit with Dr. Anderson focused on hypertension. A.R., at 228.

(2) On June 3, 2002, plaintiff saw Dr. Anderson regarding a rash. A.R., at 228.

(3) An August 26, 2002, visit concerned chest congestion. A.R., at 229.

(4) Plaintiff's next visit was not until March of 2003, a gap of nearly seven months. During this visit, Dr. Anderson made no notations of any complaints of pain. Instead, he outlined plaintiff's major conditions as hypertension, glucose intolerance, asthma, and hyperlipidemia (high cholesterol). A.R., at 223.

(5) On June 13, 2003, Dr. Anderson commented in the office visit notes that Plaintiff's pain in hips and legs increased when she stopped taking Celebrex. When Plaintiff started taking the medication again, her pain level returned to base line. A.R., at 224.

(6) In September 2003, Dr. Anderson indicated that plaintiff was having some pain issues, but was doing "relatively well overall at this point in time," noting that the medication she had been taking had proved to be very helpful. A.R., at 221.

(7) On December 4, 2003, Dr. Anderson wrote that Plaintiff's "neuropathy pain seems to have significantly improved although not completely gone." A.R., at 222.

(8) Dr. Cypcar's notes concerning plaintiff's asthma and allergies also showed improvement. A.R., at 257.

Based on this information, defendant commissioned an Employability Analysis. In this Employability Analysis, the responses from Dr. Anderson and Dr. Cypcar to Hartford's questionnaire were relied upon to provide the parameters of plaintiff's restrictions and limitations. The resulting Employability Analysis Report indicated that plaintiff was capable of performing sedentary jobs, such as Final Assembler and Atomizer Assembler, which would not require previous training. A.R., at 1055.

**\*4** Based primarily upon the doctor's statements and the underlying medical records obtained directly from her treating physicians, defendants terminated payment of

benefits to plaintiff on May 31, 2004, notifying her by letter dated June 1, 2004. A.R., at 1046-49.

### G. Plaintiff's First, *Pro Se*, Appeal

Plaintiff appealed defendant's termination of her LTD benefits by sending a one-page, hand-written letter describing her ailments and asking defendant to contact her doctors by telephone. A.R., at 89, 1033. On June 28, 2004, defendant noted in denying such appeal that plaintiff

> provides the number of her physicians yet both her physicians have already agreed with the assessment that she is capable of sedentary employment if allowed positional changes and with the other restrictions noted. Neither physician has written a letter on her behalf to argue that she is now disabled from sedentary employment or that their prior opinion has in any way changed.

A.R., at 89. Defendant further stated that

> Both Dr. Anderson and Dr. Cypcar were sent a letter asking whether they agreed with the assessment that you were capable of sedentary work. Both of your physicians responded affirmatively.

A.R., at 1028.

### H. Plaintiff's Second Appeal

After the first appeal was denied, the plaintiff, by letter dated August 25, 2004, requested that her claim be reopened and provided the defendant with a letter from Dr. Anderson dated August 9, 2004, in which Dr. Anderson stated that he had, in the letter dated March 2004, "mistakenly approved Mrs. Teague for eight hours of sitting with allowances". A.R., at 1021-1023. The August 9, 2004, letter from Dr. Anderson provided, as follows:

> Referring to a letter signed by me in March 2004, which was forwarded to your attention, I had mistakenly approved Mrs. Teague for 8 hours of sitting with allowances. This statement evidently led to your conclusion that she could return to full-time sedentary capacity for employment. Upon review of my records and "Physical Capacities Evaluation" forms which had been forwarded to your company on several occasions prior, Mrs. Teague is significantly disabled. She at best could sit for 4-5 hours at a time, but would require allowances to stand and walk every 1-1.5 hours. She has significant pain issues, which can be only partially controlled with the use of multiple medications–many of which are sedating. At this time, Mrs. Teague is unable to perform even the routine duties of active daily living, much less the requirements of her employer. For this reason I have kept the patient out of work for medical reasons, and it seems clear to me that her combination of diagnoses and treatment needs makes her disabled. It is my medical opinion that Mrs. Teague's disabilities are considered total and permanent. I hope this letter illuminates the issues surrounding Mrs. Teague's case, and clarifies my position regarding the total and permanent disabilities unfortunately facing Mrs. Teague. If I may be of further assistance, please do not hesitate to contact my office.

A.R., at 1023.

By letter dated September 8, 2004 the defendant advised the plaintiff that although the defendant had received the plaintiff's letter of August 25th, along with the letter of August 9, 2004, from Dr. Anderson, that it was the defendant's position that the final appeal decision was made on June 28,

2004, and stated that "there are no provisions for additional appeals or reopening the administrative records after a final appeal determination." A.R., at 1018. Thereafter, the plaintiff retained an attorney, and on November 15, 2004, the plaintiff's attorney sent a letter requesting that the defendant reopen the claim and consider new medical and other evidence. A.R., at 194. By letter from the defendant's appeal specialist, James A. Powell, dated November 23, 2004, Mr. Powell advised the plaintiff's counsel that the final decision in regard to the plaintiff's claim had been made on June 28, 2004, and that the administrative remedies provided by ERISA and the plan had been exhausted. A.R., at 193. In response, plaintiff's counsel sent at letter to Mr. Powell dated November 29, 2004, stating that legal action would be taken on January 3, 2005. A.R., at 191-192. Mr. Powell responded to the plaintiff's counsel with a letter dated December 28, 2004, and advised plaintiff's counsel that the defendant had determined to reopen the plaintiff's claim and to consider the information and documents that had been sent by plaintiff's counsel. A.R., at 189. The reasons for this further review and further consideration are found in the notes of the appeals specialist, James A. Powell, dated January 11, 2005:

**\*5** It is interesting to note that Mrs. Teague, throughout 2002 and 2003, had not really reported significant pain in her back, legs, neck, etc. As noted above, her office visits primarily were focused on issues with her hypertension and asthma. It was not until 06/04/04 that she began again complaining of severe physical pain. The determination letter was sent on 06/01/04 and thus it seems to follow that her visit following the receipt of said letter prompted these complaints. This, of course, does not rule out the possibility that she does indeed have chronic pain and continues with physical pain that would limit her activity, but it does suggest that the extent and severity of these complaints may not be entirely supported by the medical findings. It certainly must be acknowledged that Mrs. Teague does have an extensive medical history significant for fairly traumatic injuries following her motor vehicle accident. And following from this, she would likely have some issues of chronic pain although the extent and level of pain is unclear, if not going solely by her report. The issues of asthma and hypertension have been chronic problems for many years and she was capable of working with these conditions. An IME may be helpful in this situation, although prior to conducting a further medical review I will examine the vocational information on file. If indeed prior reviews found no occupations and if the more recent review indicated no transferable skills, it may not be feasibly (sic) to expect Mrs. Teague could resume employment....

As previously noted, an IME would be helpful in this situation as it would allow an independent examiner to fairly review her records and perform an examination of her musculoskeletal status and how severely limited she is by her old injuries. At this time, the records will be copied and a referral made to NAME/vendor for assistance in scheduling an IME.

A.R., at 91-92

On that same day, Mr. Powell prepared a letter with questions for the independent medical examiner to answer regarding the plaintiff's condition, A.R., at 185-186, and further sent a letter to the plaintiff's counsel advising that an independent medical exam (hereinafter "IME") would be helpful in evaluating the plaintiff's claim on appeal. A.R., at 179. Mr. Powell further made arrangements to send plaintiff's medical records to Dr. Stephen Shaffer, an orthopedic surgeon located in Asheville, North Carolina, so that Dr. Shaffer could perform the IME. A.R., at 175.

On January 12th, plaintiff's counsel responded to Mr. Powell and stated that the plaintiff would submit to the examination but that a friend or family member would accompany the plaintiff to the exam and would videotape the IME. A.R., at 174. The defendant contacted the independent examining physician concerning this requirement made by the plaintiff's counsel. The independent examiner stated that a family member could attend the examination but the examiner was not agreeable to the examination being videotaped. A.R., at 92-93. Mr. Powell, on behalf of the defendant, contacted plaintiff's counsel concerning this issue and advised the plaintiff that he would seek another physician to conduct the examination. After further considering the matter, Mr. Powell contacted plaintiff's counsel by letter dated January 13th and stated that he had reviewed the defendant's policies and that he could not agree to have a relative at the examination or to have the examination videotaped. A.R., at 171. In the letter, Mr. Powell stated that the defendant was going to proceed with scheduling the IME with the physician that originally agreed to conduct the examination. A.R., at 171. By letter dated January 14th, plaintiff's counsel advised Mr. Powell that the plaintiff could be examined, but only if someone was with her to record the examination. Plaintiff's counsel further stated,

Teague v. Hartford Life and Accident Insurance Company, Not Reported in Fed. Supp....

2006 WL 8455977

the only way I will consent to not videotaping the IME is if Hartford immediately places Mrs. Teague back on benefits and pays all her back benefits owed. In that event, she will still have someone accompany her to the IME.

A.R., at 167-168. On January 26, 2005 Mr. Powell made notes concerning the issue of the IME:

As previously noted, the inclusion of a relative and video camera is not agreeable as it is our position that only the physician and the claimant are present during the exam. As such, further pursuit of IME would not be helpful, especially in light of the fact that the physician initiall [*sic*] slotted would simply not perform the evaluation if Mrs. Teague showed up with a video camera. This issues [*sic*] has thus become a non-starter.

**\*6** It is still the opinion of this review that physician input would be helpful as the record as it stands failed to adequately substabntiate [*sic*] her claim but also new medical information was submitted and her physician now maintains the opinion that she is incapable of working, despite his earlier opinion. Thus, pursuant to ERISA, a medical review is necessary. Since the attorney is blocking the attempt for an IME for the above-stated reasons, the clami [*sic*] will be referred for a medical record review at this time. A.R., at 94.

On that same date, Mr. Powell, having declined to satisfy the claimant's counsel, advised her that the IME had been cancelled. A.R., at 155. The defendant then requested a review of the medical records of the plaintiff by two consulting physicians, one being a neurosurgeon to perform a "physical review," and a psychiatrist to perform a "psychiatric review." The defendant prepared questions for the reviewing physicians and included in the physical review a request that the reviewing physician contact Dr. Anderson and Dr. Cypcar and that the psychiatric reviewing physician contact Dr. Anderson. A.R., at 157-159.

### I. Defendant Reconsiders Plaintiff's Claim

Review of the administrative record reveals that the final, appealable decision of the Plan Administrator originated from the above referenced reconsideration. The undersigned has more closely reviewed this decision to determine whether it is supported by substantial evidence. The defendant accepted plaintiff's attorney's submission of numerous additional documents that accompanied the November 2004 letter requesting reconsideration. A.R., at 194. Thus, when the Plan Administrator made its final, appealable decision in this matter, the medical record had been corrected or clarified as it concerned Dr. Anderson's medical and vocational conclusions.

The defendant commissioned the review of the medical records by Dr. Robert L. Marks, Board Certified in neurology, who reviewed the plaintiff's medical records to assess the plaintiff's physical complaints of chronic pain, asthma and hypertension. A.R., at 0157-0159. As a result of that medical record review, Dr. Marks provided a report. A.R., at 132-140. With regard to the plaintiff's complaint of back and neck pain, Dr. Marks found that there was no evidence of impingement in the imaging study and no mention of encroachment on a spinal root. Id. The record indicates that Dr. Marks contacted and spoke with Dr. Cypcar (plaintiff's respiratory doctor), who reiterated his belief that plaintiff could carry out the duties of a sedentary occupation from a pulmonary standpoint, but that he could express no opinion from a musculoskeletal standpoint. Notwithstanding Dr. Cypcar's *caveat*, the record does contain contemporaneous observations by Dr. Cypcar during plaintiff's office visits, which include that plaintiff "is able to walk and use her limbs well." A.R., at 135. In addition to talking with Dr. Cypcar personally, Dr. Marks also attempted to talk with Dr. Anderson on three separate occasions in early February 2005, however, Dr. Anderson stated that he was in the middle of a busy day and that he could not discuss the plaintiff's condition with Dr. Marks. A.R., at 0138.

Dr. Marks opined that based on his review of the medical records and information, the plaintiff was not precluded from performing sedentary work. A.R., at 140. [3] Dr. Marks explained what materials he had reviewed as well as his findings in a written report. Id.

**\*7** Defendant also commissioned a psychiatric record review from Dr. Melvyn Lurie, M.D., who is Board Certified in psychiatry, to assess plaintiff's complaints of anxiety and depression, as these complaints were also present in plaintiff's medical records. [4] Dr. Lurie's review found no evidence that plaintiff's anxiety and depression was at a disabling level. Dr. Lurie also attempted to contact Dr. Anderson on three

*Teague v. Hartford Life and Accident Insurance Company*, Not Reported in Fed. Supp....

2006 WL 8455977

occasions in early February 2004 but Dr. Anderson did not return the calls. A.R., at 152.

After commissioning such reviews, and receiving into the record the reports, defendant reaffirmed its earlier termination of plaintiff's claim and notified plaintiff by letter dated February 22, 2005. A.R., at 126. This action timely followed.

## II. Standard Applicable to Cross Motions for Summary Judgment

In this case, the parties have submitted cross motions for summary judgment, wherein each side contends that there are no issues for trial and that judgment may be rendered as a matter of law. Finding that the facts are adequately presented in the administrative record, that the court's review is limited to the administrative record that was before the Plan Administrator, and that no genuine issues of material fact exist, summary judgment is an appropriate means to resolve the issues presented.

On a motion for summary judgment, the moving party has the burden of production to show that there are no genuine issues for trial. Upon the moving party's meeting that burden, the non-moving party has the burden of persuasion to establish that there is a genuine issue for trial.

When the moving party has carried its burden under Rule 56(c), its opponent

> must do more than simply show that there is some metaphysical doubt as to the material facts. In the language of the Rule, the nonmoving [sic] party must come forward with "specific facts showing that there is a *genuine issue for trial.*" Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no "genuine issue for trial."

Matsushita Electric Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986) (citations omitted; emphasis in the original) (quoting Fed. R. Civ. P. 56). To survive summary judgment, there must be more than just a factual dispute; the fact in question must be material and readily identifiable by the substantive law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986).

By reviewing substantive law, the court may determine what matters constitute material facts. Anderson, supra. "Only disputes over facts that might affect the outcome of the suit under governing law will properly preclude the entry of summary judgment." Id. at 248. A dispute about a material fact is "genuine" only if the evidence is such that "a reasonable jury could return a verdict for the nonmoving party." Id. The court must credit factual disputes in favor of the party resisting summary judgment and draw inferences favorable to that party if the inferences are reasonable, however improbable they may seem. Cole v. Cole, 633 F.2d 1083, 1092 (4th Cir. 1980). Affidavits filed in support of a Motion for Summary Judgment are to be used to determine whether issues of fact exist, not to decide the issues themselves. United States ex rel. Jones v. Rundle, 453 F.2d 147 (3d Cir. 1971). When resolution of issues of fact depends upon a determination of credibility, summary judgment is improper. Davis v. Zahradnick, 600 F.2d 458 (4th Cir. 1979).

**\*8** In this case, cross-motions for summary judgment have been filed. Where cross motions for summary judgment are filed, such motions are

> no more than a claim by each side that it alone is entitled to summary judgment, and the making of such inherently contradictory claims does not constitute an agreement that if one is rejected the other is necessarily justified or that the losing party waives judicial consideration and determination whether genuine issues of material fact exist. If any such issue exists it must be disposed of by a plenary trial and not on summary judgment.

> In short, the mere fact that both parties seek summary judgment does not constitute a waiver of a full trial or the right to have the case presented to a jury.

Wright & Miller, 10A Fed. Prac. & Proc. Civ.3d § 2720.

## III. Defendant's Motion to Strike

Defendant has moved to strike plaintiff's exhibit two concerning the alleged bias of the consulting physicians defendant hired to review plaintiff's medical records. In so moving, defendant notes that such documents are beyond the scope of review inasmuch as they are not a part of the administrative record. Sheppard & Enoch Pratt Hosp., Inc. v. Traveler's Ins. Co., 32 F.3d 120, 125 (4th Cir. 1994).

Plaintiff argues that Doctors Marks and Lurie are biased in that they provide services almost exclusively to the insurance industry. In support, plaintiff points to the promotional materials contained in exhibit two, which defendant seeks to strike.

Teague v. Hartford Life and Accident Insurance Company, Not Reported in Fed. Supp....

2006 WL 8455977

Undoubtedly, there are some doctors who will routinely render an opinion favorable to a plaintiff and others who will routinely give an opinion favorable to defendants. The personal biases or predilections of doctors or consultants is not an issue under ERISA; rather, the only issue is whether the Plan Administrator properly did his or her job. As the district court has unequivocally held:

> it is not the conflict of interest of a consultant employed by a fiduciary that the Fourth Circuit has held is relevant ... it is the conflict of the fiduciary.

