# Exhibit A

Case 1:22-cv-00186-WO-JLW   Document 33-1   Filed 12/02/22   Page 1 of 18

**2010 WL 11643527**
Only the Westlaw citation is currently available.
United States District Court, D.
South Carolina, Charleston Division.

Judy CASEY, Plaintiff,
v.
HARTFORD LIFE AND ACCIDENT
INSURANCE COMPANY, Defendant.

2:09-cv-00313-CWH
|
Signed 08/31/2010
|
Filed 09/07/2010

**Attorneys and Law Firms**

Robert Edward Hoskins, Foster and Foster, Greenville, SC, for Plaintiff.

Ingrid Blackwelder Erwin, Julia Kelley Ebert, Jackson Lewis Law Firm, Greenville, SC, for Defendant.

**ORDER**

C. WESTON HOUCK, UNITED STATES DISTRICT JUDGE

 **\*1** This is a civil action under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1132(a)(1)(B), seeking a declaration that Judy Casey ("Plaintiff") is entitled to short term and long term disability benefits under the terms of her short term and long term disability insurance coverage plans. Hartford Life and Accident Insurance Company ("Defendant") was both the insurer and the administrator of the plans during the relevant time period. The Plaintiff and the Defendant have each filed motions for summary judgment on the issue of the Plaintiff's entitlement to benefits under her short term disability plan. For the reasons discussed below, the Plaintiff's motion for summary judgment (Docket Entry #22) is DENIED and the Defendant's motion for summary judgment (Docket Entry #23) is GRANTED.

**I. BACKGROUND**

The Plaintiff was the owner of a dress shop in Charleston, South Carolina, known as "The Finicky Filly." The Plaintiff's primary responsibilities as owner of The Finicky Filly were the purchase and sale of merchandise and the training of employees. (R. 327). The Plaintiff's duties also included traveling to purchase merchandise for the shop, organizing fashion shows, and bookkeeping. (R. 443). The physical aspects of the Plaintiff's position included continuous standing and walking as well as occasional stooping, kneeling, reaching, and climbing. (R. 442). The Plaintiff also would often have to lift and carry clothes and boxes weighing 5-12 lbs. Id.

A. The Short Term Disability Plan

The Plaintiff participated in a short term disability (STD) plan ("the Plan") through The Finicky Filly that was insured by the Defendant. The Plan provided the following relevant definition of "Disability":

Disability means that Injury or Sickness causes physical or mental impairment to such a degree of severity that You are:

1) continuously unable to perform the Material and Substantial Duties of Your Regular Occupation; and

2) not Gainfully Employed.

(R. 520). The Plan further provided that a claimant must provide the following proof of disability:

The following items, supplied at Your expense, must be a part of Your proof of loss. Failure to do so may delay, suspend or terminate Your benefits.

1) The date Your Disability began;

2) The cause of Your Disability;

3) The prognosis of Your Disability;

4) Proof that You are receiving Appropriate and Regular Care for Your condition from a Doctor, who is someone other than You or a member of Your immediate family, whose specialty or expertise is the most appropriate for Your disabling condition(s) according to Generally Accepted Medical Practice.

5) Objective medical findings which support Your Disability. Objective medical findings include but are

not limited to tests, procedures, or clinical examinations standardly accepted in the practice of medicine, for Your disabling condition(s).

6) The extent of Your Disability, including restrictions and limitations which are preventing You from performing Your Regular Occupation.

7) Appropriate documentation of Your Weekly Earnings. If applicable, regular monthly documentation of Your Disability Earnings.

 **\*2**  8) If You were contributing to the premium cost, Your Participating Employer must supply proof of Your appropriate payroll deductions.

9) The name and address of any Hospital or Health Care Facility where You have been treated for Your Disability.

10) If applicable, proof of incurred costs covered under other benefits included in the Policy.

(R. 526). The Plan also granted the Defendant "discretionary authority to determine ... eligibility for and entitlement to benefits under the Policy." (R. 533). The Finicky Filly's effective date of coverage under the Plan was July 1, 2004. (R. 518).

#### B. The Plaintiff's August 13, 2004 Claim for STD Benefits

On June 18, 2004, the Plaintiff visited a Doctor's Care facility in Charleston, South Carolina. One of the Plaintiff's complaints was that she was "feeling very weak." (R. 361). In connection with this visit, a Dr. Joseph Marino ordered, among other tests, a test to determine whether the Plaintiff was suffering from Lyme disease. (R. 360). The Plaintiff tested negative for Lyme disease at that time. (R. 365).

The Plaintiff stopped working on July 3, 2004, and, sometime in July of 2004, the Plaintiff was treated by a Dr. William Ginsburg at the Mayo Clinic in Jacksonville, Florida. A July 27, 2004 note from Dr. Ginsburg indicates that the Plaintiff tested positive for lyme serology and that the Plaintiff "probably" had early Lyme disease. (R. 458).

On August 10, 2004, the Plaintiff visited a Dr. Richard Falkenstein in Middleburg, Virginia. Dr. Falkenstein's notes reflect that the Plaintiff was feeling better and that he expected that she would be able to return to work "by just after Labor Day (9/6/04)." (R. 456).

On August 13, 2004, the Plaintiff submitted a claim for STD benefits to the Defendant in which the Plaintiff described her disability as "Lymes [sic] Disease – Pain – Exhaustion." (R. 461). The Plaintiff's claim form also included a section that was filled out by Dr. Falkenstein, as the Plaintiff's attending physician. He listed the Plaintiff's diagnosis as "Lyme disease," stated that her total disability commenced on June 12, 2004, and indicated that her expected return to work date was September 7, 2004. (R. 462).

The Defendant ultimately approved the Plaintiff's August 13, 2004 claim for STD benefits for the period of July 3, 2004 through October 2, 2004, which represented the maximum period (13 weeks) for which STD benefits were available to the Plaintiff under her STD policy. (R. 518). The Defendant, however, denied a subsequent claim for long term disability (LTD) benefits based on this claim when the Defendant discovered that the Plaintiff had been tested for Lyme disease on June 18, 2004. Although that particular test was negative, the Defendant relied on the test to deny the Plaintiff's claim for LTD benefits because it showed that the Plaintiff's Lyme disease – the condition for which the Plaintiff was seeking benefits – was a preexisting condition on July 1, 2004, when the Plaintiff's policy went into effect. [1]

#### C. The Plaintiff's Current Claim for STD Benefits

 **\*3**  Sometime in January of 2005, the Plaintiff submitted to the Defendant another claim for STD benefits, which listed her disability as "exhaustion – pain." (R. 449). The form did not indicate the last day worked by the Plaintiff, nor did it provide an expected return-to-work date. Instead, the Plaintiff simply wrote "no" in the box for "date employee expected to return to work." Id. In February of 2005, the Plaintiff supplemented this claim with an Attending Physician Statement ("APS") from a Dr. Richard Sall. The APS lists "Lyme disease" as the Plaintiff's diagnosis and states that the Plaintiff's disability commenced on September 6, 2004. (R. 450). Approximately one year later, on February 14, 2006, the Plaintiff, through her attorney, submitted another claim for disability benefits, which the Plaintiff's attorney referred to as a "draft application." (R. 326).

1. The Defendant's First Denial of the Plaintiff's Claim

On April 3, 2006, the Defendant denied the Plaintiff's claim for STD benefits. In a letter to the Plaintiff's attorney, the Defendant reasoned:

> We notified you on 12/22/05 and 3/9/06 via telephone that we needed additional information in order to determine Ms. Casey's eligibility for STD benefits. This information included proof of her return to work dates, proof of her return to work earnings, draws taken from the company since 2004, and supporting information from treating providers from her last day worked through the present. To date, we have received only her company draws.

