IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
Case No. 1:22-cv-00186-WO-JLW

| | |
|---|---|
| REBECCA PIFER, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| LINCOLN LIFE ASSURANCE | ) |
| COMPANY OF BOSTON, | ) |
| | ) |
| Defendants. | ) |
| | ) |
| | ) |
| | ) |
| | ) |

## **DEFENDANT'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW**

Defendant Lincoln Life Assurance Company of Boston n/k/a The Lincoln National Life Insurance Company ("Lincoln"), pursuant to Local Rule 40.1(c), submits the following proposed findings of fact and conclusions of law for the Court's consideration.

### I.     Proposed Findings of Facts

The following proposed findings of facts are drawn from the Administrative Record, numbered LIN000001-1301, which was submitted with Lincoln's summary judgment brief in two parts. (*See* D.E. 24-2 and 24-3).

### The Group Policy

1. Plaintiff was employed at Blue Cross Blue Shield of North Carolina ("BCBSNC") as a Dental Analyst. Her job duties included reviewing dental insurance benefits claims. (LIN001285-86).

2. Plaintiff stopped working on 1/28/11, and Lincoln approved and paid her claim effective 7/30/11.

3. BCBSNC obtained a group policy of long-term disability insurance issued by Lincoln and bearing group policy number GF3-850-286395-01 (the "Group Policy"). (LIN000399-437).

4. Plaintiff was enrolled as a Class 4 employee under the Policy. (LIN000001).

5. The Group Policy provides that a Class 4 employee is entitled to 24 months of benefits if the employee is unable to perform their "Own Occupation." (LIN000405). After 24 months of benefit payments, a Class 4 employee is entitled to benefits if they are "unable to perform, with reasonable continuity, the Material and Substantial Duties of Any Occupation." (*Id.*).

6. Lincoln paid long-term disability benefits to Plaintiff from July 30, 2011, through May 18, 2021. Therefore, the applicable definition of disability is "Any Occupation."

7. The Group Policy places the burden of proving a continuous disability on Plaintiff. It reads: "The Proof must be given upon Lincoln's request at the Covered Person's expense". (LIN000414).

8. The Group Policy provides that the Monthly Benefit will cease on the earliest of (among other events):

the date the Covered Person fails to provide Proof of continued Disability;

the date the Covered Person refuses to be examined or evaluated at reasonable intervals;

or

the date the Covered Person is no longer Disabled according to the Group Policy.

(LIN000424).

9. Pursuant to the Any Occupation definition within the Group Policy, "Disability" or "Disabled" are defined to mean that as a result of "Injury or Sickness the Covered Person is unable to perform the Material and Substantial Duties of Any Occupation". (LIN000405). "Material and Substantial Duties" means responsibilities that are normally required to perform the Covered Person's Own Occupation, or any other occupation, and cannot be reasonably eliminated or modified." (LIN000406). "Any Occupation" means any occupation that the Covered Person is or becomes reasonably fitted by training, education, experience, age, physical and mental capacity. (LIN000404).

10. The Group Policy affords Lincoln "the right and opportunity to have a Covered Person, whose Injury or Sickness is the basis of a claim, examined or evaluated at reasonable intervals deemed necessary by Lincoln" and "as often as reasonably required". (LIN000430).

11. The Group Policy contains a clear grant of discretion to Lincoln, stating:

**Interpretation of the Policy**

Lincoln shall possess the authority, in its sole discretion, to construe the terms of this policy and to determine benefit eligibility hereunder. Lincoln's decisions regarding construction of the terms of this policy and benefit eligibility shall be conclusive and binding.

(LIN000431).

3

Lincoln approves and pays Plaintiff's LTD benefits claim beginning July 30, 2011, subject to annual review.

12.     As noted above, Plaintiff stopped working on 1/28/11, and Lincoln approved and paid her claim effective 7/30/11.   Lincoln subsequently reviewed Plaintiff's claim annually for proof of ongoing disability.

13.     In February, 2020, Lincoln renewed Plaintiff's benefits informed by a 2/5/20 APS by Dr. Linda Belhorn (rheumatology), restricting Plaintiff to "no prolonged sitting, standing, heavy lifting or repetitive activities". (LIN000011; 579).  This was consistent with Belhorn's annual APS's starting 2014. (LIN000590; 610; 629; 637; 661; 668). Notably, Belhorn's 2013 APS contained more expansive restrictions, deeming Plaintiff "disabled for all duties". (LIN000669).

Recent medical records show improvement in Plaintiff's condition.

14.     Records obtained during review show that on 1/21/19, Plaintiff presented to Belhorn with "gradual worsening" of symptoms since February 2018, and expressing a "gradual worsening of her symptoms from year to year".  (LIN000162-66).   On 2/11/19, Dr. John Kallianos (PCP) found "interval worsening" and stated "[s]he is still permanently disabled".   (LIN000191-92).   On 5/15/19, Kallianos again noted interval worsening. (LIN000193-95).   On 8/5/19, Belhorn noted worsening pain and request for physical therapy referral, particularly for cervical pain.  (LIN000158-62).

15.     Plaintiff began physical therapy with Mackenzie Eldridge, DPT on 8/8/19. (LIN000193-95)  She reported a pain level of 6, but also that her general health was "good" and that she "currently walks her dog about 2 miles".  (LIN000154-57)   On 8/21/19,

4

Eldridge recorded a pain level of 1 with "just stiffness", and that Plaintiff was tolerating physical therapy well, with improvement. (LIN000150-53) On 9/11/19, Plaintiff's pain level was still 1, and her neck and shoulder had improved. (LIN000147-50).

16. On 2/5/20, Belhorn recorded that Plaintiff felt "stable on her current regiment [*sic*]" and had been going to the gym, gardening and landscaping "without any major flareups". [LIN000143-47] On 8/5/20, Belhorn wrote that "she does feel that she is improving", and Plaintiff took a trip to the beach in July. (LIN000140-43)

Informed by new information indicating Plaintiff's improvement, Lincoln obtains surveillance, which reveals normal mobility.

17. Lincoln's Lisa Porriello conducted the 2021 annual review using updated records. Porriello called Plaintiff on 2/17/21. (LIN000010). Plaintiff reported worsening symptoms, pain (including in her right shoulder), needing to walk with a cane, and inability to garden or travel. (Id.) She had received a steroid injection to her right shoulder in September 2020, which "helped but doesn't fix it". (Id.)

