IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

REBECCA PIFER,                      )
                                    )
            Plaintiff,              )
                                    )
      v.                            )        1:22-cv-186
                                    )
LINCOLN LIFE ASSURANCE COMPANY      )
OF BOSTON,                          )
                                    )
            Defendant.              )


### MEMORANDUM OPINION AND ORDER

**OSTEEN, JR., District Judge**

Presently before this court are the parties' cross-motions for summary judgment. Plaintiff Rebecca Pifer initiated this action to recover long term disability benefits from Defendant Lincoln Life Assurance Company of Boston under Section 502 of the Employee Retirement Income Security Act of 1974 ("ERISA"), codified as amended at 29 U.S.C. § 1132(a)(1)(B). (Compl. (Doc. 1) at 1.) Plaintiff moves for summary judgment, (Doc. 20), as does Defendant, (Doc. 23). These motions, (Doc. 20; Doc. 23), are ripe for disposition. For the reasons set forth herein, this court will grant in part Plaintiff's motion for summary judgment, will deny Defendant's motion for summary judgment, and will remand Plaintiff's claim to Defendant for further action in accordance with this Memorandum Opinion and Order.

## I. __FACTUAL BACKGROUND__

The facts in this case have been taken from the Administrative Record. (Ex. 1, Attach. 1, Part 1 Claim file and policy ("Administrative Record") (Doc. 21-1).)[1] The parties do not appear to dispute the majority of the facts of the case, but instead dispute the legal implications of those facts.

### A. __Plaintiff's Initial Diagnosis and Disability Benefits__

In 2011, Plaintiff worked as a Dental Analyst for Blue Cross Blue Shield of North Carolina ("BCBS"). (See id. at 40.) BCBS provided disability insurance to Plaintiff under Group Policy GF3-850-286395-01 issued by Defendant ("Policy"). (Id. at 399–437.) Under the Policy, Defendant makes disability benefits eligibility determinations and pays disability benefits from insurance funds. (Id. at 399, 431.) Plaintiff is classified as a Class 4 employee under the Policy, (id. at 1), which entitles her to twenty-four months of disability benefits if, "as a result of Injury or Sickness, [she is] unable to perform the Material and Substantial Duties of [her] Own Occupation," (id.

_____

[1] All citations in this Memorandum Opinion and Order to documents filed with the court refer to the page numbers located at the bottom righthand corner of the documents as they appear on CM/ECF.

at 405). Thereafter, she is entitled to long-term disability benefits if she "is unable to perform, with reasonable continuity, the Material and Substantial Duties of Any Occupation." (Id.)

In 2011, Plaintiff was diagnosed with "Ehlers Danlos Syndrome with associated osteoarthritis involving the cervical spine, right shoulder, hands and feet as well as a right shoulder rotator cuff tear status post surgical correction." (Id. at 762.) In 2012, Defendant approved Plaintiff for long-term disability benefits based upon her inability to perform "any occupation" due to her underlying medical conditions. (Id. at 709.) Defendant approved Plaintiff's benefits following a report from a consulting physician, Dr. Howard Blank. (Id. at 760–63.) Dr. Blank noted that Plaintiff suffered from numerous physical limitations:

> Standing and walking are both limited to approximately 10 minutes at a time with a total of 30 minutes per eight hour work day. There is limited use of the right upper extremity due to the right shoulder arthritis, primarily as a result of pain. Fine manipulation of the fingers is limited to occasional as a result of the osteoarthritis and repetitive use of the hands should be avoided. Neck rotation, flexion and extension is also limited to occasional. Lifting up to 10 pounds with the left upper extremity only is limited to occasional. All of the noted restrictions and limitations are of a permanent nature.

(Id. at 762.)

From the initial approval for disability benefits in 2012 to 2020, Defendant continued to approve Plaintiff's claims for long-term disability benefits annually. (Id. at 19 (2012 approval in Claim Notes 117 and 119); id. at 16 (2014 approval in Claim Note 134); id. at 15 (2015 approval in Claim Note 137); id. at 14 (2016 approval in Claim Note 141); id. at 13 (2017 approval in Claim Note 144); id. at 12 (2018 approval in Claim Note 150); id. at 11 (2019 approval in Claim Note 155 and 2020 approval in Claim Note 157).) Every year, Plaintiff submitted "Attending Physician's Statements" ("APS") from her physicians to Defendant to corroborate her claim. (Administrative Record (Doc. 21-1) at 669 (2013 APS); id. at 668 (2014 APS); id. at 676 (additional 2014 APS); id. at 658 (2015 APS); id. at 637 (2016 APS); id. at 629 (2017 APS); id. at 610 (2018 APS); id. at 590 (2019 APS); id. at 579 (2020 APS).)

Prior to Plaintiff's 2021 claim for benefits, on January 21, 2019, Dr. Linda Belhorn, Plaintiff's rheumatologist, noted "worsening of [Plaintiff's] disease activity in her cervical spine as well as her ankles and shoulders." (Id. at 162–64.) On February 11, 2019, Dr. John Kallianos, Plaintiff's primary care provider, noted that Plaintiff's peripheral neuropathy "symptoms have shown some interval worsening." (Id. at 191.) On May 15,

- 4 -

2019, Dr. Kallianos again noted "some interval worsening." (Id. at 193.)

On August 5, 2019, Dr. Belhorn noted that Plaintiff "has been reasonably stable" since Plaintiff's January 21, 2019 appointment. (Id. at 158–60.) However, Dr. Belhorn also noted that Plaintiff "has had some increased pain in her right thumb joint and some loss of range of motion. She has also had some worsening neck pain and would like to have a physical therapy referral. . . . She reports that she has had an occasional burning sensation in her upper back in a cross type distribution with significant pain that occurs intermittently." (Id. at 160.)

Plaintiff began physical therapy with Mackenzie Eldridge, DPT, and she attended at least three appointments with Ms. Eldridge in August 2019. (Id. at 158.) Initially, Ms. Eldridge noted that although Plaintiff's general health was "good," Plaintiff "report[ed] with chronic neck pain and associated stiffness," as well as several "deficits [that] collectively limit [Plaintiff's] functional mobility and [that] would benefit from skilled therapy." (Id. at 156–57.) One long-term goal to be addressed over six weeks was to have Plaintiff "be able to sit for 60[] minutes with no increase in symptoms." (Id.) Ms. Eldridge noted that prolonged sitting, twisting/turning, range of motion, driving,

- 5 -

lifting/pushing/pulling were all aggravating factors for Plaintiff's pain. (Id. at 156.) Ms. Eldridge also noted that Plaintiff stopped going to the gym, skiing, or playing tennis due to pain. (Id.) In August 2019, Plaintiff experienced a pain level of six on a ten-point scale. (Id.) By September 11, 2019, Ms. Eldridge noted that Plaintiff "report[ed] improvement with her neck pain and stiffness" and that Plaintiff experienced a pain level of one. (Id. at 150.) Nonetheless, Plaintiff was instructed to return for further physical therapy on September 25, 2019 and October 9, 2019. (Id.)

On February 5, 2020, Plaintiff saw Dr. Belhorn again for an annual appointment. (Id. at 143.) Dr. Belhorn noted that Plaintiff was "trying to stay as active as possible" and was "using tramadol and ibuprofen with benefit." (Id. at 145.) Dr. Belhorn also noted that Plaintiff had "overall stable disease activity" but that "[h]er cervical spine and shoulders continue to be one of her worst areas of involvement." (Id. at 147.) Plaintiff saw Dr. Belhorn again on August 5, 2020. (Id. at 140.) At this appointment, Dr. Belhorn noted that Plaintiff "had some mild increased symptoms in her hands," "worsening fatigue," and that Plaintiff had to "pace herself" when doing yard work. (Id. at 142.) Dr. Belhorn also noted that Plaintiff was considering a higher dose in her antidepressant medication and

- 6 -

that Plaintiff was considering seeing an orthopedic surgeon because of shoulder concerns. (Id. at 142.)

## B. Defendant's Denial of Plaintiff's 2021 Claim for Disability Benefits

On February 4, 2021, approximately one year after Defendant's latest claim note on Defendant's claim file for Plaintiff, Defendant noted that one of its claim reviewers, Lisa Porriello, requested approval for two "days of surveillance for activities check." (Id. at 11 (Claim Note 159).) A manager approved this request. (Id. at 10 (Claim Note 161).) On February 17, 2021, the claim reviewer called Plaintiff and noted that Plaintiff

> remains out of work for worsening symptoms of Ehlers
> Danlos Syndrome[,] . . . states that she has a lot of
> joint pain, increasing most in hands, C3 of neck, and
> [right] shoulder[,] states [that] she has trouble
> ambulating, has a cane when [she] needs it[,] has a
> lot of trouble sleeping and feels tired[,] doesn't do
> any hobbies anymore[,] . . . can't travel anymore as
> walking is tough and has to be very calculated[,] . .
> . states her knees and ankles roll and are painful.

(Id. (cleaned up).) Defendant received a surveillance report consisting of "16 hours of surveillance . . . on [Plaintiff]" from HUB Enterprises on March 5, 2021. (Id. at 482-83.) The surveillance report explained that "video was obtained of [Plaintiff] approaching and walking near a vehicle at the residence, carrying clothing items, and entering and operating a

- 7 -

vehicle. When observed, [Plaintiff] appeared to ambulate in a normal manner, without the use of any visible medical devices." (Id. at 484.)

On March 9, 2021, based on the surveillance and Plaintiff's phone call suggesting improvement in management of her illness, Defendant's claim reviewer recommended Plaintiff's claim for renewed disability benefits receive a functional capacity evaluation ("FCE"). (Id. at 9–10 (Claim Note 168).) Anna Davidow, a physical therapist at WorkStrategies, completed the FCE and concluded that Plaintiff had the ability to work in an occupation with a "[s]edentary physical demand level." (Id. at 462.) An occupation in the "sedentary" physical demand category involves "[e]xerting up to 10 lbs. of force occasionally (Occasionally: activity or condition exists up to 1/3 of the time) and/or a negligible amount of force frequently (Frequently: activity or condition exists from 1/3 to 2/3 of the time to lift, carry, push, pull or otherwise move objects, including human body)." (Id. at 475.) Ms. Davidow explained that:

> [Plaintiff] demonstrated the ability to perform in the Sedentary physical demand level category of work for an eight hour day.
>
> [Plaintiff] demonstrated the ability to occasionally lift up to 12.5 lbs. floor to waist, 12.5 lbs. waist to shoulder, carry up to 10 lbs., push 27 lbs. of force, and pull 20 lbs. of force. She demonstrated the

- 8 -

> following activities on a frequent basis: sitting,
> reaching, kneeling, balancing, stooping, object
> handling, fingering, simple hand grasp, firm hand
> grasp, and fine/gross hand manipulation. She
> demonstrated the following activities on an occasional
> basis: standing, walking, stair climbing, and
> crouching. [Plaintiff] failed to complete the single
> stage treadmill test at a level that can accurately
> predict her functional aerobic capacity.
>
> Deficits identified during testing include elevated
> pain throughout testing, specifically in the right
> shoulder and upper back area. . . .
>
> [Plaintiff] reported current pain at an intensity of 7
> (0 = no pain; 1,2,3 = low; 4,5,6 = moderate;
> 7,8,9 = severe; 10 = emergency pain). She reported
> that the pain ranges from 5 at best to 9 at its worst.
> She stated that prolonged activity and overuse
> aggravates her symptoms, and that rest provides
> relief. Perceived abilities include: sitting 20
> minutes, standing 20 minutes, walking 30 minutes, and
> driving 20 minutes.