Abromitis v. Continental Cas. Co., 261 F.Supp.2d 388, 390 (W.D.N.C. 2003), aff'd, 114 Fed.Appx.57 (4th Cir. 2004). Where plaintiff argues that the Plan Administrator hired a biased consultative physician, the correct method of review would appear to be an increased scrutiny in the application of the sliding scale of review. That scrutiny does not focus on the opinions of the consultant in other cases or their promotional materials; instead, the court will closely review the administrative record to determine if other evidence exists that contradicts the findings of the consultant, such as the opinions of a treating physician or another consulting physician who actually performed a clinical examination of the plaintiff.

This concept was, perhaps, better explained by the district court in Chandler v. Underwriters Laboratories, Inc., 850 F.Supp. 728 (N.D. Ill. 1994):

> As to ... Parkside's internal notes, which Chandler argues show it to be a "hired gun," do not fairly support a conflict-of-interest characterization. Such an argument proves too much, for it might *always* be thought to be in the interest of a Plan Administrator or its consultants to deny benefit applications. Though to be sure such a "conflict must be weighed as a 'facto[r] in determining whether there is an abuse of discretion' " (Bruch, 489 U.S. at 115, 109 S.Ct. at 956, citing Restatement (Second) of Trusts § 187, Comment d (1959)), that factor simply enters into the evaluation of the decision in arbitrary and capricious terms--as Donato, 19 F.3d at 380 n. 3 put it:
>
> > **\*9** This is a variation on a theme ... that the arbitrary and capricious standard of review is a sliding scale

standard that should be more penetrating the greater is the suspicion of partiality, less penetrating the smaller that suspicion is.

Chandler v. Underwriters Laboratories, Inc., 850 F.Supp. 728 (N.D. Ill. 1994)(citation and corresponding quotation marks omitted).

In any event, bias of consultants is a slippery slope for both sides in an ERISA case: reports commissioned by a Plan Administrator that are "favorable" to a claimant are unlikely to be appealed to federal court because it is likely that the employee prevailed. Statistical evidence based on reported cases is inherently unreliable. As an example, a litigant could argue that consulting doctors who provide opinions to the State Agency in Social Security cases are biased inasmuch as just about every reported case involving such State Agency doctors has an opinion adverse to the claimant. Such a method of statistical accounting overlooks the overwhelming number of cases wherein benefits are awarded based on such doctors' opinions.

In any event, the undersigned is bound to follow the law of this circuit as found in Abromitis, and has sworn to do so no matter how appealing or commonsensical the method for evaluation suggested by the plaintiff. Further,

> [t]o be admissible at summary judgment stage, 'documents must be authenticated by and attached to an affidavit that meets the requirements of Rule 56(e)."

Orsi v. Kirkwood, 999 F.2d 86, 92 (4th Cir. 1993)(quoting 10A Charles Wright, et al., Federal Practice and Procedure § 2722, 58-60 (1983 & 1993 Supp.)). Even if ERISA allowed consideration of such materials outside the administrative record, plaintiff's submission is not in a form that would allow admission in any event in that it has not been accompanied by an appropriate affidavit. In conducting this review, the undersigned has slid the scale to the degree warranted by plaintiff's argument, has reviewed the administrator's decision based on the entire administrative record, and has closely reviewed the administrative record to determine if other evidence exists that contradicts the findings of the consultants, such as the opinions of a treating physician or another consulting physician who actually performed a clinical examination of the plaintiff. Defendant's Motion to Strike, however, will be granted.

**IV. Discussion**

Teague v. Hartford Life and Accident Insurance Company, Not Reported in Fed. Supp....

2006 WL 8455977

**A. Applicable ERISA Standard of Review**

Where a Plan Administrator is granted discretionary authority by the terms of the Plan to determine eligibility or to construe the terms of the Plan, the denial of benefits must be reviewed for abuse of discretion. See Firestone Tire and Rubber Co. v. Bruch, 489 U.S. 101 (1989).

> Under this deferential standard, the administrator or fiduciary's decision will not be disturbed if it is reasonable, even if this court would have come to a different conclusion independently.

Ellis v. Metropolitan Life Ins. Co., 126 F.3d 228, 232 (4th Cir. 1997). In determining whether discretion has been abused, the Court of Appeals for the Fourth Circuit has identified the following eight factors for consideration by a reviewing court:

(1) the language of the Plan;

(2) the purposes and goals of the Plan;

 **\*10**  (3) the adequacy of the materials considered to make the decision and the degree to which they support it;

(4) whether the fiduciary's interpretation was consistent with other provisions in the Plan and with earlier interpretations of the Plan;

(5) whether the decision-making process was reasoned and principled;

(6) whether the decision was consistent with the procedural and substantive requirements of ERISA;

(7) any external standard relevant to the exercise of discretion; and

(8) the fiduciary's motives and any conflict of interest it may have.

Booth v. Wal-Mart Stores, Inc. Associates Health and Welfare Plan, 201 F.3d 335, 342-43 (4th Cir. 2000).

In addition to development of law at the appellate level, the undersigned also turns for guidance from published opinions at the trial-court level that concern ERISA. The district court has explained, as follows:

there is a slight change in the deference afforded a plan fiduciary under this standard of review where the plan fiduciary is operating under a conflict of interest. Ellis, supra, at 233. The Supreme Court has recognized that where such a conflict of interest exists, "that conflict must be weighed as a factor in determining whether there is an abuse of discretion." Firestone, supra (quotations omitted). The Fourth Circuit has explained that any conflict of interest is to be judged on a case-by-case basis, and should be regarded as one of several factors in reviewing whether the Plan Administrator had abused its discretion. Ellis, 126 F.3d at 233 (citing Haley v. Paul Revere Life Ins. Co., 77 F.3d 84, 89 (4th Cir. 1996)). While the reviewing court should never deviate from an abuse of discretion standard, the Fourth Circuit has held that a lessened level of deference should be afforded a plan fiduciary operating under a conflict of interest. Bedrick, supra.

Boyd v. Liberty Life Assurance Co. of Boston, 362 F.Supp.2d 660, 664-65 (W.D.N.C. 2005) (Thornburg, J.).

Under ERISA, a Plan fiduciary is obligated to act "solely in the interest of the participants and beneficiaries." 29 U.S.C. § 1104(a)(1). ERISA anticipates that conflicts of interest are inherent in benefit determinations and provides that such conflicts be considered as a factor in determining whether there was an abuse of discretion by a Plan's administrator and fiduciary. Ellis, supra, at 233. Where a conflict is shown, the deference to the decision of the fiduciary "will be lessened to the degree necessary to neutralize any untoward influence resulting from the conflict." Id.; accord Boyd, supra, at 665.

> The more incentive for the administrator or fiduciary to benefit itself by a certain interpretation of benefit eligibility or other Plan terms, the more objectively reasonable the administrator or fiduciary's decision must be and the more substantial the evidence must be to support it.

Ellis, supra, at 233. Where, as here, it is satisfactorily shown that the decision maker has a financial interest that conflicts with its duties as a Plan fiduciary, the "abuse-of-discretion" standard is modified on a sliding scale to counterbalance such impact. Bedrick v. Travelers Ins. Co., 93 F.3d 149

Teague v. Hartford Life and Accident Insurance Company, Not Reported in Fed. Supp....

2006 WL 8455977

(4th Cir. 1996)(citations omitted). The modified abuse-of-discretion standard requires close judicial scrutiny of the Plan Administrator's decision. Holder v. Woodmen of the World, 2001 WL 369680 (4th Cir. 2001);[5] Doe v. Group Hospitalization & Medical Services, 3 F.3d 80, 82 (4th Cir. 1993).

 **\*11** In this case, plaintiff has satisfactorily shown a conflict of interest, inasmuch as the decision maker was both a fiduciary under the Plan and the carrier who ultimately would have been required to continue to pay, had a decision favorable to plaintiff been rendered. Thus, the undersigned will apply a modified abuse-of-discretion standard, and determine, through close scrutiny, whether the Plan Administrator abused his discretion in rendering his decision. In applying such standard, the undersigned has closely reviewed the administrative record to determine if other evidence exists that contradicts the findings of the consultants, such as the opinions of a treating physician or another consulting physician who actually performed a clinical examination of the plaintiff.

### B. Review of the Administrative Decision

The undersigned has closely reviewed not only the final decision of the Plan Administrator, but the evidence of record which purports to support such decision. Such review has focused on whether there was an abuse of discretion by the fiduciary in the decision-making process, by and through a review of the eight factors provided in Booth, supra. Under this standard, a

> federal court's ability to review a discretionary decision of the administrator of an employee benefit plan is significantly limited.... Under the abuse of discretion standard, the administrator's decision will not be disturbed if it is the result of a deliberate reasoning process and it is supported by substantial evidence.

Elliott v. Sara Lee Corp., 190 F. 3d 601, 605 (4th Cir. 1999).

### 1. The Language of the Plan

In conducting such review, the undersigned has reviewed the pertinent language of the Plan. Under the Plan,

> Totally disabled means that ... you must be so prevented from performing the Essential Duties of Any Occupation for which you are qualified by education, training and experience.

A.R., at 23. The undersigned determines that the language of the Plan provides a clear statement that benefits will only be awarded where a person does not have the residual functional capacity to perform any substantial gainful activity for which they are qualified.

### 2. The Purpose and Goals of the Plan

Review of the Plan reveals that it is an employee funded employee welfare benefit Plan. The stated goal of the Plan is to

> provide[ ] you with income protection if you become disabled from a covered accidental bodily injury, sickness or pregnancy.

A.R., at 17. In relevant part under the Plan, benefits may terminate as of the "date you are no longer Totally Disabled." A.R., at 31. Thus, the purpose of the Plan is to provide qualified employees with income security when they are disabled, but that such benefits will cease if they regain the ability to work.

### 3. The Adequacy of the Materials

The duty of this court is to determine the adequacy of the materials *considered by the Plan Administrator* in making his or her decision and the degree to which they support that decision. In making such determination, the undersigned has closely reviewed not only the materials that were before the Plan Administrator, but also that subset of record materials

that were relied on by Doctors Marks and Lurie. Inasmuch as plaintiff has asserted that their decisions were both biased and uninformed, the undersigned has closely reviewed the materials on which such doctors state they relied to determine whether such materials provided an adequate basis for their decisions.

Just as a treating physician's findings must be supported by clinical observations and findings, so too must a consultative physician's opinion be based on an adequate review of relevant medical records. Review of the extensive Administrative Record in this case reveals that both the Plan Administrator and the consulting doctors had before them all of plaintiff's relevant medical records. The fact that doctors only cited documents they considered relevant does not, per se, make such opinions unworthy of consideration by a Plan Administrator.

 **\*12** Dr. Marks' report appears at pages 130 through 142 of the administrative record. On page one, he summarizes the questions put to him by defendant and recounts the description of plaintiff's condition which was provided to him by defendant. Dr. Marks' summary appears to accurately reflect the underlying conflict between the parties, in that it provides that Dr. Anderson first answered the questionnaire in the affirmative and further provides that Dr. Anderson later withdrew this answer and provided specific vocational restrictions based on plaintiff's continued pain. A.R., at 130.

In his written report, Dr. Marks further outlined the materials he reviewed. A.R., at 132. Dr. Marks summarized a September 2004 questionnaire prepared by counsel for plaintiff and completed by Dr. Anderson in November 2004, A.R., at 202-209, and summarized Dr. Anderson's and the other doctors' treatment notes dating from the accident in 1999. A.R., at 132-33.

In answering the questions posed by the Plan Administrator, Dr. Marks opined that Dr. Anderson's original declaration of disability appeared to have been based on plaintiff's subjective complaints of pain and that there was no medical evidence to support disabling pain past February 2000. Dr. Marks reviewed an actual imaging study report, and opined that such report revealed no foraminal stenosis with no mention of encroachment on a spinal root; however, Dr. Marks found that the study did show a central protrusion of a disc against the thecal sac, but without evidence of actual impingement.

Based on such findings, Dr. Marks concluded that there did not appear to be significant neurological abnormalities based on the examinations conducted by plaintiff's physicians. A.R., at 136. He further found that as a result of the motor vehicle accident, plaintiff did suffer from "significant medical problems which medically justified disability from work from 8/21/99 through 2/00." A.R., at 137. After that point, however, he opined that the "only objective abnormality concerned the report of an intervertebral disc protrusion against the thecal sac, but without evidence of actual impingement." Id.

In discussing Dr. Anderson's finding of vocational limitations, Dr. Marks not only disagreed with Dr. Anderson's finding of total disablity, he explained his disagreement, opining that plaintiff could have performed "8 hours of work at the sedentary level" post-convalescence. Id. Dr. Marks did, however, agree with Dr. Anderson's finding that plaintiff would require a change in posture every 60 to 90 minutes. Dr. Marks opined that "the reported abnormalities of the cervical spine would not explain the other complaints such as low back and leg pain. The fractures apparently healed well, and so would not be expected to preclude working." A.R., at 140.

While plaintiff apparently takes issue with the necessity of Dr. Lurie's consulting opinion as opposed to its conclusion, it appears that Dr. Marks consulted with Dr. Lurie on any mental health issues that may have impacted her ability to work:

> On 2/7/05 discussed Ms. Teague's case with co-reviewer Melvin Lurie, M.D. Dr. Lurie did not feel that psychiatric considerations were primary with regard to the claimant's inability to return to work.

Id., at 136. Dr. Lurie's 12 page opinion, in turn, likewise discusses at length the materials he considered, which the undersigned finds more than adequate.

In addition to the materials that were before the consulting physician, the undersigned has also reviewed the entire administrative record to determine whether it provided a decision maker with an adequate basis for decision. The record is extensive, it includes all the materials submitted by plaintiff in support of her claim, and provided the Plan Administrator with an adequate basis for decision.

Teague v. Hartford Life and Accident Insurance Company, Not Reported in Fed. Supp....

2006 WL 8455977

Specifically, the record contains detailed medical records from plaintiff's office visits with Dr. Anderson, and others, during the period of alleged total disability. These are precisely the type of records which a Plan Administrator should consider in determining whether a person is entitled to continued benefits under a employee welfare benefits plan.

### 4. Whether the Fiduciary's Interpretation was Consistent with Other Provisions in the Plan and with Earlier Interpretations of the Plan

**\*13** There appear to be no issues of interpretation as to the language of this particular Plan and plaintiff has not pointed the court to any prior inconsistent interpretations of the Plan document. There simply is no inherent inconsistency where a Plan Administrator first finds long term disability, and later finds that the employee has recovered sufficiently to engage in substantial gainful activity. The undersigned finds the final decision of the Plan Administrator to be consistent with the language of the Plan.

### 5. Whether the Decision-Making Process was Reasoned and Principled

This factor requires the court to focus on the process that was afforded to plaintiff and her claim and whether the decision making process was both reasoned and principled. Under an abuse of discretion standard, a decision of a Plan Administrator will be found to be reasoned and principled where it is supported by substantial evidence. Bernstein v. Capitalcare, Inc., 70 F.3d 783, 788 (4th Cir. 1995). "Substantial evidence" is evidence which a reasonable mind would accept as sufficient to support a particular conclusion. LeFebre v. Westinghouse Elec. Corp., 747 F. 2d 197, 208 (4th Cir. 1984). Defendant does not have the burden of proving a negative; instead, plaintiff has the burden of proving that defendant has abused its discretion. Id.

It is undisputed in the record before the court that the onset of plaintiff's disability was the result of a automobile accident, not the result of congenital disorders. It is also undisputed that the Plan Administrator's given reason for terminating benefits was a conclusion that plaintiff had recovered sufficiently from her injuries to return to gainful employment. While plaintiff argues that the Plan Administrator engaged in periodic review a year earlier than anticipated, the undersigned can neither assign error nor find an abuse of discretion based on such

increased diligence. Plan Administrators have a fiduciary duty not just to plaintiff, but to all plan participants, and in furtherance of such obligation to use due diligence to insure that benefits are not only paid to those who qualify, but not paid to those who do not qualify.

> The Plan Administrator's fiduciary duties extend to everyone covered by the plan, and an administrator who fails properly to investigate a claim breaches its fiduciary duty to all beneficiaries by granting benefits to unqualified claimants.

Tillery v. Hoffman Enclosures, Inc., 280 F.3d 1192, 1197 (8th Cir. 2002)(citation omitted). In this case, the Plan Administrator had before it contemporaneous medical records that reflected a person who had sufficiently recovered from a traumatic accident to return to work. Prior to plaintiff receiving the letter terminating her benefits on June 1, 2004, even plaintiff's subjective complaints upon presentation to her physician show a person who had made significant progress and was managing residual pain with common prescription medication. A.R., 201-254. Dr. Anderson's observations provided even further support for such a conclusion. Beginning in 2003 and leading up to the date of plaintiff's termination of benefits, plaintiff's medical records show three important things: first, she presented with few (if any) complaints of lingering pain; second, her visits were infrequent; and third, the objective observations of her physicians concerning her condition and ambulation would provide a decision maker with reason to question whether plaintiff was suffering disabling pain.