> The lack of the information requested that is noted above, hindered our ability to determine Ms. Casey's eligibility for STD benefits, and whether she has satisfied the provisions of the STD policy. Because of this, Ms. Casey's STD benefits must be denied and her claim has been closed.

(R. 142). The Defendant did note, however, that it would provide the Plaintiff an opportunity to "perfect her claim by providing the necessary information" and informed the Plaintiff's attorney that he "should send verification of the dates that [Plaintiff] returned to work, hours worked per day, and verification of her earnings for the period of 7/3/04 through the present." (R. 142-43).

### 2. The Plaintiff's Attorney Provides the Requested Information

On May 13, 2006, the Plaintiff's attorney sent the Defendant a fax that detailed the Plaintiff's work history. Specifically, the Plaintiff's attorney noted that the Plaintiff had returned to work during the week of October 4, 2004, and that "[f]or several months thereafter she felt well and worked consistently until the symptoms of monoclonal gammopathy disease set in that Dr. Amiram Katz diagnosed and declared Ms. Casey disabled beginning on January 17, 2005." (R. 259). The Plaintiff's attorney followed this with a letter to the Defendant on June 19, 2006, in which he clarified that the Plaintiff considered her claim for disability to be effective from January 17, 2005. (R. 301).

### 3. The Defendant Again Denies the Plaintiff's Claim

On October 9, 2006, the Defendant, by letter, once again denied the Plaintiff's claim for STD benefits. (R. 178-82). The Defendant's letter noted that the Defendant reviewed the following papers contained in the Plaintiff's file when making its determination: office notes and medical records from Dr. Sall from 9/16/04 through 2/14/05; office notes and medical records from Dr. Lafsky from 12/9/04 through 12/9/04; office notes and medical records from Dr. Katz from 1/17/05 through 12/6/05; office notes and medical records from Dr. Wiley from 1/18/06 through 4/27/06; office notes and medical records from Dr. Felsenstein from 4/6/06 through 4/6/06; office notes and medical records from Dr. Afrin; the Plaintiff's job description dated 5/13/05; and a letter from the Plaintiff's attorney detailing the Plaintiff's earnings/losses for the 2004 tax year. (R. 179). The Court now will briefly review the medical records that the Plaintiff submitted to support her claim.

### a. Dr. Sall

**\*4** Beginning in September of 2004, the Plaintiff began visiting a Dr. Richard Sall, who practiced with the Infectious Diseases Specialists of Virginia, LLC in Fairfax, Virginia. The Plaintiff's condition apparently improved after she began seeing Dr. Sall – the Plaintiff had returned to work on October 4, 2004, and a medical record from this time period states that the Plaintiff "feels about 100%" and "was able to walk 3 miles" the preceding weekend without pain or weakness. (R. 401). A medical record from Dr. Sail's office dated October 25, 2004, indicates that the Plaintiff was "feeling much worse," however, with symptoms including exhaustion, pain in her wrists and ankles, and headaches. (R. 400). Dr. Sail's staff's notes from a subsequent visit with the Plaintiff on December 13, 2004, indicate that the Plaintiff complained of "mental fogginess, ankle, knee joint pains worse in wrist and fingers." (R. 390). On December 20, 2004, the Plaintiff complained to Dr. Sall that she was suffering from fatigue. (R. 389). On December 28, 2004, the Plaintiff similarly reported that she was feeling exhausted, (R. 385), and on January 4, 2005, Dr. Sall prescribed a course of treatment with Rocephin, an antibiotic. [2] (R. 384). A February 14, 2005 progress note from Dr. Sall notes that the Plaintiff's symptoms included "joint pain" and "fatigue." (R. 375).

### b. Dr. Lafsky

The Plaintiff also visited a Dr. Robert Lafsky, a gastroenterologist, on December 9, 2004. Dr. Lafsky noted the Plaintiff's history of heartburn and other

gastroenterological problems, as well as the Plaintiff's recent Lyme disease diagnosis. (R. 391).

### c. Dr. Katz

On January 17, 2005, the Plaintiff consulted with a Dr. Amiram Katz, a neurologist located in Connecticut. Dr. Katz noted the Plaintiff's complaints as:

> Fatigue, pain in her wrists and ankles, inability to walk more than a few blocks without getting extremely tired (was in a great physical shape prior to the onset of her illness). "Brain fog", which is sometimes so bad that she cannot trust herself driving. Forgetfulness. Night sweats.

(R. 410). After reviewing the Plaintiff's medical history, Dr. Katz concluded that the Plaintiff was suffering from "partially treated CNS-Lyme." (R. 411). Dr. Katz also added an addendum to the Plaintiff's medical records on February 1, 2005, in which he stated that the Plaintiff's blood tests "confirmed the presence of monoclonal gammopathy on the protein electrophoresis which on immunofixation ended up being IgG lambda (a light chain bound to a heavy chain) which requires a hematologic consult." (R. 412). Dr. Katz also noted that the Plaintiff was "found to be and [sic] HLA DR4, had a positive ANA of 1:80, homogenous, her C-reactive protein was 3.0 (normal <0.8)." Id. Dr. Katz did note, though, that the Plaintiff "[i]n the past two weeks ... had a dramatic improvement in her condition." Id.

On December 14, 2005, the Plaintiff submitted to the Defendant an additional report from Dr. Katz. That report, dated December 6, 2005, states in pertinent part:

> Ms. Casey, suffers from autoimmune neurologic and rheumatologic conditions (ICD9 – 279.4) resulting in fatigue, joint pain, muscle pain and cognitive decline.

> She has monoclonal gammopathy, which was further evaluated with bone marrow studies, at the Mayo Clinic in Florida, on March of this year, reporting plasma cell proliferation (5%, some look atypical).

She is HLA-DR4 (which puts her at high risk for ankylosis spondylitis). She has persistently positive ANA's and elevated CRP's, which are indicative of active autoimmune process that might be originating from her gammopathy.

> She has been tried on Plaquenil for almost a year without any alleviation of her symptoms. She has been using NSAIDs, which are not ameliorating her symptoms. She was prescribed Provigil to stay awake, but this medication results in significant side effects.

> At this point, after treating Ms. Casey for a year, I FIND Ms. Casey to continue and [sic] be totally disabled. She cannot continue and work. Her disability dates back to the first time I saw her, on January 17, 2005.

**\*5** (R. 330).

### d. Dr. Wiley

On January 18, 2006, the Plaintiff was seen by a Dr. Kathleen Wiley at the Medical University of South Carolina in Charleston, South Carolina. Dr. Wiley noted that the Plaintiff had "a very complicated medical history" that "started in 6/04 when she developed an illness characterized by extreme fatigue and muscle aches that primarily involved her lower extremities, her wrists, and an [sic] occasionally has areas of tenderness over her shoulders and her neck." (R. 291). Dr. Wiley provided the following recounting of the Plaintiff's medical history:

> She has been diagnosed as Lyme disease by a Dr. Katz in Connecticut and has been treated with Rocephin and several other antibiotics and he has recently suggested that she might benefit from plasmapheresis. She has also been seen twice at the Mayo Clinic in Jacksonville and most recently has been [seen] by a rheumatologist, hematologist and neurologist. It was at that time that she was diagnosed with MGUS. When she has these episodes she says that she has difficulty with being very mentally foggy, difficulty thinking and just seems to kind of go away from

her surroundings. She says after each one of these episodes she feels like she loses a little bit of her stamina that never really returns. She previously was a very active business woman with two dress shops, one in Virginia and one here in Charleston and was very active with community affairs. She has been able to do none of these things and is in the process of closing down both of her businesses.