18. On 2/23/21, Porriello reviewed a 2/8/21, note from Belhorn reporting Plaintiff had experienced "significant benefit" from the steroid injection, was performing "some exercises with strength training and Tai [c]hi that are conservative to help improve her shoulder symptoms" and her pain level was down to 3. (LIN000134)[1]

---

[1] Lincoln received a 3/12/21 note from Kallianos on appeal. At that visit, Plaintiff's first with him since May 2019, and after her 2/17/21 conversation with Porriello, Plaintiff presented using a cane.

5

19. Porriello received a surveillance report from HUB Enterprises, (HUB) on 3/8/21. (LIN000010; 482). Plaintiff was shown walking [unassisted and with a normal gait], carrying items, and entering/operating a vehicle. (LIN000484).[2]

20. The surveillance is just one small piece of the puzzle, but it deserves weight, particularly because of the inconsistency between Plaintiff's observed activity, and the limitations she reported. Plaintiff was admittedly recorded "walking in and out of view, walking to the driver's side of the vehicle, placing the items she was carrying in the vehicle, entering the vehicle, and departing" on 2/23/21. (D.E. 28 at p. 11). Less than a week earlier, on 2/17/21, Plaintiff told Lisa Porriello, of Lincoln, that she needed a cane to walk. (LIN000010). That description is in striking contrast to the unassisted and, by all appearances, normal gait displayed in the footage.

<u>In light of new information, Lincoln orders a Functional Capacity Evaluation that reveals Plaintiff retains a sedentary occupational capacity.</u>

21. Informed by new information, Ms. Porriello ordered an FCE. (LIN000009-10). Exam Coordinators Network (ECN), an independent medical provider, engaged Anna Davidow, PT, who performed the FCE on 4/21/21. (LIN000009; 462).

22. Plaintiff drove to the appointment, and ambulated slowly and methodically using a standard cane.[3] (LIN000465-66). Ms. Davidow took a history from Plaintiff, who reported constant pain for the last two years in her arms and hands, knees, lower and upper

---

[2] The footage is accessible by hyperlink at page 3 of the HUB Report. (LIN000484-85).

[3] Notably, she ambulated unassisted and with a normal gait on surveillance.

6

back and cervical pain, general weakness, frequent instability and tingling/numbness of the hands. (Id.)

23. Plaintiff's reported pain level was 7 (her best being 5 and worst 9) and self-limitations of sitting, standing and driving for twenty minutes and walking thirty minutes. (Id.)

24. She was capable of performing activities of daily living (dressing, personal hygiene and basic household activities) and her average day included household activities and caring for animals. (Id.)

25. Davidow conducted a musculoskeletal screening summary. (LIN000466). Plaintiff's posture appeared equal and level at all aspects, and neurologically intact to light-touch discrimination. (Id.) Plaintiff exhibited moderate tenderness to the right shoulder, trapezius, interscapular and lower back areas. (Id.)

26. Plaintiff's aerobic capacity was not evaluated because she did not reach the required walking speed of two miles per hour. (Id.) She walked one mile per hour for eight minutes, and again for five minutes after a break (far less than the 2 mile dog walks she previously reported to her physical therapist). She complained of pain (to the right foot and shoulders) and fatigue. (Id.)

27. During the material handling segment, Plaintiff carried ten pounds over twenty-five feet. (LIN000467). She declined to finish dynamic lift testing of 12.5 pounds because she complained of pain and fatigue. (Id.) Plaintiff pushed 27 pounds and pulled 20 pounds on an isometric strain gauge. (Id.)

7

28. Ms. Davidow conducted a range of motion (ROM) and strength analysis. (LIN000472-74). Plaintiff showed decreased ROM within the cervical range, but normal thoracic and lumbar range. (LIN000472). Plaintiff had normal ROM for all upper and lower extremities except for the shoulders (except with respect to adduction). (Id.)

29. Plaintiff's strength measures were uniformly 4- or 4 out of 5 for elbows, wrists, hips, knees and ankles.[4] (Id.) Her strength scores for shoulders ranged from 3- to 4-. (Id.)

30. Based on all testing and information reviewed, Ms. Davidow assessed frequent or occasional capacities for all positional tolerances, including frequent sitting and occasional standing and walking, based on her pain complaints.[5] (LIN000469; 472). Plaintiff demonstrated frequent capacity for all manipulative abilities. (Id.) There were no deficits concerning fingering, simple/firm hand grasp or fine/gross manipulation, but Plaintiff exhibited pain associated with object handling. (Id.)

31. Ms. Davidow concluded that Plaintiff retained sedentary work capacity for an eight-hour day. (LIN000462).

32. On 4/29/21, Porriello received the FCE and asked Clinical Consultant Specialist Angela Johnson to review it. (Id) Johnson found the FCE results valid and consistent with available medical records. (Id.)

---

[4] With one exception: 3+ for right plantar flexion. (LIN000472).
[5] Crawling and climbing ladders were untested. (LIN000469).

8

<u>Lincoln conducts a Transferable Skills Analysis</u>

33.     Lori Ashworth, Med., CRC, Vocational Rehabilitation Counsellor, conducted a TSA, considering Plaintiff's education, work history, sedentary restrictions per the FCE, and her adjusted skills and abilities, and identified four suitable occupations: Claim Examiner, Loan Interviewer (Mortgage), Customer Complaint Clerk and Claims Clerk II.  (LIN000458-59).

34.     Ms. Ashworth accounted for the duration of time since Plaintiff had last worked, and concluded that the identified occupations would allow Plaintiff to use her transferable skills and work experience, permit on the job training, and accordingly constitute appropriate alternative occupations.  (LIN000459).

<u>Lincoln determines that Plaintiff does not meet the Group Policy Definition of Disability</u>

35.     In light of the data obtained, Ms. Porriello concluded that Plaintiff no longer satisfied the definition of "Disabled" under the Group Policy, and so informed her by phone and letter dated 5/19/21.   (LIN000008; 453-57).