(Id. at 462, 465.) Ms. Davidow noted that Plaintiff

independently performed activities of daily living but that

Plaintiff's adult son lived with her and performed the majority

of household tasks. (Id. at 465.) Although Ms. Davidow

ultimately recommended that Plaintiff could perform in a

sedentary occupation, many tests were not completed due to

Plaintiff's physical limitations, including frequent lifting of

weights, frequent carry in carry testing, frequent push/pull

testing, and aerobic testing. (See id. at 467.) Active range of

motion tests were also not completed. (Id. at 472–73.) Further,

Plaintiff reported elevated pain when standing, walking,

- 9 -

handling objects, and during other functional capacity tests.
(Id. at 469, 471.)

On May 19, 2021, based on Ms. Davidow's recommendation that
Plaintiff could perform in a sedentary occupation, Defendant
informed Plaintiff of its decision to deny her claim for long-
term disability benefits, explaining that Plaintiff "do[es] not
meet BCBS of North Carolina's definition of disability beyond
May 17, 2021, and [her] claim is closed effective May 18, 2021."
(Id. at 447-49.)

### C.   <u>Plaintiff's Administrative Appeal</u>

On November 11, 2021, Plaintiff appealed Defendant's
decision to discontinue her disability benefits through counsel.
(Id. at 386.) In her administrative appeal, Plaintiff submitted
medical records and findings from her physicians, test results,
and a self-completed symptoms journal. (Id. at 386-94.) In the
appeal letter, Plaintiff's counsel argued that Defendant's
recent "termination of [Plaintiff's] claim in May 2021 is
inconsistent with its prior determinations from 2012 through
2020." (Id. at 393.)

Plaintiff included or referenced several submissions from
her physicians in her appeal letter. First, Plaintiff submitted
records from visits with her rheumatologist, Dr. Belhorn. (Id.
at 537-40, 132-35, 222-27.) On an August 6, 2020 appointment,

Dr. Belhorn explained that "[Plaintiff] returns for followup of her generalized osteoarthritis and Ehlers-Danlos syndrome. Since [Plaintiff's] last visit, she has had some mild increased symptoms in her hands . . . [and] some worsening fatigue. . . . She had some increased pain in her right shoulder on the lateral aspect and has difficulty with doing certain motions." (Id. at 537.) On a February 2, 2021 appointment, Dr. Belhorn explained that Plaintiff returned for a follow-up on the same conditions and was relatively stable. (Id. at 134.) Plaintiff had received a steroid injection in her shoulder several months prior to her appointment that resulted in some improvement, and Plaintiff was attempting to use strength training and Tai Chi exercises to help improve her shoulder. (Id.) On August 16, 2021, Plaintiff saw Dr. Belhorn again, and Dr. Belhorn explained that Plaintiff was "not doing well . . . due to a trigger of multiple stressors," including a car accident, a fall resulting in injury to her right shoulder, and her mother passing away. (Id. at 222.) Dr. Belhorn completed an APS on October 18, 2021, in which she classified Plaintiff as experiencing class 5 physical impairments, consisting of "severe limitation of functional capacity, incapable of minimum ('sedentary') activity." (Id. at 308.) Dr. Belhorn also imposed several restrictions on Plaintiff's activity, including "no prolonged

- 11 -

sitting, standing, heavy lifting, or repetitive activities."
(Id. at 309.)

Second, Plaintiff submitted records from her shoulder
surgeon, Dr. William Silver. On September 10, 2020, Plaintiff
saw Dr. Silver for increased pain in her right shoulder. (Id. at
135-38.) On August 24, 2021, Plaintiff saw Dr. Silver for
continued or worsening pain following a car accident earlier in
2021 and a recent fall. (Id. at 237.) On September 7, 2021, Dr.
Silver administered a cortisone injection to help alleviate
Plaintiff's shoulder pain. (Id. at 240.) On October 22, 2021,
Dr. Silver also completed an APS, in which he noted a
restriction of "no heavy lifting or repetitive activity." (Id.
at 311.)

Third, Plaintiff submitted records dating back several
years to 2021 from her primary care physician, Dr. John
Kallianos. (Id. at 191-220.) During a 2019 visit to Dr.
Kallianos, he noted that "her symptoms have shown some interval
worsening" and that Plaintiff was "still permanently disabled."
(Id. at 191-192.)

Finally, Plaintiff included records from an August 19, 2021
physical therapy appointment with Minh Phuong Le at EmergeOrtho.
(Id. at 228.) Ms. Le noted Plaintiff's osteoporosis diagnosis,

as well as several strength or muscular dysfunctions. (Id. at 229-30.)

Defendant forwarded Plaintiff's appeal to Defendant's Appeal Review Unit "for a full, and fair review." (Id. at 129.) Additionally, Defendant informed Plaintiff that her appeal required an Independent Medical Evaluation ("IME"). (Id.) The IME was scheduled for January 4, 2022 with Dr. Alvin Antony. (Id. at 124.) Counsel for Plaintiff responded that Plaintiff was "willing to undergo an independent medical examination with an unbiased health care provider," but she was not willing to "undergo an examination by Dr. Antony, who is well-known for working exclusively for insurance companies and for providing examination reports of questionable accuracy." (Id. at 115.) In a subsequent letter, Plaintiff's counsel reiterated that Plaintiff refused to undergo an IME with Dr. Antony but that she "would consider a medical examination with another provider who does not have close ties to the insurance industry." (Id. at 113.) This letter also stated that Plaintiff "would like to have [Defendant] proceed with its consideration of her appeal." (Id.)

As non-insurance industry affiliated medical providers were not available to conduct an IME, Defendant proceeded with its review of Plaintiff's claim through peer review of Plaintiff's

medical records by Dr. Hunter Vincent, a board-certified
physician in physical medicine and rehabilitation pain medicine.
(Id. at 94.) Dr. Vincent reviewed and summarized each of
Plaintiff's medical "records from 03/09/2011 through
10/26/2021." (Id. at 94–105.) Dr. Vincent acknowledged that
Plaintiff's medical records supported Plaintiff's condition
"related to Ehlers-Danlos syndrome associated with generalized
osteoarthritis that involved her right shoulder, cervical spine,
and bilateral knees." (Id. at 104.) He described her symptoms as
"pain, gait disturbance, range of motion and strength
difficulties." (Id.) He also called Plaintiff's medical
providers, including Dr. Belhorn, Dr. Kallianos, Dr. Ransone,
and Dr. Silver, but he was not able to speak with any of them.
(Id.) Dr. Vincent found that Plaintiff "is functionally impaired
and requires restrictions and limitations." (Id. at 102.)
However, Dr. Vincent disagreed "with a recommendation of no work
status. [Plaintiff] has advanced degenerative joint disease
history that warrants restrictions, yet these can be
accommodated in a full-time sedentary work setting. My
assessment is similar with the FCE results." (Id. at 100.) He
recommended Plaintiff "work in a sedentary setting on a full-
time basis." (Id. at 105.)

- 14 -

It appears Dr. Vincent either did not receive, did not review, or did not address the symptoms journal Plaintiff provided to Defendant upon her initial filing of appeal. (Compare Def.'s Resp. to Pl.'s Mot. for Summ. J. ("Def.'s Opp'n Br.") (Doc. 32) at 10 ("[R]eceipt of the journal is mentioned twice in [Lincoln's appeal uphold] letter, and therein the author, Appeals Specialist Jerronda King, states that Lincoln 'carefully considered all of the information submitted in support of the claim.'") (quoting the Administrative Record), with Pl.'s Br. in Supp. of Mot. for Summ. J. ("Pl's Summ. J. Br.") (Doc. 21) at 2–3 ("[T]he symptoms journal was not provided to Lincoln's reviewing physician, and there is no evidence that Lincoln personnel reviewed it.").)

After Defendant received Dr. Vincent's report, a Lincoln employee, Nicole Hall, identified potential occupations for Plaintiff that accommodated the restrictions Dr. Vincent noted. (Administrative Record (Doc. 21-1) at 88–93.)

Defendant also provided Plaintiff with "a copy of the medical and vocational reviews completed on appeal" and offered Plaintiff "an opportunity to review new/additional evidence that has been received before a decision is rendered on [Plaintiff's] appeal." (Id. at 73.) Plaintiff's counsel responded that there was "no new evidence to submit in response to the reports of

- 15 -

Dr. Vincent and Ms. Hall" but that Plaintiff "strongly disputes their conclusions, especially Dr. Vincent's opinion that her restrictions and limitations are minimal." (Id. at 66.)

On February 17, 2022, Defendant made a final decision to deny Plaintiff's claim and appeal. (Id. at 53–64.) Defendant informed Plaintiff of this denial via a letter mailed to Plaintiff's counsel that summarized the medical records provided to Defendant and Defendant's evaluation of those records. (Id.)

## II. **PROCEDURAL HISTORY**

Plaintiff appeals Defendant's decision to deny her claim for long-term disability benefits under Section 502 of the Employee Retirement Income Security Act of 1974. Plaintiff moved for summary judgment, (Doc. 20), and filed a supporting brief, (Pl's Summ. J. Br. (Doc. 21)). Defendant responded. (Def.'s Opp'n Br. (Doc. 32).) Plaintiff replied. (Pl.'s Reply to Lincoln's Resp. to her Mot. for Summ. J. ("Pl.'s Reply") (Doc. 34).)