Counterposed to such findings before June 1, 2004, are Dr. Anderson's notes concerning plaintiff's subjective presentation commencing three days after such letter was sent. Prior to the initial adverse decision on June 1, 2004, Dr. Anderson had opined on September 10, 2003 that the plaintiff was "still having some pain issues, but actually doing relatively well at this point in time." A.R., at 221. On December 4, 2003, plaintiff again saw Dr. Anderson for a follow-up visit for her hypertension, who stated that "her neuropathy pain seems to have significantly improved although not completely gone." A.R., at 222. On June 4, 2004, plaintiff presented to Dr. Anderson (after a six-month hiatus), complaining of "significant neuropathic pain problems," that

Teague v. Hartford Life and Accident Insurance Company, Not Reported in Fed. Supp....

2006 WL 8455977

had been "an increasing difficulty for her over the past year or so," and that she reported "that she is unable to do any of the activities of daily living at her home, is unable to even sit still for any prolonged period of time sometimes even an hour just due to the discomfort in her legs making her have to move." A.R., at 220. Despite such complaints, Dr. Anderson observed that she was "in no apparent distress ... has no evidence for any active synovitis ... [t]he hip itself has possibly some slight decreased range of motion but actually quite normal ... [n]eurologic examination is otherwise nonfocal as it has been in the past, although there is some question of bilateral weakness of the lower extremities." Id. The only change in plaintiff's treatment plan was the addition of an anti-seizure medication, Gabitril. Six months earlier, plaintiff reported that her "neuropathy pain seems to have significantly improved although not completely gone," and Dr. Anderson observed that she was "in no apparent distress." A.R., at 222.

 **\*14** One month after the June 2004 visit, her focus shifted away from hypertension toward chronic pain. A.R., at 219-220. She complained of severe back and leg pain, right hip pain for the past several months, and that leg pain continues to wake her up at night. A.R., at 219. Dr. Anderson observed, however, that the "[e]xam entirely without change since last office visit."[6] As a result of a visit to Dr. Anderson on July 13, 2004, the plan of action involved a cortisone shot for hip pain, which apparently provided immediate relief, and to "rewrite to Disability services for patient." A.R., at 219.[7]

Regardless of the motivation behind plaintiff's post June 1, 2004, medical visits -- which may have been for pure medical need -- this court's review focuses on whether the evidence of record, which included such post June 1, 2004, visits provides substantial evidence in support of the Plan Administrator's decision. In reviewing plaintiff's updated medical records, defendant concluded that plaintiff's complaints of pain that had dominated her records in 1999 to 2002 were decreasing. This is fully supported by the contemporaneous medical records provided by plaintiff's providers, even if the questionnaire created by defendant and completed by Dr. Anderson is wholly disregarded. While Dr. Anderson wrote supporting letters on behalf of plaintiff's claim at her request, the conclusions are not supported by Dr. Anderson's own office notes and observations. Likewise, Dr. Anderson's description of plaintiff's complaints of fatigue and side effects from her medications, contained in his responses to the questionnaire from plaintiff's attorney, do not find support in contemporaneous clinical notes. Matos v. Lorillard

Tobacco Company Group Insurance Plan, 391 F. Supp. 392 (M.D.N.C. 2005).

Evidence that shows that the decision maker's process was reasoned and principled is revealed by the efforts made by the defendant to obtain an IME of the plaintiff. The Plan Administrator sent a letter to the plaintiff on September 8, 2004, A.R., at 1018, stating that her appeals were exhausted. On November 23, 2004, the Plan Administrator sent a letter to counsel for plaintiff stating that her administrative appeals were exhausted. A.R., at 193. However, based on requests from plaintiff's counsel, the defendant decided to reopen the plaintiff's claim to consider medical evidence and, as discussed above, attempted to obtain an IME. A.R., at 18. The administrative record shows that the defendant wanted an IME so that there could be an examination made "to fairly review her records and perform an examination of her musculoskeletal status and how severely she is limited by old injuries."

The undersigned considers that the Plan Administrator's reopening of the review process and attempts to gather additional medical opinions to be evidence of a reasoned and principled decision making process. When an IME could not be obtained, the defendant, instead of making a decision, went further and obtained a medical records review by not one, but two physicians.

The Plan Administrator's decision finds further support in the opinion of a consulting physician, Dr. Marks. In reviewing Dr. Marks' opinion as well as the decision of the Plan Administrator, the undersigned has applied an additional degree of scrutiny required. The undersigned has closely reviewed the administrative record to determine if other evidence exists that contradicts the findings of the consultants, such as the opinions of a treating physician or another consulting physician who actually performed a clinical examination of the plaintiff. Review of Dr. Marks' opinion, however, reveals that he carefully considered relevant materials, attempted to discuss plaintiff's case with her treating physician, Dr. Anderson, actually discussed it with her allergy physician, Dr. Cypcar, and that he thoroughly explained his findings and conclusions. Having conducted a searching review of Dr. Marks' opinion, the undersigned can find no *indicia* of predisposition or bias. Thus, it was reasonable for defendant to commission such a study and reasonable for defendant to rely on the conclusions contained in such reports. Most telling are the detailed questions posed by defendant to Dr. Marks, the recitation of such questions

WESTLAW  © 2022 Thomson Reuters. No claim to original U.S. Government Works.

Teague v. Hartford Life and Accident Insurance Company, Not Reported in Fed. Supp....

2006 WL 8455977

by Dr. Marks, and the detailed answers he provided to such questions. A.R., at 130-140. Likewise, to the extent Dr. Lurie's opinion was also relied on by the Plan Administrator, the undersigned can find no *indicia* of predisposition or bias. A.R., at 143-154.

**\*15** Plaintiff also contends that it is now inconsistent for the Plan Administrator to claim that plaintiff is no longer disabled because the Plan Administrator allegedly hired a Social Security attorney to represent to the Commissioner of Social Security that plaintiff was disabled. Plaintiff's Brief, at 4 & 20. This argument appears to be a *quasi*-judicial estoppel argument. In King v. Herbert J. Thomas Mem. Hosp., 159 F.3d 192 (4th Cir. 1998), the appellate court held that

> Judicial estoppel, an equitable doctrine that prevents a party who has successfully taken a position in one proceeding from taking the opposite position in a subsequent proceeding, is recognized to protect the integrity of the judicial system. Acting on the assumption that there is only one truth about a given set of circumstances, the courts apply judicial estoppel to prevent a party from benefiting itself by maintaining mutually inconsistent positions regarding a particular situation. As we have previously observed, the doctrine is invoked to prevent a party from "playing fast and loose with the courts," from "blowing hot and cold as the occasion demands," or from attempting "to mislead the [courts] to gain unfair advantage." As an equitable doctrine, judicial estoppel is invoked in the discretion of the district court and with the recognition that each application must be decided upon its own specific facts and circumstances.

Id., at 196 (citations omitted). Because the law assumes "that there is only one truth about a given set of circumstances," id., the Court of Appeals for the Fourth Circuit has adopted the doctrines of judicial estoppel and *quasi* estoppel to prevent litigants from benefiting from inconsistent factual positions, which not only make a mockery out of the courts, but would put in jeopardy the full faith and credit afforded to earlier decisions.

Judicial estoppel, *quasi* or otherwise, has no application to this case. First, plaintiff's allegation that defendant hired an attorney to represent plaintiff before the Commissioner of Social Security finds no factual support in the record. Instead, it appears to be wholly contrary to the language of the Plan. See A.R., at 74. Second, even if defendant had hired counsel for plaintiff and even if defendant had made an *amicus* appearance and championed plaintiff's

disability claim, judicial estoppel would not be invoked inasmuch as Social Security as well as this Plan anticipate the possibility that beneficiaries may later recover, no longer be disabled, and come off the rolls of those receiving disability insurance benefits. See 20 C.F.R. § 404.1594(f) (explaining the eight-step analytical framework for determining whether a claimant's disability should be terminated).

Plaintiff also takes issue with the Plan Administrator's reliance on information gathered from Dr. Cypcar, arguing that as a doctor who treated plaintiff's asthma and allergy conditions, his opinion was not relevant to the question of plaintiff's disability. Plaintiff's Brief, at 9. In plaintiff's medical records in 2003 and 2004, her complaints included her asthma condition, of which she was eventually able to get under control. A.R., at 220-221, & 0257. Not only was it reasonable for the Plan Administrator to consider Dr. Cypcar's opinions and notes, it would appear to be incumbent upon them to do so inasmuch as conditions such as asthma may well restrict the environment in which even sedentary work may accomplished. Quite correctly, Dr. Cypcar limited his response to defendant's questionnaire to whether or not plaintiff's asthma was disabling. It was also reasonable for defendant to consider Dr. Cypcar's clinical observations and assessments of her general well-being, even those that did not pertain to pulmonary function, inasmuch as it is undisputed that Dr. Cypcar is a qualified and respected medical doctor[8] and, based on a review of the medical records in this case, he routinely made such notes and observations in the regular course of providing care to plaintiff. Dr. Cypcar clearly observed that plaintiff walked and used her limbs well, and it was reasonable for defendant to take such observation into consideration in conducting its review.

**\*16** In arguing that the decision of defendant was not reasonable, plaintiff also contends that defendant improperly relied on Dr. Anderson's response to defendant's questionnaire and ignored his retraction. Specifically, plaintiff argues that defendant "did not follow-up or question Dr. Anderson about his check mark." Plaintiff's Brief, at 7. Review of the record does not support plaintiff's argument, inasmuch as it clearly shows that when it sent its questionnaire to Dr. Anderson, it also requested updated medical records. A.R., at 83, & 1093-95. When Dr. Anderson's office responded with the answer to the questionnaire, but did not provide the updated records, defendant again followed up with his office to obtain the records requested. A.R., at 1090. Dr. Anderson then provided the records on April 20, 2004, A.R., at 80, and defendant conducted a full review of all of

Teague v. Hartford Life and Accident Insurance Company, Not Reported in Fed. Supp....

2006 WL 8455977

Dr. Anderson's and Dr. Cypcar's records. When Dr. Anderson wrote the letter of August 9, 2004 stating that he had made an error, he did not explain in the letter how the error of his assessment of the plaintiff's condition had occurred. A.R., at 212. The record is equally undisputed that Dr. Marks and Dr. Lurie attempted on a number of occasions to discuss plaintiff's case with Dr. Anderson, and while the undersigned cannot fault a busy doctor for not responding to those calls, the court can equally not fault defendant, particularly in light of the fact that the defendant directed Dr. Marks and Dr. Lurie to contact Dr. Anderson. A.R., at 157-159. A.R., at 152. A.R., at 138.

In [Black & Decker Disability Plan v. Nord, 538 U.S. 822 (2003)](#), the Supreme Court held that a plan fiduciary is not obligated to accord deference to the opinions of a treating physician over other evidence in the claims file, which in this case includes the opinions of consulting physicians. Having reviewed the Plan Administrator's final decision, the undersigned finds that his decision was both reasoned and principled. The Plan Administrator properly relied on the opinions of expert consultants, and those opinions in turn were based on a fair and objective review of the medical evidence of record. Further, the decision of the Plan Administrator is supported by substantial evidence in the administrative record.

### 6. Procedural and Substantive Requirements of ERISA

The next issue is whether the Plan Administrator's decision is consistent with the procedural and substantive requirements of ERISA. Plaintiff has made no challenge to the decision based on procedural or substantive compliance with ERISA. The undersigned finds that the decision of the Plan Administrator is in substantial compliance with ERISA.

### 7. External Standards

The undersigned has been cited to no external standard that would be applicable to this particular case.

### 8. Fiduciary Motives and Conflicts of Interest

The undersigned has carefully reviewed the decision of the Plan Administrator to determine whether the Plan Administrator fulfilled his fiduciary duty to the Plan, its participants, and beneficiaries such as plaintiff. While

a conflict of interest does exist, it does not appear to the undersigned that the Plan Administrator at any time abandoned his fiduciary duty. The Plan Administrator carefully reviewed all the medical evidence of record, considered the physical demands of sedentary work, and contacted the plaintiff's physicians who each gave the opinion that the plaintiff could perform sedentary work. Thereafter, the Plan Administrator reopened the claim to allow the plaintiff to present additional records and evidence, A.R., at 189, and then attempted to have an IME performed of the plaintiff. A.R., at 89, 185 & 179. When the IME could not be performed, the defendant then employed two doctors to conduct a file review. While the undersigned notes plaintiff's argument that the firm which provided such expert opinion may, through marketing efforts directed at the insurance industry, have the appearance of bias toward findings negative to the claimant, review of the extensive memoranda in support of Dr. Marks' and Dr. Lurie's opinions indicate that such conclusions were based on a thorough review of the medical evidence of record, that it was reasoned, and that it was well within their respective fields of expertise. As discussed above, the purported bias of an expert is not relevant; rather, it is the bias of a Plan Administrator that is important. Abromitis, supra. A reasonable inference that can be drawn from the notes of plaintiff's own treating physicians is that she had, by at least 2004, recovered well from injuries sustained in the 1999 car accident.

### V. Conclusion

**\*17** The undersigned has fully considered and weighed the eight factors as provided in Booth v. Wal-Mart Stores, Inc. Associates Health and Welfare Plan, supra, and determined under a modified abuse of discretion standard that the Plan Administrator did not abuse its discretion in terminating plaintiff's benefits under the Plan. In doing so, the court has reviewed every page of the extensive administrative record and from such review this court has developed the opinion that the decision of the Plan Administrator was the product of a reasoned and principled decision making process based upon adequate materials and inquiry, and was consistent with the purposes and goals of the Plan. The question for the court is whether the administrators and fiduciaries abused their discretion in the context of a sliding-scale review, which comes down to whether plaintiff received a full and fair review. [29 U.S.C. § 1133(2)](#)(a claimant must be allowed "a full and fair review by the appropriate named fiduciary of the decision denying the claim."); [Weaver v. Phoenix Home Life Mut. Ins. Co., 990 F. 2d 154 (4th Cir. 1993)](#)(failure to

Teague v. Hartford Life and Accident Insurance Company, Not Reported in Fed. Supp....

2006 WL 8455977

provide "full and fair review" amounts to abuse of fiduciary discretion).

Plaintiff asks this court to discount the opinions of the two physicians defendant employed to review plaintiff's claim, arguing in the context of the standard of review that the Plan Administrator improperly relied on biased expert opinion. She characterizes such doctors as hired guns, which they may well be; however, the issue is not so much who hired them, but whether their aim was true.

The decision of the Plan Administrator is supported by substantial evidence contained in the Administrative Record. The undersigned has applied the standard required and has reviewed each and every page of the extensive administrative record looking for evidence that would support the plaintiff's claim of continuing disability or bolster her argument that the Plan Administrator acted with bias toward her. None is found.

The undersigned will, therefore, recommend that plaintiff's Motion for Summary Judgment be denied, that defendant's Motion to Strike be allowed, and that defendant's Motion for Summary Judgment be granted, and that the decision of the Plan Administrator be affirmed.

Finally, the undersigned appreciates the professional manner in which respective counsel have managed this most complex case and thoroughly briefed the issues. The court would, however, appreciate it in the future if the parties would work together and submit a joint Administrative Record that is bound, indexed, and tabbed.

## RECOMMENDATION

**IT IS, THEREFORE, RESPECTFULLY RECOMMENDED** that plaintiff's Motion for Summary Judgment (#9) be **DENIED**, defendant's Motion for Summary Judgment (#17) be **GRANTED**, defendant's Motion to Strike (#14) be **GRANTED**, and that the decision of the Plan Administrator be **AFFIRMED**.

The parties are hereby advised that, pursuant to 28, United States Code, Section 636(b)(1)(C), written objections to the findings of fact, conclusions of law, and recommendation contained herein must be filed within **fourteen** (**14**) days of service of same. Failure to file objections to this Memorandum and Recommendation with the district court will preclude the parties from raising such objections on appeal. Thomas v. Arn, 474 U.S. 140 (1985), reh'g denied, 474 U.S. 1111 (1986); United States v. Schronce, 727 F.2d 91 (4th Cir.), cert. denied, 467 U.S. 1208 (1984).

**All Citations**

Not Reported in Fed. Supp., 2006 WL 8455977

## Footnotes

1    Plaintiff contends that this review was one year early.

2    Dr. Anderson retracted such letter several months later, stating that he had checked "yes" in error.

3    In argument, plaintiff contends that Dr. Marks did not review all of her medical records; however, this argument is unsupported by the administrative record. Dr. Marks was furnished with all medical records contained in the claims file, A.R., at 95, however he did not list all of these documents in his formal finding. The court can find no requirement that a physician who reviews medical record list each record reviewed in his opinion letter. In cases like this, where the administrative record exceeds 1000 pages, such a task would be daunting. The undersigned agrees with defendant's logic, which is that Dr. Marks' listing of the most pertinent documents to his review does not give rise to an inference that he ignored the rest. A.R., at 204, 212.