Id. Dr. Wiley's records indicate that she gave the Plaintiff a referral for a motorized scooter "to help [Plaintiff] accomplish her activities during the day." (R. 293).

The Plaintiff returned to Dr. Wiley on April 19, 2006 "to discuss her diagnosis of fatigue." (R. 290). Dr. Wiley noted that the Plaintiff was "under a great deal of stress" as the Plaintiff's sister had recently been diagnosed with cancer and the Plaintiff was going to travel to "help take care of her sister and her sister's two disabled children." Id. Dr. Wiley noted that the Plaintiff was "very tearful discussing this" and wanted "something to help her be able to cope better." Id. Ultimately, Dr. Wiley gave the Plaintiff a prescription for Ativan and assessed the Plaintiff's condition as "[p]ossible chronic fatigue syndrome." Id. Dr. Wiley's notes indicated that she would refer the Plaintiff "to Sleep Clinic as well as Pain Management." Id. Dr. Wiley also noted "[p]atient with monoclonal gammopathy – will follow-up with Dr. Afrin." Id.

The Plaintiff saw Dr. Wiley again on April 27, 2006. Dr. Wiley's notes from this visit indicate that the Plaintiff reported having "good days and bad days." (R. 288). The notes further indicate that "[t]he bad days are associated with a lot of fatigue and pain." Id. Dr. Wiley provided an assessment of "[p]robable chronic fatigue syndrome." Id.

### e. Dr. Felsenstein

The Plaintiff was seen by a Dr. Donna Felsenstein at Massachusetts General Hospital on April 4, 2006, "for evaluation of ongoing fatigue and pain." (R. 265). Dr. Felsenstein provided the following summary of the Plaintiff's symptoms:

**\*6** The patient reports that on a good day she is able to make dinner and can walk one block. She is sometimes able to be at work for approximately 2 hours. She is often in a lot of pain. Some days she experiences generalized muscle aches and pains. Some days her pain is better than others, although she has pain almost every day. She is unable to read because it is too exhausting. She has to prop herself up in order to watch TV as she is uncomfortable otherwise. Her word finding is now back to normal, although she notes that when she is tired she has some short-term memory difficulties. She feels as though her organizational skills are poor. She cannot read a book because she cannot seem to remember the details or the characters.

(R. 265-66). In a follow up phone call on April 14, 2006, the Plaintiff noted that she "continue[d] to feel terrible with marked fatigue and discomfort." (R. 268). Dr. Felsenstein's notes from that call reflect that Dr. Felsenstein "[d]iscussed chronic fatigue syndrome vs. lyme." Id. Dr. Felsenstein further noted that "[Plaintiff's] history of improvement on antibiotics ... raises questions as to her diagnosis as this would not be expected to occur with [chronic fatigue syndrome], although there is fluctuation in symptoms with [chronic fatigue syndrome]." Id.

### f. Dr. Afrin

On December 6, 2005, the Plaintiff visited a Dr. Lawrence Afrin, a doctor at the Medical University of South Carolina in Charleston, South Carolina, for "[c]onsideration of plasmapheresis treatment for monoclonal gammopathy of undetermined significance." (R. 294). Because both parties quote heavily from Dr. Afrin's discussion of the Plaintiff's medical history, the Court notes the following pertinent observations by Dr. Afrin:

Ms. Casey, a well-educated and previously highly functional entrepreneur and owner of women's clothing stores (including one store here in downtown Charleston), presents in consultation regarding further evaluation and management of a strange asthenic syndrome, heretofore diagnosed as Lyme disease, and now recommended by one of her physicians, but not several others, to undergo plasmapheresis as treatment for her monoclonal gammopathy which also was discovered fairly recently. The reader is referred for details to the assemblage of selected records from her medical pursuits of the last 18 months that I have had scanned into her MUSC medical record, but a full re-taking of her history began this way: In June 2004 she was planning to visit Charleston, SC from her 10-acre rural estate in Middleburg, VA (which she says has one of the country's highest prevalences for Lyme disease and the infected tick that causes it). She says deer often cross her property there and she was often out and about across the property, including performing manual work nearly daily in the garden near the house. Although she cannot recall any prior sick contacts or significant travel or ever suffering a tick bite or observing the characteristic Lyme rash, she did suffer several hornet stings on her left hand in a single incident in the garden one morning shortly before she and her husband were due to travel to Charleston. This is the only insect contact she can recall. She promptly saw her local physician, who she says gave her an antihistamine shot. She and her husband remember her being very sleepy following this event. They ascribed this to the antihistamine shot, but by the next day she was so fatigued and drained of energy that the trip to Charleston had to be delayed for three days. She was little better when they did eventually travel to Charleston, and she wound up seeing a local gastroenterologist here soon after arriving due to complaints of dyspepsia. She was found to be heme-positive and soon underwent lower and upper endoscopy which found not only internal hemorrhoids and rectal polyps but also, interestingly, erosive gastritis and a positive H. pylori screen. A gastric biopsy was also obtained; the results aren't in the records available to me today, but the patient was never told of any concerning findings in it. I'm not entirely clear on the treatment she received for the gastritis – I can't tell if it was just anti-acid treatments or the full "triple therapy" for H. pylori – but meanwhile her asthenia was certainly getting no better, perhaps even getting worse, to the point where she could barely mobilize and barely cogitate and verbalize, spending 20+ hours a day in bed. Convinced she had Lyme disease

(and dissatisfied with a local infectious disease specialist who at the initial visit gave her prescriptions for seven medications, none of which she had filled after learning one of them was an anti-depressant), she went on to Mayo Jacksonville for further evaluation which seems to me as if it was quite extensive (including a bone marrow exam to follow up on discovery of a very modest degree of monoclonal IgG lambda on SPEP), but after two weeks there she says she was told she was "undiagnosable". Just as she was leaving Mayo, she convinced them to check her Lyme titers again, and upon her return to Middleburg she received the news that the titers, originally negative, had become "positive" (in fact, though, they were only barely so, with only 1 out of 3 IgM bands and only 1 out of 10 IgG bands in that particular assay showing positive). Her local physician thus proceeded to give her two weeks of an antibiotic which did not help her, and then she saw a local infectious disease specialist who gave her Rocephin for 4 weeks. This did help her feel a good bit better, but her symptoms quickly relapsed after stopping this treatment, and she soon sought consultation from a Lyme specialist in Lyme, CT. That physician recommended that Rocephin treatment for Lyme disease should be given for a total of eight weeks, but upon return to Virginia her local physician "refused" to give another month of Rocephin, instead giving her weekly "penicillin", during which time her relapse continued to worsen. She then sought consultation with Dr. Katz, a neurologist in New Haven, CT. He obtained a variety of brain scans which he showed her, pointing out "little white spots" consistent with Lyme disease. Rocephin was then restarted and she improved until developing "gallbladder problems," at which point a second antibiotic was added for a month, and then oral antibiotics for another two months. She now has been off antibiotics for two months. About this time Dr. Katz was becoming more concerned that her symptoms could be the result of her monoclonal gammopathy and began urging her to undergo plasmapheresis, though she tells me he never actually ordered the procedure for her. She says she completed another wholesale re-evaluation at Mayo Jacksonville about two weeks ago. I don't have any of those records, but she says she saw a hematologist/oncologist who felt she had MGUS and strongly advised against plasmapheresis, feeling her monoclonal protein was not the cause of her symptoms. She also saw a rheumatologist who felt she did not have a rheumatologic problem and who also felt that plasmapheresis was not indicated.