36.     Ms. Porriello informed Plaintiff of her appeal rights and that if she wished to appeal, she should submit "any additional information" that Plaintiff believed might support her claim, specifically "office treatment notes, test results, procedure reports, hospitalization records, and any medical records from your treating physicians that confirm your restrictions and limitations precluding you from performing any occupation at this time."  (LIN000455).

<u>Plaintiff appeals the claim decision, focusing largely on critique of the FCE, without offering a supporting medical opinion.</u>

9

37. Plaintiff, through counsel, appealed by letter dated 11/11/21. (LIN000386). Plaintiff submitted medical records, Attending Physicians' Statements (post-dating the claim determination) and Plaintiff's handwritten journal entries (also after the determination). (LIN000008; 243-381; 386).

38. Plaintiff submitted APS forms by Drs. Belhorne and William Silver (orthopedic).

39. Dr. Belhorne executed two APS's, dated 8/4/20 and 10/18/21, both of which contained the same limitations as her 2/5/20 APS. (LIN000307; 309).

40. Dr. Silver's APS, dated 10/25/21, restricted Plaintiff only from "heavy lifting or repetitive activity". (LIN000311).

41. Although the FCE and surveillance called these restrictions into question, neither physician reported review or analysis of either.

42. On appeal, it was Plaintiff's burden under the Group Policy to provide ongoing proof of disability as of 5/19/21. In terms of medical opinion evidence, Plaintiff's efforts to meet her burden were limited to two APS's counsel obtained from Belhorn and Silver, and some conclusory statements in Kallianos' medical records. None of these unsupported opinions was sufficient to meet Plaintiff's burden.

43. As explained above, Silver's 10/25/21 APS restricted her only from "heavy lifting or repetitive activity". This reveals nothing about Plaintiff's ability to perform the duties of any occupation. Similarly, Belhorne's APS's simply parroted the same limitations as her 2/5/20 APS, which the surveillance and FCE since called into question.

10

(LIN000307; 309).   As for Kalianos, he noted on 2/11/21 that "she needs a form completed for her life insurance re: long term disability" and later simply repeated in subsequent notes that "[s]he is still permanently disabled".   (LIN000191-92; 98; 201; 219).   Though repeating this statement (often accompanied by reference to her disability claim) Kallianos offered no explanation as to the medical reasoning or objective evidence underlying that conclusion.   Nor did he explain what he meant by "permanently disabled" and how that statement applied to the broad "any occupation" definition under the Group Policy.

44.    As a general matter, it is well settled that, for many good reasons, an ERISA administrator need not defer to treating physicians' opinions.  *See,* Black & Decker Disability Plan v. Noord, 538 U.S. 822, 834 (2003) (administrator has no duty to defer to treating physicians and no discrete burden of explaining disagreements because, in part, "a treating physician 'may favor a finding of disability'"); Frankton v. Metro. Life Ins. Co., 432 Fed.App'x 210, 215 (4th Cir. 2011) ("ERISA does not require that administrators accord special deference to the opinions of treating physicians."); Hensley v. Int'l Bus. Machines Corp., 123 Fed.App'x 534, 539 (4th Cir. 2004) ("ERISA plan administrators are not required to accord any special deference to the opinions of treating physicians over those of non-treating consultants."); Joyner v. Cont'l Cas. Co., 2013 WL 865846, at *12 (W.D.Va. Mar. 7, 2013) ("it was well within Defendant's province to weigh these conflicting opinions and side with [the consulting physicians]).

45.    It is not unusual for a treating physician, out of a desire to maintain good relations with a patient or out of simple personal concern for the patient's economic well-being, to offer support for a patient's claim.  Such support, however, obviously does not

form the basis for accurate disability determinations and advocacy is not the same thing as "proof." Maniatty v. UnumProvident Corp., 218 F.Supp.2d 500, 504 (S.D.N.Y. 2002), *aff'd,* 62 Fed.App'x 413 (2d Cir. 2003) ("it was not unreasonable for the administrator to conclude that the only material reason the treating physicians were reaching their diagnosis was based on their acceptance of plaintiff's subjective complaints: an acceptance more or less required of treating physicians, but by no means required of the administrator"). Indeed, "the possibility of a conflict of interest is just as real with respect to a treating physician who, 'in a close case, may favor a finding' for the patient." Dolfi v. DRMS, Inc., 584 F.Supp.2d 709, 735 (M.D.Pa. 2008) quoting Stratton v. E.I. DuPont De Nemours & Co., 363 F.3d 250, 255 (3d Cir. 2004).

46.     Here though, there are additional reasons why these opinions were worthy of little weight.  Most significantly, none of these physicians even purported to have reviewed the entire record which, at the time in question, included the surveillance, the FCE, the medical records of all the treating practitioners, and later, Dr. Hunter Vincent's opinions.

47.     None of these physicians purported to conduct any objective analysis or evaluation of Plaintiff's actual restrictions and limitations, whether by functional testing, review of the comprehensive medical record or otherwise. As such, none of them made any effort to reconcile their opinions with all of the evidence in the record, despite having every opportunity to do so.

48.     In sum, these opinions were not worthy of substantial weight because they were conclusory, unsupported and contrary to all the objective evidence in the record demonstrating that Plaintiff had sedentary functional capacity as of May, 2021.  *See,* Silva

v. Voya Servs. Co. Employee Welfare Benefit Plan, 2020 WL 2537454 at *10 (D.S.C. May 19, 2020) (administrator properly credited contemporaneous medical records over "prepared letters and statements" that conflicted with such records); Teague v. Hartford Life & Accident Ins. Co., 2006 WL 8455977 at *14 (W.D.N.C. March 17, 2006) (administrator properly discounted treating physician's opinion in support of claimant where that opinion conflicted with observations contained in the doctor's own contemporaneous office notes); *see also, e.g.,* Wilson v. Reliance Standard Life Ins. Co., 2018 WL 994327 at *6 (E.D.Mich. Feb. 21, 2018) ("It appears that rather than providing objective findings and evidence of [claimant's] pain, the doctors simply rubber-stamped her claim."). Moreover, these physicians uniformly declined to respond to Dr. Vincent's efforts to discuss the claim.