Additionally, Defendant moved for summary judgment, (Doc. 23), and filed a supporting brief, (Mem. in Supp. of Def.'s Mot. for Summ. J. ("Def.'s Summ. J. Br.") (Doc. 24)). Plaintiff responded. (Pl.'s Resp. to Def.'s Mot. for Summ. J. ("Pl.'s Opp'n Br.") (Doc. 28).) Defendant replied. (Def.'s Reply in Supp. of Mot. for Summ. J. ("Def.'s Reply") (Doc. 33).) The

parties' cross-motions for summary judgment are ripe for
disposition.

## III. **STANDARD OF REVIEW**

Summary judgment is appropriate when "there is no genuine
dispute as to any material fact and the movant is entitled to
judgment as a matter of law." Fed. R. Civ. P. 56(a); see Celotex
Corp. v. Catrett, 477 U.S. 317, 322–23 (1986). This court's
summary judgment inquiry is whether the evidence "is so
one-sided that one party must prevail as a matter of law."
Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986). The
moving party bears the initial burden of demonstrating "that
there is an absence of evidence to support the nonmoving party's
case." Celotex Corp., 477 U.S. at 325. If the "moving party
discharges its burden . . ., the nonmoving party must come
forward with specific facts showing that there is a genuine
issue for trial." McLean v. Patten Cmtys., Inc., 332 F.3d 714,
719 (4th Cir. 2003) (citing Matsushita Elec. Indus. Co. v.
Zenith Radio Corp., 475 U.S. 574, 586–87 (1986)). Summary
judgment should be granted "unless a reasonable jury could
return a verdict in favor of the nonmovant on the evidence
presented." McLean, 332 F.3d at 719 (citing Liberty Lobby, 477
U.S. at 247–48).

When facing cross-motions for summary judgment, this court reviews "each motion separately on its own merits to determine whether either of the parties deserves judgment as a matter of law." Rossignol v. Voorhaar, 316 F.3d 516, 523 (4th Cir. 2003) (citations and internal quotation marks omitted). "When considering each individual motion, the court must take care to resolve all factual disputes and any competing, rational inferences in the light most favorable to the party opposing that motion." Id. (citation and internal quotation marks omitted).

IV. **ANALYSIS**

ERISA provides a claimant with a civil cause of action "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." 29 U.S.C. § 1132(a)(1)(B). Courts reviewing denial of benefits under an ERISA plan should apply a de novo standard of review "unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." Firestone Tire and Rubber Co. v. Bruch, 489 U.S. 101, 115 (1989). When an administrator has been given discretion to determine whether a claimant is eligible for benefits, "the standard for review under ERISA of

- 18 -

[an administrator's] discretionary decision is for abuse of discretion," and this court is not to "disturb such a decision if it is reasonable." <u>Booth v. Wal-Mart Stores, Inc. Assocs. Health & Welfare Plan</u>, 201 F.3d 335, 342 (4th Cir. 2000) (citing <u>Firestone Tire & Rubber Co.</u>, 489 U.S. at 111); <u>see also</u> <u>Carden v. Aetna Life Ins. Co.</u>, 559 F.3d 256, 260 (4th Cir. 2009) (citing <u>Metro. Life Ins. Co. v. Glenn</u>, 554 U.S. 105, 111 (2008)).

To evaluate whether the administrator's decision was reasonable under the abuse of discretion standard, courts may consider the following eight <u>Booth</u> factors:

> (1) the language of the plan;

> (2) the purposes and goals of the plan;

> (3) the adequacy of the materials considered to make the decision and the degree to which they support it;

> (4) whether the fiduciary's interpretation was consistent with other provisions in the plan and with earlier interpretations of the plan;

> (5) whether the decisionmaking process was reasoned and principled;

> (6) whether the decision was consistent with the procedural and substantive requirements of ERISA;

> (7) any external standard relevant to the exercise of discretion; and

> (8) the fiduciary's motives and any conflict of interest it may have.

- 19 -

*Champion v. Black & Decker (U.S.) Inc.*, 550 F.3d 353, 359 (4th Cir. 2008) (quoting *Booth*, 201 F.3d at 342-43); *see also Williams v. Metro. Life Ins. Co.*, 609 F.3d 622, 631 (4th Cir. 2010). "All eight *Booth* factors need not be, and are not, in play in this case." *Helton v. AT&T Inc.*, 709 F.3d 343, 357 (4th Cir. 2013). Specifically, *Booth* factors (2), (6), and (7) are not at issue in this case, and neither party presents any argument as to those factors.

When reviewing an administrator's decision for abuse of discretion, the scope of materials this court can consider is limited; "[g]enerally, consideration of evidence outside of the administrative record is inappropriate. . . ." *Id.* at 352. The court may consider evidence that "was known to the administrator when it rendered its decision," not just evidence that "was part of the administrative record." *Id.* Accordingly, this court will consider the Administrative Record, any evidence presented by Plaintiff that was known to Defendant at the time of its decision, and the relevant *Booth* factors to determine whether Defendant's decision was reasonable.

## A.    **Booth Factor 1: The Language of the Plan**

The first *Booth* factor this court must consider is "the language of the plan." *Champion*, 550 F.3d at 359 (quoting *Booth*, 201 F.3d at 342). The language of the Policy gives Defendant

broad discretion to determine whether a claimant meets the definition of disabled. The Policy states:

> When Lincoln receives Proof that a Covered Person is Disabled due to Injury or Sickness and requires the Regular Attendance of a Physician, Lincoln will pay the Covered Person a Monthly Benefit after the end of the Elimination Period, subject to any other provisions of this policy. The benefit will be paid for the period of Disability if the Covered Person gives to Lincoln Proof of continued:
>
> > 1. Disability;
> > 2. Regular Attendance of a Physician; and
> > 3. Appropriate Available Treatment.
>
> The Proof must be given upon Lincoln's request and at the Covered Person's expense.

(Administrative Record (Doc. 21-1) at 413.) Further, the Policy provides that "[t]he Monthly Benefit will cease on . . . the date the Covered person is no Longer Disabled according to this policy." (Id. at 424.) A claimant is Disabled if "the Covered Person is unable to perform, with reasonable continuity, the Material and Substantial Duties of Any Occupation." (Id. at 405.) "'Any Occupation' means any occupation that the Covered Person is or becomes reasonably fitted by training, education, experience, age, physical and mental capacity." (Id. at 404.) "Lincoln, at its own expense, may have the right and opportunity to have a Covered Person, whose Injury or Sickness is the basis of a claim, examined or evaluated at reasonable intervals deemed necessary by Lincoln. This right may be used as often as

- 21 -

reasonably required." (Id. at 430.) Finally, "Lincoln shall possess the authority, in its sole discretion, to construe the terms of this policy and to determine benefit eligibility hereunder. Lincoln's decisions regarding construction of the terms of this policy and benefit eligibility shall be conclusive and binding." (Id. at 431.)

Under the unambiguous language of the Policy, Defendant has "sole discretion" to determine if a claimant, like Plaintiff, qualifies for long-term disability benefits. (See id.) The Policy also gives Defendant discretion to require proof of disability from Plaintiff and to decide whether that proof is sufficient to support a finding that Plaintiff is "disabled." (See id. at 430.) Defendant's discretionary power under the Policy confirms that this court is to review Defendant's decision to discontinue Plaintiff's long-term disability benefits under an abuse of discretion standard. See Firestone Tire & Rubber Co., 489 U.S. at 115 ("[A] denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a de novo standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan.") (emphasis added). As Defendant had discretion to deny or grant benefits,

the first Booth factor does not support finding that Defendant's decision was unreasonable.

Thus, the first Booth factor is not dispositive on either Plaintiff's or Defendant's motions for summary judgment, but rather, sets forth the appropriate abuse of discretion review applicable to Defendant's decision.

## B.   **Booth Factor 3: Adequacy of Materials Considered**

The third Booth factor directs this court to consider "the adequacy of the materials considered to make the decision and the degree to which they support it." Champion, 550 F.3d at 359 (quoting Booth, 201 F.3d at 342).

Plaintiff argues that Ms. Davidow's FCE does not constitute substantial evidence supporting Defendant's decision to terminate Plaintiff's benefits. (Pl.'s Summ J. Br. (Doc. 21) at 18-19.) Plaintiff also argues that Defendant's conclusion that Plaintiff could perform "sedentary work" under the Policy was an abuse of discretion because the FCE results were not representative of Plaintiff's ability to work full-time. (Id.) Plaintiff further argues that Dr. Vincent's report does not constitute substantial evidence because of his reliance on Ms. Davidow's FCE. (Id. at 19-20.) Finally, Plaintiff argues that Defendant's failure to consider Plaintiff's symptoms journal,

which Plaintiff provided to Defendant during her administrative appeal, was an abuse of discretion. (Id. at 20-21.)

On the other hand, Defendant argues that it need not defer to Plaintiff's physicians' opinions in its decision on Plaintiff's claim for long-term disability benefits. (Def.'s Summ. J. Br. (Doc. 24) at 17-19.) Defendant also argues that Plaintiff's physicians' opinions are of little weight compared to Ms. Davidow's FCE and Dr. Vincent's conclusion, as Plaintiff's physicians only evaluated discrete aspects of Plaintiff's care, not the entire record available to Defendant. (Id. at 19-20.) Finally, Defendant argues that the only other proof Plaintiff provided was her own "subjective" and "self-serving" assessment that she cannot work, and Defendant insinuates that Plaintiff's symptoms journal was "crafted for the specific purpose of supporting her claim." (Id. at 21-22.)

As part of the review process, Defendant could retain and utilize consultants, such as Dr. Vincent and Ms. Davidow, to offer opinions as to Plaintiff's condition, and doing so was not an abuse of discretion. Defendant is not required to defer to Plaintiff's physicians' opinions, and Defendant may reach its own conclusions, so long as it does not abuse its discretion in reaching those conclusions. See Scott v. Eaton Corp. Long Term Disability Plan, 454 F. App'x 154, 160 (4th Cir. 2011) (citing

<u>Black & Decker Disability Plan v. Nord</u>, 538 U.S. 822, 834 (2003)).

However, Defendant failed to provide relevant records to Dr. Vincent and Ms. Davidow, Defendant failed to reconcile conflicting information in Plaintiff's medical history, and Defendant relied on Dr. Vincent's and Ms. Davidow's opinions despite the missing or conflicting information. This was a failure to adequately consider relevant materials and a failure to rely upon materials that support Defendant's decision that Plaintiff is capable of full-time sedentary work. <u>See</u> <u>Booth</u>, 201 F.3d at 342 (explaining that the third <u>Booth</u> factor evaluates "the adequacy of the materials considered to make the decision and the degree to which they support it").