4    While plaintiff argues that she has never claimed disabling mental illness, the undersigned can ascribe no error to defendant's consideration of additional possible areas of impairment, either singularly or in

WESTLAW    © 2022 Thomson Reuters. No claim to original U.S. Government Works.    16

combination. Indeed, such review is favorable to a claimant and is evidence that the Plan Administrator conducted a thorough, reasonable, and principled review.

5       Due to the limits of electronic filing, a copy of such opinion is incorporated herein by reference to the Westlaw citation.

6       The court has taken the liberty of interpreting Dr. Anderson's shorthand based on the "Glossary of Medical Terms" maintained by the State University of New York, Upstate Medical University.

7       It is quite possible that plaintiff's apparent turn for the worse in June 2004 was simply coincidental.

8       The undersigned has taken judicial notice of this fact inasmuch as Dr. Cypcar is a well-known and well respected member of the medical community serving Asheville.

---

**End of Document**                                              © 2022 Thomson Reuters. No claim to original U.S. Government Works.

123 Fed.Appx. 534
This case was not selected for
publication in the Federal Reporter.
Not for Publication in West's Federal Reporter.
See Fed. Rule of Appellate Procedure 32.1
generally governing citation of judicial decisions
issued on or after Jan. 1, 2007. See also Fourth
Circuit Rule 32.1 (Find CTA4 Rule 32.1)
United States Court of Appeals,
Fourth Circuit.

Brenda HENSLEY, an individual, Plaintiff—Appellee,

v.

INTERNATIONAL BUSINESS MACHINES
CORPORATION, a New York Corporation;
Metropolitan Life Insurance Company, a
Delaware Corporation, Defendants—Appellants,

and

Does 1 Through 10, inclusive, Defendant.

No. 04–1162, 04–1728.
|
Argued: Sept. 29, 2004.
|
Decided: Dec. 13, 2004.

**Synopsis**
**Background:** Employee whose long-term disability (LTD) benefits were terminated sued employer and insurer for restoration of benefits under plan, which was governed by Employee Retirement Income Security Act (ERISA). The United States District Court for the Southern District of West Virginia, [Robert C. Chambers](), J., granted summary judgment for employee and awarded fees, costs and interest. Employer and insurer appealed.

**Holdings:** The Court of Appeals, Luttig, Circuit Judge, held that:

decision to terminate employee's LTD benefits was result of deliberate, principled reasoning process;

termination decision was supported by substantial evidence; and

in light of conclusion that termination of benefits was not abuse of discretion, neither degree of culpability or bad faith nor relative merits of parties' positions, the two factors primarily relied on by district court in awarding interest, costs and fees, favored employee.

Reversed and remanded.

**Procedural Posture(s):** On Appeal; Motion for Summary Judgment.

 **\*535** Appeals from the United States District Court for the Southern District of West Virginia, at Huntington. **\*536** [Robert C. Chambers](), District Judge. (CA–03–233–3; CA–03–223–3).

**Attorneys and Law Firms**

[Beth Ann Oliak](), Metropolitan Life Insurance Company, New York, New York, for Appellants.

[Mark F. Underwood](), Huntington, West Virginia, for Appellee.

[Scott A. Damron](), Damron & Taylor, Huntington, West Virginia; [C.J. Schmidt](), Wood & Lamping, Cincinnati, Ohio, for Appellants.

Before [WILKINSON]() and LUTTIG, Circuit Judges, and [HENRY E. HUDSON](), United States District Judge for the Eastern District of Virginia, sitting by designation.

**Opinion**

Reversed by unpublished opinion. Judge Luttig wrote the opinion, in which Judge [Wilkinson]() and Judge Hudson joined.

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

LUTTIG, Circuit Judge.

 **\*\*1** Defendants-appellants International Business Machines Corp. ("IBM") and Metropolitan Life Insurance Co. ("MetLife") appeal from an order of the United States District Court for the Southern District of West Virginia granting summary judgment to plaintiff-appellee Brenda Hensley. The district court held that MetLife abused its discretion in terminating Hensley's long-term disability benefits under an ERISA-governed employee benefits plan. Because we conclude that MetLife did not abuse its discretion, we reverse the judgment of the district court.

I

Appellee Hensley was employed by IBM in a sedentary capacity as an "accounts specialist" prior to August 1999. During that time, she participated in a group long-term disability plan ("the Plan") administered by MetLife on behalf of IBM. The Plan is an employee welfare benefit plan within the meaning of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 *et seq.* According to the terms of the Plan, a "totally disabled" employee is entitled to long-term disability ("LTD") benefits. J.A. 191. "Totally disabled" is defined as follows:

> [T]otally disabled means that during the first 12 months after you complete the waiting period, you cannot perform the important duties of your regular occupation with IBM because of a sickness or injury. After expiration of that 12 month period, totally disabled means that, because of a sickness or injury, you cannot perform the important duties of your occupation or of any other gainful occupation for which you are reasonably fit by your education, training or experience.

J.A. 193. The Plan also provides that the Plan's administrator "shall have discretionary authority to interpret the terms of the Plan and to determine eligibility for and entitlement to Plan benefits in accordance with the terms of the Plan." J.A. 213.

On August 9, 1999, Hensley applied for LTD benefits under the Plan, submitting a statement of her attending physician diagnosing her with osteoarthritis and rotator cuff syndrome. J.A. 726. MetLife initially granted her application for LTD benefits on November 9, 1999, but sought further information regarding her disability in January and March of 2000. A second attending physician submitted a letter to MetLife in April 2000 in response to these requests. He listed Hensley's diagnoses as morbid obesity, osteoarthritis, rotator cuff tendinitis, wrist tendon inflammation, carpal tunnel syndrome, and lower back **\*537** pain, but he did not include objective tests or x-ray reports to substantiate these diagnoses. J.A. 463. An independent physician consultant reviewed Hensley's medical records on behalf of MetLife in August

2000 and concluded that the records showed no objective impairment that would prevent Hensley from returning to work. J.A. 425. On the consultant's recommendation, a functional capacity exam ("FCE") was performed on Hensley in March 2001 to assess her physical capabilities, but the physical therapist reported that Hensley did not put forth a consistent effort during the tests and that Hensley exaggerated her pain complaints. J.A. 400–02. After the independent consultant concluded in a second review that Hensley had not produced medical evidence of incapacity for work, J.A. 390–91, MetLife terminated her benefits in November 2001.

**\*\*2** In support of two subsequent appeals to MetLife, Hensley submitted another diagnosis letter from a third attending physician and the report from a second FCE. J.A. 115, 167. But the third doctor did not provide additional objective evidence to support Hensley's diagnoses, *see* J.A. 115–16, and the physical therapist again concluded that Hensley exaggerated her symptoms and engaged in self-limiting behavior, J.A. 168. MetLife denied Hensley's appeals.

Hensley sued IBM and MetLife for restoration of her benefits under the Plan in the district court in March 2003. J.A. 6. On cross-motions for summary judgment, [1] the district court granted summary judgment for Hensley, holding that MetLife abused its discretion as administrator of the Plan in terminating Hensley's LTD benefits. J.A. 31. The district court also awarded Hensley costs and fees. *Order Granting Plaintiff's Motion for Attorney's Fees, Costs and Prejudgment and Postjudgment Interest* at 1. IBM and MetLife appeal from both orders.

II

We review the district court's grant of summary judgment de novo, applying the same standards employed by the district court. *Gallagher v. Reliance Std. Life Ins. Co.,* 305 F.3d 264, 268 (4th Cir.2002). Where, as here, an ERISA plan gives the administrator discretionary authority to interpret the terms of the plan, the district court reviews the administrator's decisions for abuse of discretion. *Booth v. Wal–Mart Stores, Inc.,* 201 F.3d 335, 341 (4th Cir.2000). Under the abuse of discretion standard, the court may not overturn the administrator's denial of benefits if the denial "is the result of a deliberate, principled reasoning process and if it is supported by substantial evidence." *Elliott v. Sara Lee Corp.,* 190 F.3d 601, 605 (4th Cir.1999) (quoting *Brogan v. Holland,* 105

F.3d 158, 161 (4th Cir.1997)). Substantial evidence is more than a scintilla, but less than a preponderance. *Newport News Shipbuilding and Dry Dock Co. v. Cherry,* 326 F.3d 449, 452 (4th Cir.2003).

Because MetLife both administers and funds the plan, however, we adjust the standard of review by decreasing our deference to MetLife in proportion to the degree of MetLife's conflict of interest. In such circumstances, we must determine whether the denial of benefits would constitute an abuse of discretion by a *disinterested* fiduciary. *See, e.g., Bailey v. Blue Cross & Blue Shield of Virginia,* 67 F.3d 53, 56 (4th Cir.1995) ("[W]e will review the merits of the [funding fiduciary's] interpretation to determine whether it is consistent with an exercise of discretion by a fiduciary acting free of the interests that conflict **\*538** with those of the beneficiaries."). Even on this adjusted scale of deference, we conclude that MetLife did not abuse its discretion because its decision to terminate Hensley's benefits was the result of a deliberate, principled reasoning process and supported by substantial evidence.

### A

It is apparent from the record that MetLife's decision to terminate benefits was the result of a "deliberate, principled reasoning process." The decision followed MetLife's multiple requests for information from Hensley's physicians, repeated reviews of her medical records by the independent consultant, and two appeals of the initial termination during which Hensley was permitted to provide supplemental medical evidence.

**\*\*3** MetLife's decision to terminate Hensley's benefits might appear inconsistent with its prior determination in November 1999 that she was "totally disabled" under a functionally identical standard.[2] But the fact that MetLife initially awarded benefits to Hensley does not mean that its subsequent termination of those benefits was the result of unprincipled reasoning. The termination of benefits was based on further investigation and review,[3] during which Hensley's physicians failed to provide objective support for their diagnoses and Hensley failed to put forth credible efforts in two functional capacity exams. And, as the district court correctly noted, the Fourth Circuit has held that no vested right to benefits accrues under an employee welfare benefits plan, *see Gable v. Sweetheart Cup Co.,* 35 F.3d 851, 855 (4th Cir.1994), so that "the decision to grant benefits initially

cannot create an obligation by which a plan fiduciary is estopped from later terminating benefits." J.A. 26.

### B

We also conclude that MetLife's decision was supported by substantial evidence. As MetLife's consultant twice concluded, the record is largely devoid of *objective* medical evidence of total disability, such as x-rays, test results or MRI reports.[4] J.A. 391, 425. Instead of objective evidence, Hensley relies principally on the diagnosis letters of her three treating physicians, Dr. Wazulak, Dr. Harvey, and Dr. Martin. But none of these doctors provided objective evidence of disability to support his conclusions. Dr. Wazulak's report of August 1999 listed nothing under "objective findings," but listed only subjective pain symptoms to support his diagnoses. J.A. 726. Likewise, Dr. Harvey's letter of April 2000 reported several pain-related **\*539** diagnoses for Hensley, but admitted that Dr. Harvey did not have actual x-ray reports or reports from specialists substantiating these diagnoses. J.A. 463. And Dr. Martin's letter of December 2001 merely recited the same diagnoses as Dr. Harvey's, without providing additional objective medical evidence. J.A. 115–16.

In the absence of *objective* evidence of Hensley's disability, it was reasonable for MetLife to conclude that the diagnoses of her treating physicians rested primarily or exclusively upon Hensley's *subjective* pain complaints. But the results from her subsequent FCEs substantially undercut the credibility of those pain complaints. Both physical therapists concluded that Hensley engaged in self-limiting behavior and symptom magnification during the FCEs. J.A. 167, 402. The report from the second FCE, which was performed upon the referral of her treating physician, emphasized Hensley's self-limitation:

> The results of this FCE do not represent a valid measure of Brenda's maximum functional capacities as she significantly limited her performance due to pain and, at the same time, demonstrated maximum signs of magnified illness behavior.... Her requests to terminate testing due to pain were made in conjunction with the lack of objective pain behavior and

a pleasant, even jovial demeanor while
rating her pain at a '9 out of 10.'

**\*\*4** J.A. 168. Despite his inability to assess her full physical capacities, the therapist nevertheless concluded that Hensley was capable of "SEDENTARY" work under Department of Labor Standards. J.A. 167. Given that the Plan placed upon Hensley the burden of producing evidence of total disability, J.A. 193, and given her non-cooperation in both FCEs, it was reasonable for MetLife to conclude that Hensley was capable of sedentary occupation.

The district court reasoned that it was unreasonable for MetLife to credit the opinion of an independent consultant who had never treated Hensley, over the contrary conclusions of her treating physicians. J.A. 27 ("To rely solely on the opinion of an independent consultant physician who examined only medical records—as opposed to examining the claimant—in the face of the unanimity of the physicians who had examined the claimant ... is arbitrary and capricious."). But the Supreme Court has explicitly held that ERISA plan administrators are not required to accord any special deference to the opinions of *treating* physicians over those of non-treating consultants. *Black & Decker Disability Plan v. Nord,* 538 U.S. 822, 834, 123 S.Ct. 1965, 155 L.Ed.2d 1034 (2003) ("[C]ourts have no warrant to require administrators automatically to accord special weight to the opinions of a claimant's physician...."). As noted above, MetLife had reason to believe that the treating physicians' diagnoses rested on subjective pain complaints whose credibility was undermined by the FCE tests, which were designed to assess actual functional capacities and to detect pain magnification. *See* J.A. 401 (evaluating Hensley's pain behavior during testing). In light of this evidence, it was reasonable for MetLife to discount the conclusions of Hensley's treating physicians.

The district court also emphasized that subjective pain complaints can often constitute a medically sound basis for diagnosis. J.A. 28 ("Merely because we cannot see pain or fatigue on an x-ray, or measure it in a laboratory, does not mean that it is not real." (quoting *Palmer v. Univ. Med. Group,* 994 F.Supp. 1221, 1233 (D.Or.1998))). But the Fourth Circuit has held that denials of benefits are permissible where the claimant provides only subjective pain complaints and not objective evidence. **\*540** *See, e.g., Lown v. Continental Casualty Co.,* 238 F.3d 543, 546 (4th Cir.2001) (upholding, on de novo review, the denial of benefits against the opinions

of three treating physicians where the insurer "determined that [the claimant's] documentation was inadequate to prove a total disability because of the lack of test results or other objective evidence to support the disability"); *Ellis v. Metropolitan Life Ins. Co.,* 126 F.3d 228, 231 (4th Cir.1997) (approving MetLife's reliance on a board of non-treating consultants over the opinions of treating doctors who credited the claimant's pain complaints but could not pinpoint their "etiology"). This preference for objective verification is all the more reasonable in light of the evidence of symptom magnification present in this case.

**\*\*5** In sum, MetLife's decision to terminate Hensley's LTD benefits was the result of a deliberate, principled reasoning process. And the record clearly contains substantial evidence to support MetLife's conclusion. MetLife's decision thus did not constitute an abuse of discretion, even under the adjusted standard of review.

III

MetLife and IBM also appeal from the district court's award of pre- and postjudgment interest, costs, and attorney's fees. We review the district court's award for abuse of discretion. *Metropolitan Life Ins. Co. v. Petitt,* 164 F.3d 857, 865 (4th Cir.1998). In awarding attorney's fees, the district court applied the five factors of *Quesinberry v. Life Ins. Co. of North Am.,* 987 F.3d 1017, 1029 (4th Cir.1993) (en banc).[5] Here the district court relied primarily on (1) the degree of opposing parties' culpability or bad faith, and (5) the relative merits of the parties' positions. *Order Granting Plaintiff's Motion for Attorney's Fees, Costs and Prejudgment and Postjudgment Interest* at 4. In light of our conclusion that MetLife did not abuse its discretion, neither of these factors favors Hensley. Therefore the district court's order granting fees, costs, and interest is also reversed.

CONCLUSION

The judgment of the district court is reversed and the case is remanded with instructions to enter judgment for appellants.

*REVERSED*

**All Citations**

123 Fed.Appx. 534, 2004 WL 2857576

## Footnotes

1   The parties did not dispute any material fact in the record. J.A. 22.

2   The Plan's "regular occupation" definition of total disability applied to the April 1999 decision, while the "any occupation" definition applied to the November 2001 termination. But because this dispute focuses on Hensley's ability to perform *any sort* of sedentary labor at all, there is no practical difference between the two standards for the purposes of this appeal.

3   This factor, among others, distinguishes the case upon which Hensley principally relies, *Norris v. Citibank Disability Plan,* 308 F.3d 880 (8th Cir.2002). The *Norris* court emphasized that the plan administrator's denial of benefits came "a few months later, and *on the basis of no new medical evidence,"* after a prior determination that the claimant was totally disabled. *Id.* at 885 (emphasis added).