**\*7** Today she says she is in the middle of another relapse (or, as she calls it, a "siege") that began about 1-2 weeks

ago. As with the original period of her illness, it is an utter draining of energy – "I feel like I'm dying" – that leaves her barely able to think and vocalize, let alone mobilize. She used to have "a very high energy level," walking four miles a day, administering her businesses, and simultaneously coordinating three fundraisers, but now she says she can function only three hours a day, and five minutes on a bicycle wipes her out so badly she is bedridden for the next 2-3 days. She also suffers deep aching throughout much of her skeleton, particular in the areas just proximal to the wrists and ankles, extending up into the forearms and forelegs. She often finds that her dependent areas become particularly intensely achey. She describes it as "the worst painful flu you could ever imagine." She sleeps "20 hours a day," has no appetite, and has lost significant weight with each flare of the illness (12 lbs. in a week with the initial presentation, she says). Interestingly, she has never had any fever, chills, cough, chest or abdominal discomfort, jaundice, or any changes in stools or urine. She has never noted a rash, and I can't find any evidence in the lab reports available to me today that she has ever been significantly anemic, though she says one of her physicians previously told her she looked "very gray" during the early course of her illness.

(R. 294-96). Dr. Afrin ultimately concluded that the Plaintiff had "suffered a true (i.e., not hypochondriacal or psychiatric or otherwise factitious), quite disabling illness that I think best fits the general pattern of a chronic viral infection of as yet unknown specific type, though other (non-viral) infections (such as Lyme) and autoimmune syndromes are also possible." (R. 299).

### g. The Defendant's Denial Letter to the Plaintiff

The Defendant's October 9, 2006, letter to the Plaintiff recounted the various materials that the Plaintiff had submitted in support of her claim, but ultimately determined that there was "no support for restrictions or limitations which would preclude [Plaintiff] from being able to perform the material and substantial duties of her occupation to include sitting, standing, walking, talking, hearing, stooping, kneeling, climbing, reaching, lifting and carrying." (R. 181). The Defendant thus concluded that the Plaintiff did not meet the Plan's definition of Disability because she "was capable of performing the material and substantial duties of her occupation as of [January 17, 2005]." Id. The letter closed by

informing the Plaintiff of her right to appeal the Defendant's decision within 180 days. Id.

### 4. The Plaintiff's Appeal

The Plaintiff appealed the Defendant's rejection of her STD benefits claim. The Plaintiff supported her appeal with additional letters from Dr. Wiley, Dr. Felsenstein, and Dr. Katz. Additionally, the Defendant referred the Plaintiff's claim to an independent peer-review physician, Dr. Gary Nudell, to determine whether the medical evidence supported a finding of continuous functional impairment beginning January 17, 2005. Dr. Nudell's peer-review report was also available to the Defendant when it considered the Plaintiff's appeal. The Court summarizes these items below.

### a. Dr. Wiley's Letter

On November 28, 2006, Dr. Wiley addressed a letter to the Defendant in which she discussed the Plaintiff's illness. With respect to the Plaintiff's symptoms and limitations, Dr. Wiley noted:

> Simple activities such as going to her office or trying to do some shopping will leave her fatigued and bedridden for a day or more. She has difficulty with concentration and also has problems with chronic muscle aches. She has been given several different diagnoses as this illness has unfolded, but it seems most likely now to be a chronic fatigue syndrome. She has closed her business and has had to limit her usual activities because of this illness.

(R. 223). Dr. Wiley concluded her letter by stating her belief that "Mrs. Casey's illness is so severe and so prolonged that she will not be able to return to any employment." Id.

### b. Dr. Felsenstein's Letter

The Plaintiff also submitted to the Defendant a letter from Dr. Donna Felsenstein, dated January 12, 2007. Dr. Felsenstein provided the following overview of the Plaintiff's symptoms and limitations:

> Although you were functioning at a very high level prior to your illness, when 1 saw you on April 4, 2006, it was apparent that you were no longer able to function at that high level. You were having significant difficulty managing on a daily basis aside from the fact that it affected your work dramatically. In particular, on a "good day," your activity was noted for the fact that you were able to make dinner and could walk one block, but were not able to partake in additional normal every day activities. We discussed the fact that you were often in a lot of pain. Minor chores such as even reading a book was too exhausting. In addition, you were unable to read because you were unable to remember the details of what you were reading. You were having word finding difficulties as well as short term memory difficulties. In addition, you were having difficulty with your organizational skills. You are apparently in pain and suffering on an every day basis. Some days are worse than others. All these symptoms have affected your lifestyle dramatically making you unable to function at your work.

 **\*8**  (R. 202). Dr. Felsenstein concluded that the Plaintiff's degree of disability in April 2006 was "significant" and that, in Dr. Felsenstein's opinion, the Plaintiff was "disabled and unable to function at a level to maintain a job let alone run a business." Id.

#### c. Dr. Katz's Letter

The Plaintiff also provided the Defendant with a record of an additional visit to Dr. Katz, the Connecticut neurologist. In Dr. Katz's record of the visit, dated January 13, 2007, he provides the following assessment of the Plaintiff's condition:

> Ms. Casey suffers from an autoimmune condition associated with monoclonal gammopathy with possible Lyme induced autoimmune condition. As a result of her illness, she suffers from extreme fatigue, joint and muscle aches, along [sic] cognitive difficulties. From an active energetic lady she became limited in her physical activities and can spend only one to three hours on her feet (on good days). Her cognitive difficulties have resulted in inability to function at her previous level as a businesswoman and are impairing her ability to be gainfully employed.

(R. 214). Dr. Katz concluded that his January 13, 2007, examination of the Plaintiff "supports the previous determination that she is totally disabled and cannot be gainfully employed" and that the "determination dates back to February 2005, which was a month after I originally saw her." Id.

#### d. Dr. Nudell's Peer-Review Report

On March 7, 2007, the Defendant had forwarded the Plaintiff's claims file to Dr. Gary Nudell, an independent medical reviewer. (R. 183). Dr. Nudell, after reviewing the Plaintiff's medical records and speaking to both Dr. Wiley and Dr. Katz, concluded that the "[m]edical evidence does not support functional impairment from 1/17/05 onward." (R. 166). Dr. Nudell reasoned:

> The claimant has been diagnosed with [chronic fatigue syndrome], possibly as a result of previous Lyme infection. Whatever the inciting cause, the claimant now reportedly experiences fatigue, with associated aches/pains and some cognitive dysfunction. The difficulty in assessing this case is

that there are truly no objective findings to corroborate the claimant's complaints. There was one Lyme test that came back positive, but there seems to be debate among the treating physicians as to whether this was truly the diagnosis. While the claimant did have some response to antibiotics, this response was limited. The treating physicians believe the claimant to be "disabled" secondary to [chronic fatigue syndrome], but none of the exams reveal any joint or musculoskeletal abnormalities, neurological dysfunction, or clinical evidence of cognitive dysfunction. Based on the records, there is no objective rational to support full loss of functional capacity in the workforce.

(R. 166-67).