49. Plaintiff's proof is limited to her own subjective self-assessment that she can do no work. Such subjective evidence, while it should be and was considered (indeed, Dr. Vincent recommended significant restrictions and limitations based on such subjective complaints), simply cannot, standing alone, constitute the "proof" required under the Group Policy. Where a plan, as here, requires "proof" of continued disability, Courts in the Fourth Circuit, as elsewhere, regularly hold that the concept of proof connotes an "objective" component to such evidence. *See* Coffman v. Metropolitan Life Ins. Co., 217 F.Supp.2d 715, 732 (S.D.W.Va. 2002), *aff'd*, 77 Fed.App'x 174 (4th Cir. 2003); *see also, e.g.,* Maniatty v. Unum Provident Corp., 218 F.Supp.2d 500, 504 (S.D.N.Y. 2002), *aff'd,* 62 Fed.App'x 413 (2d Cir. 2003), *cert. denied*, 540 U.S. 966 (2003). "Where an opposite rule to apply, LTD benefits would be payable to any participant with subjective and

13

effervescent symptomology simply because the symptoms were first passed through the intermediate step of self-reporting to a medical professional." Coffman, 217 F.Supp.2d at 732. "Without an objective component to this proof requirement, administrative review of a participant's claim for benefits would be meaningless because a plan administrator would have to accept all subjective claims of the participant without question." Williams, 250 F.Supp.2d at 648. *See also*, Maniatty, 218 F.Supp.2d at 504 ("Although . . . subjective information should be considered, . . . reliance on such complaints, without more, would result in insurance companies paying virtually all claims"). And as Courts have noted, the administrator's "fiduciary role" in "scrutinizing self-reporting," "preventing malingering," "guard[ing] the assets of the [plan]," and paying only "legitimate claims" would be "greatly hampered." Coffman, 217 F.Supp.2d at 732 (quoting Brogan v. Holland, 105 F.3d 158, 164 (4th Cir. 1997)).[6]

50. There were additional reasons why Plaintiff's subjective self-assessments of her work capacity were worth little weight. In addition to being contrary to the other objective evidence in the file, even Plaintiff's self-serving journal entries, crafted for the specific purpose of supporting her claim, clearly failed to do so.

51. Plaintiff maintains that Lincoln abused its discretion by allegedly ignoring her journal, without presenting any evidence to support her contention. She simply asserts that the journal is not mentioned in Lincoln's claim notes, and that it is not discussed in detail in

---

[6] DuPerry v. Life Ins. Co. of N. Am., 632 F.3d 860 (4th Cir. 2011) states that an administrator may not ignore or dismiss reports of pain on the basis of subjectivity. Lincoln did not do that here. The question is not whether Plaintiff feels pain or to what degree. The question is the extent to which pain precludes her ability to work. *See*. Griffin v. Hartford Life & Acc. Ins. Co.*,* 898 F.3d 371, 382 (4th Cir. 2018) (subjective complaints alone insufficient to prove disability where inconsistent with other evidence).

the appeal uphold letter, and infers that Lincoln neither considered the journal nor transmitted it to Dr. Vincent.

52.    Plaintiff acknowledges, as she must, that Lincoln's appeal uphold letter of 2/17/22 makes specific reference to journal.  In fact, receipt of the journal is mentioned twice in that letter, and therein the author, Appeals Specialist Jerronda King, states that Lincoln "carefully considered **all** of the information submitted in support of the claim".  (LIN000054, 57, 62) (emphasis added).   Accordingly, the uncontroverted evidence in the record is that Lincoln did, in fact, review and consider the journal.  Plaintiff's argument is simply unsupported by the facts.

53.    Plaintiff's argument necessarily fails because relevant law does not support her contention.  Plaintiff maintains that the absence of discussion of an item means that it was not reviewed, and constitutes an *ipso facto* violation of 29 C.F.R § 2560.503-1(h)(2)(iv) and an abuse of discretion.  In <u>Frankton v. Metropolitan Life Ins. Co.</u>, No. 1:08-cv-2209 (D.Md., Sept. 30, 2009), the plaintiff made a similar argument, asserting that the insurer withheld an office visit note (authored by a treating physician) from an independent medical reviewer.  The Court noted that the plaintiff did "not indicate what new information the 'office note' provide[d] or how its substance undermine[d] the reasonableness of MetLife's conclusion.  Instead, Plaintiff points only to the failure to include it as evidence of an unreasonable process."  <u>Id</u>.  The Court stated that because the plaintiff did not "indicate what the note would have added to the record substantively", the failure to provide it to the independent medical reviewer "amount[ed] to a procedural irregularity."  <u>Id</u>. The Court further held that "[s]uch a minor procedural violation is not sufficient to undermine the

15

reasonableness of MetLife's conclusions." Id. (citing Larson v. Old Dominion Freight Line, Inc., 277 Fed. Appx. 318, 321 (4th Cir. 2008). See also, Lohr v. UnitedHealth Group, Inc., No. 1:11-cv-134 (M.D.N.C., Jan. 31, 2013) (consulting physician's opinion was "not invalid for failing to review the entire record" including "Plaintiff's submissions as well as those of her medical providers" where the plaintiff failed to identify "any specific aspect of the record which [consulting physician] failed to review" and the consulting physician's report "reveal[ed] a detailed analysis of [plaintiff's] medical files, as well as an independent inquiry" to plaintiff's treating physician).[7]

54. Additionally, implicit in Plaintiff's argument is the erroneous notion that Lincoln's reviewers should have specifically discussed each piece of evidence. But just as there is no "discrete burden of explanation" when an administrator chooses to credit reliable evidence that is contrary to a treating physician's opinion, Black and Decker Disability Plan v. Nord, 538 U.S. 822, 834 (2003), there can be no similar discrete burden to specifically discuss every piece of evidence in the record. See, e.g., Niebauer v. Crane & Co., Inc., 783 F.3d 914, 928 (1st Cir. 2015) (rejecting similar argument and holding that "the denial letter need not detail every bit of information in the record"); Spenrath v. Guardian Life Ins. Co., 564 Fed. App'x 93, 98 (5th Cir. 2014) ("[I]t would be impractical to require the plan administrator to mention each piece of evidence it considered in reaching its conclusion."); Teague v. Hartford Life and Accident Ins. Co., No. 1:05-cv-223 n.3 (W.D.N.C., Mar. 17, 2006) ("The court can find no requirement that a physician who

---

[7] As explained below, Dr. Vincent attempted to conduct peer-to-peer discussions with four treating physicians, none of whom returned his calls. (LIN000104).

reviews medical record[s] list each record reviewed in his opinion letter. In cases like this, where the administrative record exceeds 1000 pages, such a task would be daunting. The undersigned agrees with defendant's logic, which is that [the consulting physician's] listing of the most pertinent documents to his review does not give rise to an inference that he ignored the rest.").