### 1. **Defendant's Reliance on Dr. Vincent's and Ms. Davidow's Opinions**

In the Fourth Circuit, "the primary responsibility for providing medical evidence to support a claimant's theory rests with the claimant." <u>Harrison v. Wells Fargo Bank, N.A.</u>, 773 F.3d 15, 24 (4th Cir. 2014). Administrators are not "under any duty to secure evidence supporting a claim for disability benefits when [the administrator] had in [its] possession reliable evidence that a claimant was not, in fact, disabled." <u>Berry v. Ciba-Geigy Corp.</u>, 762 F.2d 1003, 1008 (4th Cir. 1985). "[A]

claimant who did not submit supplemental evidence to disprove the existing record showing that she was not disabled, '[could not then] prevail on an argument that [her employer] had insufficient evidence to make a reasoned decision.'" Harrison, 773 F.3d at 22 (quoting Elliott v. Sara Lee Corp., 190 F.3d 601, 608 (4th Cir. 1999)). Further, when contrary evidence exists, "plan administrators need not accord treating physicians controlling deference in the face of contrary evidence." Smith v. Reliance Standard Life Ins. Co., 778 F. App'x 207, 211 (4th Cir. 2019) (citing Black & Decker Disability Plan, 538 U.S. at 834). Nonetheless, for "an administrator's decision [to be] reasonable," it must be "supported by substantial evidence." Evans v. Eaton Corp. Long Term Disability Plan, 514 F.3d 315, 322 (4th Cir. 2008). Substantial evidence supporting a claimant's position or an administrator's decision "consists of less than a preponderance but more than a scintilla of relevant evidence that 'a reasoning mind would accept as sufficient to support a particular conclusion.'" Whitley v. Hartford Life & Accident Ins. Co., 262 F. App'x 546, 551 (4th Cir. 2008) (quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966)); see also Wilson v. UnitedHealthcare Ins. Co., 27 F.4th 228, 238 (4th Cir. 2022) ("Substantial evidence is evidence that a

reasonable mind might accept as adequate to support a
conclusion.") (internal citation and quotation marks omitted).

The evidence that supports Plaintiff's claim for disability
benefits and that was provided to Defendant began in 2011 with
Plaintiff's original diagnosis. There is no dispute Plaintiff
provided relevant records from 2012 until 2021 and during her
administrative appeal. The administrative record has been
provided by both Plaintiff, (Administrative Record (Doc. 21-1)),
and Defendant, (Doc. 24-2; Doc. 24-3), and there is no dispute
as to that record. Thus, Plaintiff provided historical records
of her medical condition and disability status to Defendant.

In addition to those historical records and information
provided from 2011 to 2021, for purposes of her administrative
appeal, Plaintiff provided Defendant several years' worth of
medical records from her treating physicians, including her
primary care physician, her rheumatologist, her shoulder
surgeon, and her physical therapist. (Administrative Record
(Doc. 21-1) at 386-94.) Plaintiff also provided a self-logged
symptoms journal. (Id. at 243-86.) Plaintiff's treating
physicians deemed Plaintiff "permanently disabled." (Id. at
192.) However, a plan administrator is not required to give
special deference to a claimant's treating physicians' opinions,
particularly when conflicting evidence exists. See Spry v. Eaton

- 27 -

Corp. Long Term Disability Plan, 326 F. App'x 674, 679 (4th Cir. 2009) (holding that the ERISA administrator's termination of the claimant's benefits was not unreasonable when the medical evidence concerning the claimant's ability to work, including doctors reports and independent medical examinations, conflicted). Thus, "[t]here was nothing inherently unreasonable in [Defendant's] decision not to adopt the opinions of [Plaintiff's] [treating] physicians." See id.

Plaintiff cites to Stup v. UNUM Life Ins. Co. of America, 390 F.3d 301 (4th Cir. 2004), in support of her argument that Defendant improperly relied on Ms. Davidow's FCE in reaching its decision to deny Plaintiff's claim for benefits. (Pl.'s Summ. J. Br. (Doc. 21) at 18.) However, while Stup does have some relevance to the facts of this case, the record in Stup is more limited than the present record, making Stup factually distinguishable. In Stup, the physical therapist completing the FCE specifically noted flaws in the FCE, the insurer's in-house doctor reviewing the plaintiff's medical records only provided a one-paragraph report that focused solely on the FCE results, and the plaintiff's doctor subsequently submitted a letter disputing the defendant's conclusion that the plaintiff could perform sedentary work. Stup, 390 F.3d at 305–06.

Here, although Ms. Davidow's FCE was not fully completed, Ms. Davidow did not identify concerns with Plaintiff's FCE, as in Stup. Additionally, and contrary to the consulting physician in Stup, Dr. Vincent analyzed not only the FCE, but also other medical records. Unlike Ms. Stup, Plaintiff did not submit medical evidence assessing and disputing Dr. Vincent's conclusions.[2] Defendant is not obligated to defer to Plaintiff's treating physicians or to obtain evidence supporting Plaintiff's claim for disability benefits. See Elliot, 190 F.3d at 608; see also Black & Decker Disability Plan, 538 U.S. at 830 ("Nothing in

[ERISA] . . . suggests that plan administrators must accord special deference to the opinions of treating physicians. Nor

---

[2] Plaintiff's decision to decline the opportunity to supplement the record is a factor in this court's decision to remand, rather than reverse, the administrator's decision in this case. Plaintiff had the opportunity to supplement the record, either by completing the IME or by having her treating physicians directly address Ms. Davidow's and Dr. Vincent's conclusions. (See Administrative Record (Doc. 21-1) at 113 (Plaintiff rejecting an independent medical examination); id. at 73 (letter from Defendant providing Plaintiff with an opportunity to review and respond to Dr. Vincent's report and Defendant's vocational assessment); id. at 66 (letter from Plaintiff's counsel explaining that Plaintiff "has no new evidence to submit in response to the reports of Dr. Vincent and Ms. Hall").) It would have benefitted Plaintiff to do so, as she bears the burden of proving her disability. See Elliot, 190 F.3d at 608.

- 29 -

does [ERISA] impose a heightened burden of explanation on administrators when they reject a treating physician's opinion."); Spry, 326 F. App'x at 679 ("[T]here was nothing inherently unreasonable in the decision not to adopt the opinions of [the plaintiff's] primary care physicians."); Mills v. Union Sec. Ins., 832 F. Supp. 2d 587, 598 (E.D.N.C. 2011) (explaining that a plan administrator is not required "to accord special weight to the opinions of a claimant's physician" but that the administrator's "decision must be based on the whole record" and that the administrator "cannot pick and choose evidence that supports its decision while ignoring other relevant evidence in the record").

This court finds that Stup is distinguishable and therefore not controlling.

## 2. Defendant's Errors while Considering Plaintiff's Medical History

Although Stup is not controlling, there are failures by Defendant that compel this court to conclude Defendant's decision was an abuse of discretion requiring remand. Defendant failed to provide relevant records to Ms. Davidow and Dr. Vincent, and Defendant relied upon their opinions even though Defendant's consultants lacked relevant information. Those errors show that Defendant did not adequately consider the

- 30 -

record in reaching its decision and that Defendant's decision was not adequately supported by the record. See Champion, 550 F.3d at 359.

First, Defendant's failure to consider, or have its consultants consider, Plaintiff's symptoms journal constitutes a failure to consider relevant evidence and cannot be excused by an argument that the evidence is subjective and "crafted for the specific purpose of supporting [Plaintiff's] claim." (See Def.'s Summ. J. Br. (Doc. 24) at 21.) "This case falls into that difficult class of ERISA disability cases involving subjective complaints of pain as a primary cause and driver of the insured's claim of disability." DuPerry v. Life Ins. of N. Am., 632 F.3d 860, 867–68 (4th Cir. 2011) (quoting the lower court). Defendant does not dispute this. (Def.'s Summ. J. Br. (Doc. 24) at 22 ("[M]any people work with pain and difficulties."); id. at 21 n.8 ("The question is not whether Plaintiff feels pain or to what degree. The question is the extent to which pain precludes her ability to work.").)

Plaintiff produced "the only type[] of evidence a claimant in her situation could procure, her own description of the severity of her subjective symptoms . . . ." DuPerry, 632 F.3d at 873. While the Policy grants Defendant discretion in evaluating Plaintiff's medical records, it does not permit

Defendant to ignore a claimant's subjective evaluation of her symptoms, particularly pain. And although Defendant argues that nothing in the administrative record suggests that Defendant did not consider Plaintiff's symptoms journal, (Def.'s Opp'n Br. (Doc. 32) at 10-13), this court concludes Defendant did not review the symptoms journal.

Defendant does not forecast any evidence suggesting that Defendant did, in fact, consider Plaintiff's symptoms journal or provide it to Dr. Vincent.[3] (See id.) At most, Defendant's letter denying Plaintiff's administrative appeal states: "Journal entries were received." (Administrative Record (Doc. 21-1) at 57.) Mere receipt of the journal and a form letter of acknowledgment does not indicate meaningful review. Given the thoroughness of Dr. Vincent's explanation of the records he did review and the thoroughness of the records maintained by Defendant describing the evidence reviewed, the complete lack of reference to the symptoms journal in Dr. Vincent's review suggests neither Defendant, nor its consultants, reviewed the symptoms journal. This court finds Defendant ignored "the only

---

[3] Dr. Vincent's failure to mention the symptoms journal suggests that either he did not receive it or that he did not review it. Regardless, it is Defendant's responsibility to ensure its chosen agents review the relevant medical information, and here, Defendant cannot demonstrate the journal was considered by anyone.

type[] of evidence a claimant in [Plaintiff's] situation could procure, her own description of the severity of her subjective symptoms . . . ." See DuPerry, 632 F.3d at 873.

Failure to review the symptoms journal is not harmless. As described in this opinion, it appears Defendant and Dr. Vincent failed to consider Plaintiff's established limitations of osteoarthritis in her hands and feet, see infra at 37–40, nor did they consider Plaintiff's 2019 physical therapy with Ms. Eldridge to alleviate her pain, id. at 40–42. The symptoms journal contains numerous entries relating to Plaintiff's pain in her hands, feet, and ankles. (See, e.g., Administrative Record (Doc. 21-1) at 243 ("PAIN 10 – neck, arms, both shoulders, back, knees, hips, hands.") (emphasis in original); id. at 244 ("arms/hands . . . P-9"); id. at 246 ("arms/hands . . . P-9"; id. at 248 ("Arms/neck/hands not happy.").) The difficulties described in the symptoms journal are subjective manifestations of pain consistent with Plaintiff's objective conditions recognized by Dr. Blank, Defendant's consultant in 2012, which were ignored by Defendant during the course of the present denial of benefits.