4   One exception is that a spine MRI performed on Hensley in April 2000 confirmed that she had degenerative disc disease. That MRI, however, found no disc herniation. J.A. 453. A doctor examining Hensley and the MRI report at that time described her as "a middle-aged female in no acute distress" and noted that she had refused to undergo nerve conduction studies that might confirm the diagnosis of her carpal tunnel syndrome. J.A. 455.

5   The five factors are: (1) degree of the opposing parties' culpability or bad faith, (2) the ability of opposing parties to pay fees, (3) whether the fee award would deter others similarly situated, (4) whether the parties requesting fees sought to benefit other claimants or to resolve a significant ERISA-related legal question, and (5) the relative merits of the parties' positions. *Quesinberry,* 987 F.2d at 1029.

**End of Document**                                      © 2022 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment

Declined to Follow by   Allen v. Lilly Extended Disability Plan,   S.D.Ind.,
March 29, 2019

2005 WL 1910905
Only the Westlaw citation is currently available.
United States District Court,
N.D. Illinois, Eastern Division.

Kurtis NICKOLA, Plaintiff,

v.

CNA GROUP LIFE ASSURANCE, CO., Defendant.

No. 03 C 8559.
|
Aug. 5, 2005.

**Attorneys and Law Firms**

Mark D. Debofsky, Marcie E. Goldbloom, Frederick J. Daley,
Daley, Debofsky & Bryant, Chicago, IL, for Plaintiff.

Philip F. Brown, Michael E. Heffernan, Brenner, Brown,
Golian & McCaffrey, Columbus, OH, Robert James Golden,
Dowd & Dowd, Ltd., Chicago, IL, for Defendant.

*MEMORANDUM OPINION AND ORDER*

FILIP, J.

 **\*1**  Kurtis Nickola ("Nickola" or "Plaintiff") brings this
action against CNA Group Life Assurance Company ("CNA"
or "Defendant"). [1]  Plaintiff filed a complaint (D.E.1) [2]  that
invokes Section 502(a)(1)(B) of the Employee Retirement
Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1132(a)
(1)(B) ("Section 502"). Plaintiff alleges that he has been
wrongfully denied long-term disability ("LTD") benefits
which he had been receiving for some three years prior
to Defendant's alleged wrongful and improperly justified
termination of those benefits in 2003. Plaintiff has moved
for summary judgment (D.E.12) and Defendant has filed a
cross-motion for summary judgment (D.E.21). Defendant has
also filed a motion to strike certain attachments to Plaintiff's
Response to Defendants' Statement of Facts (D.E.29). As
explained below, Plaintiffs's motion (D.E.12) is granted,
Defendant's motion for summary judgment (D.E.21) is
denied, and Defendant's motion to strike (D.E.29) is denied-

although in practical terms that motion is of no consequence
and is effectively moot.

I. *FACTS* [3]

From October 17, 1994, through November 6, 1999, Kurtis
Nickola was employed by the Ag States Agency, LLC, as
a Department Manager for Consumers Coop Oil Company.
(D.E. 12 ¶ 7.) His background indicates that he has a high
school diploma and his work experience includes over seven
years as an HVAC (heating, ventilation, and air conditioning)
technician and fifteen years as an automobile mechanic. (D.E.
22 ¶ 46.) His position required him to have complete mobility,
including the ability to climb stairs and ladders, carry heavy
objects, squat, and kneel. (*Id.* ¶ 13; D.E. 12 ¶ 7.) As part of his
employment, Plaintiff was insured under, and thus Plaintiff
was a "participant" in, a long term disability plan ("LTD Plan"
or "Plan") underwritten by CNA. (D.E. 12 ¶ 8; D.E. 22 ¶¶
5-6.)

The Plan provides for benefits after the passing of a 90-day
elimination period. (D.E. 12 ¶ 9.) Relevant to the present
inquiry, the Plan defines "Disabled" as follows:

> *Disability* means that during the *Elimination Period* and the
> following 24 months, *Injury or Sickness* causes physical or
> mental impairment to such a degree of severity that You
> are:
>
> > 1. continuously unable to perform the Material and
> > *Substantial Duties of Your Regular Occupation;* and
> >
> > 2. not working for wages in any occupation for which
> > *You* are or become qualified by education, training, or
> > experience.
>
> After the LTD *Monthly Benefit* has been payable for 24
> months, *Disability* means that *Injury* or *Sickness* causes
> physical or mental impairment to such a degree of severity
> that *You* are:
>
> > 1. continuously unable to engage in any occupation
> > for which You are or become qualified by education,
> > training, or experience; and
> >
> > 2. not working for wages in any occupation for which
> > *You* are or become qualified by education, training, or
> > experience.

 **\*2**  (D.E. 22 ¶ 8 (emphasis in original).) There were also
some specific limitations on the amount of earnings one could

Case 1:22-cv-00186-WO-JLW   Document 32-1   Filed 11/30/22   Page 40 of 55

acquire and still qualify under the LTD Plan. (D.E. 22 ¶ 10.) The Plan further states other requirements to filing a claim. In relevant part,

> The following items, supplied at *Your* expense, must be a part of *Your* proof of loss. Failure to do so may delay, suspend, or terminate *Your* benefits:
>
> > 5. Objective medical findings which support Your Disability. Objective medical findings include but are not limited to tests, procedures, or clinical examinations accepted in the practice of medicine, for *Your* disabling condition(s).
> >
> > 6. The extent of Your Disability, including restrictions and limitations which are preventing *You* from performing *Your Regular Occupation.*

(*Id.* ¶ 9.)

Amendment Number 4 to the policy, which potentially took effect on January 1, 2002 (this is a matter of dispute between the parties, as referenced below), states that

> [t]he Administrator and other Plan fiduciaries have discretionary authority to interpret the terms of the Plan and to determine Your eligibility for and entitlement to benefits under the Plan and to interpret the terms and provisions of any insurance policy issued in connection with the Plan. With respect to making benefit decisions, the Plan Administrator has delegated sole discretionary authority to Continental Casualty Company to determine Your eligibility for and entitlement to benefits under the Plan and to interpret the terms and provisions of any insurance policy issued in connection with the Plan.

(*Id.* ¶ 10.) The Amendment was signed by the Chairman of the Board of Continental Casualty Company, and the Plan was maintained by Ag States Agency, LLC. (D.E. 13 at 004, 008.) In addition, the Plan contained a Certificate of Insurance, which stated that "[w]hen making a benefit determination under the policy, [Continental Casualty Company has]

discretionary authority to determine *Your* eligibility for benefits and to interpret the terms and provisions of the policy." (D.E. 22 ¶ 11.)

Nickola signed his "LTD Employee's Statement" on November 12, 1999. (D.E. 12 ¶ 12.) This statement indicated that his last day of work was November 5, 1999. (*Id.*) About this time he requested LTD benefits. Over the next month, Dr. James Slattery ("Dr.Slattery"), Dr. James Sehloff ("Dr.Sehloff"), and Dr. Steven Johnson ("Dr.Johnson") submitted documents to CNA indicating, respectively, that Plaintiff's cervical spine degeneration limited him to sedentary exertion, that his asbestosis and pulmonary disease also limited his work ability, and that Nickola also suffered from spasmodic, frenzied diarrhea. (*Id.* ¶¶ 13-15; D.E. 22 ¶¶ 14-16.) On or about December 23, 1999, Plaintiff filed his claim for benefits under the Plan. (D.E. 22 ¶ 12.)

Dr. Slattery, in particular, had treated Nickola for some time prior to the November filing; in addition to assessing back pain since June 1998 (he was treating Nickola for degenerative changes of the cervical spine (D.E. 12 ¶ 17)), in August 1998 Dr. Slattery noted that Plaintiff was "using Vicodin four to five tables daily," and this Vicodin use was not impeding Plaintiff's ability to work. (D.E. 22 ¶ 22.) Apparently, however, by November 1999, Plaintiff's chronic pain from his back was sufficiently intense that Dr. Slattery increased Plaintiff's OxyContin [4] dose (seemingly from 80 mg/day to 120 mg/day), and continued the Vicodin for "breakthrough pain." (D.E. 12 ¶ 17; A.R. 247.) During this time period, it appears that Plaintiff's pulmonary problems (stemming largely, if not entirely, from his asbestosis) remained status quo and neither improved nor worsened. [5] (D.E. 22 ¶ 25.) At around the same time, Dr. Johnson noted that Nickola had been vomiting in the mornings and having intermittent diarrhea and constipation. (D.E. 12 ¶ 18.) As a consequence, he concluded that disability was appropriate, and that Nickola could work a sedentary job, although he would have to miss numerous days due to his various maladies. (*Id.;* D.E. 22 ¶ 35.)

**\*3** On February 22, 2000, CNA approved Nickola's application for LTD benefits, with a recognized disability date of November 6, 1999. (D.E. 12 ¶ 28; D.E. 22 ¶ 36.) Benefits became payable on February 4, 2000, after the expiration of a ninety-day elimination period. (D.E. 12 ¶ 28.)

By late 2001, Dr. Johnson's treatment notes indicate Nickola was taking a wide variety of medicines to treat, among other things, pain, insomnia, and GI symptoms. (D.E. 12 ¶ 19.) Dr. Johnson also signed an Attending Physician's Statement showing that Dr. Johnson diagnosed Plaintiff with "(1) Chronic Diarrhea, (2) Cervical Radiculitis-Chronic; neck pain, (3) COPD [chronic obstructive pulmonary disease]-Pulmonary Fibrosis & asbestosis," and Dr. Johnson stated that Plaintiff's symptoms had not changed in the past three years. (D.E. 22 ¶ 38.) Dr. Johnson further noted that he "expect[ed] no improvement. No treatments (different from already tried) available." (*Id.*)

On February 7, 2003, in response to an inquiry from CNA, Dr. Johnson completed a Functional Assessment Tool which indicated he did not believe Nickola would be capable of performing full-time work that was primarily seated in nature, but allowed the flexibility to stand when needed and required lifting less than ten pounds. (D.E. 22 ¶ 44; D.E. 12 ¶ 24.) On February 7, 2003, Dr. Johnson again examined Nickola and concluded that he continued to have severe abdominal and bowel issues, for which there had been no effective treatment. (D.E. 22 ¶ 45; D.E. 12 ¶ 25.) On May 9, 2003, Dr. Johnson again concluded that he believed Nickola was "permanently disabled" by his problems. (D.E. 22 ¶ 48.)

In a May 16, 2003, letter to CNA's Rebecca Katz ("Katz"), Dr. Johnson again stated he did not think Nickola had improved and concluded that Nickola's "gastrointestinal problems cause unpredictable and intermittent diarrhea and vomiting. If he was to hold a job, I would expect he would miss probably every other day.... In addition, [Nickola] is on chronic narcotics on a daily basis...." (D.E. 12 ¶ 27.) Furthermore, by 2003, Plaintiff's prescribed narcotics treatment had doubled from the level in 1999, in that he was taking 240 mg/day of OxyContin. (*Id.*) Dr. Johnson stated he would "not expect somebody that is taking 240 mg of OxyContin a day to be able to able to function normally or appropriately in any sort of job situation." (*Id.*) In sum, Dr. Johnson concluded that Nickola's medical and severe diarrhea problems would interfere "with virtually any job he might hold," such as security guard or customer support representative. (*Id.*) While the demands of the job (*e.g.,* walking, not sitting) would preclude the former, the apparent justification for the latter stems from the likelihood that Nickola would, in Dr. Johnson's view at least, regularly miss substantial amounts of time on an unpredictable but recurrent basis.

There is no evidence in the record that Dr. Johnson witnessed the sudden intestinal attacks; Defendant claims (and this is not substantially challenged by Plaintiff) that most of Dr. Johnson's statements in this regard were based on Nickola's reporting of his symptoms to Dr. Johnson. (D.E. 22 ¶ 54.) Nonetheless, as Plaintiff highlights, there is material third-party corroboration for Plaintiff's claims about his vomiting and spasmodic diarrhea. Specifically, his former boss, Daniel Baun, wrote Defendant to attest to Nickola's health problems, including having seen the regular, emergency, spasmodic diarrhea episodes. *See* A.R. 105 (Baun letter to CNA in conjunction with benefits appeals review process, in which Baun attests to having seen Nickola's "sudden and unpredictable needs of bathroom facilities, often interrupting in the middle of a sentence or discussions. These interruptions can last for five, ten or several minutes longer. And these are on good days. There are many times when he is virtually bed ridden or confined to a chair or even the bathroom for hours at a time. How is it possible for any employer to even consider hiring a person in this condition?"); *see also* A.R. 102-03 (Baun letter protesting Defendant's final denial of LTD benefits for Plaintiff and discussing various issues, including regular emergency diarrhea episodes).

**\*4** On April 30, 2003, CNA issued a determination that Nickola was no longer disabled and thus would be discontinuing his LTD benefits. (D.E. 12 ¶ 30.) The finding indicated that Nickola was able to fill other appropriate jobs, such as "Automotive Materials Dock Supervisor," "Customer Support Representative," and "Stationary Security Guard," and it included vocational assessment assertions offered by its claim representative, Ms. Rebecca Katz. (*Id.*) Nickola requested an appeal on May 21, 2003. (*Id.* ¶ 31.) On June 13, 2003, CNA advised Plaintiff that his file was being referred to a medical consultant for assessment and CNA further indicated that it would reinstate Plaintiff's benefits pending that review. (D.E. 22 ¶ 51.)

On July 21, 2003, Dr. Eugene Truchelut ("Dr.Truchelut"), serving as a medical consultant to CNA, provided an initial report to Rebecca Katz. (D.E. 12 ¶ 38.) (Defendant apparently had not had a medical consultant review the file before it decided to reverse its prior disability determination and to conclude that continued LTD payments for Plaintiff were inappropriate.) Dr. Truchelut concluded that Nickola's pulmonary difficulties mandated that he not go above a sedentary exertional level and that his gastrointestinal symptoms would "not preclude each and every occupation" if a restroom "was close at hand." (*Id.;* D.E. 22 ¶ 52.) He found

that "the information provided in the medical records supplied and reviewed above does not currently support the claimant's inability to perform full-time work if this was primarily seated with the flexibility to stand when needed, use a keyboard and mouse and required no lifting more than ten pounds." (D.E. 22 ¶ 52.) Two days later, after speaking with Dr. Johnson, Dr. Truchelut supplemented his report with more notes, but his ultimate conclusion (that Nickola was not entirely disabled) remained the same. (*Id.* ¶ 56.) After the supplement was filed, the Appeals Committee informed Plaintiff that CNA decided not to change its April 30 decision terminating payment of Nickola's LTD benefits. (D.E. 12 ¶ 34; D.E. 22 ¶ 58.) In late November 2003, Plaintiff filed this action claiming wrongful denial/termination of benefits under ERISA. (D.E. 22 ¶ 59.)

II. *STANDARDS OF REVIEW*

A. ERISA

Under ERISA, the judicial standard of review for benefit determinations hinges on whether the plan administrator or fiduciary has been granted discretion in making the benefit determination. *See, e.g., Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 115, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989). As a default, courts review benefit determinations under ERISA through a *de novo* standard. *Id.* However, if the administrator or fiduciary is given discretionary authority to determine eligibility for benefits, the decision will be reviewed under the deferential arbitrary and capricious standard. *Hackett v. Xerox Corp. Long-Term Disability Income Plan,* 315 F.3d 771, 773 (7th Cir.2003). For a plan to convey enough discretion to a plan administrator to trigger the more administrator-friendly review, the plan " 'must contain language that ... indicates with the requisite if minimum clarity that a discretionary determination is envisaged." ' *Coles v. LaSalle Partners Inc. Disability Plan,* 287 F.Supp.2d 896, 900 (N.D.Ill.2003) (quoting *Herzberger v. Standard Ins. Co.,* 205 F.3d 315, 331 (7th Cir.2000)).

**\*5** Under the arbitrary and capricious standard, determinations will be overturned by the court if they are "unreasonable, and not merely incorrect." *Herzberger,* 205 F.3d at 329; *accord, e.g., James v. Gen. Motors Corp.,* 230 F.3d 315, 317 (7th Cir.2000) (stating that a benefit determination will only be found arbitrary and capricious when "downright unreasonable"). Nonetheless, while arbitrary-and-capricious review is quite deferential, it does not involve the court being a " 'rubber stamp." ' *Hupp v. Metromail Corp. Special Severance Plan,* 133 F.Supp.2d 681, 688 (N.D.Ill.2001) (quoting *Donato v. Metro. Life Ins.*

*Co.,* 19 F.3d 375, 380 (7th Cir.1994)). Reversal is warranted, for example, when the court is "very confident that the decisionmaker overlooked something important or seriously erred in appreciating the significance of the evidence." *Pokratz v. Jones Dairy Farm,* 771 F.2d 206, 209 (7th Cir.1985). In other words, when the arbitrary and capricious standard is applied, the decision of the administrator will be left undisturbed if (and only if) the administrator " 'makes an informed judgment and articulates an explanation for it that is satisfactory in light of the relevant facts...." ' *Wolff v. Continental Cas. Co. ., a CNA Co.,* No. 03 C 4667, 2004 WL 2191579, at \*9 (N.D.Ill. Sept.28, 2004) (quoting *Loyola Univ. of Chicago v. Humana Ins. Co.,* 996 F.2d 895, 898 (7th Cir.1993)); *accord, e.g., Hess v. Hartford Life & Accident Ins. Co.,* 274 F.3d 456, 461 (7th Cir.2001) (teaching that decision is arbitrary and capricious where it fails to consider and analyze an important factor that bears on the assessment) (citing *Exbom v. Central States, Southeast and Southwest Areas Health and Welfare Fund,* 900 F.2d 1138, 1142-43 (7th Cir.1990)).