### 5. Denial of the Plaintiff's Appeal

On March 29, 2007, the Defendant reaffirmed its decision to deny the Plaintiff STD benefits and thus rejected her appeal. With respect to the additional medical records from Dr. Felsenstein, Dr. Katz, and Dr. Wiley that the Plaintiff submitted in support of her appeal, the Defendant reasoned:

> The medical records received on appeal from Dr. Felsenstein, Dr. Katz and Dr. Wiley were reviewed and it is acknowledged that these records support that when you were seen by Dr. Felsenstein in April 2006 and by Dr. Wiley commencing January 2006 and by Dr. Katz on January 13, 2007, your condition had deteriorated and each of the doctors noted an inability to work, either due to fatigue, poor sleep, neuropathy with pain in all positions and/or poor cognitive function. However, prior to these office visits, the medical evidence from January 17, 2005 did not support

continual functional impairment and you remained able to perform the material and substantial duties of your occupation to include sitting, standing, walking, talking, hearing, stooping, kneeling, climbing, reaching, lifting and carrying.

**\*9** (R. 164-65). The Defendant also noted Dr. Nudell's conclusion that no objective findings corroborated the Plaintiff's complaints. The Defendant concluded:

> Therefore, based on the appeal assessment, including the report of Dr. Nudell, whose opinion and expertise we further relied upon, there are no supporting medical records indicating functional impairment exists such that it would preclude you from performing the material and substantial duties of your occupation as of the date you ceased working on January 17, 2005.

(R. 165).

### 6. Additional Communications
### Between the Plaintiff and the Defendant

On May 7, 2007, the Plaintiff's son, who had taken over representation of the Plaintiff in her claim, contacted the Defendant to state a desire to appeal the denial of the Plaintiff's claim. (R. 144). By letter dated May 7, 2007, the Defendant noted that the Plaintiff had exhausted her right to appeal the denial of her claim. The Defendant stated, however, that it would "extend the courtesy" of looking at any additional medical information as to when the Plaintiff last worked, which the Plaintiff wished to submit for review, if that information was presented to the Defendant by July 2, 2007. (R. 139).

The Plaintiff did not submit any additional medical information. The Plaintiff did communicate with the Defendant by telephone several times over the next several months, however, and on March 3, 2008, the Defendant sent

**WESTLAW** © 2022 Thomson Reuters. No claim to original U.S. Government Works.

the Plaintiff a letter in which it summarized the Plaintiff's claims:

Our claim system shows three (3) separate disability claims:

1. You had last worked on July 3, 2004, claiming disability due to Lyme Disease. Your Short-Term Disability benefits were paid through the maximum period payable of October 2, 2004; however, due to your Lyme Disease being pre-existing, your Long Term Disability benefit had been denied. This corresponds to the denial letter dated October 9, 2005.

2. You had returned to work on October 4, 2004 and continued working until January 16, 2005. You had submitted a Short-Term Disability claim for this loss, indicating that you were unable to continue working due to Chronic Fatigue Syndrome. Your Short-Term Disability claim was denied on October 9, 2006 and details regarding this decision are found in Ms. Kelly M. Smith's letter of that date.

3. The last claim is regarding your Long Term Disability benefits that are related to your inability to continue working beyond January 16, 2005. A Long Term Disability claim was set up; however, as you were not found to be disabled in accordance with the Short-Term Disability policy, you were not eligible for any Long Term Disability benefits regarding your date of loss claimed for your inability to work beyond January 16, 2005. There are no further periods of return to work with this Policyholder beyond January 16, 2005.

(R. 079). The Defendant also again informed the Plaintiff of her right to bring a civil action under Section 502(a) of ERISA. (R. 080).

### D. Procedural History

The Plaintiff instituted the current action on February 6, 2009. Docket Entry #1. On July 10, 2009, the Plaintiff and the Defendant filed a Joint Submission of Relevant Information that included both the governing plan documents and the administrative record of the Plaintiff's claim. Docket Entry #14 and #15. The instant motions for summary judgment were each filed on September 8, 2009. Docket Entry #22 and #23.

## II. DISCUSSION

### A. Legal Standard

**\*10** When a party has moved for summary judgment, "[t]he judgment sought should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). To prevail on a motion for summary judgment, the movant must demonstrate that: (1) there is no genuine issue as to any material fact and (2) he is entitled to judgment as a matter of law. As to the first of these determinations, a fact is deemed "material" if proof of its existence or nonexistence would affect the disposition of the case under the applicable law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). An issue of such material fact is "genuine" if the evidence so offered is such that a reasonable jury might return a verdict for the non-movant. Id. at 257, 106 S.Ct. 2505. In determining whether a genuine issue has been raised, the court must construe all inferences and ambiguities against the movant and in favor of the non-moving party. U.S. v. Diebold, Inc., 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962).

### B. Standard of Review

The Court first considers whether it should review the Defendant's decision to deny the Plaintiff STD benefits de novo or for an abuse of discretion. The Supreme Court has held that "a denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a de novo standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989). "When ... an ERISA benefit plan vests with the plan administrator the discretionary authority to make eligibility determinations for beneficiaries, a reviewing court evaluates the plan administrator's decision for abuse of discretion." Williams v. Metro. Life Ins. Co., 609 F.3d 622, 629-30 (4th Cir. 2010). The Plan at issue in this case included the following relevant language:

The plan administrator and other plan fiduciaries have discretionary authority to determine Your eligibility for and entitlement to benefits under the Policy. The plan administrator has delegated sole discretionary authority to CNA Group Life Assurance Company to determine Your eligibility for benefits and to interpret the terms and provisions of the plan and any policy issued in connection with it. [3]

(R. 533). The Court concludes that this language expressly vested discretionary authority to make benefits eligibility determinations with the Defendant. [4] Accordingly, the Court will review the Defendant's decision to deny the Plaintiff STD benefits under an abuse of discretion standard.

**\*11** Under the abuse of discretion standard, the Court should not "disturb a plan administrator's decision if the decision is reasonable," even if the Court "would have come to a contrary conclusion independently." Williams, 609 F.3d at 630. A decision is reasonable if it is "the result of a deliberate, principled reasoning process" and "supported by substantial evidence." Brogan v. Holland, 105 F.3d 158, 161 (4th Cir. 1997). The Court should guide its inquiry into the reasonableness of an administrator's decision by considering eight non-exclusive factors:

(1) the language of the plan; (2) the purposes and goals of the plan; (3) the adequacy of the materials considered to make the decision and the degree to which they support it; (4) whether the fiduciary's interpretation was consistent with other provisions in the plan and with earlier interpretations of the plan; (5) whether the decisionmaking process was reasoned and principled; (6) whether the decision was consistent with the procedural and substantive requirements of ERISA; (7) any

external standard relevant to the exercise of discretion; and (8) the fiduciary's motives and any conflict of interest it may have.

Booth v. Wal-Mart Stores. Inc., 201 F.3d 335, 342-43 (4th Cir. 2000) (footnote omitted).

### C. The Defendant's Decision was Principled and Supported by Substantial Evidence

The Court begins by noting that the issue in this case is not whether the Plaintiff was suffering from chronic fatigue syndrome, monoclonal gammopathy, or some other malady on January 17, 2005. That a claimant suffers from an illness does not require a finding of disability. Cf. Conrad v. Cont'l Cas. Co., 232 F. Supp. 2d 600, 604 (E.D.N.C. 2002) (noting that "a diagnosis of fibromyalgia does not equate to a finding of disability"). Rather, the issue is whether the Defendant's conclusion that the Plaintiff did not meet her Plan's definition of Disability – the continuous inability to perform the material and substantial duties of her occupation – as of January 17, 2005, was "the result of a deliberate, principled reasoning process" and "supported by substantial evidence." [5] Brogan, 105 F.3d at 161.