55.     If there was some requirement to discuss every item submitted by a claimant, it would not only impair the discretion afforded to administrators under ERISA, but would also encourage claimants to pile irrelevant and unnecessary materials into the claim file with the hope that an administrator's failure to specifically discuss every piece of it might lead to reversal of an otherwise correct determination.  That would run directly counter to ERISA's underlying interests.  Bernstein v. CapitalCare, Inc., 70 F.3d 783, 788 (4th Cir. 1995) (administration of plans should be "left to plan fiduciaries, not federal courts," in furtherance of "ERISA's goals of expeditiously, efficiently, and inexpensively resolving coverage disputes").

56.     The question before the reviewer was whether Plaintiff is capable of sedentary work; the least demanding occupational classification.  Plaintiff's journal entries support that she experienced pain, which Lincoln does not dispute.  They also demonstrate that she is self-sufficient, able to cook, clean, take care of herself, visit with neighbors, run errands, perform her morning exercises, and walk the dog for 30-40 minutes most days. To be sure, the journal reflects that her son helped out and that she experienced some difficulties.  But many people work with pain and difficulties.  The journal entries simply do not support an inability to work in any occupation.

17

57.     Evidence of injury or illness, or of pain, is not *ipso facto* evidence of disability[8], and the medical record does not provide substantial evidence, generated by any of Plaintiff's physicians, supporting that the identified conditions and symptomology rendered her incapable of sedentary work.  In other words, the objective evidence presented is not proof of impairment from sedentary work, and Plaintiff cannot meet her burden of proof only with subjective complaints.

58.     Plaintiff also argued that the FCE was flawed because Ms. Davidow's conclusions were inconsistent with the data reported therein.  (LIN000390).

59.     Notably, Plaintiff did not present any evidence, such as a statement from a medical professional, to support that assertion.  Nor did Plaintiff, who bore the burden of proof, provide alternative testing or evaluation at odds with the FCE.  Instead, Plaintiff simply summarized various office visit notes, most of which post-dated the claim determination.  (LIN000390-93).

60.     Despite the significant problems with her "proof", Plaintiff focused almost all her efforts on appeal, on attacking the FCE.

---

[8] *See, e.g,* Speciale v. Blue Cross and Blue Shield Ass'n, 538 F.3d 615, 622 (7th Cir. 2008) (recognizing the distinction between evidence of pain versus evidence of resultant impairment); Boardman v. Prudential Ins. Co. of America, 337 F.3d 9 (1st Cir. 2003) (affirming denial of disability benefits where, although plaintiff's medical evidence proved the existence of a medical condition, benefits were denied on the grounds that plaintiff failed to provide evidence to establish resultant restrictions and limitations); Van Valen v. Employee Welfare Benefits Committee Northrop-Grumman Corp., 741 F.Supp.2d 756, 763 (W.D.Va. 2010) (recognizing distinction between evidence of medical condition and evidence of impairment); Casey v. Hartford Life and Accident Insurance Company, No. 2:09-cv-00313-CWH, 2010WL11643527, at. p. *14 (D.S.C., Sept. 7, 2010) (failure of the Plaintiff to introduce objective evidence that her illness impaired her ability to perform her occupational duties, coupled with the independent peer-reviewer's conclusion that the Plaintiff was not disabled, provided substantial evidence to support the Defendant's decision to deny disability benefits).

18

61. To begin, this was impermissible burden shifting. Lincoln had no burden to disprove Plaintiff's claim. Griffin, 898 F.3d at 382 (where policy required proof of continuing disability, administrator did not have burden of proving that plaintiff was no longer disabled).

62. More importantly, Plaintiff's attacks were misplaced. Plaintiff's counsel set forth a laundry list of test findings that he claimed, as a lay person, were contrary to Ms. Davidow's conclusion that Plaintiff was capable of sedentary work. (LIN000388-89). But none of those findings demonstrated any such thing. They demonstrated that Plaintiff has legitimate restrictions and limitations, which Lincoln does not dispute. Instead, the purpose of the FCE was to address the narrow question of whether those restrictions and limitations resulted in complete inability to perform sedentary work. Ms. Davidow opined that they did not and nothing in counsel's letter provided any "proof" to the contrary.

In response to the medical information, and critique of the FCE, as presented on appeal, Lincoln schedules an IME, but Plaintiff refuses to appear.

63. Despite Plaintiff's failure to prove her claim on appeal, Lincoln continued to give her every opportunity to do so moving forward. Lincoln sought an IME (as is its right under the Group Policy) through an outside, independent vendor, and Plaintiff refused. Lincoln even offered Plaintiff the opportunity to choose the physician and still she declined.

64. Lincoln assigned Plaintiff's appeal to Appeals Specialist Jerronda King. (LIN000007).

65.     Ms. King ordered an IME of Plaintiff by a physician specializing in Pain Management and Rehabilitation, and informed Plaintiff of its decision to conduct an IME by letter dated 12/15/21. (LIN000006; 129).

66.     Independent, outside medical vendor ECN referred the file to Alvin K. Antony, MD, and as appointment was scheduled for 1/4/22, with Ms. King notifying Plaintiff of the same by letter dated 12/21/21.  (LIN000120; 124).

67.     On 12/22/21, counsel for Plaintiff refused Lincoln's request that she present for the IME, asserting that Dr. Antony was "biased" in favor of "insurance companies." (LIN000115).

68.     In response, Ms. King called counsel and offered to schedule an IME with a physician "that Plaintiff prefers".  (LIN000005).

69.     Counsel for Plaintiff responded by letter dated 12/28/21, reiterating his refusal to present Plaintiff for an IME with any physician allegedly affiliated with the "insurance industry", and stating that "Ms. Pifer does not know of *any* provider who can perform an independent medical evaluation for Lincoln" and that she "would like to have Lincoln proceed with its consideration of her appeal."  (LIN000113, emphasis added)

70.     Lincoln has a contractual right under the Group Policy to require Plaintiff to present for an IME, and there is no language in the Group Policy that affords Plaintiff any say in the selection of the provider.   Despite her obligations under the Group Policy, Plaintiff flatly refused to present for the scheduled IME.  That refusal, alone, was grounds to terminate benefits.  (LIN000424).