"[A]n administrator's decision is reasonable . . . if it is supported by substantial evidence." Evans, 514 F.3d at 322. The "decision must be based on the whole record, and [the

- 33 -

administrator] cannot pick and choose evidence that supports its decision while ignoring other relevant evidence in the record. Mills, 832 F. Supp. 2d at 598 (citing Myers v. Hercules, Inc., 253 F.3d 761, 768 (4th Cir. 2001)); see also Donovan v. Eaton Corp., Long Term Disability Plan, 462 F.3d 321, 329 (4th Cir. 2006) (finding a claim administrator abused its discretion in denying benefits when that decision was based on the opinion of a reviewing physician with incomplete information).

In Myers v. Hercules, Inc., the Fourth Circuit found that a claim administrator's decision to terminate a claimant's benefits was an abuse of discretion when the administrator "misread[] some evidence and [took] other bits of evidence out of context." 253 F.3d at 768. Specifically, the claim administrator concluded that the claimant was capable of performing in a full-time sedentary occupation based on isolated evidence that the claimant engaged in light physical activities, performed light housekeeping work, and did clerical work at home for two hours daily, as well as physicians' statements that the claimant was "doing well" overall and that "a sedentary occupation would be probable." Id. at 767-68. However, the evidence also showed that when the claimant engaged in those light activities, she needed "considerable" time to rest her back daily between activities. Id. at 767. Further, one

- 34 -

physician opined that even though the claimant was "doing well,"
she still needed to limit her activity to one-hour intervals.
Id. at 765-68. She also needed three one-hour intervals of rest
daily. Id. This was consistent with that physician's opinion
that the claimant was totally disabled for any full-time job.
Id. Similarly, another physician opined that "a sedentary
occupation would be probable" only after the claimant received
vocational rehabilitation for her "significant orthopedic
limitations," not that the claimant was capable of a full-time
sedentary occupation that warranted termination of disability
benefits. Id. at 765, 768. The Myers court concluded that the
administrator's decision to terminate the claimant's benefits —
based on picking and choosing evidence to support its decision —
"was not reasoned and that its decision was not supported by the
evidence," so the administrator "abused its discretion." Id.

In cases when subjective complaints of pain pertain to the
claimant's case, those subjective reports are considered
relevant to the claim for disability benefits. See DuPerry, 632
F.3d at 874-75 (explaining that the defendant "was not required
to 'simply accept [the plaintiff's] subjective complaints of
pain without question,' but neither could [the defendant]
'simply dismiss such subjective complaints of pain out of hand,
especially where there is objective medical proof of a disease

- 35 -

that could cause such pain.'") (quoting the district court).
When a claimant suffers pain and fatigue because of her disease,
the claimant's subjective complaints serve "to pinpoint the
precise intensity of her symptoms and her inability to endure
them over the course of a workweek." DuPerry, 632 F.3d at 875.

Like the claimant in DuPerry, Plaintiff's symptoms journal
provides her subjective evaluation of her symptoms and pain,
which is indeed relevant to her ability to withstand that pain
while in a sedentary occupation for a full-time workweek. Dr.
Vincent's evaluation of Plaintiff's medical records may have
resulted in a different conclusion had he reviewed Plaintiff's
symptoms journal and subjective evaluation of pain throughout
her day, particularly given that he did not assess Plaintiff
directly or speak to Plaintiff's treating physicians. Whether
Defendant failed to provide the symptoms journal to Dr. Vincent
or Dr. Vincent received the journal but failed to consider it,
the failure to consider the symptoms journal suggests
Defendant's decision was not "based on the whole record," see
Mills, 832 F. Supp. 2d at 599, so Defendant's decision "was not
reasoned" and "was not supported by the evidence," see Myers,
253 F.3d at 768.

Defendant argues that Griffin v. Hartford Life & Accident
Ins. Co., 898 F.3d 371 (4th Cir. 2018), supports its argument

that Plaintiff's subjective reports of her pain were
"insufficient to prove disability where inconsistent with other
evidence." (Def.'s Summ. J. Br. (Doc. 24) at 21 n.8.) However,
in Griffin, the claimant had not been "receiving treatment for
his condition and . . . had not seen any of his medical
providers for over six months. . . . [B]oth [of the claimant's
doctors] . . . had not seen [the claimant] in nearly a year and
. . . they were not providing any functionality restrictions or
limitations." 898 F.3d at 381. The Fourth Circuit agreed with
the lower court that the claimant's self-reporting of his
condition did not provide "objective medical evidence" of his
disability. Id. at 382. In contrast, here, Plaintiff regularly
sees several doctors for treatment, regularly reports pain due
to her conditions, takes medications to manage her pain, and has
numerous restrictions and limitations on her activities; even
Dr. Vincent agreed with and noted restrictions on Plaintiff's
activities. This case is not like Griffin, where the claimant
was "no longer receiving treatment and was not regularly taking
pain medication. Id.

    Second, Defendant's failure to reconcile conflicts in its
independent medical consultants' reviews of Plaintiff's
disability status was an abuse of discretion. Defendant appears
to have chosen "evidence that supports its decision while

- 37 -

ignoring other relevant evidence." Mills, 832 F. Supp. 2d at
598.

In 2012, Defendant engaged Dr. Howard Blank to review
Plaintiff's medical file for her initial claim for long-term
disability benefits. (See Administrative Record (Doc. 21-1)
at 760–63.) Dr. Blank reviewed Plaintiff's medical file and
concluded that Plaintiff had several functional impairments.
(Id. at 762.) Dr. Blank described Plaintiff as a "52 year old
female with Ehlers Danlos Syndrome complicated by the
development of osteoarthritis involving primarily the hands,
right shoulder, cervical spine, and feet." (Id. at 761 (emphasis
added).) He described her impairments as

> Ehlers Danlos Syndrome with associated osteoarthritis
> involving the cervical spine, right shoulder, hands
> and feet . . . . There is limited use of the right
> upper extremity due to the right shoulder arthritis,
> primarily as a result of pain. Fine manipulation of
> the fingers is limited to occasional as a result of
> the osteoarthritis and repetitive use of the hands
> should be avoided. . . . All of the noted restrictions
> and limitations are of a permanent nature.

(Id. at 762 (emphasis added).)

Dr. Vincent's description of Plaintiff's medical history
and impairments in 2021, particularly concerning impairments in
her hands, is somewhat contradictory; this court concludes that
Dr. Vincent did not consider or address the osteoarthritis
involving Plaintiff's hands and the related limitations, even

- 38 -

though Dr. Blank recognized those limitations in 2012 as permanent. Dr. Vincent initially describes Plaintiff's medical history as "significant for Ehlers-Danlos syndrome, generalized osteoarthritis of the right shoulder and bilateral knees, cervical degenerative disc disease, and cervical canal stenosis." (Id. at 94.) Later, he describes Plaintiff as being "diagnosed with Ehlers-Danlos syndrome associated with osteoarthritis involving the hands, feet, right shoulder, cervical spine, and bilateral knees." (Id. at 101.) He also notes limitations in Plaintiff's hands and feet while describing Dr. Blank's 2012 review. (Id. at 95 ("Record revealed that the claimant's impairments include Ehlers Danlos Syndrome with associated osteoarthritis involving the cervical spine, right shoulder, hands and feet . . . .").) However, without explanation, Dr. Vincent did not recognize or consider the osteoarthritis in Plaintiff's hands and feet as an impairing diagnosis, even though Dr. Blank opined that it was a permanent impairment. Specifically, Dr. Vincent's report includes the following question and answer:

> 1. Please identify the primary impairing Diagnosis(es) . . . .
>
> Ehlers-Danlos syndrome (Q79.60)
> Generalized osteoarthritis of the right shoulder and bilateral knees (M15)
> Cervical degenerative disc disease (M50.30)
> Cervical canal stenosis

(Id. at 100.) There is no mention of osteoarthritis of the hands or feet. Defendant's independent reviews of Plaintiff's medical conditions and resulting conclusions of disability status, with the first in 2012 by Dr. Blank and the second in 2022 by Dr. Vincent, conflict. Defendant's failure to take steps to resolve the conflicting findings as to osteoarthritis limitations in Plaintiff's hands and feet is both a failure to engage in a reasoned decisionmaking process and — by ignoring undisputed evidence favorable to Plaintiff, such as Dr. Blank's 2012 review — a failure to adequately consider all materials on the record.

Dr. Blank's review is unequivocal. He concluded that Plaintiff's impairments included "Ehlers Danlos Syndrome with associated osteoarthritis involving . . . hands and feet . . ." (Id. at 762.) According to Dr. Blank, that condition resulted in certain limitations: "[f]ine manipulation of the fingers is limited to occasional as a result of the osteoarthritis and repetitive use of the hands should be avoided." (Id.) Dr. Blank further concluded that "[a]ll of the noted restrictions and limitations are of a permanent nature." (Id.)

Although Dr. Vincent's report acknowledges Dr. Blank's 2012 findings, (see id. at 95), it does not address whatsoever these previously noted permanent limitations. Dr. Vincent's failure to

address Plaintiff's limitations as to her hands and feet, including permanent limitations concerning fine manipulation of the fingers and no repetitive use of the hands, is noteworthy because Ms. Davidow's FCE is contrary to Dr. Blank's opinion. Ms. Davidow states that Plaintiff has a manipulative ability including fingering, hand grasping, and manipulation, of "frequent," (id. at 464, 469), even though Plaintiff's "[p]resent symptoms include: Constant pain along bilateral upper extremities that extends to her hands," (id. at 465).

This court finds Defendant's failure to address or explain a permanent limitation on Plaintiff's functional capacity as to her hands and feet shows Defendant's decision to deny her claim for long-term disability benefits was not reasoned and was not supported by adequate evidence. See Myers, 253 F.3d at 768.

Third — in addition to Dr. Vincent's failure to analyze the osteoarthritis in Plaintiff's hands and Plaintiff's symptoms journal — Defendant failed to consider, or require that its consultants consider, records from Plaintiff's 2019 physical therapy with Ms. Eldridge. Dr. Vincent writes in his peer review: "[T]aking into consideration the entire clinical picture, including standards of care and evidence-based medicine and any medication or other treatment side effects, the claimant has a level of impairment that translates into restrictions from

- 41 -

May 19, 2021 to the present." (Administrative Record (Doc. 21-1) at 101 (emphasis added).) Yet Dr. Vincent's report does not appear to have considered Plaintiff's 2019 physical therapy appointments with Ms. Eldridge.