B. Summary Judgment

Summary judgment is proper where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The nonmovant cannot rest on the pleadings alone, but must identify specific facts, *see Cornfield v. Consol. High Sch. Dist. No. 230,* 991 F.2d 1316, 1320 (7th Cir.1993), that raise more than a scintilla of evidence to show a genuine triable issue of material fact, *see Murphy v. ITT Educ. Servs., Inc.,* 176 F.3d 934, 936 (7th Cir.1999) (citation omitted). Mere "metaphysical doubt as to the material facts" does not amount to a genuine issue for trial. *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The Court views the record and all reasonable inferences drawn therefrom in the light most favorable to the nonmovant. *See* Fed R. Civ. P. 56(c); *see also Foley v. City of Lafayette,* 359 F.3d 925, 928 (7th Cir.2004). The party opposing summary judgment may not rest upon the pleadings, but must set forth specific facts showing that there is a genuine issue for trial. *See Anderson Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). There is no genuine issue for trial unless there is "sufficient evidence favoring the non-moving party for a jury to return a verdict for that party." *Id.*

**\*6** As courts in this district have repeatedly noted, when, as here, parties have filed cross-motions for summary judgment, the analytical endeavor can be a Janus-like one that can require consideration of any legitimate factual disputes in the record as they bear on each movant's respective summary judgment claims. *See, e.g., Northern Contracting Inc. v. State of Illinois,* No. 00 C 4515, 2004 WL 422704, \*46 (N.D.Ill. March 3, 2004) (Pallmeyer, J.) (quoting *Buttitta v. City of Chicago,* 803 F.Supp. 213, 217 (N.D.Ill.1992)). The Court proceeds accordingly.

III. *DISCUSSION*

A. The Court Will Assume That The Appropriate Standard of Review is The Arbitrary and Capricious Standard

In this case, the parties engage in lengthy and contentious disputes about the applicable standard of review. These disputes relate to subjects such as: whether the record establishes that the Amendment Number 4 referenced above actually was properly accepted by Defendant; whether Defendant effected a valid reservation of discretion and delegation of discretion that comports with the specific requirements of the ERISA statute and regulations; whether a particular Seventh Circuit decision (*Ruiz v. Continental Cas. Co. .,* 400 F.3d 986 (7th Cir.2005)) was correctly decided or is in implicit conflict with other Seventh Circuit caselaw such that its apparent holding must be disregarded, even by this District Court; and whether a proposed rule of the Illinois Department of Financial and Professional Regulation, Division of Insurance, that would purport to prohibit discretionary clauses in accident and health insurance policies, mandates a *de novo* standard of review in this case. The parties also reference the possibility that the state regulation (or, to be more specific, the proposed regulation) is preempted by the federal ERISA regime, and the related possibility that the regulation cannot be preempted because it falls with ERISA's savings clause, 29 U.S.C. § 1144(b)(2)(A).

The Court declines to entertain these debates, because even if Defendant is correct that the arbitrary and capricious standard of review applies, Defendant's decision to terminate payment of Plaintiff's LTD benefits still must be reversed, as explained below. There is no need to attempt to resolve all of these issues and sub-issues (for some of which there seems to be little relevant precedent to guide the analysis) because Defendant's process and analysis in terminating Plaintiff's long-term disability benefits is so defective that it fails arbitrary and capricious review. Accordingly, the Court will assume without deciding that the arbitrary and capricious standard applies.

B. Defendant's Decision to Terminate Nickola's Long-Term Disability Benefits Fails the Arbitrary and Capricious Standard of Review

As explained below, the Court concludes that Defendant's decision to terminate payment of the long-term disability benefits it had previously awarded to Plaintiff was downright unreasonable for a number of reasons. Some of those reasons are interrelated, but there are at least three independent bases for reversal (*see* III B.1, III B.3, and III B.4, *infra* ), as explained further below.

1. Defendant Failed to Adequately Consider and Explain The Impact of Plaintiff's Prescribed Narcotics Use

**\*7** Defendant's decision to cease paying Plaintiff's LTD benefits is subject to reversal because of Defendant's lack of meaningful analysis of whether Plaintiff's daily use of substantial amounts of prescription narcotic pain medication rendered him incapable of obtaining and keeping gainful employment. In this regard, Plaintiff's physician in May 2003 noted, in discussing various medical problems of Plaintiff, that Plaintiff was "on chronic narcotics on a daily basis, and I certainly would not expect somebody that is taking 240 mg of OxyContin per day to be able to function normally or appropriately in any sort of job situation." (A.R.152); *see also* A.R. 105 (letter from Plaintiff's former employer, expressing extreme displeasure with Defendant's decision to terminate Plaintiff's LTD benefits, and asserting that Plaintiff is effectively unemployable given the "massive amount of prescribed narcotics [he takes] on a daily basis").

In its review of Plaintiff's LTD benefits status on appeal, Defendant's medical reviewer stated that Plaintiff's

> cervical pain has reportedly been treated successfully with narcotic analgesics, which the claimant has been taking for some time and with habituation to these, should not necessarily be an occupational problem. In fact in the older records, it was noted that the claimant actually

> missed less work because of the use of these drugs.

(A.R.124.) The reference in the last sentence is an apparent reference to a 1998 report of Dr. Slattery, of which Dr. Johnson was sent a copy, where it noted that Plaintiff was taking four to five Vicodin tablets daily, and further noted that the use of such pain killers was allowing Plaintiff to miss work less frequently and to participate better in family activities. (A.R.251.) In addition, although it does not appear to be specifically referenced in the medical reviewer's notes, there also is a 1999 record of Dr. Slattery, in which he noted that Plaintiff had been using 80 mg of OxyContin per day, along with four Vicodin tablets for breakthrough pain. (A.R.247.) At that time (*i.e.,* prior to Defendant having awarded Plaintiff LTD benefits), Dr. Slattery suggested that Plaintiff would be capable of sedentary work. (A.R.246.)

Irrespective of what records suggested was the situation in 1998 or 1999, by 2003, it is clear that there was meaningful medical evidence taking the position that Plaintiff's increased doses of narcotic medication had reached the point where they were disabling and precluded him from gainful employment. (A.R.152.) Furthermore, there was at least some third-party corroboration from Plaintiff's former supervisor that Plaintiff's narcotics usage rendered him unemployable. (A.R.105.) Precedent teaches that an administrator cannot fail to adequately address the potential impact of narcotic pain medication on a claimant's ability to hold a job. *See Adams v. Prudential Ins. Co. of America,* 280 F.Supp.2d 731, 740-41 (N.D.Ohio 2003) (collecting numerous cases, and finding administrator's decision to terminate LTD benefits was arbitrary and capricious where administrator failed to consider the impact of, *inter alia,* OxyContin); *accord, e.g., Conrad v. Reliance Std. Life Ins. Co.,* 292 F.Supp.2d 233, 241-42 (D.Mass.2003) (similar).

 **\*8** Although Defendant was not required to agree with the evidence in the record maintaining that Plaintiff was disabled because of his prescription narcotic use as of 2003, Defendant was required to make a meaningful and reasoned assessment of what impact that drug use would have on Plaintiff's ability to obtain and hold a job. Reliance on the fact that, years earlier, Plaintiff had tolerated and been helped by what the parties appear to agree were significantly lower doses of prescription narcotics does not answer the question of whether Plaintiff's use of substantially greater amounts of pain-killers was disabling as of 2003. Given Defendant's

failure to address this significant issue-which at least one physician thought alone impeded Plaintiff from keeping a gainful job-Defendant's decision to terminate Plaintiff's LTD benefits was arbitrary and capricious. *See, e.g., Hess,* 274 F.3d at 461 (teaching that plan administrator's decision is arbitrary and capricious where decision failed to consider important factor that bears on the analysis) (citing *Exbom v. Central States, Southeast and Southwest Areas Health and Welfare Fund,* 900 F.2d 1138, 1142-43 (7th Cir.1990)).

2. Defendant Failed To Justify Its Decision to Depart from Its Prior Conclusion That Plaintiff Was Entitled to Long-Term Disability Payments

Defendant expressly acknowledges that where, as here, the insurer had determined that the Plaintiff was entitled to LTD benefits, " 'the previous payment of benefits is a circumstance that must weigh against the propriety of an insurer's decision to terminate those payments." ' (D.E. 21 at 19 (acknowledging and quoting *McOsker v. Paul Revere Life Ins. Co.,* 279 F.3d 586, 589 (8th Cir.2002)). To be sure, and as commonsense would suggest, a decision that someone is entitled to long-term disability payments at one point in time does not forever estop the insurer from changing its mind. *Accord McOsker,* 279 F.3d at 589. Fortunately, sick and disabled people often get better, and their ability to return to work is only one positive consequence of such a development. Nonetheless, as common sense also would suggest, if an insurer has already admitted that someone is so incapacitated that they are entitled to long-term disability payments, one can reasonably view the failure to produce evidence of improvement as a suspicious failing if the insurer decides that LTD benefits are no longer warranted. *See id.; Levinson v. Reliance Standard Life Ins. Co.,* 245 F.3d 1321, 1331 (11th Cir.2001). [6]

In this case, Defendant had decided that Plaintiff qualified for long-term disability benefits under the Plan and was providing him with a monthly benefit in the amount of approximately $2,285. (A.R.190.) Defendant further stated that "[t]his benefit is payable thru 12/26/2018 providing you continue(s) to meet the terms of the Long Term Disability policy." (*Id.*)

Notwithstanding this prior statement, Defendant can point to no serious evidence in the record that Plaintiff had improved from his total disability status at the time that Defendant decided to terminate the LTD benefits. In its briefing, Defendant states that "in this case, there was evidence

that Plaintiff's condition had improved. The Social Security Administration decision revealed that when Dr. Singaram examined Plaintiff for his abdominal problems, he 'noted that claimant's constipation had greatly improved." ' (D.E. 21 at 19 (quoting A.R. 202).) Defendant's position, however, with all respect, is misplaced. The ALJ's decision-which denied Social Security benefits, and which incidentally was subsequently overturned and remanded by Judge Crabb of the United States District Court for the Western District of Wisconsin-did note that Dr. Singaram in the Summer of 2000 had indicated that Plaintiff had substantially less trouble with constipation. However, constipation problems are not even close to the center of the medical conditions that Plaintiff and his physicians have identified as justifying his disability status. Simply put, the passing reference to long-past improvement in the area of constipation (Defendant terminated Plaintiff's LTD in 2003) is a make-weight attempt to find some evidence of improvement during the time that Plaintiff was awarded LTD benefits.

**\*9** In conjunction with Defendant's failure to identify evidence of material improvement from the time that Plaintiff was previously awarded LTD benefits, the Court also notes that Defendant initially decided to terminate Plaintiff's LTD benefits without even having a physician look at whether termination was appropriate. Put differently, Defendant did not have an MD look at whether termination was appropriate until after Plaintiff had appealed the termination of his prior LTD benefits. (*See, e.g.,* A.R. 155 (initial termination of LTD benefits determination from April 30, 2003); A.R. 128 (June 13, 2003 letter from Defendant to Plaintiff acknowledging request for appeal of benefits termination decision and indicating that Plaintiff's "file will also be referred to a Medical Consultant for an assessment"). Given that Plaintiff had submitted a substantial amount of medical opinion that he was disabled, [7] and Defendant had identified no meaningful evidence to indicate that Plaintiff's situation had materially improved since the time that Defendant found that Plaintiff was entitled to LTD benefits, Defendant's decision to terminate Plaintiff's benefits without even initiating an MD review raises questions about the sincerity of Defendant's benefits review. The Court is not stating that a medical review is *always* necessary, of course, but when an insurer has already determined that LTD benefits are appropriate, and there is no concrete evidence of improvement, an insurer's decision to reverse its prior decision without even having a medical review of the file raises commonsense doubts about the *bona fides* of the review process and decision to terminate LTD benefits. *Accord Hess,* 274 F.3d at 461 (teaching that one

can employ common sense in assessing whether an insurer's decision is arbitrary and capricious) (citing *Gallo v. Amoco Corp.,* 102 F.3d 918, 922 (7th Cir.1996)).

### 3. Defendant Failed to Consider the Total Impact of Plaintiff's Conditions On His Ability to Obtain and Maintain Employment

Precedent teaches that an administrator making a disability determination must make a reasoned assessment of whether the total combination of a claimant's impairments justify a disability finding, even if no single impairment standing alone would warrant the conclusion. *See, e.g., Austin v. Continental Cas. Co.,* 216 F.Supp.2d 550, 558 (W.D.N.C.2002) ("It is consideration of the full panoply of ailments and their combined impact on capacity for work that is important, as appellate courts consistently have found ....") (citing *Layton v. Heckler,* 726 F.2d 440, 442 (8th Cir.1984)). [8] Defendant failed to engage in reasoned decisionmaking by considering this possibility, and that deficiency alone would justify reversal of Defendant's termination of Plaintiff's LTD benefits.

In this regard, the Court notes (although it is certainly not essential to the Court's analysis) that the Defendant's own papers suggest that it previously thought that the combined impact of Plaintiff's health impairments were material to its determination of LTD status. *See* A.R. 301 (Defendant's internal screening sheet concerning LTD benefits application, in which Defendant accepted liability on Plaintiff's claim "[d]ue to multiple chronic deteriorating conditions including asbestosis, cervical radiculopathy, diarrhea, peptic ulcer disease + diverticulitis-will not improve, deteriorate ... [over] time"). In any event, Defendant did not adequately consider the combined impact of Plaintiff's various maladies on his ability to obtain and hold a job. Plaintiff has a variety of documented ailments, including asbestosis, COPD, and neck and scapular pain related to degeneration in his spine that has limited his range of motion and has prompted substantial usage of prescription narcotics for pain treatment. *See, e.g.,* A.R. 152 (letter from Dr. Johnson in 2003 stating that Plaintiff's "gastrointestinal problems cause unpredictable and intermittent diarrhea and vomiting. If he was to hold a job, I would expect he would miss probably every other day as a result of this difficulty. He, in addition, is on chronic narcotics on a daily basis, and I certainly would not expect somebody that is taking 240 mg of OxyContin per day to be able to function normally or appropriately in any sort of job situation"); A.R. 170 (Dr. Johnson detailing various impairments); A.R. 195 (same); A.R. 208

(same). As discussed elsewhere, Plaintiff also has, or at least is reported to have violent, recurrent, spasmodic diarrhea episodes that would necessitate his being absent from the work place on an unpredictable, yet recurrent and regular basis. Defendant must make a reasoned assessment, which it did not do, of whether the total impact of these problems would justify maintaining his prior award of LTD benefits. Furthermore, precedent teaches that Defendant must make a reasoned assessment of how these impairments in the aggregate would impact Plaintiff's ability to maintain a job, assuming he could be hired at one. *See, e.g., Ruggerio v. Fedex,* No. Civ. A. 01-11809-RWZ, 2003 WL 21955024, at *3 (D.Mass. Aug.14, 2003) (overturning benefits denial because of lack of consideration of the combined effect of plaintiff's problems, "which at best, make her an unreliable worker as they do not manifest in a linear fashion and, at worse, totally disable her for unspecified and unpredictable periods of time"); *see also Dix v. Sullivan,* 900 F.2d 135, 138 (8th Cir.1990) (overturning denial of SSA benefits because " '[a] finding that a claimant is able to engage in substantial gainful activity requires more than a simple determination that the claimant can find employment and that he can physically perform certain jobs; it also requires a determination that the claimant can *hold* whatever job he finds for a significant period of time' ") (quoting *Singletary v. Bowen,* 798 F.2d 818, 822 (5th Cir.1986)) (emphasis in original). Defendant did not make that assessment, and as such, its decision to terminate Plaintiff's LTD benefits is not sufficiently reasoned even to pass arbitrary and capricious review. *See also* A.R. 105-06 (letter from Plaintiff's former employer stating that it is "appalled" that Plaintiff's LTD benefits were revoked and asserting the view that Plaintiff's gastrointestinal problems and substantial daily narcotics use effectively make it impossible for any company to keep him on as an employee).