### 1. A Deliberate and Principled Reasoning Process

First, the Defendant's decision to deny the Plaintiff STD benefits under the Plan was the result of a deliberate and principled process. After receiving two submissions for STD benefits from the Plaintiff that did not include appropriate documentation with respect to the Plaintiff's work dates and earnings information, the Defendant notified the Plaintiff that such information was necessary to process her claim. (R. 142). Although the Defendant initially denied the Plaintiff's claim because of these omissions, it nonetheless allowed her the opportunity to submit the required information in order to perfect her claim. Id. The Defendant allowed the Plaintiff to submit medical records and opinions from her various treating physicians, and the Defendant reviewed these records when it considered the Plaintiff's claim. (R. 179). After reviewing the Plaintiff's claim, the Defendant notified the Plaintiff that it was denying her claim because the Plaintiff had not submitted any evidence that indicated "restrictions

or limitations which would preclude [Plaintiff] from being able to perform the material and substantial duties of her occupation to include sitting, standing, walking, talking, hearing, stooping, kneeling, climbing, reaching, lifting and carrying." (R. 181). Consequently, the Defendant determined that the Plaintiff was capable of performing the material and substantial duties of her occupation on a full time basis as of January 17, 2005. Id. The Defendant informed the Plaintiff that she could appeal this decision and that it would consider any additional information that she wished to submit in support of her claim. Id.

 **\*12** The Plaintiff submitted letters from three of her physicians (Dr. Katz, Dr. Wiley, and Dr. Felsenstein) in support of her appeal, and the Defendant considered those letters when it reexamined its denial of the Plaintiff's claim. The Defendant also referred the Plaintiff's claim to an independent peer-review physician (Dr. Nudell) who concluded that none of the Plaintiff's medical records revealed "any joint or musculoskeletal abnormalities, neurological dysfunction, or clinical evidence of cognitive dysfunction" and that there was thus "no objective rational [sic] to support full loss of functional capacity in the workforce." (R. 167). The Court notes that, in conducting this review, the peer-review physician had access to all medical records "received as of the date of this referral" and also spoke with two of the Plaintiff's treating physicians, Dr. Wiley and Dr. Katz. (R. 166). Relying on the report of the peer-review physician, as well as its own conclusion that the additional materials submitted by the Plaintiff did not constitute objective findings that the Plaintiff had been disabled as of January 17, 2005, the Defendant notified the Plaintiff that it was going to uphold its denial of her claim. (R. 34-35). The Plaintiff sought an additional appeal of the Defendant's decision, and, even though the Plaintiff had exhausted her rights to appeal, the Defendant notified her that it would extend the courtesy of reviewing any additional medical information that she wished to submit in support of her claim. (R. 139). The Plaintiff did not submit any additional medical information.

In short, the record reflects that the Defendant reviewed the Plaintiff's medical records, discussed those records in its correspondence with the Plaintiff, explained its reasoning to the Plaintiff, and consistently offered the Plaintiff the opportunity to supplement her claim with objective evidence of her functional limitations. Under these circumstances, the Court concludes that the Defendant's decision to deny the Plaintiff STD benefits was the result of a deliberate and

principled process. Cf. Tucci v. First Unum Life Ins. Co., 446 F. Supp. 2d 473, 484-85 (D.S.C. 2006).

### 2. Substantial Evidence

The Plaintiff contends that "the Defendant ignored Plaintiff's evidence and relied upon a medical reviewer who never had the opportunity to see the Plaintiff in person or talk with her and whose opinion was rendered more than two years after the fact." Docket Entry #22-1 at 27. The Plaintiff argues that she submitted "three medical opinions of disability and supporting objective medical test results," Docket Entry #22-1 at 30, and that the Defendant abused its discretion by disregarding this evidence.

In particular, the Plaintiff directs the Court to the opinions and reports of Drs. Wiley, Felsenstein, and Afrin, as well as Dr. Katz's December 6, 2005 report and the Plaintiff's January 17, 2005 blood tests. The Plaintiff cites the Fourth Circuit cases of Donovan v. Eaton Corp., 462 F.3d 321 (4th Cir. 2006), and Stup v. UNUM Life Ins. Co. of Am., 390 F.3d 301 (4th Cir. 2004), to support her argument.[6] After reviewing those cases, the Court concludes that they do not support finding an abuse of discretion in this case because, unlike the claimants in Donovan and Stup, the Plaintiff in this case has not presented the Defendant with unequivocal evidence supporting her claim.

### a. Drs. Wiley, Felsenstein, and Afrin

 **\*13** The Court begins by noting that any failure by the Defendant to credit the opinions and reports of Drs. Wiley, Felsenstein, and Afrin does not amount to an abuse of discretion because those doctors' opinions and reports simply do not support the Plaintiff's claim. To wit, none of those doctors have expressed any opinion with respect to the Plaintiff's condition on January 17, 2005 – the relevant date for determining the Plaintiff's disability. Dr. Wiley's letter of November 28, 2006, for example, stated her belief that the Plaintiff would not be able to return to any employment, but did not address the Plaintiff's ability to work as of January 17, 2005. (R. 223). Indeed, Dr. Wiley only began seeing the Plaintiff in January of 2006. Id. Dr. Felsenstein's letter of January 12, 2007 similarly did not address the Plaintiff's ability to work as of January 17, 2005, but opined that "the degree of disability ... in April 2006 was significant and ... in my opinion [the Plaintiff was] disabled and unable to function

at a level to maintain a job let alone run a business." (R. 202). Dr. Afrin's December 6, 2005 record of his visit with the Plaintiff likewise failed to discuss the Plaintiff's condition or ability to work as of January 17, 2005. Given the failure of these doctors to express any opinion with respect to the Plaintiff's condition on January 17, 2005, the Court sees nothing unreasonable in the Defendant's conclusion that these records do not support the Plaintiff's claim.

### b. Dr. Katz

The Plaintiff's primary argument, especially in her response to the Defendant's motion for summary judgment, appears to be that this Defendant committed an abuse of discretion similar to the one that occurred in Donovan when it focused on office notes from the Plaintiff's initial visit with Dr. Katz on January 17, 2005, without crediting "Dr. Katz's considered opinion of December 6, 2005" that the Plaintiff was disabled as of January 17, 2005. There appears to be no dispute that Dr. Katz, in his December 6, 2005 report, concluded that the Plaintiff was totally disabled and that this disability dated back to January 17, 2005. (R. 330). The Court believes, however, that two characteristics of Dr. Katz's opinion sufficiently distinguish this case from Donovan.

First, unlike the doctor's affidavit in Donovan, Dr. Katz's December 6, 2005 report finding the Plaintiff disabled as of January 17, 2005 was not Dr. Katz's last word on the subject. Indeed, an even later submission from Dr. Katz – his record of his visit with the Plaintiff on January 13, 2007 – concludes that the Plaintiff's disability "dates back to February 2005 ... a month after I originally saw her." (R. 214). Thus, to the extent that the Plaintiff seeks to frame Dr. Katz's December 2005 report as the doctor's final considered opinion on the Plaintiff's disability, the Plaintiff's argument fails to account for Dr. Katz's later pronouncement on the issue, which is in contradiction to his December 6, 2005 report. Moreover, unlike in Donovan, the Plaintiff has not suggested that Dr. Katz's January 2007 record finding the Plaintiff disabled as of February 2005 was in any way based on incomplete information.