20

71. Unable to obtain an IME, Lincoln obtained an IMR through an outside, independent vendor, from Dr. Vincent, who concluded that Plaintiff has full-time sedentary work capacity. Lincoln gave Plaintiff the chance to respond and explain why it should reject his recommendation. She again declined.

72. Ms. King once again engaged ECN, which selected Hunter Vincent, DO (Board Certified, Pain Management and Rehabilitation). (LIN000105).

73. Dr. Vincent's 1/24/22 report demonstrated that he carefully reviewed the entire medical record, making specific reference to numerous contemporaneous medical records, the various APS's, the surveillance report, and the FCE. (LIN000094-99).

74. Dr. Vincent agreed that Plaintiff has legitimate restrictions and limitations based on Ehlers-Danlos syndrome and osteoarthritis at the right shoulder, cervical spine, and knees and a prognosis of ongoing degeneration. (LIN000102). He noted that she had also been recently involved in a motor vehicle accident that aggravated underlying morbidities. (Id.) Vincent opined that based on these conditions and ongoing pain, Plaintiff should limit activities that might aggravate her symptoms. (Id.)

75. Dr. Vincent concluded that Plaintiff is functionally impaired and requires the following restrictions and limitations:

> Unrestricted reaching at desk level B/L, fine manipulation LUE and simple and firm grasping LUE; Constantly sitting (up to 6 hours/day); Frequently standing (up to 3 hours per/day and with assistive devices if needed); Occasionally: walking (up to 2 hours/day and with assistive devices if needed), lifting, carrying, pushing, and pulling up to 20 lbs. B/L, climbing, stooping, kneeling, crouching, crawling, reaching overhead and below waist, operating foot

controls, fine manipulation RUE and simple and firm grasping RUE; Never: balancing, climbing ladders, working at unprotected heights and operating heavy machinery.

(LIN000102-03.)

76. Dr. Vincent recommended restrictions and limitations beginning 5/19/21 (date of claim determination) through the date of his report, with reassessment beginning 4/4/22. (LIN000103).

77. Dr. Vincent disagreed with the assertion that Plaintiff is unable to work, even at a sedentary occupation. (LIN000100).

78. Dr. Vincent articulated that he based his opinion on the record as a whole, not on any one particular piece of data. He noted that based on that comprehensive review of all the evidence, his "assessment is similar to the FCE results". (LIN000100).

79. Dr. Vincent tried unsuccessfully to speak with Plaintiff's treating physicians. He made two calls each, leaving messages for Belhorn, Kallianos, Ransone and Silver. He received no response. (LIN000104).

80. In light of Dr. Vincent's new restrictions, Vocational Rehabilitation Consultant Nicole Hall performed a Supplemental TSA which identified two suitable occupations for Plaintiff; information clerk and surveillance-system monitor. (LIN000088-90). Hall omitted several occupations from the first TSA as outside Dr. Vincent's updated restrictions.[9]

> <u>Lincolns offers Plaintiff the opportunity to review and respond to the IMR and Supplemental TSA, and she declines.</u>

---

[9] This underscores that Vincent's restrictions were not only independent of Davidow's, they were stricter.

81.    Ms. King provided Plaintiff copies of Dr. Vincent's report and the Supplemental TSA on 2/1/22, inviting any comments or response. (LIN000073-74). Plaintiff declined to submit additional information on or about 2/9/22.   (LIN000066).

In light of the medical evidence, Lincoln upholds the determination on appeal.

82.    Informed by Vincent's assessment, and in the absence of any information in response, Lincoln made the only logical decision: to uphold the determination on appeal. (LIN000003).

83.    Ms. King informed Plaintiff of the decision by letter dated 2/17/22. (LIN000053-64).  The twelve-page letter explains in exacting detail Lincoln's review, and demonstrates a thorough analysis of all information submitted by Plaintiff, as well as that obtained by or for Lincoln.  (Id.)

84.    Plaintiff avers that Lincoln's decision was not only wrong, but unreasonable. Ironically, the gravamen of Plaintiff's claim is that Lincoln's decision was not based on enough information.   But, it was Plaintiff, despite having the burden of proof, who failed to provide Lincoln with any information that could have rationally warranted another result. Plaintiff could have submitted a physician's statement supporting her critique of the FCE, or even a competing FCE.   Plaintiff could have appeared for the IME, or commissioned her own IME.  Plaintiff could have urged any of the four treating physicians who ignored Dr. Vincent's inquiries to return his call.  Plaintiff could have presented a medical opinion in response to Vincent's.  She did none of these things. Instead, her position is that Lincoln should have accepted the conclusions of her treating physicians at face value, ignoring all other available data, including Dr. Vincent's opinion.

23

85.     Lincoln has not taken the extreme position that the medical record is void of objective evidence supporting any limitations.  To the contrary, Dr. Vincent's opinion embraces that fact, and acknowledges restrictions and limitations consistent with sedentary work.  Thus, Lincoln correctly relied on the advice of an independent physician who, to the credit of his objectivity, recognized Plaintiff's legitimate restrictions and limitations.  However, he concluded that those restrictions *did not* preclude her from sedentary work.  See, e.g., Cusson v. Liberty Life Assur. Co. of Boston, 592 F.3d 215, at 226 (1st Cir. 2010) (insurer properly relied on reviewing physician consultants who disagreed with treating physicians).  See also, Joyner, 2013 WL 865846, at *12, *supra*. And Dr. Vincent is the only practitioner who actually reviewed the entire medical record and rendered an objective opinion. *See, e.g.,* Beltman v. Sun Life Assurance Company of Canada, 2019 WL 1614584, *8 (W.D.Mich. March 29, 2019) ("The Court also gives greater weight to Sun Life's experts as they are the only practitioners in the case to have reviewed the whole of Beltman's medical records before offering their assessments") *citing,* Etkin v. Merk & Co., Inc., 2001 WL 1246368, at *6 (E.D.Pa. Oct. 30, 2001) ("[I]t is [proper] to rely on the opinions of non-examining physicians who had before them the entire record of medical evidence, more evidence than was available to any one doctor who saw plaintiff previously."))