Those records are relevant to whether Plaintiff's disability level did improve such that she is capable of full-time sedentary employment and contain a relevant measure of Plaintiff's physical abilities. They also offer a basis upon which to compare Plaintiff's performance and pain over several months during physical therapy with Plaintiff's performance for a period of two hours during Ms. Davidow's functional capacity evaluation. (Compare id. at 462-476 (Ms. Davidow's functional capacity evaluation), with id. at 156-158 (reports from Plaintiff's physical therapy with Ms. Eldridge).) In his report, Dr. Vincent agreed with Ms. Davidow's conclusions in her functional capacity evaluation, (id. at 100 ("My assessment is similar with the FCE results."); id. at 105 ("My assessment agrees with the FCE study recommending the claimant to work in a sedentary setting on a full-time basis.").) Plaintiff's physical therapy with Ms. Eldridge is relevant to an assessment of Plaintiff's abilities, and Dr. Vincent does not appear to have reviewed those records. In his report, Dr. Vincent appears to agree with Ms. Davidow's FCE conclusions without explanation or

- 42 -

comparison to Plaintiff's 2019 physical therapy with Ms.
Eldridge. Accordingly, Defendant's reliance upon Dr. Vincent's
report even though Dr. Vincent did not review Plaintiff's 2019
physical therapy records suggests Defendant's decision was not
reasoned and was not supported by adequate evidence. See Myers,
253 F.3d at 768.

This court reviews Defendant's decision on Plaintiff's
claim under an abuse of discretion standard, as "administration
of . . . plans should be the function of designated fiduciaries,
not the federal courts," Bernstein v. CapitalCare, Inc., 70 F.3d
783, 788 (4th Cir. 1995), and this court should exercise "a
healthy measure of judicial restraint," Evans, 514 F.3d at 323.
Notwithstanding that restraint, courts require "ERISA
administrators' decisions . . . to rest on good evidence and
sound reasoning; and to result from a fair and searching
process." Id. at 322–23. "The [d]efendant's decision must be
based on the whole record and Defendant cannot pick and choose
evidence that supports its decision while ignoring other
relevant evidence in the record." Mills, 832 F. Supp. 2d at 598.

Defendant may not "pick and choose" the evidence that
supports its decision and ignore Plaintiff's evidence in support
of her condition. See Mills, 832 F. Supp. 2d at 598. Overall,
Defendant failed to review, failed to provide to Dr. Vincent, or

- 43 -

Dr. Vincent failed to review Plaintiff's symptoms journal. Defendant failed to reconcile the conflicts between Dr. Blank's and Dr. Vincent's assessments of Plaintiff's osteoarthritis in her hands and feet. And Defendant relied upon Dr. Vincent's report even though Dr. Vincent did not review Plaintiff's 2019 physical therapy with Ms. Eldridge. Dr. Vincent provided no explanation for his conclusion or his disagreement with Dr. Blank.

Even if Dr. Vincent's omission of those records was harmless (which this court does not find), Defendant's reliance upon Dr. Vincent's report given the omissions and conflicts suggests Defendant's decision was not based on adequate evidence. Defendant did not provide any explanation for these failures, nor did Defendant provide explanation for its decision to deny Plaintiff's claim beyond reference to Ms. Davidow's and Dr. Vincent's conclusions. It appears Defendant's decision was solely based on its consultants' conclusions. Those errors were material because Plaintiff's diagnosis and the pain her illness causes her is the exact issue before this court. Although Defendant need not defer to Plaintiff's treating physicians in the face of contrary evidence in the form of Ms. Davidow's and Dr. Vincent's conclusions, see Smith, 778 F. App'x at 211 (citing Black & Decker Disability Plan, 538 U.S. at 834),

- 44 -

Defendant still must ensure it considered adequate evidence in reaching its decision and that evidence supports its decision, See Champion, 550 F.3d at 359. Defendant's errors show Defendant's decision was not "based on the whole record," but instead, Defendant "pick[ed] and [chose] evidence that support[ed] its decision while ignoring other relevant evidence in the record. See Mills, 832 F. Supp. 2d at 598. Accordingly, Defendant's decision was not supported by adequate materials and did not consist of a reasoned decisionmaking process. See Champion, 550 F.3d at 359 (quoting Booth, 201 F.3d at 342).

C.  **Booth Factor 4: Consistency of the Fiduciary's Interpretation of the Plan**

The fourth Booth factor directs this court to consider "whether the fiduciary's interpretation was consistent with other provisions in the plan and with earlier interpretations of the plan." Champion, 550 F.3d at 359 (quoting Booth, 201 F.3d at 342). When an administrator determines a claimant is not disabled after prior findings of that claimant's disability without new intervening evidence, the administrator's decision may be an abuse of discretion. See, e.g., Mills, 832 F. Supp. 2d at 601–02 (finding that the defendant's denial of disability after previously approving it without new medical evidence was unreasonable under the fourth Booth factor); Stull v. Life Ins.

- 45 -

Co. of N. Am., No. 3:20-CV-291-DCK, 2021 WL 4993485, at *9
(W.D.N.C. Oct. 27, 2021) (finding that an administrator failed
the fourth Booth factor when it determined the claimant was not
disabled in 2017 after previously granting the claimant benefits
in 2016 and "nothing with respect to [the claimant's] disability
ha[d] materially changed").

Plaintiff argues that Defendant's decision to deny her 2021
claim for long-term disability benefits and to deny her
administrative appeal is contrary to Defendant's earlier
interpretation of the Policy from 2011 to 2020, during which
Defendant granted her claim for long-term disability benefits.
(Pl.'s Summ. J. Br. (Doc. 21) at 22–23.) Defendant argues that
it received new information showing improvement in Plaintiff's
condition that ultimately led to Defendant's decision to deny
Plaintiff's claim. (Def.'s Summ. J. Br. (Doc. 24) at 17 ("During
annual claim review, Lincoln identified information that raised
questions about Plaintiff's current activity level. Lincoln
followed the evidence and obtained surveillance that, at
minimum, warranted further investigation.").)

In 2012, Defendant first approved Plaintiff's claim for
long-term disability benefits on the grounds that she was unable
to perform "any occupation" after Dr. Blank assessed Plaintiff
and determined her disability was of "a permanent nature."

- 46 -

(Administrative Record (Doc. 21-2) at 709.) For the next seven years, Defendant annually requested an APS from Plaintiff's medical providers for each subsequent claim for disability benefits. Plaintiff provided records from Dr. Kallianos, her primary care provider, and Dr. Belhorn, her rheumatologist, every year. And each year, Defendant approved Plaintiff's benefits. Defendant last approved Plaintiff's claim for long-term disability benefits in February 2020. (Administrative Record (Doc. 21-1) at 11 (Claim Note 157).)

However, on February 4, 2021, Defendant's claim file for Plaintiff's claim for long-term disability benefits contained two notes: first, that Lisa Porriello received Plaintiff's medical records, and second, that Lisa Porriello requested manager approval for two days of surveillance of Plaintiff. (Id. (Claim Note 158, Claim Note 159).) As Plaintiff noted, Ms. Porriello provided no explanation for her decision to conduct surveillance. Defendant argues it was "[i]nformed by new information indicating Plaintiff's improvement." (Def.'s Summ. J. Br. (Doc. 24) at 5.)

The new information Defendant claims that it relied upon that "show[ed] improvement in Plaintiff's condition" and that ultimately lead to Defendant's decision to conduct surveillance consists of: August and September 2019 physical therapy reports;

- 47 -

2019 appointments with Dr. Belhorn and Dr. Kallianos; a February
5, 2020 appointment with Dr. Belhorn; and an August 5, 2020
appointment with Dr. Belhorn. (Id. at 5 ("Recent medical records
show improvement in Plaintiff's condition."); see also
Administrative Record (Doc. 21-1) at 162-66 (January 21, 2019
appointment with Dr. Belhorn); id. at 191-92 (February 11, 2019
appointment with Dr. Kallianos); id. at 193-95 (May 15, 2019
appointment with Dr. Kallianos); id. at 158-61 (August 5, 2019
appointment with Dr. Belhorn); id. at 147-57 (August and
September 2019 physical therapy with Ms. Eldridge); id. at 143-
46 (February 5, 2020 appointment with Dr. Belhorn); id. at 140-
43 (August 5, 2020 appointment with Dr. Belhorn).)

The 2019 physical therapy, 2019 doctors' appointments, and
the February 5, 2020 appointment with Dr. Belhorn all predate
Plaintiff's 2020 claim for benefits, which Defendant approved on
February 7, 2020. (Id. at 11 (Claim Note 157).) The 2019
physical therapy appointments may suggest some improvement in
Plaintiff's medical condition and disability, as her reported
pain level decreased from a pain level of six on August 8, 2019,
(id. at 156), to a pain level of one by September 11, 2019, (id.
at 150).

Defendant's review and approval of Plaintiff's 2020 claim
for benefits was general in nature. (Id. at 11 (Claim Note 157

stated "RECVD SIGNED AUTH FORM.--- BASED ON INFO RECVD, IT IS
SUPPORTIVE FOR ONGOING LTD. F/U FOR ANNUAL REVIEW.").) On
February 7, 2020, Defendant also noted receiving records from
Plaintiff's doctor, and Defendant informed Plaintiff that it was
"all set with [Plaintiff's] annual forms." (Id. at 11 (Phone
Note 91).) It is not clear from Defendant's notes concerning
Plaintiff's claim history which specific documents, medical
records, or information Defendant received or considered in
Plaintiff's 2020 claim review. Even so, the 2019 physical
therapy, 2019 doctors' appointments, and the February 5, 2020
appointment with Dr. Belhorn are all part of Plaintiff's medical
history and represent her condition prior to her 2020 claim for
benefits.

Plaintiff's August 5, 2020 appointment with Dr. Belhorn is
the only new development in Plaintiff's condition prior to
Defendant's review of Plaintiff's 2021 claim for benefits.
During that August 5, 2020 appointment, Dr. Belhorn noted that
Plaintiff "had some mild increased symptoms in her hands . . .
has had some increased pain in her right shoulder on the lateral
aspect . . . [and] has some issues with her neck that tend[] to
respond to physical therapy." (Administrative Record (Doc. 21-1)
at 142.) The only indication of improvement in Dr. Belhorn's
report is a note that Plaintiff "does feel that she is

- 49 -

improving" when discussing Plaintiff's psychotherapy and divorce-related stress, as well as a note that Plaintiff "went to the beach to celebrate" her 60th birthday. (Id.) These notes do not indicate new medical evidence after Defendant's review of Plaintiff's 2020 claim showing improvement in Plaintiff's disability that would "raise[] questions about Plaintiff's current activity level." (Def.'s Summ. J. Br. (Doc. 24) at 17.) Yet based on this report, Defendant followed-up with Plaintiff about her condition, obtained surveillance on Plaintiff, and ordered an FCE, which concluded Plaintiff was capable of a sedentary occupation — thus no longer meeting the Policy's definition of disabled for "any occupation." (Administrative Record (Doc. 21-2) at 9–10.) Subsequently on her administrative appeal, Plaintiff provided evidence that her condition had worsened due to a car accident and a fall in 2021 after Defendant's initial denial of her claim. Even with that evidence, Dr. Vincent still concluded that Plaintiff could work in a sedentary setting.