4. Defendant's Determination that Plaintiff Could Hold Other Jobs Was Inadequately Reasoned and Explained

**\*10** As one might expect, the assessment of whether Plaintiff is entitled to LTD benefits (or more precisely, in this case, was entitled to maintain the receipt of LTD benefits that he had already been receiving for some three years) involves not only an assessment of whether Plaintiff could hold his former job, but also any other reasonably available job. As explained below, Defendant's determination that Plaintiff could hold other jobs was inadequately reasoned and supported, and this deficiency, too, independently would justify reversal of Defendant's decision to terminate Plaintiff's LTD benefits.

In this Court, Defendant makes no serious attempt to justify the assertion in the record of Ms. Rebecca Katz-who appears to be a disability claims manager for Defendant-that Plaintiff could perform the occupations of stationary security guard, customer support representative, or automobile materials dock supervisor. (A.R.155.) Plaintiff asserts, and Defendant does not challenge, that there is no evidence that Ms. Katz has any training to assess whether Plaintiff could obtain and maintain these jobs. *See* D.E. 21 at 20 (Defendant's concession that "[t]he administrative record is admittedly silent as to Ms. Katz's qualifications" to offer any opinion as a vocational analyst). Given Defendant's concession and the utter lack of reasoning reflected in Ms. Katz's report as to why one could reasonably conclude that Plaintiff could obtain and maintain such jobs, the Court cannot conclude that Ms. Katz's assertions represent reasoned decisionmaking.

Defendant nonetheless asserts that "Plaintiff completely ignores the evidence from the vocational expert contained in the [ALJ's] Social Security decision." (*Id.*) (As explained below, Defendant's reference is to an ALJ's decision that Plaintiff was not disabled to such a degree that he was entitled to SSA disability benefits-a decision that was subsequently reversed and remanded by Judge Crabb in the Western District of Wisconsin.) According to Defendant, "even assuming Ms. Katz was not qualified to render a vocational opinion, there was nonetheless evidence from a vocational expert that found that Plaintiff could perform sedentary occupations based on his education, training and experience." (*Id.*) Putting aside for a moment the question of whether one can defend a benefits denial on the basis of an ALJ decision that itself was later found to be inadequately reasoned and supported, Defendant's argument is nonetheless flawed.

Precedent teaches that in order for a claimant to ERISA benefits to receive a " 'full and fair review' of a denial of benefits, 29 U.S.C. § 1133, and, in order to permit such a review, the notice of decision [denying a benefits claim] must include specific reasons." *Halpin v. W.W. Grainger, Inc.,* 962 F.2d 685, 693 (7th Cir.1992) (citations to ERISA regulations omitted). As *Halpin* explained, "[t]his requirement ensures that a full and fair review is conducted by the administrator, enables the claimant to prepare adequately for appeal to the federal courts or further administrative review, and makes it possible for the courts to perform the task, entrusted to them by ERISA, of reviewing that denial." *Id.,* 962 F.2d at 693 (citation omitted). In this case, while the record reflected that Defendant was aware of the denial of Plaintiff's SSA benefits

application (in that Defendant informed Plaintiff that even if the ALJ's decision were reversed, Defendant did not intend to maintain payment of LTD benefits (A.R.100)), nothing in Defendant's denial letter to Plaintiff even suggested that the Defendant's decision rested on any vocational assessment or conclusion of the ALJ in the SSA proceedings. *See, e.g.,* A.R. 107-08 (April 30, 2003 denial correspondence); A.R. 154-56 (similar); *accord* A.R. 98-100 (appeal denial letter). As a result, Defendant cannot seek to patch over its faulty analysis in the first instance (*i.e.,* the Katz assertions) by reference to the ALJ's assessment now. [9]

 **\*11** Because of this fundamental, threshold deficiency with the vocational assessment, Defendant's heated assertions that Plaintiff has engaged in illicit behavior by explaining that the ALJ decision was subsequently reversed and remanded because of various inadequacies in its analysis (including the vocational assessment) are not of material consequence. Nonetheless, in the interests of completeness, and because Defendant went so far as to file a motion to strike references to the subsequent reversal of the ALJ decision, a brief response is in order.

To be sure, it is a truism that arbitrary and capricious review entails a review of the materials that were available to a plan administrator at the time a benefits determination was made. *See, e.g., Perlman v. Swiss Bank Corp. Comprehensive Disability Protection Plan,* 195 F.3d 975, 982 (7th Cir.2000) (collecting cases). Nonetheless, precedent teaches that while ERISA does not require an administrator to conduct a " 'full-blown' investigation ... it does demand a 'reasonable inquiry' into a claimant's medical condition and his vocational skills and potential." *O'Reilly v. Hartford Life & Accident Ins. Co.,* 272 F.3d 955, 961 (7th Cir.2001) (citation omitted). Defendant cites no authority to suggest that an administrator's reliance (assuming it had actually occurred and been properly documented) on a facially defective ALJ assessment about job potential would discharge Defendant's burden of conducting a reasonable inquiry. Judge Crabb's subsequent decision reversing the ALJ's deficient decision confirms that the ALJ decision was in fact facially deficient, but Judge Crabb's ruling simply confirmed what otherwise would have been apparent to Defendant had it engaged in a serious assessment and documentation of Plaintiff's job potential. Moreover, the Court finds it difficult to understand how Plaintiff can be faulted (almost at the level of acting in an untoward manner) by pointing out that the ALJ's legal decision was later reversed, a matter of public record that does not appear to be meaningfully analogous to a misstep such

as suggesting that additional discovery might be warranted in an abuse of discretion case, or suggesting that previously unprovided medical reports suggest a different result.

Defendant's motion to strike Plaintiff's references to the fact that the ALJ decision was subsequently reversed and remanded is denied. The motion is of no practical consequence, as Defendant did not assert that it was relying on any SSA determination or analysis in its denial notifications to Plaintiff, such that Plaintiff could administratively challenge such purported reliance and analysis. Furthermore, irrespective of whether one is cognizant of Judge Crabb's subsequent reversal, the deficiencies in the ALJ opinion are present, and would have been apparent to Defendant, if Defendant had engaged in a meaningful review of the issue of whether Plaintiff could maintain other employment. (As addressed below, perhaps one could reasonably conclude that Plaintiff could maintain some job, but Defendant certainly made no meaningful, documented analysis of the issue before it terminated Plaintiff's LTD benefits.) Because the motion to strike is of no practical consequence, and because Defendant cites no authority to suggest that Plaintiff's notation that the deficiencies apparent in the ALJ decision were confirmed in a publicly available legal decision by Judge Crabb is somehow illicit, Defendant's motion to strike is denied. [10]

### 5. Reasoned Decisionmaking Requires More Effort and Documentation Than Just Skepticism

 **\*12** As explained above, the Defendant's decision to terminate Plaintiff's receipt of LTD benefits suffered from serious procedural and substantive flaws. The Court nonetheless notes that it is clear from a review of the record that Defendant does not believe that Plaintiff is nearly as incapacitated as he claims, at least from his diarrhea problems. In this regard, Defendant noted, for example, that despite Plaintiff's claims of a chronic, incapacitating diarrhea condition, Plaintiff has never experienced weight loss nor needed to be hospitalized or treated for dehydration. (A.R.154.) Defendant also noted that Dr. Johnson had not personally witnessed Plaintiff's claimed incapacitating diarrhea problems, but instead largely relied on Plaintiff's reports of his problems in this regard. Nonetheless, as explained elsewhere, there is meaningful evidence in the record from a third-party (i.e., Mr. Baun, Plaintiff's former supervisor) attesting to Plaintiff's incapacitating bouts of diarrhea-*see* A.R. 105. [11] Defendant is not required, of course, to credit all testimony and diagnoses offered by a claimant, but Defendant switched course and reversed

its own prior LTD benefits award without even having a medical doctor review the file. And after Defendant referred the matter to its medical analyst, that doctor never undertook any meaningful analysis of how Plaintiff's claimed diarrhea problems would impact his ability to maintain other employment. Instead, Defendant's doctor simply speculated that "[r]egarding the gastrointestinal symptoms, this would be a matter of degree, but if restroom facilities were close at hand, this would also not preclude each and every occupation." (A.R.124.) It is difficult to disagree with the doctor's tautology-most things in life are a question of degree-but that is not a reasoned rejection of the evidence from Plaintiff's former supervisor, and the conclusions of Plaintiff's physician, Dr. Johnson, that Plaintiff's diarrhea problems were so acute and so recurrent that he was effectively incapable of holding a job. Defendant is not precluded in law from being skeptical (indeed, it has a responsibility to its shareholders to have a reasonable degree of skepticism), but skepticism alone is not enough to constitute reasoned decisionmaking sufficient to pass arbitrary and capricious review. *See generally Black & Decker Disability Plan v. Nord,* 538 U.S. 822, 834, 123 S.Ct. 1965, 155 L.Ed.2d 1034 (2003) (holding that plan administrators are not required to accord special weight to the views of a claimant's treating physician, but also teaching that administrators "of course, may not arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician" and also requiring administrators to adduce "reliable evidence that conflicts with a treating physician's evaluation"); *O'Reilly v. Hartford Life & Accident Ins. Co.,* 272 F.3d 955, 961 (7th Cir.2001) (explaining that ERISA requires a "reasonable inquiry" into, among other things, a claimant's medical condition). The Court notes that if Plaintiff's diarrhea and vomiting problems are nearly as bad as he, his doctor, and his former supervisor claim, [12] even a modest level of medical analysis and review will confirm his claims. And, conversely, if medical review and observation fails to substantiate Plaintiff's accounts, then Defendant might have a legitimate basis to reject Plaintiff's claims about the diarrhea debilitation and perhaps to question whether Plaintiff actually is entitled to LTD benefits prospectively. But the inquiry never was completed. So, Defendant's skepticism, cursory analysis, and *ipse dixit* are not enough to justify reversal of its prior decision to award LTD benefits to Plaintiff. Reasoned Decisionmaking demands more to avoid the conclusion that Defendant acted arbitrarily and capriciously.

6. Appropriate Remedy

**\*13** Given the missteps described above, the Court must consider the proper disposition of the case and the pending motions. Precedent teaches that where, as here, the plaintiff was otherwise entitled to continuing long-term disability benefits, and there has been an arbitrary and capricious termination of those benefits by the defendant, the proper course is to order damages in the amount of benefits that would otherwise have paid. *See, e.g., Hackett v. Xerox Corp. Long-Term Disability Income Plan,* 315 F.3d 771, 776-77 (7th Cir.2003) (collecting cases); *Halpin,* 962 F.2d at 697 (collecting cases). As was explained in *Hackett,* this Court's decision does not preclude, nor does it speculate about the proper or permissible outcome of, any future attempt by Defendant to terminate Plaintiff's long-term disability benefits if Defendant believes that is warranted. *See Hackett,* 315 F.3d at 777; *accord Halpin,* 962 F.2d at 697. Nonetheless, in the absence of a properly conducted review, and a properly supported decision, the *status quo ante* applies, and in this case that warrants payment of long-term disability benefits to Plaintiff. *See* A.R. 190 (letter from Defendant to Plaintiff explaining that Plaintiff was entitled to long-term disability benefits until age 65 (*i.e.,* through December 26, 2018), at least absent further action).

Plaintiff is also entitled to prejudgment interest. The " 'presumption in favor of prejudgment interest awards [for violations of federal law] is specifically applicable to ERISA cases.' " *Fritcher v. Health Care Serv. Corp.,* 301 F.3d 811, 820 (7th Cir.2002) (quoting *Rivera v. Benefit Trust Life Ins. Co.,* 921 F.2d 692, 696 (7th Cir.1991)). Defendant offers no reason in law or equity as to why the presumption in favor of prejudgment interest should not control here, and an award of prejudgment interest simply serves to make Plaintiff whole. *Accord Fritcher,* 301 F.2d 820. The parties have not addressed the proper rate of prejudgment interest, so the Court is left without their views on that subject. Although assessment of this rate is a discretionary call, precedent teaches that the prime rate in a sensible benchmark, along with some modest premium to account for the risk of default. *See id.* (discussing and applying *Gorenstein Enters., Inc. v. Quality Care-USA, Inc.,* 874 F.2d 431, 436-37 (7th Cir.1989)). The risk of default here seems modest, at best, so the Court will order prejudgment interest at the prime rate in effect as of the approximate date of this opinion (6.25%), plus a .35% (*i.e.,* thirty-five basis point) premium for risk of default, or a 6.6% total rate of ordinary interest. This premium will also incorporate the potential for calculating compounding interest, which will not be awarded. *Accord Fritcher,* 301 F.3d at 820.

7. Plaintiff Is Entitled to Reasonable Attorney's Fees

The Court also must exercise its discretion to determine whether an award of attorney's fees and taxable costs is appropriate. *See id.* at 818-19 (collecting cases); *accord, e.g., Little v. Cox's Supermarkets,* 71 F.3d 637, 644 (7th Cir.1995) (holding that "a district court's determination will not be disturbed if it has a basis in reason"). As the Seventh Circuit has noted, it has offered two metrics to determine whether an attorney's fees award is appropriate in ERISA cases. *See Fritcher,* 301 F.3d at 819; *Prod. and Maint. Employees' Local 504 v. Roadmaster Corp.,* 954 F.2d 1397, 1404-05 (7th Cir.1992). The first, and most commonly used, test involves an assessment of five factors:

> **\*14** (1) the degree of the offending party's culpability or bad faith; (2) the degree of the offending party's ability to satisfy an award of attorney's fees; (3) the degree to which such an award would deter other persons acting under similar circumstances; (4) the amount of benefit conferred on all the plan members; and (5) the relative merits of the parties' positions.

*Fritcher,* 301 F.3d at 819 (internal quotation marks and citation omitted). There is a second test, which borrows factors typically used for fee assessments under the Equal Access to Justice Act, but the ultimate substance of the two tests is materially identical. *See, e.g., Prod. and Maint. Employees' Local 504,* 954 F.2d at 1405 ("[W]e [have] decided that the difference between the two tests was insubstantial.") (citing *Meredith v. Navistar Int'l Trans. Corp.,* 935 F.2d 124, 128 (7th Cir.1991)). "The 'bottom-line question' under either approach 'is essentially the same: was the losing party's position substantially justified and taken in good faith, or was that party simply out to harass its opponent?' " *Prod. and Maint. Employees' Local 504,* 954 F.2d at 1405 (quoting *Meredith,* 935 F.2d at 128). Importantly, because of the difficulty of making such a showing, a party need not "actually show subjective bad faith to justify a fee award." *Prod. and Maint. Employees' Local 504,* 954 F.2d at 1405 (citing *Bittner v. Sadoff & Rudoy Indus.,* 728 F.2d 820, 830 (7th Cir.1984)). In fact, precedent teaches that there is a "modest presumption ... in favor of awarding reasonable

attorney's fees to the winning party ... unless the loser's position, while rejected by the court, has a solid basis." *Prod. and Maint. Employees' Local 504,* 954 F.2d at 1405 (internal quotation marks and citation omitted).

In this case, the Court finds that an award of reasonable attorney's fees and taxable costs is appropriate. Reviewing the typically employed five-factor test, the Court finds that the Defendant has substantial culpability in terms of its deficient treatment of Plaintiff's LTD claim and benefits stream. As explained at length above, Defendant's analysis of the propriety of terminating Plaintiff's LTD benefits was deficient in a number of significant and often independent respects. Relatedly, the fifth factor, the relative merits of the parties' positions, also militates in favor of an award. There also is no dispute that the second factor-*i.e.,* Defendant's ability to pay-also cuts in favor of an award. The third factor-the degree to which such an award would deter other persons acting under similar circumstances-also cuts in favor of an grant of fees and costs. To be sure, the fourth factor-the amount of benefit conferred on all the plan members-is functionally non-existent. (This was not a suit designed to confer benefits generally to all plan participants, and if a plaintiff's simply prevailing were sufficient to satisfy the fourth factor, then this factor would be close to meaningless in terms of trying to make a discretionary assessment.) Nonetheless, the absence of this single factor does not change the bottom-line analysis, particularly given the modest presumption in favor of an award of fees applicable here. Accordingly, based on an overall review of the five factors, the Court finds that an award of fees and taxable costs is justified.

**\*15** The amount of the attorney's fee award cannot be determined based on the filings presented. The parties are directed to confer and see if they can determine a mutually agreed number (with Defendant reserving all rights to dispute the propriety of the Court's rejection of its disability assessment, of course, should it choose to do so). In this regard, it is worth noting that the analysis will substantially hinge on the familiar lodestar method of analysis. *See Fritcher,* 301 F.3d at 819 (collecting cases).

IV. *CONCLUSION*

For the foregoing reasons, the Court grants the summary judgment motion of the Plaintiff (D.E.12). Plaintiff is entitled to an award of monies that should have been paid but for the defective termination of Plaintiff's long-term disability benefits, plus prejudgment interest as specified above (*i.e.,* prime plus .35%). The Court also awards attorneys' fees

and taxable costs, in an amount to be determined. The Court denies the summary judgment motion of the Defendant (D.E.21). Defendant's motion to strike (D.E.29) is effectively moot, for the reasons stated above, and denied on that basis and on the merits for the reasons stated above as well.