The lesson of Donovan and other similar cases cited by the Plaintiff is that claims administrators cannot rely on a doctor's initial pronouncements with respect to a claimant's disability at the expense of more recent determinations made by the same doctor and supported by evidence that was unavailable at the time of the initial determination. See, e.g., Holder

*v. Woodmen of the World*, 11 F. App'x 103, 105 (4th Cir. 2001) (per curiam) (finding summary judgment in favor of the Plan inappropriate when "more recent evidence support[ed] a finding that [the claimant] suffered from a total disability and that the only evidence to the contrary was an initial letter from [the claimant's] treating physician who later concluded that [the claimant] had reached maximum recovery and was totally disabled"). Since Dr. Katz's most recent opinion, dated January 13, 2007, concludes that the Plaintiff was disabled as of February 2005, and not January 17, 2005, the Court concludes that the Defendant's failure to rely on Dr. Katz's intermediary pronouncement of December 6, 2005 that the Plaintiff was disabled on January 17, 2005 does not amount to an abuse of discretion.

Also, even if the Court focuses only on Dr. Katz's December 6, 2005 letter, it is difficult to say that this letter, standing alone, constitutes objective evidence of the Plaintiff's disability such that the Defendant's failure to rely on it amounts to an abuse of discretion. Under the terms of her Plan, the Plaintiff would only be disabled if she was "continuously unable to perform the Material and Substantial Duties of [her] Regular Occupation," and the Defendant denied the Plaintiff's claim because she did not provide "medical records indicating functional impairment exists such that it would preclude you from performing the material and substantial duties of your occupation as of the date you ceased working on January 17, 2005." (R. 035). Dr. Katz's letter, although providing his conclusion that the Plaintiff "suffers from neurologic and rheumatologic conditions ... resulting in fatigue, joint pain, muscle pain and cognitive decline," included no discussion of how these conditions or symptoms affected the Plaintiff's ability to perform her occupational duties as the owner of The Finicky Filly as of January 17, 2005.

**\*14** The Plaintiff's claim that the Defendant ignored abnormal blood test results that support her claim is unavailing for the same reason. The Plaintiff argues:

> Blood work collected on January 17, 2005, the date Plaintiff claims disability, demonstrated that Plaintiff had numerous abnormal test results. Plaintiff's [white blood count] was low. Plaintiff's [mean cell volume] and [corpuscular hemoglobin] were high. Plaintiff's neutrohils, absolute, were low. Plaintiff's vitamin B12 serum was high. Plaintiff's IA screen for nuclear Ab titer was positive. Plaintiff's C-reactive protein level was also high. Plaintiff's test results also showed that she tested positive for "41 kB(IgM) band."

In a February 1, 2005 addendum to his records, Dr. Katz concluded that Plaintiff's "blood work confirmed the presence of monoclonal gammopathy on the protein electrophoresis which on immunofixation ended up being lgG8 lambda (a light chain bound to a heavy chain) which requires a hematologic consult. She was found to be and HLA DR4, has a positive ANA of 1:80, homogenous, her C-reactive protein was 3.0 (normal <0.8)."

In test results from Medical Diagnostic Laboratory, Plaintiff tested positive for Lyme Disease. A mildly abnormal MRI study of Plaintiff's brain demonstrated that Plaintiff may also suffer from the early stages of Alzheimer's disease. Blood work from May 31, 2005 demonstrated that Plaintiff had a low "IGG total."

Finally, blood test results demonstrated that Plaintiff's blood contained a monoclonal component. In bone marrow testing from March 2005 demonstrated that Plaintiff had "plasma cell proliferative disorder,"

Docket Entry #22-1 at 10-14 (footnotes omitted). The Plaintiff's blood test results indicate that the Plaintiff may have been ill on January 17, 2005, but they do not speak to the Plaintiff's ability to stand, walk, stoop, kneel, reach, climb, or carry light weight.

In short, the Court believes that Dr. Katz's records, as well as the Plaintiff's abnormal blood test results, establish only that the Plaintiff was suffering from an illness on January 17, 2005. The Defendant did not deny the Plaintiff's claim because she failed to submit objective medical evidence that she was ill, however. Rather, the Defendant denied the Plaintiff's claim because she failed to provide objective medical evidence that her illness resulted in functional impairment such that she was not able to perform the duties of her occupation as of January 17, 2005. Given the failure of Dr. Katz to discuss how the Plaintiff's ailments precluded her from performing these duties, the Defendant's failure to credit Dr. Katz's reports as objective evidence supporting the Plaintiff's claim was reasonable. See, e.g., Williams v. Aetna Life Ins. Co., 509 F.3d 317, 323 (7th Cir. 2007) (upholding denial of benefits based on the failure of claimant to submit specific data reflecting how the claimant's fatigue impaired her ability to work); Johnson v. Metro. Life Ins. Co., 437 F.3d 809, 814 (8th Cir. 2006) (claimant's failure to submit evidence that any alleged ailments precluded her from performing her job supported reasonableness of denial of benefits); Boardman v. Prudential Life Ins. Co. of Am.,

337 F.3d 9, 17 (1st Cir. 2003) (denial of benefits not arbitrary and capricious where the claimant failed to present evidence indicating that her medical condition limited her ability to perform the duties of her occupation). Here, the failure of the Plaintiff to introduce objective evidence that her illness impaired her ability to perform her occupational duties, when coupled with the independent peer-reviewer's conclusion that the Plaintiff was not disabled as of January 17, 2005, provided substantial evidence to support the Defendant's decision to deny the Plaintiff STD benefits. [7]

### D. Conflict of Interest

**\*15** The Plaintiff also suggests that the Defendant, because it was both insurer and administrator of the Plaintiff's Plan, was operating under a conflict of interest and that the Court should factor this conflict into its ultimate determination of the reasonableness of the Defendant's decision to deny the Plaintiff benefits. Indeed, the Plaintiff argues that this is a close case and that under these circumstances the Defendant's conflict of interest should act as a "tiebreaker." See Metro. Life Ins. Co. v. Glenn, 554 U.S. 105, 128 S. Ct. 2343, 2351, 171 L.Ed.2d 299 (2008) (noting that a conflict of interest is a factor that can "act as a tiebreaker when the other factors are closely balanced"). The Court disagrees.

As an initial matter, the Court notes that, unlike in the past, the existence of a conflict of interest no longer necessitates a more demanding review of a claims administrator's decision. As the Fourth Circuit recently explained:

> [B]efore Glenn, when we found a conflict of interest, we applied a "modified" abuse-of-discretion standard that reduced deference to the administrator to the degree necessary to neutralize any untoward influence resulting from the conflict of interest.... As it now stands after Glenn .... courts are to apply simply the abuse-of-discretion standard for reviewing discretionary determinations by that administrator, even if the administrator operated under a conflict of interest.

Champion v. Black & Decker (U.S.) Inc., 550 F.3d 353, 359 (4th Cir. 2008) (citations omitted). The Court should still uphold a discretionary decision if it was reasonable. Id. As discussed above, the Court believes that the Defendant's decision denying the Plaintiff STD benefits was reasonable – this is not a close case.