86.     Plaintiff simply did not meet her continuing burden of proving that she remained disabled as of May 18, 2019.  Lincoln gave her ample opportunity to prove her claim, but she refused to do so at every turn.

24

87.     To the extent that the evidence might be viewed as showing conflicting medical opinions, mere conflict between the medical evidence proffered by a claimant and relied upon by an administrator, cannot possibly render the administrator's decision arbitrary and capricious.    Indeed, Plaintiff's efforts to pick at the evidence relied on by Lincoln, demonstrates, at a minimum, that reasonable medical professionals might differ on this record.

88.     In *Evans v. Eaton Corp. Long Term Disability Plan,* 514 F.3d 315, 324 (4th Cir. 2008), the Fourth Circuit, faced with a much closer case on the medical evidence than Pifer's, noted that:

> [s]uch point/counterpoint shows what a close case this was, and thus how very important the abuse of discretion standard-which, like other standards, bites mainly in close cases-should have been.  The district court [having reversed the administrator's decision] should have acknowledged the essential equipoise and stayed its hand.

89.     Finally, this is not a case where Lincoln's so-called structural conflict is an important factor.  The Supreme Court holds that the existence of such a conflict does not alter ERISA's deferential standard.  Rather, the conflict factor "should prove less important (perhaps to the vanishing point) where the administrator has taken active steps to reduce potential bias and to promote accuracy."  *See*, Glenn, 554 U.S. at 117; Champion, 550 F.3d at 362.  Here, the record demonstrates Lincoln's "active steps" to reduce bias and promote accuracy—including its use of independent third party medical professionals at the claim and appeal levels and imposing a separation between Lincoln and the consulting medical professionals by enabling a third party to independently retain consultants.  In addition, Lincoln further documented its procedural safeguards in the Declaration of Jordan Bennan, submitted as Exhibit A, to Lincoln's Memorandum in Support of Summary Judgment.

[D.E. 24-1]. *See*, *e.g.*, <u>Fine v. Sun Life Assurance Co.</u>, 97 F.Supp.3d 799, 812–13 (E.D.Va. 2015); <u>Patel v. United Omaha Life Ins. Co.</u>, 2012 WL 2370129 at *2–3 (D.Md. June 21, 2012) (citing <u>Denmark v Liberty Life Assurance Co.</u>, 566 F.3d 1, 10 (1st Cir. 2009)).  There is nothing in the record indicating that bias improperly influenced Lincoln's determination.

90.     Plaintiff has not offered evidence to support a finding that the decision-making process was tainted by a conflict of interest, and her conclusory assertion on the point obviously fails.  Conversely, Lincoln has demonstrated that this is not a case where its so-called structural conflict is an important factor.  As noted therein, the Supreme Court holds that the existence of such a conflict does not alter ERISA's deferential standard.  Rather, the conflict factor "should prove less important (perhaps to the vanishing point) where the administrator has taken active steps to reduce potential bias and to promote accuracy."  <u>See</u>, <u>Metropolitan Life Insurance Company v. Glenn</u>, 554 U.S. 105, 117 (2008); <u>Champion v. Black and Decker, Inc.</u>, 550 F.3d 353, 362 (4th Cir. 2008).

91.     Moreover, Lincoln would have been within its rights under the Group Policy to close Plaintiff's administrative appeal and affirm the discontinuation of benefits when Plaintiff refused Lincoln's reasonable request for an IME.  (LIN000424, 430).  Instead, Lincoln attempted to accommodate Plaintiff by agreeing to assign a physician who was acceptable to her.  (LIN000005).  When Plaintiff refused to participate in the selection of a physician (LIN000113), Lincoln elected to continue reviewing her claim by obtaining Dr. Vincent's IMR. (LIN000115).

92. There is nothing in the record indicating that bias improperly influenced Lincoln's determination. To the contrary, the record reflects that the importance of any structural conflict of interest reduced "to the vanishing point".

II. Proposed Conclusions of Law

1. The Court has jurisdiction over this controversy under 29 U.S.C. § 1132(e)(1) of the Employee Retirement Income Security Act of 1974.

2. ERISA represents "a careful balancing of the need for prompt and fair claims settlement procedures against the public interest in encouraging the formation of employee benefit plans." Aetna Health Inc. v. Davila, 542 U.S. 200, 208 (2004) (quoting Pilot Life Ins. Co. v. Dedeaux, 481 U.S. 41, 54 (1987)). In keeping with this purpose, ERISA gives employers "large leeway to design disability and other welfare plans as they see fit." Heimeshoff v. Hartford Life & Accident Ins. Co., 571 U.S. 99, 108 (2013) (quoting Black & Decker Disability Plan v. Nord, 538 U.S. 822, 833 (2003)). "And once a plan is established, the administrator's duty is to see that the plan is 'maintained pursuant to [that] written instrument.'" Id. (quoting 29 U.S.C. § 1102(a)(1)). Since the substantive content of the plan is up to the plan sponsor who need not provide any benefits at all, ERISA claims administrators are required to administer the plan as written. See, Boyd v. Metropolitan Life Ins. Co., 636 F.3d 138, 140–41 (4th Cir. 2011) (citing Kennedy v. Plan Administrator for DuPont Savings & Inv. Plan, 555 U.S. 285 (2009)).

3. Lincoln had a contractual and regulatory duty, in connection with its "full and fair review," to adhere to and strictly enforce all of the terms of the Group Policy, including its explicit proof of claim requirements. See 29 C.F.R. §§ 2560.503-1(h)

56961663.v1-OGLETREE

(outlining procedures designed to ensure that administrator determinations are made in accordance with the written terms of the plan).

4. This duty does not "favor payment over nonpayment," but rather compels an "impartial account of the interest of all beneficiaries" and "recognizes the need to preserve assets to satisfy future, as well as present, claims." Varity Corp. v. Howe, 516 U.S. 489, 514 (1996); *see also,* Conkright v. Frommert, 559 U.S. 506, 520 (2010) (holding that ERISA administrators "have a duty to all beneficiaries to preserve limited plan assets").[10]

5. To achieve ERISA's careful balance, Courts must also respect the discretionary authority of claim administrators where such authority is expressly granted in the plan documents. *See*, Conkright v. Frommert, 559 U.S. 506, 517 (2010) ("*Firestone* deference protects these interests and, by permitting an employer to grant primary interpretive authority over an ERISA plan to the plan administrator, preserves the 'careful balancing' on which ERISA is based").