It appears Defendant's decision to seek surveillance and more rigorously examine Plaintiff's claim — if based only on Plaintiff's August 5, 2020 appointment with Dr. Belhorn — is questionable. Even if Ms. Davidow's FCE constitutes intervening evidence showing a change in Plaintiff's disability that was not

- 50 -

present in Mills and Stull, Plaintiff provided evidence showing worsening in her condition after the FCE. Even Dr. Vincent's peer review of Plaintiff's medical records on Plaintiff's administrative appeal acknowledged that Plaintiff's doctors found her impairments were "unchanged" and that "there are no expected . . . improvement[s] in the future." (Administrative Record (Doc. 21-1) at 100.) Based on his report, it appears that Dr. Vincent also failed to review or address Plaintiff's 2019 physical therapy, 2019 appointments with Dr. Kallianos and Dr. Belhorn, and February 5, 2020 appointment with Dr. Belhorn, (see id. at 94, 95-96), even though Defendant cites these appointments as showing improvement in Plaintiff's condition and disability level, (see Def.'s Summ. J. Br. (Doc. 24) at 5). Without considering the full "clinical picture," Dr. Vincent still "disagree[d] with a recommendation of no work status" and recommended that "a full-time sedentary work setting" was appropriate. (Administrative Record (Doc. 21-1) at 100-01.)

Notwithstanding Dr. Vincent's recommendation, Defendant has not presented any evidence of a change in Plaintiff's disability status. Dr. Vincent's peer review is merely an assessment of Plaintiff's preexisting medical history, not medical evidence of an improvement in Plaintiff's condition that impacts her disability status. Like in Stull and Mills, without new evidence

- 51 -

of a change in Plaintiff's condition, denying disability benefits after previously approving them for almost a decade suggests Defendant's "interpretation was [not] consistent with . . . earlier interpretations of the plan," thus weighing in favor of finding an abuse of discretion. See Champion, 550 F.3d at 359 (quoting Booth, 201 F.3d at 342).

D.   **Booth Factor 5: Whether the Decisionmaking Process was Reasoned and Principled**

The fifth Booth factor considers whether the administrator's "decisionmaking process was reasoned and principled." Champion, 550 F.3d at 359 (quoting Booth, 201 F.3d at 342). "A complete record is necessary to make a reasoned decision, which must 'rest on good evidence and sound reasoning; and . . . result from a fair and searching process.'" Harrison, 773 F.3d at 21 (quoting Evans, 514 F.3d at 322–23). "A searching process does not permit a plan administrator to shut his eyes to the most evident and accessible sources of information that might support a successful claim." Id. This requires administrators to notify claimants if their claims lack specific information that is material to the success of the claim. Id. This requirement has also been described as needing "a meaningful dialogue between ERISA plan administrators and their

beneficiaries." Id. (quoting Booton v. Lockheed Med. Benefit Plan, 110 F.3d 1461, 1463 (9th Cir. 1997)).

Plaintiff argues summarily that "the evidence discussed . . . in connection with the third and fourth factors also supports a finding that [Defendant's] decision-making process was not reasoned and principled." (Pl.'s Summ. J. Br. (Doc. 21) at 23.) It appears Plaintiff's argument hinges on Defendant's reliance on Ms. Davidow's FCE, Defendant's failure to consider Plaintiff's symptoms journal, and Defendant's failure to renew Plaintiff's long-term disability benefits after eight years of granting her claim for benefits, all of which this court has discussed previously. See supra Section III.B.2 and Section III.C. Defendant argues that Plaintiff is merely "cherry-picking the record." (Def.'s Opp'n Br. (Doc. 32) at 17.) Notwithstanding this court's findings as to the other Booth factors, this court finds that Defendant engaged in an extensive dialogue with Plaintiff, and at times, Plaintiff failed to submit evidence to refute Defendant's conclusions. Nonetheless, Defendant failed to consider and address all relevant evidence in reaching its decision to terminate Plaintiff's disability benefits, suggesting it "shut [its] eyes to the most evident and accessible sources of information" supporting Plaintiff's claim. See Harrison, 773 F.3d at 21. Accordingly, Defendant failed to

- 53 -

engage in a "reasoned and principled" decisionmaking process. See Champion, 550 F.3d at 359 (quoting Booth, 201 F.3d at 342).

In its process to review Plaintiff's claim, on February 4, 2021, approximately one year after Defendant's latest claim note on Defendant's claim file for Plaintiff, one of Defendant's claim reviewers requested approval for two "days of surveillance for activities check." (Administrative Record (Doc. 21-1) at 11 (Claim Note 159).) This request was approved. (Id. at 10 (Claim Note 161).) On February 17, 2021, the claim reviewer called Plaintiff to discuss Plaintiff's symptoms. (Id. (Claim Note 92).) On March 5, 2021, Defendant received a surveillance report consisting of "16 hours of surveillance to be conducted on [Plaintiff]." (Id. at 482–83.)

Based on the surveillance report, Defendant requested an FCE with Ms. Davidow. (Id. at 9 (Claim Note 173 and 171); id. at 462–72.) Ms. Davidow recommended that Plaintiff was suitable for a sedentary occupation. (Id. at 462.) On May 4, 2021, Dr. Kanelos reviewed Plaintiff's file and FCE on Defendant's behalf, and Defendant noted that the "FCE was reviewed and appear consistent and valid. Results of FCE were sustained sedentary work capacity[,] which is consistent with available medical records." (Id. at 9 (Claim Note 175).) Accordingly, Defendant decided that Plaintiff was no longer "disabled" under the

- 54 -

Policy, and Defendant informed Plaintiff of its finding on May 19, 2021. (Id. at 453–57.)

Plaintiff appealed Defendant's decision and provided copies of medical records and a symptoms journal. (Id. at 386.) Subsequently, Defendant informed Plaintiff that her appeal had been forwarded to Defendant's Appeal Review Unit and that Defendant was setting up an Independent Medical Evaluation of her appeal. (Id. at 129.) Defendant notified Plaintiff on December 21, 2021 that an appointment for an IME had been set with Dr. Antony. (Id. at 124.) Thereafter, counsel for Plaintiff refused Defendant's request for an IME with Dr. Antony due to risk of bias. (Id. at 115.) Defendant provided Plaintiff with the opportunity to select a medical provider to conduct an IME. (Id. at 5 (Phone Note 98).) Even so, counsel for Plaintiff reiterated Plaintiff's refusal to undergo an IME with Dr. Antony but that she "would consider a medical examination with another provider who does not have close ties to the insurance industry." (Id. at 113.) This letter also stated that Plaintiff "would like to have [Defendant] proceed with its consideration of her appeal." (Id.)

Consequently, Defendant proceeded with its review of Plaintiff's appeal through peer review of Plaintiff's medical records by Dr. Vincent. (Id. at 94–99.) Notably, Dr. Vincent

- 55 -

concluded that Plaintiff was capable of a sedentary occupation with certain restrictions and limitations. (Id. at 105.) Defendant provided Plaintiff's counsel with "a copy of the medical and vocational reviews completed on appeal" and offered Plaintiff's counsel "an opportunity to review on new/ additional evidence that has been received before a decision is rendered on [Plaintiff's] appeal." (Id. at 73.) Plaintiff's counsel responded that there was "no new evidence to submit" and referred Defendant to Plaintiff's initial appeal. (Id. at 66.)

On February 17, 2022, Defendant made a final decision to deny Plaintiff's claim and appeal. (Id. at 53–64.) Defendant informed Plaintiff of this denial via a letter mailed to Plaintiff's counsel that summarized the medical records provided to Defendant and Defendant's evaluation of those records. (Id. at 53–64.)

This entire process reflects extensive back-and-forth between Defendant and Plaintiff at every step of Defendant's review of Plaintiff's claim. Plaintiff was provided numerous opportunities to provide additional information to Defendant, including the opportunity to complete an IME, (see Administrative Record (Doc. 21-1) at 113), and the opportunity to have her physicians respond to Dr. Vincent's report, (id. at 104, 73, 66). Plaintiff failed to do so. It was Plaintiff's

responsibility to "submit supplemental evidence to disprove the existing record showing that she was not disabled." See Harrison, 773 F.3d at 22. Her attorney merely responded to Defendant that Plaintiff "strongly disputes [Dr. Vincent's and Ms. Hall's] conclusions, especially Dr. Vincent's opinion that her restrictions and limitations are minimal [and] do not prevent her from working." (Id. at 66.) Plaintiff's attorney further referred Defendant to Plaintiff's initial appeal from November 11, 2021. (Id.) Plaintiff's position that her treating physicians' opinions were entitled to more weight than Defendant's independent consultants does not indicate an abuse of discretion by Defendant, as "plan administrators need not accord treating physicians controlling deference in the face of contrary evidence." Smith, 778 F. App'x at 211 (citing Black & Decker Disability Plan, 538 U.S. at 834).

This is certainly a "dialogue between [Defendant] and [Plaintiff]." See Harrison, 773 F.3d at 22. Despite the extensive dialogue, Defendant still failed to consider all relevant evidence that Plaintiff submitted, including Plaintiff's symptoms journal. See supra Section III.B.2. Defendant also failed to consider and address the entirety of Plaintiff's medical history, including Plaintiff's osteoarthritis of the hands and feet and Plaintiff's 2019

- 57 -

medical records. See id. This included a failure to resolve
conflicts between Defendant's own consultants' conclusions as to
Plaintiff's limitations in her hands and feet. See id. Finally,
Dr. Vincent did not review all of Plaintiff's medical records,
namely Plaintiff's 2019 physical therapy with Ms. Eldridge, yet
Defendant relied on his conclusion without explanation of that
shortcoming. See id.

Thus, the process employed by Defendant was sufficient to
provide an opportunity for a meaningful dialogue; regardless,
the opportunity for dialogue alone is not sufficient to outweigh
the deficiencies in the decisionmaking process previously
identified. Defendant's decision did not rest on the "complete
record," which is "necessary to make a reasoned decision." See
Harrison, 773 F.3d at 21 (quoting Evans, 514 F.3d at 322-23).
Furthermore, Defendant ignored evidence favorable to Plaintiff,
including Plaintiff's symptoms journal and Dr. Blank's 2012
conclusion as to Plaintiff's limitations, suggesting Defendant
"shut [its] eyes to the most evident and accessible sources of
information that might support a successful claim." See id.
Accordingly, Defendant's decisionmaking process was neither
reasoned, nor principled. See Champion, 550 F.3d at 359 (quoting
Booth, 201 F.3d at 342).