So Ordered.

**All Citations**

Not Reported in F.Supp.2d, 2005 WL 1910905

## Footnotes

1    For purposes of this opinion, the Court will treat all references to Continental Casualty as being references to CNA. These two formerly distinct organizations merged at some undisclosed time. In any event, the Court will follow the parties' lead and treat the titles as interchangeable with each other.

2    The various docket entries in this case are cited as "D.E. ___."

3    The relevant facts are taken from the Defendant's Local Rule 56 .1 ("L.R.56.1") statement of facts and exhibits, Plaintiff's response to Defendant's statement of facts, Plaintiff's LR 56.1 statement of facts, and Defendant's response to Plaintiff's statement of facts. As cited, the facts are also taken from the Administrative Record ("A.R.___"). Where the parties disagree over relevant facts, the Court sets forth the competing versions. In addition, the Court, as it must, resolves genuine factual ambiguities in the respective non-movant's favor. *Foley v. City of Lafayette,* 359 F.3d 925, 928 (7th Cir.2004).

4    OxyContin is a narcotic pain reliever similar to morphine. It is intended to relieve pain which is moderate to severe in intensity. See www.fda.gov/cder/drug/infopage/oxycontin.

5    It appears that Plaintiff was first diagnosed with asbestosis in either 1994 or 1995. (D.E. 13 at 275.) The extent to which the affliction worsened between 1995 and approximately late 1999 is unclear.

6    The Court is not implying that Nickola's LTD benefits had vested perpetually in 2000, or that Defendant was precluded from determining that circumstances had changed such that LTD benefits were not longer appropriate (or even, one can assume, that Defendant had erred the first time and now analyzed things correctly). Instead, the Court is saying, as caselaw teaches and Defendant even concedes, that if an insurer already has acknowledged that someone is suffering from a long-term disability, one can reasonably expect a reasoned explanation if the insurer changes position, and that failure to show evidence of improvement is not an immaterial consideration in assessing whether a change of course is defensible.

7    *See, e.g.,* A.R. 160 (February 2003 report of Dr. Johnson stating that [r]eally no Tx has been effective for his bowel Sx.... I think he is still disabled and unable to work as a result of his multiple problems"); A.R. 259 (November 1999 report of Dr. Johnson stating, *inter alia,* that "I think disability is appropriate" and that "[i]t is possible symptoms may improve over the next few months but I doubt that given his longstanding history") *see also* A.R. 244 (December 1999 record of Dr. Johnson noting that if Plaintiff were to hold a job, he "will frequently miss days due to diarrhea, pain"); A.R. 195 (January 2002 letter from Dr. Johnson to Defendant stating that Plaintiff "has multiple chronic problems which include chronic gastrointestinal difficulties, chronic cervical radiculitis and pulmonary fibrosis and asbestosis").

8    Defendants correctly note that *Austin* appears to have applied a presumption in favor of crediting the views of a claimant's physician that is inconsistent with the Supreme Court's subsequent teaching in *Black & Decker Disability Plan v. Nord,* 538 U.S. 822, 834, 123 S.Ct. 1965, 155 L.Ed.2d 1034 (2003). Nonetheless,

this Court is not citing *Austin* for any proposition that the views of a claimant's physician are entitled to a privileged status. Instead, the Court cites *Austin* for the well-established and commonsense proposition that the combined impact of a number of negative health conditions can be greater than the impact of any one of them. Accordingly, even if one single impairment might not be debilitating, the combined force of multiple impairments might be, and that subject merits a reasoned assessment.

9 Defendant overreads certain statements in at least certain respective physician's reports which asserted that Plaintiff would be capable of sedentary work. For example, Dr. James Slattery, an orthopedic surgeon, wrote in November 1999 that Plaintiff "is capable of sedentary work only." (A.R.246.) Similarly, James Sehloff, who specializes in pulmonary medicine, wrote in November 1999 that Plaintiff "needs stationary work." (A.R.276.) Aside from the fact that these reports were not particularly probative of Plaintiff's situation in 2003 when Defendant elected to terminate payment of his LTD benefits, it is clear that both of these reports were based on the respective doctor's assessment of the impact of limitations created by medical issues related to the doctor's respective speciality. As precedent instructs, the relevant analysis entails a look at whether a claimant is disabled as a result of all of his medical impairments. *See also* A.R. 152 (May 2003 letter from Dr. Johnson asserting that Plaintiff was disabled and could not hold a job because of gastrointestinal problems and the effects of taking substantial, daily doses of narcotic pain medication); A.R. 122, 124 (analysis of Defendant's medical reviewer glossing over gastrointestinal issues and conducting inadequate analysis of impact of prescription narcotic use because reviewer relied on reports concerning impact of lower doses of drugs years earlier).

10 Even if Defendant's motion to strike were granted, it would not alter the result in this case at all. Defendant did not document any reliance on the ALJ decision in its denial letters, as was required. Moreover, even if it were illicit to know that Judge Crabb's decision subsequently reversed the ALJ opinion, Defendant cannot create reasoned decisionmaking for the ALJ opinion that is not reflected in it, and accordingly cannot show that Defendant itself engaged in any reasonable assessment of Plaintiff's LTD benefit status.

11 Although not part of the record for arbitrary and capricious review, because it was submitted in frustration after Plaintiff's LTD benefits were finally terminated, Mr. Baun wrote a letter to Defendant in August 2003, in which he underscored that "I can tell you first hand as an employer, that I have witnessed Kurt [Nickola] having to excuse himself more than once while working on the sales floor with a customer, and heading immediately to the restroom. And no, I did not follow Kurt into the restroom to witness his actions, but I can tell you that this was not your normal need to relieve oneself. Again, I am not a doctor, but an employer, and isn't this about Kurt's ability to obtain, complete and hold a job?" A.R. 102; *see also id.* ("I will ask you to reconsider your recent determination once more, before I sever our ties with CNA. This is not right. The reality is, that this man is incapable of holding any full time job. I would be happy to discuss my experiences as his employer with you at any time.")

12 *See, e.g.,* A.R. 119 (reference to Plaintiff's account of having diarrhea and vomiting that are "completely unpredictable" but "occur on at least an every-other-day basis"); A.R. 105 (Baun letter to CNA in conjunction with benefits appeals review process, in which Baun attests to having seen Nickola's "sudden and unpredictable needs of bathroom facilities, often interrupting in the middle of a sentence or discussions. These interruptions can last for five, ten or several minutes longer. And these are on good days. There are many times when he is virtually bed ridden or confined to a chair or even the bathroom for hours at a time").

---

**End of Document** © 2022 Thomson Reuters. No claim to original U.S. Government Works.

2012 WL 2370129
Only the Westlaw citation is currently available.
United States District Court, D. Maryland.

Ranna PATEL

v.

UNITED OF OMAHA LIFE INSURANCE CO.

Civil Action No. DKC 12–0880.
|
June 21, 2012.

**Attorneys and Law Firms**

Edward L. Norwind, Karp Frosh Lapidus Wigodsky and Norwind PA, Rockville, MD, for Ranna Patel.

Jeaneen J. Johnson, Colleen K. O. Brien, Semmes Bowen and Semmes, Baltimore, MD, for United of Omaha Life Insurance Co.

**MEMORANDUM OPINION AND ORDER**

DEBORAH K. CHASANOW, District Judge.

**\*1** The parties in this case involving allegations of improper termination of disability benefits under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §§ 1001 et seq., have advised of a disagreement regarding the nature and scope of discovery. Specifically,

> [t]he Plaintiff believes that she is entitled to discovery into the basis of the Defendant's decision to deny benefits, and also into the Defendant's potential conflict of interest.... Defendant believes that, as the Plaintiff's claims are governed by [ERISA], no discovery is allowed, as the [c]ourt must rely solely on the administrative record.

(ECF No. 8 ¶ 3). Plaintiff separately filed a motion for modification of the scheduling order, requesting extension of the discovery deadline in order to conduct discovery

outside the administrative record (ECF No. 9), and Defendant opposed this motion (ECF No. 10). [1]

Under ERISA, 29 U.S.C. § 1132(a)(1)(B), an individual who has been denied benefits under an employee benefit plan may challenge that denial in federal court. In reviewing such a claim, "the court must first decide whether the plan at issue vested discretion in the plan administrator with respect to the contested benefits." *Bartel v. Sun Life Assurance Co. of Canada,* 536 F.Supp.2d 623, 627 (D.Md.2008) (citing *Blackshear v. Reliance Standard Life Ins. Co.,* 509 F.3d 634, 638 (4th Cir.2007)).

Where a plan grants the administrator discretionary authority to determine benefits, the court conducts a "de novo review to determine whether a plan administrator abused its discretion ... based solely on the existing administrative record, rather than on any testimony or other additional evidence obtained outside the administrative record." *Williams v. Met. Life Ins. Co.,* 609 F.3d 622, 631 (4th Cir.2010). "Plaintiffs in such actions have generally not been entitled to discovery beyond the administrative record." *Clark v. Unum Life Ins. Co. of America,* 799 F.Supp.2d 527, 531 (D.Md.2011) (citing *Briggs v. Marriott Intern., Inc.,* 368 F.Supp.2d 461, 467 n. 4 (D.Md.2005)).

In the case of a plan that does not clearly grant discretion to the administrator, "the standard of review is de novo." *Gallagher v. Reliance Standard Life Ins. Co.,* 305 F.3d 264, 269 (4th Cir.2002) (citing *Feder v. Paul Revere Life Ins. Co.,* 228 F.3d 518, 522 (4th Cir.2000)). Generally, courts conducting *de novo* review also consider "only the evidentiary record that was presented to the plan administrator or trustee except where the district court finds that additional evidence is necessary for resolution of the benefit claim." *Quesinberry v. Life Ins. Co. of North America,* 987 F.2d 1017, 1026–27 (4th Cir.1993). As the Fourth Circuit has explained:

> Exceptional circumstances that may warrant an exercise of the court's discretion to allow additional evidence include the following: claims that require consideration of complex medical questions or issues regarding the credibility of medical experts; the availability of very limited administrative review procedures with little or no evidentiary record;

the necessity of evidence regarding interpretation of the terms of the plan rather than specific historical facts; instances where the payor and the administrator are the same entity and the court is concerned about impartiality; claims which would have been insurance contract claims prior to ERISA; and circumstances in which there is additional evidence that the claimant could not have presented in the administrative process.

**\*2** *Quesinberry,* 987 F.2d at 1027.

It is unclear, based on the instant record, whether the plan at issue is discretionary. Neither party has submitted any evidence—such as, for example, the plan itself—in support of their respective position. The parties agree, however, that Defendant had "the dual role of paying any plan benefits and determining eligibility under the Policy and was[,] therefore, acting under a structural conflict of interest in determining the LTD claim at issue in this case." (ECF No. 10, at 2). A number of courts, including two in this district, have found that "the Supreme Court's decision in *Metropolitan Life Ins. Co. v. Glenn,* 554 U.S. 105, 128 S.Ct. 2343, 171 L.Ed.2d 299 (2008), may have opened the door to additional discovery" where a conflict is presented. *Clark,* 799 F.Supp.2d at 531; *see also Anderson v. Reliance Standard Life Ins. Co.,* No. WDQ–11–1188, 2012 WL 32568 (D.Md. Jan.5, 2012).

In *Glenn,* 554 U.S. at 115, the Court "elucidate[d] what [it] set forth in *Firestone* [*Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989) ], namely, that a conflict should be weighed as a factor in determining whether there is an abuse of discretion." (Internal quotation marks and citation omitted). The Court explained that a conflict of interest "should prove more important (perhaps of greater importance) where circumstances suggest a higher likelihood that it affected the benefits decision, including, but not limited to, cases where an insurance company administrator has a history of biased claims administration." *Glenn,* 554 U.S. at 117. On the other hand, "[i]t should prove less important (perhaps to the vanishing point) where the administrator has taken active steps to reduce potential bias and to promote accuracy, for example, by walling off claims administrators from those interested in firm finances, or by imposing management checks that penalize inaccurate decisionmaking

irrespective of whom the inaccuracy benefits." *Id.* Thus, "[t]he weight to be given to the conflict ... depends on the 'likelihood that it affected the benefits decision.' " *Clark,* 799 F.Supp.2d at 532 (quoting *Glenn,* 554 U.S. at 117).

"The Fourth Circuit has not yet decided the question of what effect, if any, *Glenn* had on the availability of extrarecord discovery in ERISA cases." *Clark,* 799 F.Supp.2d at 532.[2] The majority of other circuit courts addressing the issue, however, have found that it "fairly can be read as contemplating some discovery on the issue of whether a structural conflict has morphed into an actual conflict." *Denmark v. Liberty Life Assur. Co. of Boston,* 566 F.3d 1, 10 (1st Cir.2009); *see Clark,* 799 F.Supp.2d at 532 (listing cases). As the First Circuit explained:

> In future cases, plan administrators, aware of *Glenn,* can be expected as a matter of course to document the procedures used to prevent or mitigate the effect of structural conflicts. That information will be included in the administrative record and, thus, will be available to a reviewing court. Conflict-oriented discovery will be needed only to the extent that there are gaps in the administrative record. If, say, the plan administrator has failed to detail its procedures, discovery may be appropriate, in the district court's discretion. Otherwise, discovery normally will be limited to the clarification of ambiguities or to ensuring that the documented procedures have been followed in a particular instance.

**\*3** *Denmark,* 566 F.3d at 10.

Here, Plaintiff has provided no basis for the court to determine whether any "gaps in the administrative record" warrant outside discovery regarding the nature and effect of the conflict of interest. Similarly, to the extent that she seeks discovery "regarding Omaha's decision-making process for such claims generally, and the decision-making process in her claim in particular" (ECF No. 9, at 4–5), no showing has been made that the administrative record is deficient. Indeed, it appears that the administrative record has not yet been produced; thus, Plaintiff's motion is premature. In any event, she has failed to present exceptional circumstances warranting discovery outside the administrative record.

This finding is entirely consistent with Judge Bredar's well-reasoned opinion in *Clark,* 799 F.Supp.2d at 533, in which he determined,

*Glenn* created an exception to the general rule (still otherwise in force) that extra-record discovery is unavailable to ERISA plaintiffs. Such discovery is available when an administrator has a structural conflict of interest and information not contained in the record is necessary to enable the court to determine the likelihood that the conflict influenced the particular benefits decision at issue.

*See Anderson,* 2012 WL 32568, at *3–4 (following Clark). Notably, Judge Bredar ordered supplemental briefing on the question of whether "the information already contained in the administrative record [was] sufficient to determine the extent, if any, to which Defendant's conflict of interest influenced its decision to deny Plaintiff's claim for long-term disability benefits." *Clark,* 799 F.Supp.2d at 533–34 (emphasis removed). After receiving that briefing, he concluded that the administrative record was sufficient "to allow the [c]ourt to determine the likelihood that Defendant's conflict of interest (i.e., its financial incentive to avoid paying claims) improperly influenced its decision to terminate Plaintiff's LTD benefits." *Id.* at 535–36. Thus, the plaintiff's motion to compel discovery was ultimately denied.

In the instant case, there is no question that a structural, if not an actual, conflict of interest exists, but until the administrative record is produced and examined, it cannot be known whether extra-record discovery is warranted. Thus, Plaintiff has not shown good cause for modification of the scheduling order. *See* Fed.R.Civ.P. 16(b).

Accordingly, it is this 21st day of June, 2012, by the United States District Court for the District of Maryland, ORDERED that:

1. Plaintiff's motion for modification of the scheduling order (ECF No. 9) BE, and the same hereby IS, DENIED without prejudice;

2. Plaintiff's consent motion to stay scheduling order (ECF No. 11) BE, and the same hereby IS, DENIED as moot; and

3. The clerk is directed to transmit copies of this Memorandum Opinion and Order to counsel for the parties.

**All Citations**

Not Reported in F.Supp.2d, 2012 WL 2370129

---

## Footnotes

1  Plaintiff also filed a motion to stay the scheduling order pending resolution of her motion for modification. (ECF No. 11). That motion will be denied as moot.

2  As noted, in an earlier decision, the court at least implied that discovery would be available in "[e]xceptional circumstances," such as "where the payor and the administrator are the same entity and the court is concerned about impartiality." *Quesinberry,* 987 F.2d at 1027. Its post-*Glenn* decisions are not inconsistent. *See Champion v. Black & Decker (U.S.), Inc.,* 550 F.3d 353, 362 (4th Cir.2008) (finding "no evidence raising a concern that would increase the weight of the conflict"); *Spry v. Eaton Corp. Long Term Disability Plan,* 326 Fed.Appx. 674, 678–79 (4th Cir.2009) (per curiam) ("proof of acts warranting imputation of improper motives to a plan administrator still aids claimants challenging adverse benefits decisions").

---

**End of Document**

© 2022 Thomson Reuters. No claim to original U.S. Government Works.