Even if the Plaintiff did present a close case, a conflict of interest only operates as a tiebreaker when evidence in the record suggests "a higher likelihood that it affected the benefits decision." Glenn, 128 S. Ct. at 2351. No such evidence exists in this case. The Plaintiff has not pointed to a history of biased claims administration by the Defendant, for example. Moreover, the Court notes that the Defendant here voluntarily granted the Plaintiff an opportunity to supplement her claim even after she had exhausted her appeals. In Champion, the Fourth Circuit noted that a similar approach by the administrator in that case "increased the likelihood of an accurate final decision" and thus reduced the importance of the conflict factor "to the vanishing point." Champion, 550 F.3d at 362. This Court similarly concludes that the evidence in this case "does not support giving such weight to. the conflict that it acts as a tiebreaker when the other factors

are closely balanced." Id. (internal quotation marks, internal modification, and citation omitted).

### E. Conclusion

The Court has reviewed the administrative record and the submissions of the parties. After a consideration of the Booth factors, in particular factors three, five, and eight, the Court concludes that the Defendant did not abuse its discretion when it denied the Plaintiff STD benefits. The Defendant's decision was the result of a deliberate, principled reasoning process and supported by substantial evidence. Moreover, there is no evidence that a conflict of interest played a role that affected the Defendant's decision. For these reasons, the Defendant's motion for summary judgment is granted and the Plaintiff's motion for summary judgment is denied.

**AND IT IS SO ORDERED.**

**All Citations**

Not Reported in Fed. Supp., 2010 WL 11643527

---

**Footnotes**

1    In a letter to the Plaintiff dated October 19, 2005, the Defendant reasoned:

According to the records, you were seen for fatigue and tested for Lyme disease on 6/18/04. Although this test was negative for Lyme disease a little over a month later, the diagnostic testing was positive. There are many reasons for a false negative such as the antibodies are not at a detectable level, medications interfering with the results, or the laboratory cutoff level is too high to detect. It is reasonable that a month later the antibodies were at a detectable level and you were then diagnosed with Lyme disease. Based on the medical records submitted and your reported symptoms of fatigue and exhaustion which are consistent with Lyme disease and the positive diagnostic testing, we have determined that you were treated in the pre ex period for the same condition for which you are claiming disability. Based on this information, your present disability is considered to be pre-existing according to your policy, and we are unable to honor your claim for benefits.

(R. 347). Although the record indicates that the Plaintiff intended to administratively appeal this decision, see (R. 343), the parties have pointed to no evidence suggesting that the Plaintiff has pursued a formal appeal of the Defendant's decision to deny the Plaintiff LTD benefits based on her claim of August 13, 2004.

2    According to the Plaintiff's medical records, this was not the first time that she had been treated with Rocephin. Notes from the Plaintiff's visit with Dr. Katz on January 17, 2005, note that the Plaintiff had "improved dramatically" after a five week treatment of Rocephin and that the treatment was discontinued due to her

improvement. Dr. Katz then notes that the Plaintiff was "restarted on Rocephin two weeks ago" – January 4, 2005. (R. 369).

3    The Defendant was substituted for CNA Group Life Assurance Company by an amendment to the policy. (R. 534).

4    The Plaintiff argues that the language of the Plan is "vague and far from being clear" and "is insufficient to clearly confer discretionary authority to the Defendant." Docket Entry #22-1 at 19-20. The Plaintiff cites the cases of Woods v. Prudential Ins. Co. of Am., 528 F.3d 320 (4th Cir. 2008), and Sanders v. CNA Group Life Assurance Co., 322 F. Supp. 2d 1142 (D. Or. 2004), to support her argument.

With respect to Woods, the Court finds that case inapposite. The parties in Woods agreed that the plan in that case did not expressly confer any discretionary authority over benefit determinations to the defendant, and the court thus focused on whether the plan had done so implicitly. Woods, 528 F.3d at 322. Here, by contrast, the Plan clearly grants the plan administrator "discretionary authority to determine ... eligibility for and entitlement to benefits under the Policy."

Sanders, on the other hand, does support the Plaintiff's position. In that case, a district court in Oregon determined that plan language essentially identical to the language in the Plaintiff's policy was "ambiguous ... as to the plan administrator's discretionary authority to interpret the terms of the plan" and thus de novo review of the defendant's denial of benefits was warranted. Sanders, 322 F. Supp. 2d at 1147. The Court notes, however, that multiple courts, including the Fourth Circuit, have concluded that language similar to the language in the Plaintiff's policy is sufficient to confer discretionary authority on a plan administrator. See, e.g., Wilson v. Metro. Life Ins. Co., 183 F. App'x 286, 290 (4th Cir. 2006) (per curiam); Webb v. Hartford Fin. Servs. Grp., Inc., 608 F. Supp. 2d 1218, 1224 (C.D. Cal. 2009); Richmond v. Cont'l Cas. Co., No. 04-3024, 2006 U.S. Dist. LEXIS at *21 (W.D. Ark. May 22, 2006).

5    Both parties agree that January 17, 2005, is the relevant date for determining the Plaintiff's disability. Docket Entry #22-1 at 25; Docket Entry # 24 at 2.

6    In Donovan, the Fourth Circuit held that a claims administrator abused its discretion in denying a claimant long term disability benefits when it ignored evidence favorable to the claimant in rendering its decision. Specifically, the administrator focused on a statement by the claimant's doctor that suggested that she was capable of performing sedentary activities without addressing the same doctor's subsequent affidavit that stated that the claimant was disabled. Donovan, 462 F.3d at 329. The claimant's physician had concluded in April of 2004 that the claimant could perform a sedentary occupation. The claimant's July 2004 radiology reports then "revealed that she had stenosis, spinal cord compression, right median nerve entrapment in her wrist, and R C6 radiculopathy." Id. at 328. The Fourth Circuit noted that the "discovery in July [2004] of cervical back problems, in addition to the [the claimant's] severe low back problems, len[t] substantially greater weight to [her doctor's] affidavit in August 2004 than his April 2004 statement." Id.

The Fourth Circuit in Stup held that an administrator's denial of benefits constituted an abuse of discretion when the administrator, although aware of undisputed medical evidence supporting the claimant's diagnosis and the claimant's conclusion that she could not work, relied on equivocal and ambiguous evidence in denying her claim. The Fourth Circuit concluded that equivocal and ambiguous evidence "does not constitute 'substantial evidence' arrived at after a 'deliberate, principled reasoning process.' " Stup, 390 F.3d at 311.

7    The Plaintiff, in her submissions to the Court, repeatedly notes that the independent peer-reviewer did not physically examine her and contrasts this fact with the circumstances surrounding the medical opinions that she has submitted in support of her claim:

Plaintiff submitted three medical opinions from highly qualified physicians who had an opportunity to treat Plaintiff and evaluate her in person.... Conversely, the Defendant ignored Plaintiff's evidence and relied upon a medical reviewer who never had the opportunity to see the Plaintiff in person or talk with her and whose opinion was rendered more than two years after the fact.

Docket Entry #22-1 at 27. The Court notes that the Supreme Court has rejected the treating physician rule: "[C]ourts have no warrant to require administrators automatically to accord special weight to the opinions of a claimant's physician; nor may courts impose on plan administrators a discrete burden of explanation when they credit reliable evidence that conflicts with a treating physician's evaluation." Black & Decker Disability Plan v. Nord, 538 U.S. 822, 834, 123 S.Ct. 1965, 155 L.Ed.2d 1034 (2003).

---

**End of Document**

© 2022 Thomson Reuters. No claim to original U.S. Government Works.