6. Here, the Group Policy expressly confers discretionary authority, and this Court must give deference to Lincoln's determination and may overturn it only upon

---

[10] In accordance with the express terms of the Group Policy, the proper allocation of the burden of proof to the Plaintiff is also well established in Fourth Circuit law. *See,* Harrison v. Wells Fargo Bank, N.A., 773 F.3d 15, 24 (4th Cir. 2014) ("It bears repeating that the primary responsibility for providing medical evidence to support a claimant's theory rests with the claimant."); Elliott v. Sara Lee Corp., 190 F.3d 601, 609 (4th Cir. 1999) (holding that the burden is at all times on claimant and "administrator is under no duty to secure specific forms of evidence"); Donnell v. Metro. Life Ins. Co., 165 Fed.App'x 288, 296 n.9 (4th Cir. 2006) ("[Claimant] has the burden to prove that she is entitled to receive disability benefits under the Plan."); Band v. Paul Revere Life Ins. Co., 14 Fed.App'x 210, 212 (4th Cir. 2001) ("The burden is on [claimant] to prove his or her total disability benefits under a Plan.").

28

Plaintiff's showing that Lincoln abused its discretion. Feder v. Paul Revere Life Ins. Co., 228 F.3d 518, 522 (4th Cir. 2000).

7. As such, Lincoln's decision should "not be disturbed if reasonable even if the court itself would have reached a different conclusion independently." Ellis v. Metro Life Ins. Co., 126 F.3d 228, 232 (4th Cir. 1997); *see also,* Smith v. Continental Casualty Co., 369 F.3d 412, 417 (4th Cir. 2004); Evans, 514 F.3d at 322.

8. In the Fourth Circuit, the non-exclusive factors the Court may consider include:

> (1) the language of the plan; (2) the purposes and goals of the plan; (3) the adequacy of the materials considered to make the decision and the degree to which they support it; (4) whether the fiduciary's interpretation was consistent with other provisions in the plan and with earlier interpretations of the plan; (5) whether the decision-making process was reasoned and principled; (6) whether the decision was consistent with the procedural and substantive requirements of ERISA; (7) any external standard relevant to the exercise of discretion; and (8) the fiduciary's motives and any conflict of interest it may have.

Champion v. Black & Decker (U.S.) Inc., 550 F.3d 353, 359 (4th Cir. 2008) (quoting Booth v. Wal-Mart Stores, Inc., 201 F.3d 335, 342–43 (4th Cir. 2000)). The weight of the evidence demonstrates that Lincoln's decision is manifestly in accord with the Booth factors.

9. The deferential standard of review is not altered by the presence of a so-called structural conflict. *See* Glenn, 554 U.S. at 108; Champion, 550 F.3d at 359 ("Courts are to apply simply the abuse of discretion standard . . . even if the administrator operated under a conflict of interest. Under that familiar standard, a discretionary determination will be upheld if reasonable.").

10.     Plaintiff did not prove disability beyond 5/19/21 and she cannot satisfy her burden.  The Administrative Record clearly supports that Lincoln's decision was not an abuse of discretion. Accordingly, Plaintiff is not entitled to benefits under the Group Policy and the Lincoln's claim decision must be upheld.

### III.     Conclusion and Relief Sought

Lincoln is entitled to judgment in its favor. Lincoln requests the following relief: (1) a judgment that Lincoln's decision to terminate payment of long-term disability benefits to Plaintiff was not an abuse of discretion; (2) a judgment that Lincoln is not obligated under the terms of the Group Policy to pay any long-term disability benefits to Plaintiff; (3) dismissal of a claims alleged by Plaintiff with prejudice; and (4) and an award of attorney's fees and costs against Plaintiff pursuant to 29 U.S.C. § 1132(g)(1).

Lincoln will present arguments in favor of its claim for attorney's fees and costs if the Court grants judgment in its favor on Plaintiff's claim for benefits.

Respectfully submitted this the 20th day of June, 2023.

OGLETREE, DEAKINS, NASH,
 SMOAK & STEWART, P.C.

/s/  *Vanessa N. Garrido*
Vanessa N. Garrido (N.C.  Bar No. 53470)
8529 Six Forks Road
Forum IV, Suite 600
Raleigh, North Carolina 27615
Telephone: 919-789-3194
Facsimile: 919-783-9412
Email: vanessa.garrido@ogletree.com

and

30

OGLETREE, DEAKINS, NASH,
SMOAK & STEWART, P.C.

/s/ *W. Kyle Dillard*

W. Kyle Dillard (S.C. State Bar # 69408) *by Special Appearance*
300 North Main Street, Suite 500
Greenville, SC 29601
Telephone: 864-240-8317
Facsimile: 864-235-8806
kyle.dillard@ogletree.com
*Attorneys for Defendant*

31

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that on this date a copy of the foregoing DEFENDANT'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF was electronically filed with the Clerk of Court using the CM/ECF system, which will send notification of such filing to the following:

Andrew Whiteman
Whiteman Law Firm
5400 Glenwood Avenue, Suite 225
Raleigh, NC 27612
aow@whiteman-law.com

Respectfully submitted this the 20th day of June, 2023.

OGLETREE, DEAKINS, NASH,
 SMOAK & STEWART, P.C.

/s/ *Vanessa N. Garrido*
Vanessa N. Garrido (N.C.  Bar No. 53470)
8529 Six Forks Road
Forum IV, Suite 600
Raleigh, North Carolina 27615
Telephone: 919-789-3194
Facsimile: 919-783-9412
Email: vanessa.garrido@ogletree.com

and

/s/ *W. Kyle Dillard*
W. Kyle Dillard (S.C. State Bar # 69408) *by Special Appearance*
300 North Main Street, Suite 500
Greenville, SC 29601
Telephone: 864-240-8317
Facsimile: 864-235-8806
kyle.dillard@ogletree.com
*Attorneys for Defendant*

32