**E.** **<u>Booth</u> Factor 8: The Fiduciary's Motive and Conflicts of Interest**

The final <u>Booth</u> factor directs this court to consider "the fiduciary's motives and any conflict of interest it may have." <u>Champion</u>, 550 F.3d at 359 (quoting <u>Booth</u>, 201 F.3d at 343). Plaintiff argues that Defendant's dual role as "claims administrator and payor" constitutes a conflict of interest impacting this court's reasonableness determination. (Pl.'s Summ. J. Br. (Doc. 21) at 24.) Defendant refutes this contention. Defendant argues that "[t]here is nothing in the record indicating that bias improperly influenced Lincoln's determination" and that Defendant takes "'active steps' to reduce bias and promote accuracy." (Def.'s Opp'n Br. (Doc. 32) at 18–19.)

The Supreme Court has held that when "a plan administrator both evaluates claims for benefits and pays benefits claims," there is a conflict of interest. <u>Glenn</u>, 554 U.S. at 112. Thus, a conflict of interest is present, as Defendant "serve[s] in the dual role of both evaluating and paying [Plaintiff's] claims." <u>Champion</u>, 550 F.3d at 360. Accordingly, this court must "consider the conflict as but one among many factors in determining the reasonableness of the [Policy's] discretionary determination." <u>Id.</u>

When claims administrators take active measures to reduce
or mitigate for a conflict of interest, this <u>Booth</u> factor may
not be important in assessing the reasonableness of the
administrator's decision. As the Supreme Court explained, "[t]he
conflict of interest . . . should prove more important (perhaps
of great importance) where circumstances suggest a higher
likelihood that it affected the benefits decision, including,
but not limited to, cases where an insurance company
administrator has a history of biased claims administration. It
should prove less important (perhaps to the vanishing point)
where the administrator has taken active steps to reduce
potential bias and to promote accuracy, for example, by walling
off claims administrators from those interested in firm finances
. . . ." <u>Glenn</u>, 554 U.S. at 117.

Plaintiff has not forecast any evidence demonstrating
circumstances that a conflict of interest affected Defendant's
decision as to Plaintiff's long term disability benefits claim.
To the contrary, Defendant has provided evidence of "active

steps to reduce potential bias and to promote accuracy."[4] See id.
For instance, when Plaintiff refused an IME performed by Dr.
Antony due to potential bias, Defendant offered Plaintiff the
opportunity to select the physician performing her IME.
(Administrative Record (Doc. 21-1) at 5 (Phone Note 98); id.
at 113.) Additionally, it appears Dr. Vincent, the physician
reviewing Plaintiff's appeal file, was provided Plaintiff's file
by a third-party, ECN, rather than by Defendant directly. (Id.
at 94.) Thus, Defendant has forecast some evidence suggesting
that it "walled off" review of Plaintiff's claim from review of
Plaintiff's medical records and reaching a medical opinion on
Plaintiff's disability status. See Glenn, 554 U.S. at 117. These
circumstances suggest that the structural conflict of interest
resulting from Defendant's dual role as administrator and payor
did not impact Defendant's evaluation of Plaintiff's claim. This
court finds the eighth Booth factor does not weigh in favor of
finding Defendant's decision unreasonable.

---

[4] Defendant cites to a declaration by Jordan Bennan,
Director of Claim Resolution Services, in support of its
contention that Defendant institutes procedural safeguards to
mitigate any potential conflicts of interest. (Def.'s Opp'n Br.
(Doc. 32) at 18.) However, Mr. Bennan's declaration does not
showcase any personal knowledge of the facts of Plaintiff's case
specifically. (See Decl. of Jordan Bennan (Doc. 24-1).) Thus,
this court does not find Mr. Bennan's declaration dispositive to
its evaluation of the eighth Booth factor.

Overall, this court finds that Booth factors one and eight
do not weigh in favor of finding that Defendant's decision to
deny Plaintiff's claim and appeal was unreasonable. However,
Booth factors three, four, and five compel this court to find
Defendant's decision unreasonable. "At its immovable core, the
abuse of discretion standard requires a reviewing court to show
enough deference to a primary decision-maker's judgment that the
court does not reverse merely because it would have come to a
different result in the first instance." Evans, 514 F.3d at 322.
"[I]n ERISA cases, the standard equates to reasonableness: We
will not disturb an ERISA administrator's discretionary decision
if it is reasonable, and will reverse or remand if it is not."
Id.

In Evans, the Fourth Circuit acknowledged the "cross-
cutting ambiguity" of the "medical evidence in this case,"
recognizing that both parties had significant medical evidence
supporting their positions. Id. at 323. The lower court had
ruled in favor of the claimant. Id. at 326. However, the Fourth
Circuit directed the lower court to "stay[] its hand" and not
weigh each party's medical evidence, ultimately reversing the
lower court. Id. at 325-26. The Fourth Circuit explained that
"[w]here an ERISA administrator rejects a claim to benefits on
the strength of substantial evidence, careful and coherent

- 62 -

reasoning, faithful adherence to the letter of ERISA and the language in the plan, and a fair and searching process, there can be no abuse of discretion — even if another, and arguably a better, decision-maker might have come to a different, and arguably a better, result." Id.

However, here, unlike in Evans, Defendant's decision did not comport with the Booth factors that indicate a reasonable decision by an ERISA administrator. Although certain aspects of Defendant's decisionmaking process, such as Defendant's extensive back-and-forth with Plaintiff, showed an attempt at a reasonable process, other aspects — particularly Defendant's failure to address Plaintiff's symptoms journal, to consider Plaintiff's entire clinical picture during peer review, and to forecast evidence that showed any intervening change or improvement in Plaintiff's medical condition between granting benefits in 2020 and denying benefits in 2021 — were unreasonable. In contrast, Plaintiff has forecast evidence showing a worsening in her condition between Defendant's first denial of her claim in May 2021 and Defendant's subsequent denial of her appeal. While this court does not weigh each party's medical evidence, it weighs evidence concerning Defendant's decisionmaking process. Overall, these flaws render Defendant's decisionmaking process not reasonable.

- 63 -

The Fourth Circuit has directed this court to "reverse or remand" an ERISA administrator's discretionary decision if it is not reasonable. Id. at 322. Remand is appropriate to ensure that "the administration of benefit and pension plans" is "the function of the designated fiduciaries, not the federal courts," to promote "internal resolution of claims," and to "encourag[e] informal and non-adversarial proceedings under ERISA." Bernstein, 70 F.3d at 789 (instructing the district court to remand the case to the administrator "to review the evidence that has been developed since the original denial, to receive additional evidence, and to make a new determination"). However, "remand should be used sparingly." Berry, 761 F.2d at 1008 (internal citation omitted). "The case for a remand is strongest where the plan itself commits the trustees to consider relevant information which they failed to consider or where decision involves 'records that were readily available and records that the trustees had agreed that they would verify.'" Id.; see also Elliott, 190 F.3d at 609 (quoting Berry when discussing remand to the administrator as a remedy). But see Garner v. Cent. States, Se. & Sw. Areas Health & Welfare Fund Active Plan, 31 F.4th 854, 860 (4th Cir. 2022) (explaining that when the administrator failed to consider evidence supporting the claimant three times in the claim review process, permitting the

- 64 -

administrator a "fourth opportunity" via remand "would neither encourage the careful and efficient resolution of benefits claims, nor would it be fair to" the claimant, so awarding benefits directly to the claimant was the appropriate remedy); Weaver v. Phoenix Home Life Mut. Ins. Co., 990 F.2d 154, 159 (4th Cir. 1993) (explaining that remand is unnecessary and the proper course is reversal of the administrator's decision when "the evidence clearly shows that [the administrator] abused its discretion"); Bernstein, 70 F.3d at 789 n.6 ("[I]n cases where the fiduciary committed clear error or acted in bad faith, a reversal, rather than a remand, would be within the discretion of the district court.") (internal citation and quotation marks omitted).

Here, Plaintiff has not forecast evidence of bad faith or clear error compelling a finding of long-term disability. Instead, Defendant's errors as identified herein should be corrected and the case considered as to all available evidence. Accordingly, this court finds that remand to Defendant is necessary to allow Defendant the opportunity "to review the evidence that has been developed since the original denial, to receive additional evidence, and to make a new determination." Bernstein, 70 F.3d at 790. Plaintiff's claim for long-term disability benefits will be remanded to Defendant to allow

- 65 -

Defendant to consider Plaintiff's full medical evidence, as well as any additional evidence that Plaintiff or Defendant wish to develop and offer. In light of remand, this court will deny Defendant's motion for summary judgment, grant in part Plaintiff's motion for summary judgment, and remand this matter for further review.

## V.    CONCLUSION

In sum, <u>Booth</u> factors one and eight do not suggest Defendant's decision was unreasonable. <u>Booth</u> factors three, four, and five suggest Defendant's decision was unreasonable. In weighing these <u>Booth</u> factors, this court finds that Defendant's decision was an abuse of discretion. Defendant failed to consider evidence on the record that Plaintiff provided, and Defendant failed to forecast any evidence that Plaintiff's condition improved in a manner that warranted a reversal of Defendant's prior decisions granting Plaintiff's claims for long-term disability benefits. However, this court finds that remand, rather than reversal, is the appropriate remedy to allow Defendant to consider all of Plaintiff's evidence in support of her claim for long-term disability benefits.

For the foregoing reasons,

**IT IS THEREFORE ORDERED** that Plaintiff's Motion for Summary Judgment, (Doc. 20), is **GRANTED IN PART** and Defendant's decision to deny long-term disability benefits to Plaintiff is **VACATED**.

**IT IS FURTHER ORDERED** that Defendant's Motion for Summary Judgment, (Doc. 23), is **DENIED**.

**IT IS FURTHER ORDERED** that Plaintiff's claim for long-term disability benefits from May 18, 2021 is **REMANDED** to Defendant for further review and proceedings consistent with this Memorandum Opinion and Order.

A Judgment remanding this action will be filed contemporaneously herewith. In lieu of a dismissal, the court **DIRECTS** the Clerk to administratively close the case. Should further review become necessary, either party may file a motion to reopen the case for further proceedings.

This the 14th day of August, 2023.


_____
United States District Judge